

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AAS:JN/DKK/SME                                 *271 Cadman Plaza East*
F. #2017R05903                                 *Brooklyn, New York 11201*

May 7, 2020

**FILED PARTIALLY UNDER SEAL**

By ECF and Email

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

        Re:    United States v. Huawei Technologies Co., Ltd., et al.
               Criminal Docket No. 18-00457 (S-3) (AMD)

Dear Judge Donnelly:

        The government respectfully submits this response in opposition to the motion filed by defendants Huawei Technologies Co., Ltd., Huawei Device Co., Ltd., Huawei Device USA Inc. and Futurewei Technologies, Inc. (collectively, "Huawei") seeking the Court's authorization to downgrade more than 21,000 documents from Sensitive Discovery Material ("SDM") to regular Discovery Material ("DM") under the protective order entered by the Court on June 10, 2019, see ECF No. 57 (the "Protective Order").  See Huawei SDM Motion (hereinafter "SDM Motion" or "SDM Mot."), ECF No. 143.  Although Huawei has refused to provide these documents to the prosecution team—on the purported grounds that identifying 21,000 "most essential" documents would reveal its defense strategy—the little information that Huawei has provided to the government is sufficient to establish that the SDM Motion should be denied.

        First, the government had good cause to designate the more than 21,000 documents (the "SDM Materials") as SDM.  It did so to protect the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and to ensure the SDM Materials would not be misused outside of the jurisdiction of this Court.

        Second, the designations for the SDM Materials do not materially or substantially restrict Huawei's ability to defend itself in this matter because its employees can review these materials—which constitute less than five percent of the government's discovery to date—in the United States and other jurisdictions on which the parties agree.

1

Third, should the Court not deny the SDM Motion in its entirety, Huawei has not
shown that the government's firewall counsel—rather than the prosecution team—should litigate
this motion.  Specifically, Huawei cannot credibly argue that providing more than 21,000
documents to the prosecution team would reveal anything about Huawei's "defense strategy"
that Huawei has not already revealed to the government and to the public.  Moreover, proceeding
through firewall counsel alone would result in an inefficient use of judicial and governmental
resources.

I.      Background

        The Protective Order, entered nearly a year ago by this Court, was jointly
submitted by the parties after significant negotiation.  The Protective Order includes three
categories of discovery: DM, SDM, and "Attorneys' Eyes Only."[1]

        Under the Protective Order, DM may be used by Huawei only in connection with
defending against the instant charges.  (Protective Order ¶ 2).  DM may be taken outside of the
United States and shared with potential witnesses and employees of Huawei as necessary for
Huawei's defense.  (Id. ¶ 5).  Attorney work product obtained from DM may be retained by
witnesses' counsel and Huawei employees' counsel, but cannot be disclosed, disseminated or
discussed publicly.  (Id.).  Each witness and employee must sign Attachment A to the Protective
Order, indicating he/she understands the Protective Order.  (Id.).  An executed copy of
Attachment A, however, is provided only to Huawei's defense counsel and not to the
government.  (Id.).  The DM cannot be shared with the media in any form.  (Id. at ¶ 8).

        The Protective Order provides extra protections to materials designated SDM.
That designation may be applied to "identifying information of any potential witness, victim or
individual not a party to this litigation; proprietary or sensitive information of a victim financial
institution or of a witness . . . information that could implicate the safety of others  . . . and/or any
other information that the government deems in need of heightened protection under [the]
Protective Order."  (Id. ¶ 19). The Protective Order generally requires that SDM—and attorney
work product derived from SDM—be reviewed in the United States, and provides the option for
Huawei employees to seek safe passage to the United States for such review.  (Id. ¶ 13).  The
Protective Order also allows for the review of SDM outside of the United States upon agreement
of the parties. (Id. ¶ 14).

        To date, the government has made more than 20 productions of discovery
pursuant to the Protective Order.  Those productions include more than 550,000 documents—
nearly five million pages—along with the contents of ░░░░░░░░░░░░ accounts, ░░░░░░░░
░░░░░ account, one laptop computer image, certain other electronic evidence and five Access
databases containing records for slightly more than 22,500 wire transactions.  Approximately
500,000 documents, the laptop computer image, the electronic evidence and the Access
databases, were marked DM.  Approximately 60,000 documents, ░░░░░░░░░░░ accounts and the

---

[1] The government has not yet designated any discovery under the most restrictive
category, Attorneys' Eyes Only.

███████████ account were marked SDM.  Therefore, SDM comprises approximately 12 percent of the total discovery in this case.[2]

Since the entry of the Protective Order, the government has repeatedly attempted to accommodate Huawei's requests with respect to its designation of SDM, and continues to discuss those requests with Huawei.  (See SDM Mot. at 3).  For example, the government has already agreed to downgrade certain discovery from SDM to DM (see SDM Mot. at 3), including the majority of emails with a Huawei sender or recipient, along with attachments, as Huawei likely already had access to these materials from Huawei internal systems.[3]  In fact, on April 2, 2020, the government agreed to downgrade more than 450 documents previously marked SDM that fit this criterion.[4]  The government has also agreed, on an ad hoc basis, that SDM may be accessed from certain countries to which defense counsel was traveling for other business, and that Huawei could review all SDM with counsel in Japan just a few months ago in November 2019.  In connection with that agreement, the government provided a safe passage letter to Huawei's Chief Legal Officer Song Liuping for travel to Japan from November 18, 2019, through November 25, 2019.  Notably, though expressly contemplated under the Protective Order, Huawei has never sought safe passage to the United States for any Huawei employees or representatives to review SDM.

In the SDM Motion, it appears that Huawei broadly seeks to downgrade thousands of ████████████████████████████, which are not described.  (See SDM Mot. at 7).  Huawei asserts that "[t]he[ records at issue] consist ███████ ██████████████████████████████████████████."  (SDM Mot. at 3).

After Huawei filed the SDM Motion, the government asked Huawei to provide the SDM Materials to the government for review, given that a collection of 21,000 documents could not possibly reveal Huawei's defense strategy in any detail.  Huawei declined, stating that those documents are "as a strategic matter, most essential to [its] defense," and noting the "compromise on [its] part" by not requiring the government to defend all of its SDM designations under the Protective Order.

---

[2] In its SDM Motion, Huawei represents that in its first 14 productions, the government produced 476,313 documents and designated 256,804 (more than half of the documents) as SDM.  (See SDM Mot. at 5).  It is not clear to the government how Huawei calculated these figures.  As discussed above, the SDM materials the government has produced in the more than 20 productions to date comprise a vastly smaller fraction of the discovery in this case.

[3] To the extent certain communications with Huawei employees were initially marked SDM, there was an independent reason for such designation.  Nevertheless, at Huawei's request, the government reviewed its designations and agreed to compromise on some of them.

[4] At Huawei's request, the government is still considering the downgrading of more than 1,000 SDM documents included as part of its production of ████████████ accounts, referenced above.

II.      Legal Standard

   As a general matter, courts may, "for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief."  Fed. R. Crim P. 16(d)(1).  Good cause exists "when a party shows that disclosure will result in a clearly defined, specific, and serious injury."  In re Terrorist Attacks on Sept. 11, 2001, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006).  Any finding of injury "must be based on a particular factual demonstration of potential harm, not on conclusory statements."  United States v. Smith, 985 F. Supp. 2d 506, 523 (S.D.N.Y. 2013) (internal citations omitted).

   The "specificity required in a showing of good cause varies with the scope and complexity of a case."  In re Terrorist Attacks on Sept. 11, 2001, 454 F. Supp. 2d at 222.  In "cases of unusual scope and complexity . . . broad protection during the pretrial stages of litigation may be warranted without a highly particularized finding of good cause."  Id. (finding good cause where discovery would encompass an "enormous" number of documents containing "sensitive or confidential information" despite recognizing that, "[u]nder normal circumstances, such broad assertions of good cause would be too generalized to support imposition of a protective order").  This loosened standard is based on the recognition that, in highly complex cases, requiring a particularized showing "could impose an enormous burden upon the Court and severely hinder its progress toward resolution of pretrial matters."  Id. at 223.

   A decision to limit access to discovery under Rule 16(d)(1) is left to the sound discretion of the district court, and will not be disturbed on appeal absent a showing that "the substantial rights of the defendant have been prejudiced."  United States v. Coiro, 785 F. Supp. 326, 330 (E.D.N.Y. 1992) (Glasser, J.); see also In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 93, 122 (2d Cir. 2008) (noting that Rule 16(d) grants district courts the discretion to establish conditions "under which the defense may obtain access to discoverable information"); United States v. Delia, 944 F.2d 1010, 1018 (2d Cir. 1991) (noting that because the language of Rule 16(d)(1) "is . . . permissive," the district court may "limit or otherwise regulate discovery had pursuant to the Rule").  The Advisory Committee Notes to the 1966 Amendments to the Rules make clear that "[a]mong the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger of perjury or witness intimidation, the protection of information vital to the national security, and the protection of business enterprises from economic reprisals."

III.     Argument

   The SDM Motion should be denied because there is good cause for designating the SDM Materials as such—to prevent their misuse outside of this Court's jurisdiction.  Moreover, the SDM designations do not materially or substantially restrict Huawei's ability to defend itself in this matter.  Lastly, Huawei has failed to demonstrate that the government's firewall counsel, instead of the prosecution team, should litigate the SDM Motion.

A.        Good Cause Exists for the SDM Designations

As discussed in the government's prior filings related to the propriety of SDM designations (see Gov't SDM App., Aug. 1, 2019, ECF No. 81 at 4-5 ("SDM Application")), the government has justifiably designated materials as SDM in order to avoid having sensitive emails and other documents sent outside of the jurisdiction of the United States, where they could be misused and where the government and this Court have no ability to enforce the terms of the Protective Order.

The government's concerns are particularly acute with respect to the People's Republic of China ("PRC"), where Huawei is headquartered.[5]  The PRC government—as well as the state-influenced PRC media—has demonstrated significant interest in this case.  See Ex. B at 8-9.  Indeed, recent press reports suggest that the PRC government has shown a willingness to take actions that appear designed to defend Huawei from the allegations in this case.  For example, on April 25, 2020, The New York Times published a troubling account of five former Huawei employees who were arrested by PRC authorities in December 2018 after engaging in a WeChat[6] group communication where one former employee stated that he could "prove that Huawei sold [equipment] in Iran."[7]  The conversation took place less than two weeks after Huawei's Chief Financial Officer and daughter of its founder Ren Zhengfei, Meng Wanzhou, was arrested in Canada, and after the government's initial indictment was unsealed.  Two of the former employees were interviewed by The New York Times, and both reported that PRC authorities "questioned them about Iran and asked why they had been in contact with foreign news outlets, both topics they had discussed on WeChat."  Id.  One of the men reported that he was told that he had "crossed a line" by discussing Huawei's Iranian business.[8]  Id.  The two men who spoke to The New York Times spent eight and three months in custody, respectively.  Id.  Based on this reporting, it appears that the men were possibly arrested, at least in part, as a result of potentially innocuous statements they made about Huawei's ties to Iran in a private chat group.[9]

---

[5] See Gov't Ex Parte Ltr. Regarding SDM Designations, Aug. 1, 2019, attached hereto as Exhibit A; see also Gov't Ex Parte Ltr. Regarding Discovery, June 18, 2019, attached hereto as Exhibit B.  Both letters further explain the government's concerns.

[6] WeChat is a messaging and social media mobile application that is widely used in the PRC.

[7] See Raymond Zhong, Jailed Huawei Workers Raised a Forbidden Subject: Iran, The New York Times, April 25, 2020, available at: https://www.nytimes.com/2020/04/25/technology/china-huawei-iran arrests.html?action=click&module=News&pgtype=Homepage (last visited May 6, 2020).

[8] Notably, not all sales of telecommunications equipment in Iran are illegal.

[9] The article also described the PRC's strong interest in Huawei's affairs, and its persistent defense of Huawei "as if it were a strategically vital state asset," including threats of retaliation by PRC officials.  Id.  Moreover, following Meng's arrest in Canada, it was widely reported that the PRC government engaged in diplomatic efforts to free Meng and had arrested a

If true, the allegations in this news article indicate that the PRC government may take actions to intervene on behalf of Huawei in the context of this criminal case. This reported conduct reinforces the government's concerns that, should sensitive documents be made available to Huawei in China, there is a significant likelihood that they may be misused in ways that could adversely affect the government's ████████████████████████████ ████████████████████████████

Furthermore, should the SDM Materials be provided to Huawei in the PRC, the government and this Court would have no ability to monitor the dissemination of those documents or take action to control leaks to the media. See United States v. Internet Research Agcy. LLC, 18-CR-32-2 (DLF), ECF No. 94 (D.D.C.) (detailing how documents produced by the Special Counsel's Office, pursuant to Rule 16 and a protective order, to a Russian corporate defendant were disseminated in a manner inconsistent with the protective order, and at times altered, as part of a disinformation campaign to discredit the Special Counsel's investigation). In the United States, the government has the ability to seek legal recourse against violations of the Protective Order. In contrast, in the PRC—a jurisdiction where the Protective Order has no force—Huawei could be compelled to release the documents in response to a government demand or for any other reason.[10]

Moreover, the government's concerns here fit squarely within the categories identified in the Protective Order for SDM as meriting extra protections: "identifying information of any potential witness, victim or individual not a party to this litigation; proprietary or sensitive information of a victim financial institution or of a witness . . . information that could implicate the safety of others." (Protective Order at ¶ 19). As the Court observed during oral argument on the previous SDM motion, the government's concerns—

---

number of Canadian citizens in apparent retaliation for Meng's arrest. See, e.g., Zhou Xin, Beijing Blames Canada for Huawei arrest and Threatens 'Grave Consequences for Hurting Feelings of Chinese People', South China Morning Post, December 9, 2018, available at: https://www.scmp.com/news/china/diplomacy/article/2177091/beijing-blames-canada-huawei-arrest-and-threatens-grave (last visited May 6, 2020); Anna Fifield, Canadian Analyst Held in China Is Kept in a Cell With Lights Always On, The Washington Post, December 21, 2018, available at: https://www.washingtonpost.com/world/asia_pacific/detained-canadian-analyst-kept-in-chinese-cell-with-lights-always-on/2018/12/21/451b2d72-0506-11e9-9122-82e98f91ee6f_story.html (last visited May 6, 2020); Anna Fifield and Jeanne Whalen, Canadians detained in China after Huawei Arrest Have Now Spent a Year in Custody, The Washington Post, December 10, 2019, available at: https://www.washingtonpost.com/world/canadians-detained-in-china-after-huawei-arrest-have-now-spent-a-year-in-custody/2019/12/10/3a55cd4c-1af0-11ea-977a-15a6710ed6da_story.html (last visited May 6, 2020).

[10] As indicated above, the government is unaware of any PRC-based Huawei employee appearing in Court, or seeking "safe passage" to come to the United States to review SDM. (Id. at ¶ 14). This was equally true before the current COVID-19 health crisis.

predominantly with access to the information by individuals and entities other than defense counsel and the defendants—are legitimate.  (See Sept. 4, 2019 Hr. Tr. at 36-37).

As relevant to the SDM Motion, it appears that many of the SDM Materials are

████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (See SDM

Mot. at 3, 7.) ████████████████████████████████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

████████████████████████████████████ Moreover, the information has other ██████████
█████████████████████████████ Should such information fall into the wrong hands, it
could be used to negatively affect ████████████████████████ in a number of ways, including by
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

The other SDM produced by the government is also illustrative,[11] especially because the prosecution team is not aware of what ████████████[2] Huawei seeks to downgrade (see SDM Mot. at 7):  (1) the ███████████████ accounts and ████████████ account referenced above, which were the subject of extensive briefing previously (see, e.g., SDM Application, ECF No. 81), and (2) ██████████████████████████████ documents
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

_____

[11] The government has highlighted the larger volumes of production here.  There are some smaller categories of documents produced as SDM that are not included above.

[12] To the extent the Court grants the government access to the more than 21,000 SDM Materials at issue, the government may supplement this response as to these ███████████



Like the documents from ▓▓▓▓ these documents were properly designated SDM. Notably, ▓▓▓▓

▓▓▓▓

▓▓▓▓ As discussed at length in the government's initial SDM Application, such documents require heighted protection. (See SDM Application, ECF No. 81, and Reply Letter Regarding SDM Application, Aug. 23, 2019, ECF No. 92); see also Smith, 985 F. Supp. 2d at 524-25 (noting that courts have recognized the particular need to protect the ▓▓▓▓ when entering protective orders).

The disclosure of the above-described documents beyond Huawei could lead to undue pressure ▓▓▓▓ See United States v. Bundy, 16-CR-46, 2016 WL 7030431, *3 (D. Nev. Nov. 30, 2016) ▓▓▓▓

▓▓▓▓. Such disclosure could also lead to the dissemination of ▓▓▓▓, and could result in a ▓▓▓▓ See, e.g., Alcon Vision, LLC v. Lens.com, Inc., No. 18-CV-407 (RLM), 2019 WL 8197769, at *2 (E.D.N.Y. Aug. 22, 2019) ▓▓▓▓

▓▓▓▓ ; United States v. Carriles, 654 F. Supp.2d 557, 567 (W.D. Tex. 2009) (holding that it was well-settled that economic harm is an appropriate purpose for a protective order); see also Advisory Committee Notes to the 1966 Amendments to Rule 16 (stating that "[a]mong the considerations to be taken into account by the court will be the safety of witnesses and others, a particular danger of perjury or witness intimidation…and the protection of business enterprises from economic reprisals.").

Notably, the defendants cite no authority suggesting that the SDM designations are improper. While the government does not dispute that it needs to establish "good cause" and a particularized showing that disclosure of the materials sought to be protected could cause potential harm, see, e.g., Smith, 985 F. Supp. 2d at 523, such a showing has been made here for the reasons discussed above. Significantly, none of the cases cited by Huawei (see SDM Mot. at 6-7, 10-11) addresses the situation in this case, in which a defendant seeks to take sensitive discovery outside of the United States and the jurisdiction of the Court, and particularly to the PRC. Moreover, in cases, such as this one, with an extremely broad scope and complexity, broad protection during the pretrial stages of litigation may be warranted without a highly particularized finding of good cause. See In re Terrorist Attacks on September 11, 2001, 454 F. Supp. 2d at 222-223 (entering

protective order in a multi-district litigation with unusual scope and complexity without a showing of good cause).

Huawei's other arguments about the propriety of the SDM designations lack merit.

Huawei asserts that the protections afforded documents designated DM would be sufficient to protect the SDM Materials outside of the United States.  See, e.g., SDM Mot. at 1.  Regardless of the protections afforded to DM materials, those protections do not address the government's concerns about SDM leaving the United States.

Nor does Huawei's assertion that it has, to date, respected the restrictions in the Protective Order address the government's concerns.  Because no SDM documents have been provided to Huawei in the PRC (as far as the government is aware), there has been no occasion for these documents to be misused in the ways described above.  More importantly, Huawei is expected to follow the terms of the Protective Order.  It does not logically follow that Huawei's compliance to date should necessarily lead to the downgrading of information the government deems sensitive.

Furthermore, Huawei mischaracterizes the government's position regarding SDM designations, alleging that the government has repeatedly justified SDM designations by asserting only that the documents "are ▇▇▇▇▇ documents" or "discovery that is obtained from a ▇▇▇▇▇ (See SDM Mot. at 3, 10).  To the contrary, the government has produced hundreds of thousands of documents provided by ▇▇▇▇▇, including documents from ▇▇▇▇▇ as DM.  Although the government has argued that the contents of certain ▇▇▇▇▇ accounts and a ▇▇▇▇▇ account should be deemed SDM, in large part, because those accounts contained ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇, the government has never made the blanket assertion that documents should be deemed SDM merely because they contain ▇▇▇▇▇ information.  Moreover, as discussed above, the basis for designating the ▇▇▇▇▇▇▇▇▇▇▇▇ SDM is simply not because they were ▇▇▇▇▇▇▇▇"[14]

Finally, Huawei's assertion that the government initially designated communications to and from Huawei email addresses as SDM—in an effort to portray the government's SDM designations as too broad—is unhelpful.  (See SDM Mot. at 3 n.3.)  The government has never argued that all communications to and from Huawei email addresses should be deemed SDM.  To the extent certain communications with Huawei employees were initially marked SDM, there was generally an independent reason for such designation, including

---

[14] Huawei asserts, by citing to two government press releases in this case, that "the government has, itself, already chosen to selectively disclose choice examples of the ▇▇▇▇▇ documents—or information derived therefrom—in its Indictments, press releases, and other public statements—and obviously plans to disclose more of them at trial." (SDM Mot. at 11).  Huawei has not provided any specific examples where SDM was disclosed.  To the extent the government has referred to SDM at any point during this litigation, those references were anonymized.

████████████████████████ accounts.  Furthermore, the government has worked with Huawei to downgrade documents where the parties agree that such action is appropriate.

For the reasons stated above, the government's SDM designations are appropriate under the Protective Order and should continue to be enforced with respect to the SDM Materials.

B.        The Defendants Have Failed to Show Prejudice

Huawei also fails to establish how its defense will be substantially prejudiced unless the SDM Materials are re-designated as DM.

At issue is not whether Huawei can access SDM—it can.  Huawei employees in the United States can review those materials freely, and defense counsel already shared a significant volume of SDM with Huawei's PRC-based employees in Japan several months ago. In fact, Huawei had the opportunity to review nearly all of the SDM in the 14 productions at issue in this SDM Motion while in Japan.[15]

Huawei can also share in the PRC all DM, including all communications between financial institution employees and Huawei and transactional information about the charged conduct.  It is hard to imagine how these documents are not extremely relevant to Huawei's defense given the charges at issue here—bank fraud and wire fraud, which involve affirmative misstatements or omissions by Huawei and its co-conspirators.  Huawei can also discuss topics related to SDM in the PRC, including by interviewing witnesses about information and events referenced in SDM.

Huawei's claim of prejudice relates only to the restriction that 21,000 SDM documents—which Huawei characterizes as "most important" to its case—cannot be reviewed in the PRC.  It defies credulity that what appear to be more than 21,000 ████████████ records ████████████████████████████████████, are "most important" or "key" to Huawei's defense.  This is especially so when Huawei has access in the PRC to all of the communications between the financial institutions, other companies, such as ██████████ and Huawei, as well as financial transactions, which have been produced to Huawei as DM, as well as materials already in Huawei's possession with these institutions or companies.  That said, without having the opportunity to review the SDM Materials, the government does not disregard the possibility that some of the SDM Materials could be helpful to Huawei to evaluate the strength of the government's case against it.  But that goal can be accomplished by other means, including through review of the documents outside the PRC, whether in the United States or elsewhere as agreed to by the parties, and by more generalized discussions with counsel, to the extent necessary.

---

[15] As discussed above, Huawei sought safe passage for a meeting in Japan the week of November 18, 2019, at which point, it was in possession of 13 of the 14 document productions at issue in the SDM Motion.

Notably, the government has engaged in numerous discussion with defense counsel regarding the government's SDM designations.  In a measure of good faith, the government has offered to consider downgrading certain SDM documents that Huawei deemed inappropriately designated, and to consider re-reviewing certain categories of SDM documents in order to preserve Huawei's defense strategy.  The government has even offered to consider redactions to certain documents in order to downgrade their SDM status, such as ▮▮▮▮▮▮▮ documents containing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ so that the documents could be provided to Huawei in the PRC.  However, Huawei has only once made a request to the government with respect to the proposed compromise.  As a result, the government agreed to downgrade several hundred documents, and is still considering whether to downgrade more than 1,000 other documents.

Huawei also argues that the SDM restrictions prevent it from discussing large portions of the discovery with their attorneys by phone, email or at their offices in the PRC.  (See SDM Mot. at 5, 9).  Of course, counsel is not prevented from discussing the documents with Huawei and its in-house counsel.  Huawei is free to discuss both factual developments and strategy with its lawyers and with potential witnesses.  Nor is counsel prevented from asking questions resulting from their review of SDM to in-house lawyers at Huawei or witnesses in the PRC by whatever method of communication they choose.  Counsel can also share legal memoranda evaluating the strengths or weakness of Huawei's case to the extent it does not contain SDM.

The Court should similarly reject Huawei's contention that discussing SDM outside of the United States, such as during the trip to Japan, is "difficult and expensive."  (See SDM Mot. at 9).  First, Huawei entered into the Protective Order understanding the restrictions that would apply to discovery, including SDM restrictions, and undoubtedly considered the cost that would result from having its employees travel to the United States to review SDM.  Those costs are not significantly greater for counsel's travel to Japan, and certainly no greater than the cost of travel Huawei incurs each time its attorneys travel to the PRC to meet with Huawei.  Regardless of how small a volume of SDM documents Huawei anticipated, it was on notice that some volume of SDM discovery would require review in the United States.  Moreover, Huawei has retained at least six large U.S. law firms to represent it in this matter, and at least 14 law firm partners have been involved in this case, along with countless other attorneys.  At least ten attorneys from those firms have attended the status conferences in this case alone.  It is unpersuasive that Huawei cannot bear the cost of travel in this case to review what it claims to be "the most important materials for Huawei's defense."  (SDM Mot. at 3).

Nor is Huawei's claim that it has "compromised" by asking to downgrade only the "most important" materials persuasive.  This "compromise" consists of downgrading all SDM that Huawei deems important.  However, SDM designations cannot be made based on what is important to Huawei.  To the contrary, documents that may be "most important" to Huawei may implicate all the concerns discussed above that justify the SDM designation.  In analyzing whether the SDM Materials should remain so designated, the relevant considerations are: (1) whether the SDM Materials are properly designated SDM and (2) whether there is a process in place for Huawei to review the SDM Materials in order to participate in its defense.  That is the case here.

11

In sum, the SDM Materials identified by Huawei constitute less than five percent of the total volume of documents produced in this case. Even under Huawei's belief that SDM designations were to be "relatively rare" (SDM Mot. at 2), it was completely reasonable and foreseeable that at least five percent of the discovery in this case would be designated SDM. Huawei nevertheless agreed to the terms of the Protective Order. Accordingly, Huawei—which is currently permitted to review 100 percent of the discovery produced in this case—has not suffered substantial prejudice because of the government's SDM designations.[16]

C.    Firewall Counsel Should Not Litigate the SDM Motion

Huawei has refused to provide the SDM Materials to the prosecution team on the grounds that doing so would reveal "defense strategy." (See SDM Mot. at 4). Instead, Huawei has provided those documents to the government's firewall team for review, and has asked that firewall counsel litigate the SDM motion. (See SDM Mot. at 4, 11-12). This request should be denied. To the extent the Court does not deny the SDM Motion outright, the documents should be provided to the prosecution team for its review.

As an initial matter, Huawei has failed to explain how its defense strategy could possibly be revealed by a review of so many documents. Moreover, Huawei has already revealed its defense strategy to the government (and to the public). For example, Huawei's letter pursuant to Brady v. Maryland, 373 U.S. 83 (1963), dated February 10, 2020 (see ECF No. 117) ("Brady Letter") claims, among other things, that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (See Brady Letter at 2-3). Similarly, in this SDM Motion, Huawei states that the documents it seeks to downgrade from SDM to DM ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (SDM Mot. at 7-8). In other words, Huawei's defense strategy is to blame the victims, arguing that the financial institutions knew, among other things, that Huawei actually operated Skycom as an unofficial subsidiary.[17]

---

[16] Huawei claims that "[t]ravel restrictions caused by the COVID-19 pandemic prevent client personnel from traveling from the [PRC] to the United States to review SDM," making the SDM designations "more severe." (SDM Mot. at 2). Such concern is premature. The restrictions have only been in place for a short time and it is unclear how long they will last. As discussed above, prior to the travel restrictions, counsel was able to meet with their clients in Japan to review and discuss SDM. It is therefore likely that defense counsel can follow similar procedures, which the government has already agreed to, when the instant health crisis abates.

[17] Setting aside that the evidence does not support this defense, such evidence would not be exculpatory (see SDM Mot. at 8), and would not be a defense to fraud. See, e.g., United States v. Corsey, 723 F.3d 366, 373-74 (2d Cir. 2013) (reliance by victim not element of mail or wire fraud); Bank of China, New York Branch v. NBM LLC, 359 F.3d 171, 178 (2d Cir. 2004)

Huawei's approach in seeking that firewall counsel review more than 21,000 documents also is unreasonable. Firewall counsel played no role in designating the documents SDM in the first instance, and, by definition, has not been actively litigating this case. Review of the 21,000 documents would likely take several months, to be followed by potential Court intervention to resolve thousands of discrete disputes over documents between firewall counsel and Huawei.[18] And, even if the Court were to agree to downgrade certain documents, the prosecution team would have to ultimately be informed about any such documents for case management purposes and trial administration.

To the extent the Court does not deny the SDM Motion outright, the prosecution team should have the opportunity to review the SDM Materials in order to respond to the SDM Motion most effectively. Moreover, while telling the government that the SDM Materials ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (SDM Mot. at 3), the defendants fail to provide the prosecution team with any further breakdown or characterization of the documents. The prosecution team is left to surmise, as is evident throughout this response, about the potential categories ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that comprise the extremely large number of SDM Materials. While the prosecution team believes it should have access to all the SDM Materials that Huawei seeks to downgrade, at the very least, Huawei must share with the prosecution team the categories of SDM Materials it seeks to downgrade.

For the above stated reasons, the prosecution team, not firewall counsel, should litigate the SDM Motion and have access to all the documents that Huawei seeks to downgrade.[19]

\*  \*  \*

For the foregoing reasons, the SDM Motion should be denied. In the alternative, the government should have an opportunity to review and address the SDM Materials and supplement its response.

---

("In a criminal bank fraud prosecution, the Government need not prove that any individual or institution relied on the defendant's purported misrepresentations . . . .")

[18] If Huawei had asked to downgrade, or redact, a few hundred documents, then the involvement of firewall counsel could be appropriate.

[19] The government has provided a copy of this response to firewall counsel, and asked that firewall counsel share anything else with the Court that may be relevant to the Court's consideration of Huawei's SDM Motion at this stage. If the Court denies the government access to the SDM Materials, the government respectfully requests time for firewall counsel to review the documents and file a supplemental response to the SDM Motion.

IV.     Sealing

        The government respectfully requests that an unredacted version of this submission be filed under seal, with a copy to defense counsel, because this submission discusses information derived from SDM.  The government requests permission to file a publicly redacted version removing relevant references to SDM on the public docket by Monday, May 11, 2020.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:         /s/ Julia Nestor
Alexander A. Solomon
Julia Nestor
David K. Kessler
Sarah Evans
Assistant U.S. Attorneys
(718) 254-7000

DEBORAH L. CONNOR
Chief, Money Laundering and Asset
Recovery Section, Criminal Division
U.S. Department of Justice

Laura Billings
Christian J. Nauvel
Trial Attorneys

JAY I. BRATT
Chief, Counterintelligence and Export
Control Section
National Security Division, U.S. Department
of Justice

Thea D. R. Kendler
David Lim
Trial Attorneys

cc:  All defense counsel (by ECF and by Email)

14