**ORAL ARGUMENT REQUESTED**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————

UNITED STATES OF AMERICA,

     - v. -                          18 CR 457 (S-3) (AMD)

HUAWEI TECHNOLOGIES CO.
LTD., *et al.*,

                    Defendants.

—————————————————————

**<u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO SEVER</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 5

    A.    Sanctions-Related Charges (Counts Four through Sixteen) .................................. 5

    B.    Trade Secret Charges (Counts Two and Three)...................................................... 7

    C.    RICO Charge (Count One) ...................................................................................... 9

LEGAL STANDARD................................................................................................ 10

ARGUMENT ............................................................................................................ 11

    A.    There Is No Connection Between the Sanctions-Related Charges and the Trade Secret Charges, and the Government's Attempt to Manufacture the Missing Connection Fails as a Matter of Law ................................................................. 12

        1.    The Two Sets of Charges are Utterly Distinct ........................................... 12

        2.    By Its Own Terms, the Racketeering Conspiracy Charge Cannot Apply to the Sanctions-Related Charges Because the Only "Income" Alleged Is Not Income ............................................................................. 12

    B.    Regardless of Whether the Two Sets of Counts on Their Face Can Be Joined, the Court Should Sever Them to Avoid Unfair Prejudice and Conserve Judicial Resources ................................................................................................. 16

        1.    Severance Is Necessary to Prevent Substantial Prejudice to Defendants .. 16

        2.    Severance Would Promote Efficiency ....................................................... 19

CONCLUSION.......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bernstein v. Universal Pictures, Inc.*,
  79 F.R.D. 59 (S.D.N.Y. 1978) ............................................................................21

*Ciminelli v. United States*,
  598 U.S. 306 (2023).........................................................................................13

*Creative Dimensions in Mgmt., Inc. v. Thomas Grp., Inc.*,
  96-cv-6318, 1997 WL 633684 (E.D. Pa. Sept. 30, 1997).....................................15

*Shearin v. E.F. Hutton Grp., Inc.*,
  885 F.2d 1162 (3d Cir. 1989), *abrogated on other grounds by Beck v. Prupis*,
  529 U.S. 494 (2000).........................................................................................14

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
  566 U.S. 560 (2012).........................................................................................14

*United States v. Caldwell*,
  594 F. Supp. 548 (N.D. Ga. 1984) ....................................................................21

*United States v. Casamento*,
  887 F.2d 1141 (2d Cir. 1989)................................................................... *passim*

*United States v. Cervone*,
  907 F.2d 332 (2d Cir. 1990)..............................................................................10

*United States v. Codner*,
  18-cr-609, 2022 WL 3139119 (E.D.N.Y. Aug. 5, 2022).......................................17

*United States v. Delgado*,
  972 F.3d 63 (2d Cir. 2020)................................................................................11

*United States v. Gallo*,
  668 F. Supp. 736 (E.D.N.Y. 1987) ........................................................... *passim*

*United States v. Guiliano*,
  644 F.2d 85 (2d Cir. 1981)................................................................................19

*United States v. Halper*,
  590 F.2d 422 (2d Cir. 1978)..............................................................................17

*United States v. Salameh*,
  152 F.3d 88 (2d Cir. 1998)............................................................................5, 11

*United States v. Shea*,
750 F. Supp. 46 (D. Mass. 1990) ...................................................................19

*United States v. Shellef*,
507 F.3d 82 (2d Cir. 2007).................................................................4, 10, 12, 15, 17

*United States v. Smith*,
112 F.2d 83 (2d Cir. 1940).................................................................................17

*United States v. Walker*,
142 F.3d 103 (2d Cir. 1998)..............................................................................16

**Statutes**

18 U.S.C. § 1962(a) .......................................................................................3, 9, 15

18 U.S.C. § 1962(c) ...........................................................................................3, 9

**Scholarly Authorities**

A. Leipold & H. Abbasi, *The Impact of Joinder and Severance on Federal
Criminal Cases: An Empirical Study*, 59 Vand. L. Rev. 349 (2006).....................17

**Rules**

Fed. R. Crim. P. 8 ........................................................................................3, 10, 12

Fed. R. Crim. P. 14 .......................................................................................10, 12

Fed. R. Crim. P. 14(a)........................................................................................4, 16

**Other Authorities**

Carla Baranauckas, *'Gamesmanship' Lecture Launches Menendez BriberyTrial*
(May 13, 2024), https://www.law360.com/articles/1836229 ...................................21

*Black's Law Dictionary* (12th ed. 2024)....................................................................14

*Chinese Government Poses 'Broad and Unrelenting' Threat to U.S. Critical
Infrastructure, FBI Director Says*, FBI.com (Apr. 18, 2024),
https://bit.ly/47e8s5Y ..........................................................................................18

C. Donevan, C. Dorning & M.L. Kelly, *5 Years After U.S. Left Iran Nuclear Deal,
More Enriched Uranium and Much Less Trust*, NPR (May 30, 2023) .................18

Craig Kafura, *Americans Feel More Threat from China Now Than in the Past
Three Decades*, The Chicago Council on Global affairs (Nov. 12, 2023),
https://tinyurl.com/c97f29ab ................................................................................18

*Merriam-Webster Dictionary*, https://www.merriam-webster.com/dictionary/income ......................................................................14

Alissa J. Rubin, *As U.S.-Iran Conflict Builds Across Mideast, Iraq Is Caught in Middle*, N.Y. Times (July 30, 2024) ......................................................18

Christopher Wray, FBI Director, *Opening Remarks: China Initiative Conference* (Feb. 6, 2020), https://tinyurl.com/262u3rjx ..........................................18

Wright & Miller, 1A *Federal Practice and Procedure Criminal* (5th ed. 2021) ........................10

## PRELIMINARY STATEMENT

A trial on the current indictment is unmanageable in its present form, will substantially and unfairly prejudice the Huawei Defendants, and presents a serious risk of mistrial. The government has represented to the Court that it expects its case-in-chief *alone* to take four to six months,[1] meaning the court, the jury, and the parties will be asked to devote at least *six to nine months* in total to hearing the case. In light of the government's projected trial length, the burden shifts to the government "to present a reasoned basis to support a conclusion that a joint trial . . . is more consistent with the fair administration of justice than some manageable division of the case into separate trials." *United States v. Casamento*, 887 F.2d 1141, 1152 (2d Cir. 1989). The government cannot meet that burden here.

The evidence the government will present covers wildly diverse and unrelated topics—including six distinct alleged trade secret theft events occurring over a twenty-year period; alleged violations of the International Emergency Economic Powers Act ("IEEPA") related to United States sanctions against Iran; three different alleged bank and wire fraud schemes directed at four different banks; an alleged *Klein* conspiracy directed at the United States government; an alleged money laundering conspiracy; and an alleged conspiracy to obstruct justice. At the end of that six- to nine-month period, the jury will be asked to remember all of the disparate and voluminous evidence it heard during the course of the entire trial; to assess the credibility of each of the dozens and dozens of witnesses it heard over the many months of testimony; and to analyze carefully all of the evidence to determine the guilt or innocence of four distinct corporate entities, each charged in one or more of *eleven* different conspiracy counts as

---

[1] Transcript of Status Conference (Apr. 4, 2024) at 6:25–7:9, ECF No. 419.

well as a variety of different substantive counts, each of which must be considered

independently.  No jury should be asked to take on that impossible burden.  The Huawei

Defendants should not be required to have their guilt or innocence determined in such a fashion.

And all parties should want to avoid the logistical burdens and the significant risk of mistrial due

to losing jurors over the course of such a lengthy trial.

The solution to a trial so lengthy and unworkable is simple and practical.  The Indictment

contains two sets of entirely unrelated charges: the "Sanctions-Related Charges" (Counts Four

through Sixteen) and the "Trade Secret Charges" (Counts Two and Three).  They should be

severed.  As is obvious from the face of the indictment, the two sets of charges have nothing to

do with each other—each is of an entirely different character from the other and involves entirely

distinct events, individuals, and subject matters.  Trying them separately will produce two trials

of significant but manageable length, with almost no redundancy.

Undoing the improper joinder of these two sets of charges will also relieve the

Defendants from what would otherwise be substantial unfair prejudice.  Three of the

Defendants—Huawei Device Co. Ltd., Huawei Device USA Inc., and Futurewei Technologies,

Inc.—are charged only in the Trade Secret Charges.[2]  Yet those companies are so closely

associated with the similarly-named Huawei Technologies Co. Ltd. that is charged in the

Sanctions-Related Charges that they will inevitably suffer serious spillover prejudice if the case

against them is combined with one in which the government tries to prove Huawei Technologies

guilty of fraud and sanctions violations involving vilified countries like Iran and North Korea.

At the same time, Huawei Technologies—as the only defendant named in both sets of charges—

---

[2] Huawei Device USA is also charged in Count 16, involving obstruction of justice, but is not
charged in any of the IEEPA or related charges.

will suffer spillover prejudice in *both* directions, because it will suffer not just the prejudice of having the inflammatory sanctions-violation evidence color the jury's view of the Trade Secret Charges against it but also the prejudice of having the inflammatory allegations of trade secret theft color the jury's view of the highly technical Sanctions-Related Charges.

These two sets of charges should never have been joined together and therefore must be severed.  As prescribed by Federal Rule of Criminal Procedure 8(a), charges can be joined together only if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).  These two unrelated sets of charges are none of these things.

The only thing that even purports to join them together is Count One, which charges an unusual type of RICO conspiracy predicated not on conducting an enterprise's affairs through a pattern of racketeering, *see* 18 U.S.C. § 1962(c), but on investing the income from a pattern of racketeering activity into an enterprise (here, the Huawei business itself), *see id*. § 1962(a). Absent this unusual RICO charge, no one could even consider properly trying the Sanctions-Related Charges and Trade Secret Charges together, much less in a virtually unprecedented six- to nine-month-long trial that will impose enormous burdens on the Court and the jury and inflict unfair prejudice on the defendants.  Count One's whole reason for being appears to be an attempt to join what should not be joined.

But as broad as RICO may be generally, the circumstances here do not endow Count One with the magic that the government seeks to wring from it.  Count One alleges no new or additional facts that tie the two species of charges together into some purportedly related whole. All Count One does is formulaically incorporate other allegations in the indictment by reference and allege in conclusory fashion that everything was done as part of a single conspiracy to invest

all "income received" from any "racketeering activity" into the Huawei business.  Third Superseding Indictment ¶¶ 88–93, ECF No. 126 (Feb. 13, 2020) ("S-3 Indictment").  That is reason enough to conclude that Count One is insufficient to justify the complexity and unfairness that comes with trying the Sanctions-Related Charges with the Trade Secret Charges.  This Court can and should sever on that basis alone.

In any event, nowhere does the government indicate how the "racketeering activity" associated with the Sanctions-Related Charges could have generated "income" to invest in the Huawei business within the meaning of RICO.  Five of the Sanctions-Related Charges—the four IEEPA counts and the *Klein* Conspiracy count—are not RICO predicates under the statute at all. *See id.* ¶¶ 111-24 (Counts 10-14).  And although the associated fraud charges are RICO predicates, by the indictment's own allegations they resulted only in Huawei deceiving victim banks into continuing their "banking relationships" with Huawei, pursuant to which Huawei paid them market rates for banking services.  S-3 Indictment ¶ 71.  Viewed in this light, Count One represents an obvious effort to plead around the joinder rules in order to staple together more than twenty-years' worth of disparate and unrelated conduct in order to maximize the government's chances at a single trial.

Nothing in the law allows the government to employ vague, tactical pleading to try together such disparate and unrelated charges regardless of the prejudice imposed on the Huawei defendants or the burdens imposed on the Court and the jury.  Rule 8 requires severance when a "commonsense" application of the rule to the facts shows that the joined charges are unrelated. *See United States v. Shellef*, 507 F.3d 82, 98 (2d Cir. 2007).  And even when counts are properly joined, Rule 14 empowers a court to sever for trial any counts whose joinder "appears to prejudice a defendant."  Fed. R. Crim. P. 14(a).

"Whether to grant or deny a severance motion is committed to the sound discretion of the trial judge," and "the district court's exercise of that discretion is virtually unreviewable." *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (per curiam) (cleaned up).  "In trials of this magnitude," where "the time for presentation of the prosecution's case will exceed four months," the Second Circuit has expressed particular "misgivings" that the length of the trial will cause undue prejudice and may warrant severance.  *Casamento*, 887 F.2d at 1151–52.  Mindful of this precedent, the Court should here exercise its discretion to sever the Sanctions-Related Charges (Counts Four through Sixteen) from the Trade Secret Charges (Counts Two and Three).  And to the extent Count One's RICO charge—which is infirm on various grounds and is being selectively employed against a Chinese company—survives Huawei's soon-to-be-filed motion to dismiss, it should be tried along with the Trade Secret Charges to which it actually relates.  In such a fashion, severance will allow the Court to convert what would be an extremely convoluted and unmanageable six- to nine-month-long trial into two comprehensible and manageable trials, thereby minimizing unfair prejudice to the Huawei defendants and conserving both Court and jury resources.

## **BACKGROUND**

### A.   **Sanctions-Related Charges (Counts Four through Sixteen)**

The first three iterations of the indictment alleged violations of U.S. sanctions against Iran—and fraud, money laundering, and obstruction of justice offenses related to those supposed violations—by Huawei Technologies, Huawei Device USA, Skycom, and Meng Wanzhou.  *See, e.g.*, Indictment ¶¶ 25–47, ECF No. 25 (Aug. 22, 2018), First Superseding Indictment ¶¶ 23–52, ECF No. 24 (Dec. 6, 2018); Second Superseding Indictment ¶¶ 27–56, ECF No. 19 (Jan. 24,

2019).[3]  In those charges—which persist in the operative Third Superseding Indictment—the government alleges that Huawei Technologies violated and conspired to violate IEEPA by causing American banks to provide dollar-clearing services in connection with Iran-related transactions, and also by employing a United States citizen in Iran.  *See* S-3 Indictment ¶¶ 114–24 (Counts 11–14).

The government also alleges that Huawei Technologies committed wire and bank fraud—and conspired to commit wire and bank fraud—by misrepresenting to four different banks Huawei's compliance with U.S. sanctions on Iran and its relationship to Skycom, a company operating in Iran.  *See id.* ¶¶ 99–100, 103–06, 109–10 (Counts 4, 6, 7, 9).  The indictment alleges that Huawei Technologies did so for the purpose of having the four financial institutions continue to supply banking services to Huawei Technologies and Skycom between 2007 and 2014.  *Id.* ¶¶ 64–79.  Absent those purported misrepresentations, the government alleges, the four banks "would have reevaluated their banking relationships" with Huawei Technologies.  *Id.* ¶ 71.  Separately, the indictment alleges that after Financial Institution 1 terminated its relationship with Huawei Technologies in 2017, Huawei Technologies defrauded another bank—Financial Institution 4—by saying that it was actually Huawei that initiated the termination, which, again, supposedly did no more than cause Financial Institution 4 to continue its relationship with Huawei.  *Id.* ¶¶ 83–86; 101–102; 107–108 (Counts 5 and 8).

The government also alleges that Huawei Technologies conspired to use deception to impair and impede the functions of the U.S. agency that enforces sanctions on Iran (*i.e.*, to

---

[3] Ms. Meng entered a deferred prosecution agreement, and the charges against her were dismissed on December 2, 2022.  ECF Nos. 323, 374.  Skycom was defunct before the charges were unsealed and has not made an appearance.

engage in a *Klein* conspiracy) and to launder money in connection with the alleged sanctions violations, *see id.* ¶¶ 111–13, 125–26 (Counts 10 and 15), and that Huawei Technologies and Huawei Device USA conspired to obstruct the investigation into the alleged sanctions violations, *see id.* ¶¶ 127–28 (Count 16).

Here, to render a verdict on the Sanctions-Related Charges the jury will need to sort through (among other things) evidence related to Huawei's operations in Iran, how those operations allegedly failed to comply with an extraordinarily complex sanctions regime, years of details about the complex commercial relationship between Huawei and four different major international banks, and the mechanics of how money is exchanged and transmitted around the globe in a variety of currencies.

## B.    Trade Secret Charges (Counts Two and Three)

In February 2020—eighteen months after bringing the Sanctions-Related Charges—the government added new allegations that Huawei Technologies, Huawei Device, Huawei Device USA, and Futurewei engaged in a scheme to steal trade secrets from six different companies in varying places and at various times spanning the two decades between 2000 and 2020.  The alleged scheme was charged as both conspiracy to commit trade secret theft (Count Two) and conspiracy to commit wire fraud (Count Three).  *See id.* ¶¶ 94–98.  The allegations include, for instance, stealing source code and operating system manuals in 2000 from a company headquartered in California, *id.* ¶ 18; photographing a networking device after hours at a trade show in Chicago in 2004, *id.* ¶ 28; and stealing mechanical cell phone testing technology from a lab in Seattle in 2013, *id.* ¶ 40.

The indictment does not allege that any individual Huawei employees involved in any of the alleged incidents of trade secret theft were also responsible for any of the purported sanctions

violations.  Nor does the indictment otherwise allege any fact that suggests that the Trade Secret Charges are in any way related to the Sanctions-Related Charges.

In connection with the Trade Secret Charges, the jury will hear (among other things) evidence on six separate vignettes reaching back more than two decades: alleged misappropriation of operating system source code for internet routers, command line interface, and operating systems manuals beginning in 2000, *id.* ¶¶ 18–24; alleged theft of technical specifications for a base station in 2003, *id.* ¶¶ 25–27; alleged photographing of circuitry inside a networking device at a trade show in 2004, *id.* ¶¶ 28–29; alleged misappropriation of proprietary technology to improve reception between cellular telephones and the antennas that provide cellular telephone and data services in 2009, *id.* ¶¶ 30–34; alleged misappropriation of an automated cellphone testing technology in 2012–2013, *id*. ¶¶ 35–44; and alleged misappropriation of solid-state data storage technology in 2013–2018, *id.* ¶¶ 45–58.  Since the charge is conspiracy to steal something that satisfied the statutory definition of a "trade secret," the evidence will necessarily include extensive testimony regarding a slew of wholly distinct, complex technologies—from routers and antennas to cellphone testing equipment and solid-state data storage—involving six different companies and different alleged methods of misappropriation at distinct times over two decades.  Each of those disputes could fill its own lengthy trial, as evidenced by the fact that two actually did.  The allegations concerning Company 5 were tried civilly in 2017, and the allegations concerning Company 6 were tried civilly in 2019, each taking more than three weeks.[4]  The civil lawsuits involving Companies 1,

---

[4] In order not to reveal the identities of the companies that the indictment identifies only by pseudonyms, defendants are not citing the dockets of these two cases in this brief.  Defendants will supply the citations directly to Chambers upon request.

2, and 4 were resolved amicably, but given their nature and complexity, a trial to verdict on each of these matters would have been similar in length.

## C.    RICO Charge (Count One)

The indictment seeks to stitch all of these charges together with a RICO count that involves some (but not all) of the charged defendants.  Using a less commonly charged section of the RICO statute, Count One alleges not the more traditional crime that there was a particular enterprise whose affairs were conducted through various related acts of racketeering, *see* 18 U.S.C. § 1962(c), but, rather, that three of the Huawei Defendants—Huawei Technologies, Huawei Device USA, and Futurewei—conspired with one another from "1999 to the present" to engage in a "pattern of racketeering activity" and, having done so, to "use and invest" the resulting income in an enterprise, S-3 Indictment ¶ 92; *see also* 18 U.S.C. § 1962(a).  The alleged enterprise (not *criminal* enterprise; just the enterprise that was the repository of the tainted investments) is alleged to be Huawei itself, namely Huawei Technologies and all of its "parents, global affiliates[,] and subsidiaries."  *See* S-3 Indictment ¶ 89.  The "pattern of racketeering activity" is defined to include all of the acts charged elsewhere in the indictment that happen to be RICO predicates.  *See id.* ¶ 93.  Notably, this excludes the five Sanctions-Related Charges (specifically, the four IEEPA counts and the *Klein* Conspiracy count) that are not RICO predicates under the statute.  *See id.* ¶¶ 111–24 (Counts 10–14).[5]

---

[5] These counts that are not RICO predicates are two steps removed from the Trade Secret Charges:  They are not connected to the trade secret charges by the RICO charge, but are only connected to other Sanctions-Related Charges that are, themselves, allegedly connected to the Trade Secret Charges only through the RICO count.

## **LEGAL STANDARD**

Federal Rule of Criminal Procedure 8 allows the government to join together charges if they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan," and allows the government to join defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8.  Put another way, "joinder is proper where two or more persons' criminal acts are 'unified by some substantial identity of facts or participants,' or 'arise out of a common plan or scheme.'"  *United States v. Cervone*, 907 F.2d 332, 341 (2d Cir. 1990) (quoting *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir. 1989)).  In considering whether joinder is proper, the court should "'appl[y] a commonsense rule to the[] facts' to determine whether 'a reasonable person would easily recognize the common factual elements that permit joinder.'"  *Shellef*, 507 F.3d at 98 (quoting *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988)).  Ultimately, whether the indictment on its face provides this connection is a question of law.  *United States v. Gallo*, 668 F. Supp. 736, 748 (E.D.N.Y. 1987).

Even when Rule 8 is facially satisfied, Rule 14 provides that severance of counts may nevertheless be appropriate when "the joinder of offenses . . . appears to prejudice a defendant or the government." Fed. R. Crim. P. 14.  Severance is warranted when the jury is likely to aggregate the evidence against the defendant or apply a lower burden of proof or when evidence related to one count will spill over and prejudice the jury in weighing the evidence on other counts.  Wright & Miller, 1A *Federal Practice and Procedure Criminal* § 223 (5th ed. 2021). The scale also tips in favor of severance when a single trial would not serve judicial economy. *See, e.g.*, *Gallo*, 668 F. Supp. at 754-58.

Unlike a legal determination under Rule 8 about whether joinder was technically permissible in the first place, a court's decision under Rule 14 about whether to sever a trial "is 'committed to [its] sound discretion.'" *United States v. Delgado*, 972 F.3d 63, 81 (2d Cir. 2020), as amended (Sept. 1, 2020).  "The district court's exercise of that discretion is virtually unreviewable." *Salameh*, 152 F.3d at 115 (cleaned up); *see also Gallo*, 668 F. Supp. at 748, 754 (granting severance and noting the trial court's "almost unlimited discretion under Rule 14" as well as its "Inherent Power to Control the Administration of Complex Criminal Cases").  Giving guidance on the exercise of that discretion, the Second Circuit has said that if "the time for presentation of the prosecution's case will exceed four months," the court "should oblige the prosecutor to present a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials."  *Casamento*, 887 F.2d at 1152.

## **ARGUMENT**

In bringing the S-3 Indictment, the government charged two unrelated sets of criminal conduct together in a single case. Ordinarily, Rule 8 would flatly preclude the government from doing so.  In an attempt to overcome this, the government added an unusual racketeering conspiracy charge that alleges that the otherwise unrelated charges are related because they collectively produced "income."  Setting aside that the RICO count is legally insufficient and will be the subject of a motion to dismiss, even on its own terms it cannot encompass the Sanctions-Related Charges because the alleged scheme was to deceive financial institutions into selling Huawei their services at market rates, not to obtain income.  Thus, the single thread the government relies on to tie these two different parts of the indictment into the longest criminal trial in the modern history of this District is not just gossamer-thin, it is fictive.  Accordingly, as explained below, the government's attempt should be rejected under Rule 8, and in any event,

severance should be granted under Rule 14 to ensure that the Huawei Defendants can fairly defend themselves against both sets of charges, to conserve judicial resources, and to prevent jury confusion.

**A.**     **There Is No Connection Between the Sanctions-Related Charges and the Trade Secret Charges, and the Government's Attempt to Manufacture the Missing Connection Fails as a Matter of Law.**

>    1.   The Two Sets of Charges are Utterly Distinct.

The two sets of charges in the indictment are distinct and should not be joined together in a single trial.  *See* Fed. R. Crim. P. 8, 14.  The conduct at issue in the Sanctions-Related Charges has no connection to the conduct at issue in the Trade Secret Charges.  The indictment itself makes clear that the two sets of charges are not remotely similar in kind or character, nor do they arise from the same set of occurrences or transactions.  *Supra* 5–9.  And, applying the "commonsense rule," *Shellef*, 507 F.3d 82 at 98, it is plain these charges do not overlap and should not be heard together.  The indictment even describes these two sets of charges as part of separate and distinct "schemes."  *Compare* S-3 Indictment Part II, ¶¶ 8-58 (describing "Scheme to Misappropriate Intellectual Property") *with id.* Part IV, ¶¶ 64-87 (describing "Scheme to Defraud Financial Institutions").  There is little need to belabor the point—were it not for the government's attempt to tie them together with Count One, no one could seriously contend that the Sanctions-Related Charges and the Trade Secret Charges could be charged or tried together, and defendants do not anticipate the government would contend otherwise.

>    2.   By Its Own Terms, the Racketeering Conspiracy Charge Cannot Apply to the Sanctions-Related Charges Because the Only "Income" Alleged Is Not Income.

Because there is no connection between the Trade Secret Charges and the Sanctions-Related Charges, the government was forced to invent one, which it did through its sweeping and novel RICO conspiracy charge.  The government's theory is that the Trade Secret Charges and

the Sanctions-Related Charges are collectively part of a single RICO conspiracy because they both produced "income" that the Huawei Defendants agreed to invest in the Huawei business. But this effort fails because, although the Trade Secret Charges on their face plausibly produced income, the Sanctions-Related Charges did not—even on their own terms—generate cognizable "income" within the meaning of Section 1962(a).

The indictment is clear on the objects of the sanctions-related racketeering predicates (the fraud counts and the money laundering count), and they were not to obtain income. As to the sanctions-related fraud counts, the supposed object was to prevent the financial institutions from "reevaluat[ing] their banking relationships with HUAWEI, including their provision of U.S.-dollar and Euro clearing services to HUAWEI." S-3 Indictment ¶ 71; *see also, e.g., id.* ¶¶ 74–75 (same). As Huawei will argue in a forthcoming motion to dismiss, such right-to-control fraud is not even federal fraud at all in light of *Ciminelli v. United States*, 598 U.S. 306 (2023), because deceiving a counter-party into doing business with you is not anything the federal fraud statutes recognize as money or property. But regardless, even if deceiving a vendor into selling you its services at market rates were still fraud, it is not a scheme to obtain any "income."

Consistent with this, the *only* income that the indictment alleges was obtained from *any* of the racketeering acts that comprise the Sanctions-Related Charges relates not to the main fraud scheme—the supposed scheme to deceive banks about Huawei's operations in Iran in order to cause those banks to provide dollar-clearing services—but to a distinctly ancillary, tack-on scheme to defraud Financial Institution 4 (Counts 5 and 8). Specifically, the indictment alleges that after Financial Institution 1 terminated its relationship with Huawei Technologies in 2017, Huawei Technologies deceptively told Financial Institution 4 that Huawei had been the one to initiate the termination, which supposedly led Financial Institution 4 to continue its relationship

13

with Huawei.  *Id.* ¶¶ 83–86.  According to the indictment, this conduct (again, not fraud under *Ciminelli*) caused Huawei to receive "income indirectly in the form of cost savings and the value of continued banking services, the proceeds of which income were used to operate and grow HUAWEI's business."  *Id.* ¶ 86.  However, despite this conclusory allegation, deceiving Financial Institution 4 to "expand its banking relationship with HUAWEI" in the U.S. and "maintain its existing banking relationship with HUAWEI globally," *id.* ¶ 85, could not have produced "income."  To the contrary, on its face the scheme only permitted Huawei to continue purchasing (or increase its purchases of) Financial Institution 4's services.  It could not produce "income" within the meaning of Section 1962(a), or, indeed, within any normal understanding of the term.

That conclusion flows directly from the statutory text.  "When a term goes undefined in a statute"—like "income" here—the court must "give the term its ordinary meaning."  *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  And the ordinary meaning of "income" is money or compensation earned in exchange for labor or investment of capital.  *See, e.g.*, *Black's Law Dictionary*  (12th ed. 2024) ("The money or other form of payment that one receives, usu[ally] periodically, from employment, business, investments, royalties, gifts, and the like."); *Merriam-Webster Dictionary* ("[A] gain or recurrent benefit usually measured in money that derives from capital or labor").[6]  This interpretation of the term "income" is also consistent with how courts interpret § 1962(a).  *See, e.g.*, *Shearin v. E.F. Hutton Grp., Inc.*, 885 F.2d 1162, 1165 (3d Cir. 1989) ("[A] plaintiff must allege . . . that the defendant has received money from a pattern of racketeering activity"), *abrogated on other grounds by Beck v. Prupis*, 529 U.S. 494

---

[6] Available at https://www.merriam-webster.com/dictionary/income.

(2000); *Creative Dimensions in Mgmt., Inc. v. Thomas Grp., Inc.*, 96-cv-6318, 1997 WL 633684, at *2 (E.D. Pa. Sept. 30, 1997) ("Income generally means money or at least something readily measurable in terms of dollar market value."). And, to the extent there is any ambiguity in the meaning of "income," an interpretation consistent with the ordinary meaning of the term is compelled by the rule of lenity, which requires that any ambiguities in a statute be interpreted in a criminal defendant's favor.

Rather than "receiv[ing] any income" from Financial Institution 4, *see* 18 U.S.C. § 1962(a)—allegedly in the form of "value" from "banking services" or "cost-savings"— defendants *paid fees to Financial Institution 4* for the banking services Financial Institution 4 provided. And receiving goods or services in exchange for paying money to a provider is not "income."[7] Because the *only* alleged income from the Sanctions-Related Charges is facially illogical and illusory, the Sanctions-Related Charges cannot form any part of Count One's charge that there was a conspiracy to invest racketeering income in Huawei.

Accordingly, the Sanctions-Related Charges and the Trade Secret Charges should never have been joined in the first place. On issues of joinder, the court is to "appl[y] a commonsense rule to the[] facts to determine whether a reasonable person would easily recognize the common factual elements that permit joinder." *Shellef*, 507 F.3d at 98 (internal quotation marks omitted). Here, not only is the existence of any income from the sanctions-related RICO predicates not "easily recognized"; it is totally absent from the indictment's allegations. The Court is not

---

[7] Count 15's money laundering conspiracy—the other RICO predicate among the Sanctions-Related Charges—likewise involved no obtaining of income. The supposed "laundering" consisted of the same pass-through dollar-clearing services that Huawei allegedly deceived the financial institutions into letting Huawei pay the financial institutions to perform. S-3 Indictment ¶¶ 125–26.

required to get to the end of the longest, most burdensome trial in the modern history of this District before recognizing what is clear now—that Count One does not apply to the Sanctions-Related Charges, that those charges therefore have no business being joined with the Trade Secret Charges, and that the mammoth, virtually unprecedented trial the government is proposing is both unnecessary and improper.

**B.** **Regardless of Whether the Two Sets of Counts on Their Face Can Be Joined, the Court Should Sever Them to Avoid Unfair Prejudice and Conserve Judicial Resources.**

Even were they properly joined, trying the Sanctions-Related Charges and the Trade Secret Charges together in a single trial would produce precisely the kind of unfair prejudice that Rule 14 exists to prevent.  The defendant charged in the Sanctions-Related Charges is entitled to defend itself at trial without being tarred as an intellectual property thief when the government presents completely unrelated evidence concerning alleged trade-secret offenses.  Conversely, the defendants charged in the Trade Secret Charges—three of which are not even charged in the Sanctions-Related Charges—are equally entitled to defend themselves without being tarred as (or confused for, given their close relationship with the charged entity) bank fraudsters who flout U.S. sanctions and support the Iranian regime.  Severance is the only way to protect each of the defendants from the spillover prejudice that would otherwise arise by conjoining these unrelated allegations.  *See* Fed. R. Crim. P. 14(a).  Moreover, severance would have the benefit of converting an entirely unmanageable six-to-nine-month trial into two (more) manageable trials.

1.   Severance Is Necessary to Prevent Substantial Prejudice to Defendants

Under Rule 14, "[a] defendant seeking severance must show that the prejudice to him from joinder is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials." *United States v. Walker*, 142 F.3d 103, 110 (2d Cir. 1998).  Courts consider a number of factors in making this determination, including (1) whether certain

prejudicial evidence would be admissible in a severed trial, (2) the complexity of the indictment, (3) whether a jury is likely to be confused, and (4) whether judicial resources would be saved by multiple trials.  *Gallo*, 668 F. Supp. at 749–54.  These factors strongly favor severance here.

First, there is both a general and a specific risk of spillover prejudice here.  Permitting the government to combine two sets of wholly unrelated charges creates the inevitable risk that, as judges at least as far back as Learned Hand have cautioned, "the jury may use the evidence cumulatively; that is, that although so much as would be admissible upon any one of the charges might not have persuaded them of the accused's guilt, the sum of it will convince them as to all." *United States v. Halper*, 590 F.2d 422, 430–31 (2d Cir. 1978) (quoting *United States v. Lotsch*, 102 F.2d 35, 36 (2d Cir. 1939)); *see also United States v. Smith*, 112 F.2d 83, 85 (2d Cir. 1940) ("[E]ven when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one.").  Here, there is a significant risk that the accumulation of evidence from the two unrelated sets of charges would cause the jury to inappropriately aggregate the evidence.  *See* A. Leipold & H. Abbasi, *The Impact of Joinder and Severance on Federal Criminal Cases:  An Empirical Study*, 59 Vand. L. Rev. 349, 369 (2006) (demonstrating empirical impact of joinder on jury verdicts).  This is particularly true where, like here, the prejudice of misjoinder would be a "two-way street," such that each set of unrelated charges would be highly prejudicial if tried with the other.  *Shellef*, 507 F.3d at 102.

In addition to this general risk of spillover prejudice, allowing these specific sets of wholly unrelated charges to be tried together exposes defendants to all of the risks of undue prejudice that Rules 8 and 14 ordinarily protect against.  *See, e.g.*, *United States v. Codner*, 18-cr-609, 2022 WL 3139119, at * 3–4 (E.D.N.Y. Aug. 5, 2022) (severing where the connection between the counts was "too tenuous to overcome the prejudice from . . . hearing reference" to

other crimes).  Underlying the Sanctions-Related Charges is the sentiment that Huawei's conduct advanced the interests of Iran and North Korea—regimes that are generally reviled by the United States and its citizens.  Given the history of tensions between the U.S. and Iran, for example, *see, e.g.*, C. Donevan, C. Dorning, & M.L. Kelly, *5 Years After U.S. Left Iran Nuclear Deal, More Enriched Uranium and Much Less Trust*, NPR (May 30, 2023); Alissa J. Rubin, *As U.S.-Iran Conflict Builds Across Mideast, Iraq Is Caught in Middle*, N.Y. Times (July 30, 2024) (describing the countries as "increasingly at odds" since Fall 2023), the Iran-related charges are highly inflammatory, and a jury tasked with considering unrelated charges of domestic trade secret theft ought not to be put in a position of having to turn mental gymnastics to attempt (probably impossibly) to avoid being unfairly and improperly influenced by them.

The Trade Secret Charges are likewise highly prejudicial.  These counts accuse certain defendants of a deliberate and extended scheme to steal intellectual property from American companies—an explosive accusation to lodge against a foreign company, especially a Chinese company, in today's political climate.  *Cf., e.g.*, Christopher Wray, FBI Director, *Opening Remarks: China Initiative Conference* (Feb. 6, 2020), https://tinyurl.com/262u3rjx (warning of the purported "China threat" to "our nation's information and intellectual property," and "by extension to our national security"); *Chinese Government Poses 'Broad and Unrelenting' Threat to U.S. Critical Infrastructure, FBI Director Says*, FBI.com (Apr. 18, 2024), https://bit.ly/47e8s5Y (Director Wray reiterating the same concern four years later); Craig Kafura, *Americans Feel More Threat from China Now Than in the Past Three Decades*, The Chicago Council on Global Affairs (Nov. 12, 2023), https://tinyurl.com/c97f29ab (finding, based on a public opinion survey conducted in September 2023, that "[m]ajorities of Americans say that the government has not done enough on the theft of US intellectual property by Chinese

companies (65%)").  In addition, Count One labels that conduct "racketeering."  Courts have long recognized that "tarring a defendant with the label of 'racketeer'" has a real "prejudicial effect."  *United States v. Guiliano*, 644 F.2d 85, 89 (2d Cir. 1981).  Once again, a jury tasked with considering unrelated allegations of dollar-clearing and sanctions violations ought not be put in the impossible position of trying to avoid being unfairly and improperly influenced by the allegations that Huawei is a longtime intellectual property thief and racketeer.

### 2. Severance Would Promote Efficiency

Counter-balanced against this prejudice is usually significant efficiency from a joint trial.  But when the unsevered trial would be an unworkable behemoth, there is no counter-balance at all and, if anything, the interest in judicial efficiency tips the scale further in the direction of severance.  *See Casamento*, 887 F.2d at 1151 (recognizing "the evident disadvantages which can occur in these mega-trials").  That is the case here.  The government's proposed approach of trying everything all at once would be entirely unmanageable.  Although the "'general rule' favoring joint trial is designed to 'conserve [] judicial resources, alleviate[] the burdens on citizens serving as jurors, and avoid[] the necessity of having witnesses reiterate testimony in a series of trials,'" *Gallo*, 668 F. Supp. at 748 (alterations in original) (quoting *United States v. Borelli*, 435 F.2d 500, 502 (2d Cir. 1970)), "[t]hat shibboleth should not unreflectively be taken for granted" in complex cases, *id.* at 754.  Extremely complex trials "constitute[] an enormous burden on the courts, as well as on defendants, the defense bar, jurors, and even prosecutors." *Id.* (citing Weinfeld, *The Problems of Long Criminal Trials*, 34 F.R.D. 158 (1963)); *see also United States v. Shea*, 750 F. Supp. 46, 48–49 (D. Mass. 1990) (noting that "a case such as this [over six months] presents a potential clash among the interests of the government in the prosecution of the case, the interests (including procedural rights) of the defendants in the case, and the interests of all other litigants before the court, civil and criminal").

19

This burden cannot be overstated where the government has anticipated that its case-in-chief alone will take four to six months, meaning that—with a significant defense case—the trial will take an almost unheard-of six to nine months.  That is why, where "the time for presentation of the prosecution's case will exceed four months," the Second Circuit shifts the burden, requiring the government "to present a reasoned basis to support a conclusion that a joint trial of all the defendants is more consistent with the fair administration of justice than some manageable division of the case into separate trials."  *Casamento*, 887 F.2d at 1152.  "In determining whether the prosecutor has made an adequate showing, the judge should weigh the interests of the prosecution, the defendants, the jurors, the court, and the public."  *Id.*

The government cannot meet its burden here.  A single trial on the entirety of the indictment would be extremely burdensome for all involved.  The evidence going to each set of charges will be highly technical and complex, and a combined trial will necessarily require repetition and signposting that extends the length of the trial.  Defendants anticipate that the voluminous discovery produced by the government will yield hundreds, if not thousands, of exhibits, and require scores of witnesses to address those exhibits.  In *Casamento*, by contrast, where the Second Circuit accepted that there had been no abuse of discretion in denying severance, the court emphasized that "the nature of the evidence and the legal concepts involved in the case were not extraordinarily difficult to comprehend, as they might be, for example, in a complex anti-trust case involving abstruse economic theories or an employment discrimination case involving technical statistical evidence and formulae."  *Id.* at 1150.  This case, plainly, is much more like a "complex anti-trust case" than the narcotics conspiracy at issue in *Casamento*.  Indeed, it is more like *multiple* "complex anti-trust case[s]" shoehorned together *with* complex banking and trade secret cases all "involving technical statistical evidence and formulae."  *Id.*

Even a four-month trial involving comparatively simple-to-understand narcotics charges concerned the *Casamento* court; the government's proposed trial here is a different beast altogether.

Attempting to find a jury to shoulder such a burden seems nigh impossible and, even if doable, extremely prejudicial.  For example, when the court told the jury pool at Senator Menendez's recent bribery trial "that the trial could last six or seven *weeks* and asked if that would be a hardship for any of them," "[a]lmost all of them raised their juror numbers."  Carla Baranauckas, *'Gamesmanship' Lecture Launches Menendez BriberyTrial*, Law360 (May 13, 2024), https://www.law360.com/articles/1836229 (emphasis added).  And this problem does not cease once a jury is empaneled, as the risk of a mistrial due to losing jurors over the course of a six- to nine-month trial is significant.  Recognizing the unique burden such a long trial imposes on a jury, the *Casamento* court noted that "[e]ven in the event that the aggregate time for separate trials would not be less than the time for a joint trial," "[t]he lives of each group of jurors would be imposed upon for a shorter time."  *Casamento*, 887 F.2d at 1152.

Moreover, "[a]s the number of counts and defendants in an indictment increases, 'it is obvious' that the resultant complex trial record makes it more difficult for a jury to keep straight the specific evidence and charges against each defendant."  *Gallo*, 668 F. Supp. at 749; *see also Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59, 70 (S.D.N.Y. 1978) (refusing to permit a jury trial because "the sheer size of the litigation and the complexity of the relationships among the parties render it as a whole beyond the ability and competence of any jury to understand and decide with rationality"); *United States v. Caldwell*, 594 F. Supp. 548, 552 (N.D. Ga. 1984) (severing RICO charge from charges on various predicate acts due to likely juror confusion from "conspiracy or conspiracy-like offenses involving subtle legal distinctions (e.g., RICO,

conspiracy to commit RICO, conspiracy to commit extortion both as a RICO predicate act and as separate substantive offenses), plus the large number of witnesses, and multiple defendants not involved in all conspiracies alleged"). Severed trials provide the "significant advantage[]" of "enhance[ing]" "the juror's ability to focus." *Casamento*, 887 F.2d at 1152.

Here, the nature and scope of the charges all but guarantee significant juror confusion. In addition to a RICO conspiracy, the indictment charges ten other separate conspiracies involving different combinations of alleged conspirators, different overt acts and predicate offenses. Some of the alleged conspiracies—but not all—are accompanied by a substantive count on the same conduct. The jury will inevitably struggle to keep straight the elements of each charged conspiracy and the separate requirements of the RICO conspiracy, the various alleged agreements and participants, and what alleged conduct is relevant for what charge. As a further example, the indictment charges a conspiracy to obstruct justice alleging that Huawei moved witnesses and destroyed evidence related to the Sanctions-Related Charges, S-3 Indictment ¶¶ 127-28, and also separately alleges that Huawei engaged in obstructive acts in connection with civil intellectual property disputes. *Id.* ¶ 14. If the two sets of charges are tried together, the jury will very likely conflate the alleged "obstructive" conduct from long-ago-concluded civil litigation with the conduct alleged to constitute obstruction of justice in Count 16.

It is not as though combining the charges into such an absurdly long, six-to-nine-month trial would avoid extensive duplication in severed trials. Although overall time-saving efficiencies can result from combining trials, the prospect of such efficiencies "support joint trials *only* when the indictment charges crimes 'which may be proved against all the defendants by the same evidence and which result[] from the same or a similar series of acts.'" *Gallo*, 668 F. Supp. at 736 (quoting *Borelli*, 435 F.2d at 502). Trying the RICO count and trade secret

charges in a separate trial from the sanctions-related charges would involve almost no duplication of evidence.  There is little, if any, evidence related to the Sanctions-Related Charges that actually would support the government's RICO charge.  And, to the extent the government insists that some of its sanctions-related evidence supports the RICO charge in some manner, the Court—having already heard the sanctions-related evidence in the first of the two severed trials—could manage the government's presentation to allow them to efficiently try their RICO count without unnecessary or extensive duplication of evidence.

In sum, trying all counts in a single trial will almost certainly and unnecessarily tie up the Court and a single jury for at least six to nine months, inevitably causing substantial prejudice to the Huawei Defendants and risking a potential mistrial.  By contrast, severing the two distinct sets of charges not only rectifies the improper joinder under Rule 8 and prevents the unfair spillover prejudice that Rule 14 is meant to address, but it also eases the burden on the Court by creating two more manageable, less burdensome trials with minimal, if any, duplication of evidence.  In this instance, severance is not only the fairest way to proceed, but is also far and away more efficient than a joint trial.

## **<u>CONCLUSION</u>**

For the foregoing reasons, Defendants respectfully request that the Court sever Counts 4–16 from Counts 1–3.

Dated: September 6, 2024                              Respectfully submitted,

/s/ Douglas A. Axel
Douglas A. Axel
Michael A. Levy
Jennifer Saulino
Daniel Rubinstein
Ellyce R. Cooper
Frank Volpe
Melissa Colón-Bosolet
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
Tel.: 212-839-5300
Email: daxel@sidley.com

/s/ David Bitkower
David Bitkower
Matthew S. Hellman
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
Tel: 202-639-6048
Email: dbitkower@jenner.com

*Counsel for Huawei Technologies Co., Ltd., Huawei Device USA Inc., Huawei Device Co., Ltd., and Futurewei Technologies, Inc.*