NJM:AAS/MAA/RMP/MS
F. #2017R05903

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                                           18-CR-457 (S-3) (AMD)

HUAWEI TECHNOLOGIES CO., LTD., *et al.*,

              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS

JOHN J. DURHAM
United States Attorney
Eastern District of New York

MARGARET A. MOESER
Chief, Money Laundering and
Asset Recovery Section
Criminal Division
U.S. Department of Justice

JENNIFER KENNEDY GELLIE
Chief, Counterintelligence and
Export Control Section
National Security Division,
U.S. Department of Justice

ALEXANDER A. SOLOMON
MEREDITH A. ARFA
ROBERT M. POLLACK
MATTHEW SKURNIK
Assistant U.S. Attorneys
    (Of Counsel)

TAYLOR STOUT
JASMIN SALEHI FASHAMI
MORGAN COHEN
Trial Attorneys

CHRISTIAN NAUVEL
MONICA SVETOSLAVOV
AHMED ALMUDALLAL
Trial Attorneys

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................... 2

   I.    The Applicable Legal Standard ................................................................................ 2

   II.   The Defendants Fail to Identify a Basis to Dismiss the RICO Charge Pretrial ............... 4

     A.   The Intracorporate Conspiracy Doctrine Is Inapplicable ................................................ 5

     B.   The RICO Defendants' Alter Ego Argument Is Meritless ............................................. 11

     C.   The RICO Conspiracy Charge Alleges a Domestic Application of Section 1962(d) ... 12

     D.   The RICO Conspiracy Charge Sufficiently Alleges a Pattern of Racketeering Activity ................................................................................................................ 16

     E.   The RICO Defendants' Enterprise Arguments All Fail ................................................. 17

   III.   Counts Two and Three Properly Allege Trade Secret Theft and Wire Fraud Conspiracies 19

     A.   Counts Two and Three Are Not Impermissibly Duplicitous ....................................... 21

       1.   The Scope of the Charged Conspiracies Is a Question of Fact for the Jury ............. 21

       2.   On Their Face, Counts Two and Three Each Allege Single Conspiracies ............... 23

     B.   Counts Two and Three Comply with Due Process ...................................................... 28

       1.   The IP Defendants Have Not Demonstrated Actual and Substantial Prejudice ....... 28

       2.   The Government Did Not Delay to Obtain a Tactical Advantage ............................ 34

       3.   No Hearing or Discovery Regarding Preindictment Delay is Appropriate ............. 38

i

IV.  The Financial Fraud Charges Are Sound ........................................................ 39

    A.  Relevant Allegations ................................................................................ 40

    B.  *Ciminelli* Does Not Bar Counts Four Through Nine .................................. 42

    C.  Counts Four, Six, Seven, and Nine Allege Domestic Applications of the Bank and Wire Fraud Statutes ....................................................................... 48

    D.  The Skycom-Related Fraud Charges Properly Serve as Domestic Predicate Acts for the RICO Conspiracy in Count One ......................................... 53

V.  The Sanctions and Related Money-Laundering Charges Are Sound ............................. 54

    A.  The Indictment Alleges a Sufficient Nexus to Iran to State an IEEPA Offense........... 54

    B.  Huawei Tech's Purported Due Process Arguments Are Premature on a Pretrial Motion to Dismiss ............................................................................. 58

VI.  The Klein Conspiracy Charge Is Sound ........................................................ 60

    A.  Binding Precedent Holds that Section 371 Prohibits Conspiracies to Obstruct or Impede the Lawful Operations of the Federal Government ......................................... 61

    B.  *Ciminelli* Did Not Silently Overrule More Than 100 Years of Precedent Interpreting the Defraud Clause ....................................................................... 63

CONCLUSION ....................................................................................... 67

# TABLE OF AUTHORITIES

Page

Cases

*Albrecht v. Herald Co.*,
  390 U.S. 145 (1968) .................................................................................................... 6
*Alix v. McKinsey & Co. Inc.*
  18-CV-4141 (JMF), 2023 WL 5344892 (S.D.N.Y. Aug. 18, 2023) .......................... 10
*Ashland Oil, Inc. v. Arnett*,
  875 F.2d 1271 (7th Cir. 1989) ............................................................................... 8, 10
*Bascunan v. Elsaca*,
  927 F.3d 108 (2d Cir. 2019) ...................................................................................... 53
*Bennett v. U.S. Trust Co. of New York*,
  770 F.2d 308 (2d Cir. 1985) ...................................................................................... 19
*Boneta v. Rolex Watch USA, Inc.*,
  232 F. Supp. 3d 354 (S.D.N.Y. 2017) ....................................................................... 10
*Bunker Ramo Corp. v. United Business Forms, Inc.*,
  713 F.2d 1272 (7th Cir. 1983) ................................................................................... 18
*California v. Trombetta*,
  467 U.S. 479 (1984) .................................................................................................. 31
*Carpenter v. United States*,
  484 U.S. 19 (1987) .................................................................................................... 45
*Cedric Kushner Promotions, Ltd. v. King*
  533 U.S. 158 (2001) .................................................................................................... 7
*Ciminelli v. United States*,
  598 U.S. 306 (2023) ........................................................................................... passim
*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ................................................................................................ 5, 6
*Curley v. United States*,
  130 F. 1 (1st Cir. 1904) ............................................................................................. 65
*Dennis v. United States*,
  384 U.S. 855 (1966) .................................................................................................. 63
*Detrick v. Panalpina, Inc.*,
  108 F.3d 529 (4th Cir. 1997) ................................................................................. 8, 10
*Fogie v. THORN Ams., Inc.*,
  190 F.3d 889 (8th Cir. 1999) ...................................................................................... 8
*Genty v. Resolution Trust Corp.*
  937 F.2d 899 (3d Cir. 1991) ...................................................................................... 18
*Girard v. 94th Str. & Fifth Ave. Corp.*,
  530 F.2d 66 (2d Cir. 1976) ........................................................................................ 10

iii

*Grunewald v. United States*,
 353 U.S. 391 (1957) .................................................................................................. 27

*Haas v. Henkel*,
 216 U.S. 462 (1910) .................................................................................................. 62

*Hamling v. United States*,
 418 U.S. 87 (1974) ...................................................................................................... 3

*Hammerschmidt v. United States*,
 265 U.S. 182 (1924) .................................................................................. 61, 62, 66

*Hartline v. Gallo*,
 546 F.3d 95 (2d Cir. 2008) ...................................................................................... 10

*Hoff v. Kelly*,
 No. 86-CV-2332, 1987 WL 10183 (E.D.N.Y. Apr. 13, 1987) ................................... 35, 36, 39

*Holder v. Humanitarian Law Project*,
 561 U.S. 1 (2010) ...................................................................................................... 58

*Ideal Steel Supply Corp. v. Anza*,
 652 F.3d 310 (2d Cir. 2011) .............................................................................. 18, 19

*In re Parmalat Sec. Litig.*,
 474 F. Supp. 2d 547 (S.D.N.Y. 2007) ...................................................................... 12

*Kirwin v. Price Comms. Corp.*,
 391 F.3d 1323 (11th Cir. 2004) ................................................................................. 8

*Lateral Recovery LLC v. Funderznet LLC*
 22-CV-2170 (LJL), 2024 WL 4350369 (S.D.N.Y. Sept. 27, 2024) ........................... 9

*Marinello v. United States*,
 584 U.S. 1 (2018) ...................................................................................................... 61

*McAndrew v. Lockheed Martin Corp.*,
 206 F.3d 1031 (11th Cir. 2000) ............................................................................ 5, 7

*McFadden v. United States*,
 576 U.S. 186 (2015) .................................................................................................. 66

*McNally v. United States*
 483 U.S. 350 (1987) .................................................................................................. 65

*Merhej v. I.C.S. Int'l Custody Sys., Inc.*,
 No. 13-CV-869 (JGK), 2014 WL 104908 (S.D.N.Y. Jan. 9, 2014) .......................... 10

*Neder v. United States*,
 527 U.S. 1 (1999) ................................................................................................ 44, 55

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
 30 F.3d 339 (2d Cir. 1994) ...................................................................................... 18

*RJR Nabisco, Inc. v. European Community*
 579 U.S. 325 (2016) ......................................................................................... passim

*Salinas v. United States*,
 522 U.S. 52 (1997) ...................................................................................................... 7

*Shaw v. United States*,
 580 U.S. 63 (2016) .................................................................................................... 44

*United States v. Alessi,*
   638 F.2d 466 (2d Cir. 1980)..........................................................................................22

*United States v. Alfonso,*
   143 F.3d 772 (2d Cir. 1998)................................................................................. passim

*United States v. Aliperti,*
   867 F. Supp. 142 (E.D.N.Y. 1994) ...............................................................................4

*United States v. Ames Sintering Co.,*
   927 F.2d 232 (6th Cir. 1990) ............................................................................. 5, 8, 11

*United States v. An*
   733 F. Supp. 3d 77 (E.D.N.Y. 2024) .........................................................................46

*United States v. Aracri,*
   968 F.2d 1512 (2d Cir. 1992)......................................................................................24

*United States v. Armstrong,*
   517 U.S. 456 (1996)......................................................................................................2

*United States v. Aronov,*
   No. 19-CR-408 (MKB), 2024 WL 554577 (E.D.N.Y. Feb. 12, 2024)...................47

*United States v. Atilla,*
   966 F.3d 118 (2d Cir. 2020)..........................................................................61, 62, 63, 66

*United States v. Bankman-Fried,*
   680 F. Supp. 3d 289 (S.D.N.Y. 2023)........................................................................45

*United States v. Basciano,*
   No. 03-CR-929 (NGG), 2006 WL 8451578 (E.D.N.Y. Jan. 3, 2006) .....................16

*United States v. Basroon,*
   38 F. App'x 772 (3d Cir. 2002) ...................................................................................8

*United States v. Birney,*
   686 F.2d 102 (2d Cir. 1982)........................................................................................34

*United States v. Blackmon,*
   839 F.2d 900 (2d Cir. 1988)........................................................................................27

*United States v. Calbas,*
   821 F.2d 887 (2d Cir. 1987)........................................................................................22

*United States v. Carson,*
   702 F.2d 351 .................................................................................................................22

*United States v. Castellano,*
   610 F. Supp. 1359 (S.D.N.Y. 1985)............................................................................30

*United States v. Catapano,*
   No. 05-CR-229 (SJ), 2008 WL 2222013 (E.D.N.Y. May 22, 2008)........................22

*United States v. Chang,*
   No. 18-CR-00681 (NGG), 2024 WL 2817494 (E.D.N.Y. May 31, 2024) ..............64

*United States v. Chin,*
   108 F.3d 1370 (2d Cir. 1997)......................................................................................36

*United States v. Citron,*
   783 F.2d 307 (2d Cir. 1986).........................................................................................4

v

*United States v. Concord Mgmt. & Consulting LLC*,
   347 F. Supp. 3d 38 (D.D.C. 2018) ........................................................................... 66

*United States v. Cooper*,
   No. 17-CR-296 (PKC), 2020 WL 2307646 (E.D.N.Y. May 8, 2020) ....................................... 16

*United States v. Coplan*,
   703 F.3d 46 (2d Cir. 2012) ............................................................................ 61, 63

*United States v. Cornielle*,
   171 F.3d 748 (2d. Cir. 1999) .......................................................................... 29, 30

*United States v. D'Amico*,
   No. 86-CR-111 (SWK), 1987 WL 11686 (S.D.N.Y. May 27, 1987) ....................................... 31

*United States v. DeMasi*,
   445 F.2d 251 (2d Cir. 1971) ........................................................................... 32, 35

*United States v. Ewell*,
   383 U.S. 116 (1966) ........................................................................................ 29

*United States v. Farhane*,
   634 F.3d 127 (2d Cir. 2011) ................................................................................ 59

*United States v. Fernandez*,
   No. 97-CR-233 (LMM), 1999 WL 1038049 (S.D.N.Y. Nov. 16, 1999) ................................... 22

*United States v. Gabriel*,
   920 F. Supp. 498 (S.D.N.Y. 1996) ..................................................................... 22, 23

*United States v. Giovanelli*,
   No. 01-CR-749 (JSR), 2004 WL 48869 (S.D.N.Y. Jan. 9, 2004) ....................................... 17

*United States v. Gotti*,
   399 F. Supp. 2d 214 (S.D.N.Y. 2005) ...................................................................... 16

*United States v. Gotti*,
   457 F. Supp. 2d 403 (S.D.N.Y. 2006) ...................................................................... 18

*United States v. Gotti*,
   No. 02-CR-743 (RCC), 2004 WL 32858 (S.D.N.Y. Jan. 6, 2004) ....................................... 32

*United States v. Griffin*,
   76 F.4th 724 (7th Cir. 2023) ............................................................................... 43

*United States v. Gross*,
   165 F.Supp.2d 372 (E.D.N.Y. 2001) ....................................................................... 30

*United States v. Harrison*,
   764 F. Supp. 29 (S.D.N.Y. 1991) .......................................................................... 33

*United States v. Hassan*,
   578 F.3d 108 (2d Cir. 2008) ............................................................................... 30

*United States v. Homa Int'l Trading Corp.*,
   387 F.3d 144 (2d Cir. 2004) ............................................................................... 55

*United States v. Hoo*,
   825 F.2d 667 (2d Cir. 1987) ............................................................................... 35

*United States v. Hoskins*,
   73 F. Supp. 3d 154 (D. Conn. 2014) ...................................................................... 59

vi

*United States v. Hsu,*
   155 F.3d 189 (3d Cir. 1998) .......................................................................................... 31, 34

*United States v. Huber.*
   603 F.2d 387 (2d Cir. 1979) .......................................................................................... 18

*United States v. Hugh Chalmers Chevrolet-Toyota, Inc.,*
   800 F.2d 737 (8th Cir. 1986) .......................................................................................... 8

*United States v. Hughes Aircraft Co.,*
   20 F.3d 974 (9th Cir. 1994) .......................................................................... 8, 11, 12

*United States v. Jimenez Recio,*
   537 U.S. 270 (2003) .......................................................................................... 6, 25

*United States v. Johansen*
   56 F.3d 347 (2d Cir. 1995) .......................................................................................... 22

*United States v. Johnson,*
   383 U.S. 169 (1966) .......................................................................................... 62

*United States v. Jones*
   482 F.3d 60 (2d Cir. 2006) .......................................................................................... 23

*United States v. Jordan,*
   629 F. Supp. 3d 49 (E.D.N.Y. 2022) .......................................................... 31, 32, 36, 38

*United States v. Kelly,*
   462 F. Supp. 3d 191 (E.D.N.Y. 2020) .......................................................................... 12

*United States v. Klein,*
   247 F.2d 908 (2d Cir. 1957) .......................................................................................... 60

*United States v. Kwok,*
   No. 23-CR-118 (AT), 2024 WL 1407057 (S.D.N.Y. Apr. 2, 2024) ........................... 47

*United States v. Laurent,*
   861 F. Supp. 2d 71 (E.D.N.Y. 2011) .......................................................................... 3

*United States v. Louie,*
   625 F. Supp. 1327 (S.D.N.Y. 1985) .......................................................................... 39

*United States v. Lovasco,*
   431 U.S. 783 (1977) .......................................................................... 29, 30, 36, 37

*United States v. Mansouri,*
   No. 22-CR-34 (LJV), 2023 WL 8430239 (W.D.N.Y. Dec. 5, 2023) ....................... 45

*United States v. Margiotta,*
   646 F.2d 729 (2d Cir.1981) .......................................................................... 24, 25

*United States v. Marion,*
   404 U.S. 307 (1971) .......................................................................................... 29, 33

*United States v. McGrath,*
   613 F.2d 361 (2d Cir. 1979) .......................................................................................... 22

*United States v. Messina,*
   No. 11-CR-31 (KAM), 2012 WL 463973 (E.D.N.Y. Feb. 13, 2012) ....................... 17

*United States v. Motovich,*
   No. 21-CR-497 (WFK), 2024 WL 2943960 (E.D.N.Y. June 11, 2024) ................ 43, 45

*United States v. Murray,*
    618 F.2d 892 (2d Cir. 1980)................................................................................. 24

*United States v. Navarro-Ordas,*
    770 F.2d 959 (11th Cir. 1985) ............................................................................ 18

*United States v. Nersesian,*
    824 F.2d 1294 (2d Cir. 1987).......................................................................... 61, 62

*United States v. O'Sullivan,*
    No. 20-CR-272 (PKC), 2021 WL 1979074 (E.D.N.Y. May 18, 2021) ................................. 23

*United States v. Ohle,*
    678 F. Supp. 2d 215 (S.D.N.Y. 2010)................................................................ 22, 26

*United States v. Perholtz,*
    842 F.2d 343 (D.C. Cir. 1988) ............................................................................ 18

*United States v. Perry,*
    92 F.4th 500 (4th Cir. 2024) .............................................................................. 31

*United States v. Peters,*
    732 F.2d 1004 (1st Cir. 1984).............................................................................. 8

*United States v. Phelps Dodge Indus.,*
    589 F. Supp. 1340 (S.D.N.Y. 1984)...................................................................... 12

*United States v. Pierre,*
    Nos. 22-CR-19, 22-CR-20, 2023 WL 4493511 (S.D.N.Y. July 12, 2023)............................ 46

*United States v. Raniere,*
    384 F. Supp. 3d 282 (E.D.N.Y. 2019) ............................................................ 16, 17, 59

*United States v. Rare Breed Triggers, LLC,*
    690 F. Supp. 3d 51 (E.D.N.Y. 2023) .................................................................. 62, 64

*United States v. Runner,*
    No. 18-CR-0578 (JS), 2023 WL 3727532 (E.D.N.Y. May 30, 2023)................................ 43, 48

*United States v. Sampson,*
    898 F.3d 270 (2d Cir. 2018)....................................................................... 3, 4, 24

*United States v. Scala,*
    388 F. Supp. 2d 396 (S.D.N.Y. 2005)..................................................................... 34

*United States v. Schwartz,*
    No. 22-CR-635, 2024 WL 3226575 (N.D. Ill. June 28, 2024) ....................................... 47

*United States v. Silberstein,*
    No. 02-CR-800 (SWK), 2003 WL 21488024 (S.D.N.Y. June 27, 2003) ........................... 35, 36

*United States v. St. John,*
    625 F. App'x 661 (5th Cir. 2015) .......................................................................... 7

*United States v. Stavroulakis,*
    952 F.2d 686 (2d Cir. 1992)...................................................................... 3, 27, 55

*United States v. Stringer,*
    730 F.3d 120 (2d Cir. 2013)................................................................................. 4

*United States v. Szur,*
    No. 97-CR-108 (JGK), 1998 WL 132942 (S.D.N.Y. Mar. 20, 1998) .................................. 22

*United States v. Tutino,*
  883 F.2d 1125 (2d Cir. 1989)..................................................................... 25
*United States v. Vogt*,
  910 F.2d 1184 (4th Cir. 1990) .................................................................. 18
*United States v. Williams*,
  553 U.S. 285 (2008)................................................................................. 30
*United States v. Zarrab*,
  No. 15-CR-867 (RMB), 2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016)................... 56
*United States v. Zheng*,
  113 F.4th 280 (2d Cir. 2024) ............................................................... 30, 31
*Webster v. Omnitrition Int'l, Inc.*,
  79 F.3d 776 (9th Cir. 1996) ...................................................................... 8

Statutes

18 U.S.C. § 1343................................................................................... 44, 49
18 U.S.C. § 1344(1) ................................................................................. 43
18 U.S.C. § 1344(2) ................................................................................. 43
18 U.S.C. § 1349..................................................................................... 49
18 U.S.C. § 1961(1) ................................................................................. 17
18 U.S.C. § 1961(5) ................................................................................. 17
18 U.S.C. § 1962(a) ................................................................................. 18
18 U.S.C. § 1962(a) ............................................................................. 13, 18
18 U.S.C. § 1962(c) ................................................................................. 19
18 U.S.C. § 1962(d) ............................................................................. 13, 18
18 U.S.C. § 371................................................................................... 62, 64
18 U.S.C. §§ 1341.................................................................................... 64
8 U.S.C. § 3282(a).................................................................................... 28

Rules

Federal Rule of Criminal Procedure 12(b)(3)................................................... 2
Federal Rule of Criminal Procedure 7(c)(1) .................................................. 3

Regulations

31 C.F.R. § 560.427(a)........................................................................... 55, 59

## PRELIMINARY STATEMENT

The defendants have been charged by a grand jury with sixteen counts related to their decades-long scheme to promote and grow the Huawei business through a consistent pattern of deception, fraud, theft, sanctions evasion, and obstruction.   As alleged in the Third Superseding Indictment (the "Indictment")—and as the government expects to prove at trial—the defendants obfuscated their relationship with a subsidiary in Iran for the purpose of evading U.S. sanctions, lied to financial institutions about their work in Iran and North Korea, unlawfully hired a U.S. citizen to work in Iran, caused U.S. banks to export banking services to Iran, conspired to steal trade secrets from at least six U.S. companies, lied to the U.S. Congress, hid information from law enforcement and export control authorities, and instructed employees to steal intellectual property and destroy evidence.   The defendants then took the direct and indirect proceeds of these criminal activities and reinvested them in the Huawei enterprise, bootstrapping the global business with the fruits of racketeering activity.

To avoid standing trial for this grave misconduct, the defendants now move to dismiss most counts of the Indictment.   Substituting bombast for legal analysis, they downplay the numerous crimes against them as "unremarkable, long-resolved" disputes that "could equally describe most major international businesses."   Defs. Mem. No. 1 ("Br. #1") at 1-2, ECF No. 474-1.

These complaints ring hollow.   They ignore the Indictment's detailed allegations of longstanding and extensive criminal misconduct by the defendants to support the Huawei business, along with their flagrant efforts to cover up these crimes.   Tellingly, the defendants do not actually seek dismissal on grounds of selective prosecution—a "demanding" standard they could not

1

possibly meet. *United States v. Armstrong*, 517 U.S. 456, 463 (1996). Their lofty language suggesting, wrongly, that Huawei has been targeted for political purposes, perhaps as leverage in a "trade war" with China, Br. #1 at 3, is thus unmoored from their actual motions, which are mundane, meritless, and in several places concededly foreclosed by binding precedent.

The defendants assert a variety of supposed legal defenses to the charges, many of which are premature and none of which has merit. Several of the defendants' arguments—including purported extraterritoriality and duplicity—turn on speculation about the evidence to be introduced at trial, and thus are not properly resolved at this juncture. Other arguments by the defendants—including those related to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), bank fraud, wire fraud, and the International Emergency Economic Powers Act ("IEEPA")—ignore controlling precedent and advance flawed legal theories. Still others simply misconstrue the allegations in the charging instrument.

In short, the Indictment satisfies the applicable pleading requirements and is consistent with well-established legal principles. The Court should deny the defendants' motions to dismiss, and the defendants should stand trial for these offenses.

## ARGUMENT

### I.    The Applicable Legal Standard

Under Federal Rule of Criminal Procedure 12(b)(3), a defense that an indictment fails to state an offense may be raised by a pretrial motion only "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Where the motion cannot be determined without reference to the evidence that would be presented at trial, it must be denied as premature. *See*, *e.g.*, *United States v. Laurent*, 861 F. Supp. 2d 71, 110

(E.D.N.Y. 2011) (a technically sufficient indictment "is not subject to dismissal on the basis of factual questions, the resolution of which must await trial"); *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018) ("[T]he civil summary judgment mechanism does not exist in federal criminal procedure . . . .").[1]  There is "a narrow exception to the rule that a court cannot test the sufficiency of the government's evidence on a Rule 12(b) motion"—where "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." *Sampson*, 898 F.3d at 282 (citing *United States v. Alfonso*, 143 F.3d 772, 776-77 (2d Cir. 1998)). As explained below, however, the government has not made such a full proffer here.

It is also well established that an indictment need not include all of the government's factual evidence, and that an indictment that tracks the language of a statute and states the time and place of the alleged crime is sufficient to survive a motion to dismiss for failure to state an offense.   Under Federal Rule of Criminal Procedure 7(c)(1), an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."   An indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  *Alfonso*, 143 F.3d at 776; *see also Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) ("We have often stated that an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.").   Where an indictment does so, it is sufficiently specific to withstand a

---

[1]    Except where otherwise noted, all case quotations adapt alterations and omit internal quotation marks and citations.   In addition, all pseudonyms refer to entities as defined in the Indictment.

3

motion to dismiss.  *See United States v. Citron*, 783 F.2d 307, 314 (2d Cir. 1986); *United States v. Aliperti*, 867 F. Supp. 142, 144 (E.D.N.Y. 1994); *see also United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) ("When the charges in an indictment have stated the elements of the offense and provided even minimal protection against double jeopardy, this court has repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity.").

In challenging various counts of the Indictment, the defendants invite this Court to "look[] beyond the face of the indictment" and draw "inferences as to the proof that would be introduced by the government at trial." *Alfonso*, 143 F.3d at 776-77.  Such an inquiry is premature and not appropriately addressed in a Rule 12(b) pretrial motion to dismiss.  *Id.*; *see also Sampson*, 898 F.3d at 285 ("[W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be.").

## II.    The Defendants Fail to Identify a Basis to Dismiss the RICO Charge Pretrial

Count One alleges that Huawei Tech, Huawei Device USA, and Futurewei (the "RICO Defendants") conspired to use and invest income from a pattern of racketeering activity to further the Huawei Enterprise.   Third Superseding Indictment ("S-3 Ind.") ¶¶ 89-92, ECF No. 126. As alleged, from 1999 to 2020, the RICO Defendants engaged in a pattern of unlawful conduct to "grow the global 'Huawei' brand into one of the most powerful telecommunications equipment and consumer electronics companies in the world," including by re-investing funds gained from wire fraud, financial institution fraud, obstruction of justice, witness tampering, theft of trade secrets, money laundering, and criminal copyright infringement.  *Id.* ¶¶ 90, 92.

The RICO Defendants argue that they cannot be held to account for a charge that they conspired for two decades to invest the proceeds of criminal conduct.   Their arguments fail.

4

They misunderstand the law and advance premature arguments that depend not on the allegations in the charging instrument, but instead on the evidence they expect at trial.  Count One properly states a RICO conspiracy under 18 U.S.C. § 1962(a), and the RICO Defendants should face trial on this charge.

A.    The Intracorporate Conspiracy Doctrine Is Inapplicable

First, the RICO Defendants assert that Count One must be dismissed because, as a parent company and two subsidiaries, they cannot conspire with each other.  They are wrong. The doctrine they cite—known as the intracorporate conspiracy doctrine—is narrowly confined to certain antitrust and civil contexts.  As every circuit to have considered the question has concluded, the doctrine does not extend to criminal conspiracies, which target different public harms than unreasonable restraints of trade under the antitrust laws.  *See, e.g.*, *United States v. Ames Sintering Co.*, 927 F.2d 232, 236-37 (6th Cir. 1990).

"The intracorporate conspiracy doctrine holds that . . . a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves."  *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000).  This doctrine "first developed in the anti-trust context where it seemed particularly logical to conclude that a single corporation could not conspire with itself to restrain trade in the way imagined by Section 1 of the Sherman Antitrust Act."  *Id.*

The foundational antitrust case regarding the intracorporate conspiracy doctrine is *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), where the U.S. Supreme Court decided "the narrow issue squarely presented: whether a parent and its wholly owned subsidiary are capable of conspiring in violation of § 1 of the Sherman Act."  *Id.* at 767.  Noting

that Section 1 of the Sherman Act "reaches unreasonable restraints of trade effected by a 'contract, combination or conspiracy' between *separate* entities" but not "conduct that is 'wholly unilateral,'" *id.* at 768 (quoting *Albrecht v. Herald Co.*, 390 U.S. 145, 149 (1968)), the Court explained that the danger of "concerted conduct" in the marketplace is not present in a single firm:

> [I]t is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition.
> . . . .
> For similar reasons, the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.

467 U.S. at 769-771.

These considerations do not apply in the context of criminal conspiracies generally, or RICO conspiracies in particular. A criminal conspiracy is a distinct "threat to the public" because "[c]ombination in crime makes more likely the commission of [other] crimes," and because it "decreases the probability that the individuals involved will depart from their path of criminality." *United States v. Jimenez Recio*, 537 U.S. 270, 275 (2003). These concerns do not disappear when the conspirators work for the same company or are part of the same corporate structure. Unlike in the antitrust context, multiple individuals or entities working together within

an enterprise to further criminal objectives is a "distinct evil" that is "punishable in itself" because combined criminal activity—even within a corporate enterprise—is more "dangerous to the public" than crimes committed alone. *Salinas v. United States*, 522 U.S. 52, 65 (1997).

Accordingly, the Supreme Court has expressly limited the intracorporate conspiracy doctrine to antitrust law. In *Cedric Kushner Promotions, Ltd. v. King*, the Court, in considering whether a president and sole shareholder of a corporation was a "person" distinct from a RICO enterprise, rejected the argument that the intracorporate conspiracy doctrine meant the shareholder and enterprise must be the same "person." 533 U.S. 158, 166 (2001). As the Court explained, the intracorporate conspiracy doctrine was of no moment because "that doctrine turns on specific antitrust objectives." *Id.* at 166.

Every Circuit to have considered the question has thus held that the intracorporate conspiracy doctrine is inapplicable to criminal prosecutions. In *McAndrew*, the Eleventh Circuit analyzed the "long-established conclusion that the intracorporate conspiracy doctrine does not apply to criminal conspiracies," explaining that this byproduct of the fiction of corporate personhood "was never intended nor used to shield conspiratorial conduct that was criminal in nature." 206 F.3d at 1035, 1040-41. Although the Second Circuit has not yet addressed the question, the First, Third, Fifth, Sixth, Eighth, and Ninth Circuits have all concluded, consistent with the Eleventh Circuit, that the intracorporate conspiracy doctrine does not apply to criminal prosecutions. *See United States v. St. John*, 625 F. App'x 661, 665 (5th Cir. 2015) (unpublished) ("While our court has applied the intracorporate conspiracy doctrine in antitrust and civil rights cases, we have not expanded its application to the criminal context. We decline to do so here."); *United States v. Basroon*, 38 F. App'x 772, 781 (3d Cir. 2002) (unpublished) ("Because this Circuit

7

does not recognize the intra-corporate conspiracy doctrine even within the civil context, it clearly does not apply in the criminal context."); *United States v. Hughes Aircraft Co.*, 20 F.3d 974, 979 (9th Cir. 1994) (intracorporate conspiracy doctrine "has never been applied to criminal cases"); *Ames Sintering Co.*, 927 F.2d at 236 ("[I]n the criminal context a corporation may be convicted of conspiring with its officers."); *United States v. Hugh Chalmers Chevrolet-Toyota, Inc.*, 800 F.2d 737, 738 (8th Cir. 1986) ("[A] corporation may be responsible when two or more high ranking or authoritative agents engage in a criminal conspiracy on its behalf."); *United States v. Peters*, 732 F.2d 1004, 1008 (1st Cir. 1984) ("The actions of two or more agents of a corporation, conspiring together on behalf of the corporation, may lead to conspiracy convictions of the agents (because the corporate veil does not shield them from criminal liability) and of the corporation (because its agents conspired on its behalf).").

Not only is the doctrine inapplicable to criminal prosecutions, but there is a circuit split as to whether the doctrine even applies to *civil* RICO conspiracy claims. *Compare Kirwin v. Price Comms. Corp.*, 391 F.3d 1323, 1326-27 (11th Cir. 2004) (rejecting application of doctrine); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 787 (9th Cir. 1996) (same); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989) (same), *with Detrick v. Panalpina, Inc.*, 108 F.3d 529, 544 (4th Cir. 1997) (applying doctrine); *Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 898-99 (8th Cir. 1999) (applying doctrine because of lack of distinctness).

While the Second Circuit again has not addressed the issue with respect to civil RICO conspiracies, in two recent decisions in the Southern District of New York, district courts adopted the analysis of the Seventh, Ninth, and Eleventh Circuits in finding that the doctrine does not apply to civil RICO actions.

In *Lateral Recovery LLC v. Funderznet LLC*, Judge Liman underscored the different statutory purposes underlying the Sherman Act and the RICO statute in finding that the intracorporate conspiracy doctrine does not apply to civil Section 1962(c) claims under RICO:

> Unlike the antitrust statute, RICO was not intended to allow loan sharking and racketeering within corporations, while prohibiting these activities outside of them. Rather, RICO seeks both to protect the public from unlawful corporations *and* to protect corporations from those who seek to corrupt them from within.

No. 22-CV-2170 (LJL), 2024 WL 4350369, at *40 (S.D.N.Y. Sept. 27, 2024). Judge Liman further found that *Cedric Kushner*'s distinctiveness reasoning applies with equal force to RICO conspiracy claims under Section 1962(d):

> It would not make sense if the executive in *Cedric Kushner* could be liable for violating Section 1962(c) by unlawfully conducting the affairs of the corporation, but could not be liable under Section 1962(d) for agreeing with others to commit the same violation. The law views the agreement of two people to corrupt an organization together as a harm over and above the unlawful activity of an individual. This harm is not mitigated, and may be exacerbated, by the fact that the person an employee recruits into his criminal scheme is a member of the same organization. Moreover, an association which seeks to engage in criminal activity should not be able to escape conspiracy liability by incorporation. Defendants do not dispute that two or more persons could conspire to engage in racketeering through an association in fact. It would make no sense that the same two persons would enjoy immunity from such a claim through the simple expedient of incorporating the entity through which they agree to engage in their racketeering activity.

*Id.*

Similarly, in *Alix v. McKinsey & Co., Inc.*, Judge Furman found that, "unlike in the antitrust context, excluding intracorporate conspiracies from RICO's reach would not comport with the broad remedial purpose of the RICO statute, because such conspiracies 'threaten RICO's

goals of preventing the infiltration of legitimate businesses by racketeers and separating racketeers from their profits.'"  No. 18-CV-4141 (JMF), 2023 WL 5344892, at *23 (S.D.N.Y. Aug. 18, 2023) (quoting *Ashland Oil, Inc.*, 875 F.2d at 1281).

Here, the RICO Defendants rely primarily on *Copperweld* to argue that the intracorporate conspiracy doctrine defeats the RICO conspiracy charge.  However, the antitrust policy considerations discussed in *Copperweld* plainly do not apply to the RICO conspiracy charge in this case, which targets the reinvestment of profits from patterns of racketeering activity, rather than a concerted effort to restrain trade.  *See Alix*, 2023 WL 5344892 at *23.

The RICO Defendants do not address the inapplicability of the intracorporate conspiracy doctrine to criminal prosecutions.  Not surprisingly, the cases they cite comprise civil disputes only.  *See, e.g.*, *Detrick*, 108 F.3d 529 (state law civil conspiracy); *Hartline v. Gallo*, 546 F.3d 95 (2d Cir. 2008) (civil § 1985 conspiracy); *Girard v. 94th Str. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir. 1976) (civil § 1985 conspiracy); *Boneta v. Rolex Watch USA, Inc.*, 232 F. Supp. 3d 354 (S.D.N.Y. 2017) (civil RICO claim); *Merhej v. I.C.S. Int'l Custody Sys., Inc.*, No. 13-CV-869 (JGK), 2014 WL 104908 (S.D.N.Y. Jan. 9, 2014) (civil RICO claim).  Nor do the RICO Defendants address *Lateral Recovery LLC* or *Alix*, both of which recently held that the doctrine is inapplicable to RICO generally.

Accordingly, the Court should decline the RICO Defendants' unwarranted invitation to extend the intracorporate conspiracy doctrine into the criminal context, which would be without precedent and contrary to the holdings of all seven circuits to consider the issue.

B.    The RICO Defendants' Alter Ego Argument Is Meritless

Alternatively, the RICO Defendants contend that, considering the government's past arguments to the Court that the three corporate defendants have operated as alter egos, they are incapable of conspiring with each other, and, therefore, the RICO conspiracy charge must be dismissed.  But this is an argument about the nature of the government's evidence, not the sufficiency of its allegations.   It is therefore premature at the pretrial stage.   In any case, although the government does not offer a full proffer of its trial evidence at this time, it intends to prove at trial that the RICO Defendants—including their employees—conspired to violate Section 1962(a).

For example, the government expects to offer evidence at trial establishing that, even as alter egos of Huawei Tech, the charged U.S. subsidiaries nonetheless have had their own operations and employees in the United States, entered into contracts on their own behalf, and conducted business as purportedly separate legal entities.   Such evidence would militate against the argument that the corporate entities cannot conspire with each other.

Further, again without litigating the sufficiency of the evidence in pretrial briefing, the government expects that it will elicit evidence establishing the corporate entities' liability under a *respondeat superior* theory based on the employees of the three entities conspiring to violate RICO.  *See, e.g.*, *Hughes Aircraft Co.*, 20 F.3d at 978-79 (in the context of 18 U.S.C. § 371 conspiracy, the statutory language did not exclude criminal liability for a corporation simply because its employees were the actual conspirators); *Ames Sintering Co.*, 927 F.2d at 236-37 ("[A] corporation may conspire with its officers, employees, and agents.").   "To rule otherwise would effectively insulate all corporations from liability for conspiracies involving only employees acting on behalf of that corporation."  *Hughes Aircraft Co.*, 20 F.3d at 978-79; *see also United States v.*

11

*Phelps Dodge Indus.*, 589 F. Supp. 1340, 1358 (S.D.N.Y. 1984) ("The standard for imputing liability to a corporation for the acts of its employees should be no more stringent in civil penalty proceedings than in criminal prosecutions, where courts generally require only that the illegal act be committed within the scope of the wrongdoer's employment and refuse to allow technical claims of lack of authority or even evidence that the employee acted against express instructions to defeat the corporation's responsibility."); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550-51 (S.D.N.Y. 2007) (same).   Evidence of concerted, coordinated criminal conduct by the employees of the RICO Defendants acting within the scope of their employment would thus demonstrate that the RICO Defendants entered into conspiracies.

At bottom, the RICO Defendants' pretrial motion for dismissal is premature.   Once the government presents its case at trial, the Court can revisit—if appropriate—the RICO Defendants' argument in the form of a Rule 29 motion at the close of the government's case.   But at this stage, it is not grounds for dismissal of Count One.   *See*, *e.g.*, *Alfonso*, 143 F.3d at 777 n.7 (absent the government's consent to a pretrial motion to dismiss, the appropriate vehicle for addressing satisfaction of elements of the offense would be a Rule 29 motion); *United States v. Kelly*, 462 F. Supp. 3d 191, 197 (E.D.N.Y. 2020) ("The Government is entitled to marshal and present its evidence at trial, and the defendant is entitled to challenge the sufficiency of that evidence pursuant to Rule 29 of the Federal Criminal Rules of Procedure.").

C.       The RICO Conspiracy Charge Alleges a Domestic Application of Section 1962(d)

The RICO Defendants next contend that the RICO charge should be dismissed pretrial as an improper extraterritorial application of Section 1962(d).   This argument again is premature, as it turns on the defendants' speculation about the evidence to be introduced at trial.

12

Count One properly tracks the language of the relevant statue, and therefore is sufficient to proceed to trial.   In any event, the government expects to prove at trial that the "focus" of Count One—the investment of proceeds of racketeering activity—took place in the United States.

At the outset, consistent with the requirements repeatedly endorsed by the Second Circuit, Count One tracks the language of the statute and provides the approximate time and place of the charged crime.

In relevant part, Section 1962(a) provides that it is:

> unlawful for any person who has received any income, derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Section 1962(d) criminalizes any conspiracy to violate the other provisions of Section 1962, including Section 1962(a).   The statute does not include any specific language regarding domestic or extraterritorial application.

The Indictment closely tracks the language of Section 1962(a):

> In or about and between 1999 to the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants . . . together with others, did knowingly and intentionally conspire to violate Title 18, United States Code, Section 1962(a), that is, to use and invest, directly and indirectly, a part of income and the proceeds of income, to wit: income received by HUAWEI, HUAWEI DEVICE USA and FUTUREWEI and derived, directly and indirectly, from a pattern of racketeering activity, in which HUAWEI, HUAWEI DEVICE USA and FUTUREWEI participated as principals within the meaning of Title 18, United States Code, Section 2, in the establishment and operation of the Huawei Enterprise, an enterprise that engaged in, and the activities of which affected, interstate and foreign commerce.

13

S-3 Ind. ¶ 92.   Additionally, the Indictment lists the types of racketeering activity underlying the reinvestment conspiracy:

> The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of multiple acts indictable under Title 18, United States Code, Sections 1343 (relating to wire fraud), 1344 (relating to financial institution fraud), 1503 (relating to obstruction of justice), 1512 (relating to tampering with a witness, victim or an informant), 1832 (relating to theft of trade secrets), 1956 (relating to the laundering of monetary instruments), and 2319 (relating to criminal infringement of a copyright).

*Id.* ¶ 93.

Thus, Count One tracks the language of the RICO statute, sets forth the elements of the charged crime, and alleges that the conduct took place in part in the Eastern District of New York.   As the RICO statute does not make any explicit reference to domestic or exterritorial application, there is no need to include anything further in the charging instrument.   Because it satisfies the Second Circuit's requirement that an indictment "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *Alfonso*, 143 F.3d at 776, Count One adequately states an offense.

Were the Court to assess the merits of the extraterritoriality claim—which, as outlined above, would be procedurally premature—it should find that Count One states a proper domestic application of Section 1962(d).

In *RJR Nabisco, Inc. v. European Community*, the Supreme Court "assume[d] without deciding that Section 1962(d)'s extraterritoriality tracks that of the provision underlying the conspiracy." 579 U.S. 325, 341 (2016).   Under *RJR Nabisco*, the test for whether a case involves a domestic application is as follows:

14

> If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*Id.* at 337.   With respect to a conspiracy to violate Section 1962(a), the "focus" is "domestic investment of racketeering income."   *Id.* at 341.

In this case, while the government has not provided, and does not here provide, a full proffer of its trial evidence, it expects to demonstrate at trial there is "conduct relevant to the statute's focus occurr[ing] in the United States."   *Id.* at 337.   Indeed, as alleged, a primary focus of the illicit agreement involved reinvesting the proceeds of racketeering acts in Huawei's U.S. businesses.   At the same time, the underlying racketeering activity was allegedly targeted at the United States, occurred on U.S. soil, and had significant effects in the United States.   Notably, the Indictment defines the Huawei Enterprise as follows:

> HUAWEI and its parents, global affiliates and subsidiaries, including HUAWEI DEVICE, HUAWEI DEVICE USA, FUTUREWEI and SKYCOM, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of legal entities associated in fact (hereinafter, the "Huawei Enterprise").   The Huawei Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

S-3 Ind. ¶ 89.   Accordingly, by definition, the Huawei Enterprise includes all U.S. affiliates and subsidiaries of Huawei Tech, and any agreement to invest or reinvest racketeering proceeds in Huawei's U.S.-based operations would constitute a violation of Section 1962(d) with domestic application.   *See  RJR Nabisco*, 579 U.S. at 337 ("If the conduct relevant to the statute's focus

15

occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad.").

In sum, the Indictment on its face properly alleges a conspiracy to violate Section 1962(a), and any effort to dismiss Count One based on extraterritoriality is premature and meritless.

D.    The RICO Conspiracy Charge Sufficiently Alleges a Pattern of Racketeering Activity

The RICO Defendants argue that the Indictment insufficiently alleges a pattern of racketeering activity.    Once again, the RICO Defendants impermissibly seek to address the sufficiency of the evidence in a pretrial motion to dismiss.

Courts in this district facing similar motions have uniformly rejected them as premature.    "Determining the 'relatedness' of racketeering acts in a RICO case is inappropriate at the pre-trial stage."    *United States v. Basciano*, No. 03-CR-929 (NGG), 2006 WL 8451578, at *20 (E.D.N.Y. Jan. 3, 2006) (citing *United States v. Gotti*, 399 F. Supp. 2d 214, 224 (S.D.N.Y. 2005)). Instead, so long as the government has alleged that a racketeering act "is [a] part of a pattern of racketeering activity," the act is "sufficient on its face" and the motion to dismiss should be "denied."    *Basciano*, 2006 WL 8451578, at *20; *see United States v. Cooper*, No. 17-CR-296 (PKC), 2020 WL 2307646, at *4 (E.D.N.Y. May 8, 2020) (same); *United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) ("While there is no Second Circuit ruling directly on point, other case law indicates overwhelmingly that the Government does *not* have to plead either subpart of the 'pattern' element—relatedness or continuity—with the particularity that [defendants] suggest, and that, at most, an indictment need only specify predicate acts 'that evidence continuity and relatedness.'" (quoting *United States v. Giovanelli*, No. 01-CR-749 (JSR), 2004 WL 48869, at

16

*3 (S.D.N.Y. Jan. 9, 2004)); *United States v. Messina*, No. 11-CR-31 (KAM), 2012 WL 463973, at *4 (E.D.N.Y. Feb. 13, 2012) (rejecting a challenge to an indictment because "[i]n essence, rather than challenging the sufficiency of the Indictment alone, defendant's arguments focus on whether the prosecution will be able to prove a racketeering 'enterprise' and a 'pattern of racketeering activity' at trial.").

As noted above, the Indictment alleges numerous types of indictable racketeering activity, "as defined in Title 18, United States Code, Sections 1961(1) and 1961(5)."   S-3 Ind. ¶ 93. In turn, Section 1961(5) specifies that the "pattern of racketeering activity" "requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."   The plain language of the Indictment meets these elements.   It therefore satisfies the relatedness requirements of Section 1961, and the RICO Defendants' argument fails.   *See Raniere*, 384 F. Supp. 3d at 301.

E.    The RICO Defendants' Enterprise Arguments All Fail

The RICO Defendants' myriad arguments related to the Huawei Enterprise are equally meritless.   Two of the arguments are squarely foreclosed by precedent and are made simply to preserve the defendants' position for their future appeal.[2]

---

[2]    First, the RICO Defendants concede that Second Circuit case law precludes their argument regarding distinctiveness of the "person" and the "enterprise" under Section 1962(a) and, therefore, by extension, a Section 1962(d) conspiracy to violate 1962(a).   Br. #1 at 22.   Indeed, under Second Circuit law, the distinctiveness requirement under 18 U.S.C. § 1962(c) does not apply under 18 U.S.C. § 1962(a).   Thus, a RICO defendant may be the same as the enterprise that makes use of the racketeering income or proceeds.   This is true even where the "person" engaging in racketeering activity is a corporation and the "enterprise" into which the proceeds of racketeering are invested is the same corporation.   *See, e.g.*, *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310,

Similarly lacking merit is the RICO Defendants' novel claim that Count One should be dismissed because it fails to allege that the racketeering income was invested in an entity other than the entity that generated the racketeering income.    The RICO Defendants offer no case law in support of this proposition other than the conclusory assertion that another interpretation would eviscerate the distinction between Sections 1962(a) and 1962(c).    However, these statutory provisions have entirely different elements and address different policy concerns.    Section 1962(a) addresses the investment of racketeering income in the "establishment or operation" of the enterprise, whereas Section 1962(c) prohibits the "conduct[ing] or participat[ion] . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity."    The former addresses "Congress's concern about the control of otherwise legitimate business concerns acquired by the *sub rosa* investment of profits acquired from illegal ventures," *Ideal Steel Supply Corp. v. Anza*,

---

321 (2d Cir. 2011) (observing that the RICO defendant can be the same as the enterprise); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 345 (2d Cir. 1994) (same); *see also Genty v. Resolution Trust Corp.*, 937 F.2d 899, 907 (3d Cir. 1991) (explaining that "where . . . a corporate 'person' is also the 'enterprise' through which the alleged racketeering activity occurred, liability can arise only under sections 1962(a) or (b)" because § 1962(c) requires that the 'persons' liable and the 'enterprise' be distinct entities" while "Sections 1962(a) and (b), on the other hand, do not require such separate identity."); *United States v. Vogt*, 910 F.2d 1184, 1194 (4th Cir. 1990) (broadly agreeing that the corporate person who engaged in racketeering activity need not be distinct from the enterprise); *United States v. Gotti*, 457 F. Supp. 2d 403, 406 (S.D.N.Y. 2006) (same).

Second, the RICO Defendants similarly concede that their argument that Section 1961(4) does not apply to "an association-in-fact enterprise comprised entirely of corporations," Br. #1 at 22-23, is precluded by *United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979) (argument that group of corporations cannot constitute enterprise "makes nonsense of the statute"); *see also United States v. Perholtz*, 842 F.2d 343, 353 (D.C. Cir. 1988) ("We . . . follow those courts that have held that individuals, corporations, and other entities may constitute an association-in-fact."); *United States v. Navarro-Ordas*, 770 F.2d 959, 969 n.19 (11th Cir. 1985); *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1285 (7th Cir. 1983).

652 F.3d 310, 320 (2d Cir. 2011), while Section 1962(c) addresses the situation where "the enterprise itself is often a passive instrument or victim of racketeering activity," *Bennett v. U.S. Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir. 1985).   Considering these disparate concerns, it is not surprising that there is no distinctiveness requirement for Section 1962(a) claims, *see Ideal Steel*, 652 F.3d at 321, but there is for 1962(c) claims, *see Bennett*, 770 F.2d at 315.   In any event, even if this argument had merit, it would be premature at this time, when no evidence has yet been presented at trial.

In sum, the RICO Defendants' scattershot arguments about Count One misread applicable authority, ignore the plain language of the Indictment, and seek to improperly address the sufficiency of the evidence at the pretrial stage.   The motion to dismiss Count One should be denied.

III.   <u>Counts Two and Three Properly Allege Trade Secret Theft and Wire Fraud Conspiracies</u>

In Counts Two and Three, the government alleges conspiracies by Huawei Tech, Futurewei, Huawei Device, and Huawei Device USA (the "IP Defendants") to steal intellectual property from U.S. companies, including through materially false statements and pretenses.   At their core, these charges allege that the IP Defendants conspired to grow the Huawei business through a deliberate scheme to repeatedly lie to and steal from U.S. companies.   The IP Defendants then cashed in on their theft, benefitting from both "the sale of products containing stolen intellectual property" and the avoidance of "research and development costs."   S-3 Ind. ¶ 8.

As alleged in the Indictment—and as the government expects to prove at trial—the conspiracies were wide-ranging, long-running, and directed from the top of the organization.   But while the means to pursue the conspiracies varied over time, the unlawful objective was always the

same: to grow the Huawei business through the theft of intellectual property, and to defraud victim companies out of that property through materially false pretenses.   In that regard, the Indictment describes efforts to steal intellectual property from at least six different U.S. companies, all victims of the IP Defendants' persistent, years-long scheme.   *Id.* ¶¶ 18-58.

In response, the IP Defendants downplay the allegations as "commonplace trade secret disputes" that "every sophisticated technology company faces in this competitive industry"—suggesting that the IP Defendants have been improperly targeted for conduct already addressed through civil litigation.   Defs. Mem. No. 2 ("Br. #2") at 1-2, ECF No. 474-2.   But in doing so, they ignore the overwhelming evidence of criminality described in the Indictment: the years-long pattern of theft, the official corporate policy of stealing trade secrets, the employee incentives for stealing the most valuable information, and the repeated acts of obstruction.   S-3 Ind. ¶¶ 8-17. That some of these allegations led to significant civil litigation in the past only underscores the severity of the IP Defendants' actions.   And in no event does it somehow absolve them of criminal liability.

The IP Defendants advance two technical arguments related to Counts Two and Three, neither of which has merit.   First, they argue that the counts are impermissibly duplicitous because they encompass multiple conspiracies.   But the scope of the charged conspiracies is again a question of fact for the jury, not a legal issue to be decided before trial.   And in any case, the Indictment clearly alleges consistent, years-long conspiracies to promote Huawei through theft and fraud, respectively, in Counts Two and Three.

Second, the IP Defendants contend that the government waited too long to seek the operative indictment.   There is no dispute, however, that the charges were brought within the

applicable statute of limitations.   Nor can the IP Defendants show prejudice from preindictment delay, or that the government deliberately delayed charges to gain a tactical advantage.   For all these reasons, the IP Defendants' motions to dismiss Counts Two and Three should be rejected.

A.   Counts Two and Three Are Not Impermissibly Duplicitous

The IP Defendants contend that Counts Two and Three each improperly combine multiple conspiracies into single counts.   But the scope of the conspiracies charged in Counts Two and Three is a question of fact that depends on the evidence presented at trial, not a legal question that can be resolved on the pleadings.   For that reason alone, the IP Defendants' argument should be rejected.   In any event, the Indictment on its face adequately alleges continuing conspiracies to steal trade secrets and defraud U.S. companies, belying any claim of duplicity.

1.   The Scope of the Charged Conspiracies Is a Question of Fact for the Jury

The Second Circuit has "repeatedly cautioned that the determination of whether a conspiracy is single or multiple is an issue of fact 'singularly' well suited to determination by a jury." *United States v. Gabriel*, 920 F. Supp. 498, 504 (S.D.N.Y. 1996).   As the Second Circuit explained in *United States v. Johansen*, for example, "[w]hether the government has proven the existence of the conspiracy charged in the indictment and each defendant's membership in it, or, instead, has proven several independent conspiracies is a question of fact for a properly instructed jury."   56 F.3d 347, 350 (2d Cir. 1995); *see also United States v. Alessi*, 638 F.2d 466, 472 (2d Cir. 1980) (similar); *United States v. Calbas*, 821 F.2d 887, 892 (2d Cir. 1987) (similar); *United States v. Carson*, 702 F.2d 351, 358 n. 11 (2d Cir. 1983) (similar); *United States v. McGrath*, 613 F.2d 361, 367 (2d Cir. 1979) (similar).

Accordingly, "courts in this Circuit have repeatedly denied motions to dismiss a count as duplicitous" in advance of trial. *United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010); *see*, *e.g.*, *United States v. Catapano*, No. 05-CR-229 (SJ), 2008 WL 2222013, at *13 (E.D.N.Y. May 22, 2008) (recommending denial of motion to dismiss because "[c]ourts in the Second Circuit have repeatedly held that whether a count charges a single or multiple conspiracy should be determined by the jury."); *United States v. Fernandez,* No. 97-CR-233 (LMM), 1999 WL 1038049, at *1 (S.D.N.Y. Nov. 16, 1999) ("Whether the evidence will prove the single conspiracy charged, or multiple conspiracies, cannot be determined on the face of the indictment since it is a factual issue for the jury."); *United States v. Szur,* No. 97-CR-108 (JGK), 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998) ("[S]ince the Indictment on its face sufficiently alleges a single conspiracy, the question of whether a single or multiple conspiracies exist is a question for the jury and is not a basis to dismiss the conspiracy count."). Indeed, in *Gabriel*, despite the court's view that the conspiracy charge at issue would prove to be duplicitous, the court declined to grant dismissal before trial because it was not "within the power of the Court to do." 920 F. Supp. at 504. As the court explained, "[g]iven [the count's] boilerplate allegations of a single conspiracy, the Court cannot conclude on the basis of the pleadings alone that there is *no* set of facts falling within the scope of [the count] that could warrant a reasonable jury in finding a single conspiracy." *Id.* at 505.

Here, Counts Two and Three allege a twenty-year trade secret theft conspiracy and an eleven-year wire fraud conspiracy, respectively. S-3 Ind. ¶¶ 95, 98. While the IP Defendants contend that each charge is actually a series of narrower, distinct conspiracies, that is a factual question to be resolved by the jury following the presentation of evidence, not by the Court on the

22

pleadings.  Notably, the IP Defendants do not claim that, based on the Indictment's allegations, there is "*no* set of facts" that could prove the charged conspiracies.  *Gabriel*, 920 F. Supp. at 505. As in *Gabriel*, that is fatal to their arguments.

Of course, the IP Defendants are free to argue at trial that the evidence failed to prove continuing unlawful agreements, or to present their own evidence to that effect.  But the issue itself—the scope of the charged conspiracies—cannot properly be resolved at this juncture. *See*, *e.g.*, *United States v. O'Sullivan*, No. 20-CR-272 (PKC), 2021 WL 1979074, at *6-7 (E.D.N.Y. May 18, 2021) ("Where multiple conspiracies are charged, the question of whether the evidence shows a single conspiracy or more than one conspiracy is often not determinable as a matter of law or subject to bright-line formulations" (quoting *US v. Jones*, 482 F.3d 60 (2d Cir. 2006) at 72)); *see also Sampson*, 898 F.3d at 285 ("[W]e simply cannot approve dismissal of an indictment on the basis of predictions as to what the trial evidence will be.").

2.    On Their Face, Counts Two and Three Each Allege Single Conspiracies

Even if the Court were to try to determine the scope of the charged conspiracies at this stage—before the presentation of any evidence—Counts Two and Three are not duplicitous. An indictment suffers from duplicity "if it joins two or more distinct crimes in a single count." *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).  The prohibition on duplicitous charges serves a variety of purposes, including:

> avoiding the uncertainty of whether a general verdict of guilty conceals a finding of guilty as to one crime and a finding of not guilty as to another, avoiding the risk that the jurors may not have been unanimous as to any one of the crimes charged, assuring the defendant adequate notice, providing the basis for appropriate sentencing, and protecting against double jeopardy in a subsequent prosecution.

23

*United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir.1981).

In the context of conspiracy crimes, the duplicity analysis implicates "unique issues" because "a single agreement may encompass multiple illegal objects." *Aracri*, 968 F.2d at 1518. Thus, a count is not duplicitous merely because it alleges a single agreement "to commit several crimes," or because the conspiracy is accomplished "by several means." *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980). This is because the conspiracy itself is a standalone crime, distinct from any underlying substantive offense, regardless of how "diverse its objects." *Id.*

Nor is a single conspiracy charge duplicitous merely because it could have been charged as multiple conspiracies. As the Second Circuit has explained, "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Tutino,* 883 F.2d 1125, 1141 (2d Cir. 1989).

Here, the Indictment alleges a consistent, continuing scheme over many years to grow the Huawei business by lying to and stealing intellectual property from U.S-based companies. Count Two charges a trade secret theft conspiracy from 2000 to 2020, and Count Three charges a wire fraud conspiracy from 2009 to 2020. S-3 Ind. ¶¶ 95, 98. The Indictment identifies six different victim companies—each of which is alleged to have had proprietary technology stolen by the IP Defendants—as well as additional allegations of conspiracy, such as corporate policies that expressly promoted intellectual property theft and efforts to conceal theft and obstruct investigations. *Id.* ¶¶ 8-58.

24

While the IP Defendants argue that the government should have subdivided Counts Two and Three into additional, narrower conspiracies, the government was not required to do so. The law is clear that, because Counts Two and Three each charge a "single continuing scheme," it was permissible to charge them as single counts. *Tutino*, 883 F.2d at 1141; *see also Margiotta*, 646 F.2d at 733 ("We do not agree that whatever acts the Constitution permits to be punished separately are required to be stated in separate counts, a result that would require exposure to cumulative punishments.").

The IP Defendants point to gaps in time between the thefts identified in the Indictment, suggesting that the gaps indicate multiple, rather than individual, conspiracies.   Br. #2 at 9.   But the essence of a conspiracy is the agreement itself, not the acts (here, thefts) taken in furtherance of the agreement.   *See United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003).   The Indictment alleges that the *agreements* at issue in Counts Two and Three extended for the full lengths of the charged periods.   S-3 Ind. ¶¶ 95, 98.   That alone is sufficient to survive a duplicity challenge at the pleading stage.   *See Ohle*, 678 F. Supp. 2d at 222-23 (holding that "'boilerplate allegations' of a single conspiracy" were sufficient to survive duplicity challenge, even where "subsequent description of the overt acts indicates that [the charge] may consist of multiple conspiracies").   In any case, the Indictment alleges facts apart from the six separate thefts— including corporate bonuses for stealing the most valuable information and efforts to obstruct litigants and the government from discovering the wrongdoing—that show the continuing nature of the conspiracies.

It is likewise immaterial—and indeed, unremarkable—that over the course of the conspiracies the IP Defendants targeted multiple victims using a variety of criminal means.   Br. #2

25

at 9.   There is nothing unusual about conspirators stealing from or defrauding multiple victims as part of a continuing conspiracy or adjusting their methods over time.   It is particularly unsurprising that the IP Defendants would try out different means once earlier victims discovered the thefts and initiated civil litigation.   The same holds true for the fact that each alleged theft involved a different trade secret.   *See id*.   Trade secrets are by definition confidential, and different victims would be unlikely to possess the same secrets.   Moreover, once a particular trade secret was successfully stolen, the IP Defendants possessed the relevant information and had no reason to attempt to steal it again.   The IP Defendants also ignore the consistent throughline of the charged conspiracies: the targeting of U.S.-based companies to steal confidential intellectual property, using deception and false pretenses, all to grow the Huawei business.   This is more than sufficient at the pleading stage to allege a continuing conspiracy, and the IP Defendants can point to no authority to the contrary. *See Stavroulakis*, 952 F.2d at 693 ("[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.").

To be sure, if the government had charged a series of narrower conspiracies or substantive crimes, some of those charges likely would have fallen outside the applicable statute of limitations.   *See* Br. #2 at 12-14.   But the government's investigation did not uncover a series of isolated, unconnected conspiracies.   Instead, as alleged, it revealed a years-long, continuing agreement to steal valuable intellectual property from a variety of U.S. companies, including by making false representations to first gain access to the technology.   And there is no dispute that the statute of limitations for *that conspiracy* did not begin to run until it ended in 2020.

Nor does it matter that two of the IP Defendants—Huawei Device and Huawei Device USA—were formed after the start date of the conspiracy charged in Count Two.   *Id*. at 2.

26

It is black-letter law that a defendant can join a conspiracy after it has begun and still be liable for all acts taken in furtherance of the conspiracy.  *See United States v. Blackmon*, 839 F.2d 900, 911 (2d Cir. 1988).  It is equally irrelevant that certain of the overt acts charged for Count Two took place outside the statute of limitations.  Br. #2 at 7.  The law is clear that the government need prove only one overt act in furtherance of the conspiracy during the limitations period for the case to be timely.  *See Grunewald v. United States*, 353 U.S. 391, 396-97 (1957).  And to the extent the IP Defendants claim a lack of "predictability" from being held responsible for years-old conduct, Br. #2 at 12, that is a problem entirely of their own making.  They could have ended their unlawful conspiracies years ago, but as alleged, chose not to.[3]

Finally, the IP Defendants contend that potential uncertainty about the scope of a verdict for Double Jeopardy purposes is a reason to dismiss Counts Two and Three now.  Br. #2 at 13.  But they have not identified any "ambiguity."  No "jeopardy" has attached at this stage, and any analysis of the preclusive effect of this case on other pending cases is therefore premature.

In short, the IP Defendants seek to escape accountability for their years-long criminal conspiracies by artificially subdividing and seeking dismissal of the relevant counts, in conflict with the plain language of the charging instrument.   The effort should be rejected.

---

[3]      Of course, if the jury finds that the conspiracy ended outside of the statute of limitations period—for example, finding that there no was conspiracy during the five-year period before charges were returned—then the IP Defendants can avail themselves of the statute.   In other words, there is no concern that by artful pleading they can be held to account for purely out-of-statute conduct; they are only subject to conviction because they conspired at least in part within the relevant period.  *Cf.* Br. #2 at 13.

B.  Counts Two and Three Comply with Due Process

The Indictment also complied with the Fifth Amendment's Due Process requirements.  As an initial matter, there is no dispute that Counts Two and Three were brought within the applicable five-year statute of limitations.  *See* 8 U.S.C. § 3282(a).  Nor is there any argument that the grand jury returned the Indictment too late with respect to conduct involving Company 4, Company 5, or Company 6.  *See* Br. #2 at 14.  Instead, the IP Defendants advance a narrower claim: that, despite the government complying with the statute of limitations, Counts Two and Three were brought too late to encompass conduct involving Company 1, Company 2, and Company 3, in violation of due process.  As set forth below, the IP Defendants have not—and cannot—establish that any perceived preindictment delay caused them to suffer actual and substantial prejudice, or that the government intentionally caused the delay to gain a tactical advantage.  As such, their motion to dismiss Counts Two and Three for preindictment delay should be denied.

1.    The IP Defendants Have Not Demonstrated Actual and Substantial Prejudice

The statute of limitations is the "'primary guarantee against bringing overly stale criminal charges.'"  *United States v. Marion*, 404 U.S. 307, 322 (1971) (quoting *United States v. Ewell*, 383 U.S. 116, 122 (1966)).  For that reason, an indictment brought within the statute of limitations is presumptively timely, *see United States v. Cornielle*, 171 F.3d 748, 751-52 (2d. Cir. 1999), and the Due Process Clause does not "permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment," *United States v. Lovasco*, 431 U.S. 783, 790 (1977).  Accordingly, where the government has complied with the

statute of limitations, the Due Process Clause has only a "limited role to play." *Id.* at 789. To show a due process violation based on preindictment delay, a defendant must meet a "heavy burden" of showing both that (1) the delay caused actual and substantial prejudice, and (2) the government intentionally caused the delay to obtain a tactical advantage. *United States v. Cornielle*, 171 F.3d 748, 751-52 (2d Cir. 1999); *Marion*, 404 U.S. at 324.

Given this high bar, prosecutions brought within the applicable statute of limitations have "a strong presumption of validity" and "are only rarely dismissed." *Cornielle*, 171 F.3d at 752. For a claim of preindictment delay to succeed, proceeding to trial against the defendant must be "so unfair as to violate 'fundamental conceptions of justice which lie at the base of our civil and political institutions . . . and which define the community's sense of fair play and decency.'" *United States v. Gross*, 165 F.Supp.2d 372, 377-78 (E.D.N.Y. 2001) (quoting *Lovasco*, 431 U.S. at 790).

Here, the IP Defendants have not met their "heavy burden" of demonstrating actual prejudice. *Cornielle*, 171 F.3d at 752. "Actual prejudice is a fairly stringent standard. The passage of time, and the attendant loss of evidence and dimming of witnesses' memories, is insufficient by itself to show prejudice." *United States v. Castellano*, 610 F. Supp. 1359, 1385 (S.D.N.Y. 1985). Even "the death or absence of potential witnesses or the loss of documentary evidence," absent more, does not establish actual prejudice. *Id*. (citing cases and noting that courts have "refused to infer prejudice from delays of five . . . [to] nineteen-and-a-half years.").

First, the IP Defendants contend that Company 1's original source code—one part of the intellectual property stolen from Company 1—is no longer available. Br. #2 at 16. As a preliminary matter, the government's investigation is ongoing, including with respect to the source

code.   At any rate, even if the original source code were lost, the defendants do not explain why

that would be prejudicial to *them*.   They argue that, without the source code, they "cannot challenge

whether the code actually constituted a trade secret."   Br. #2 at 16.   But "[i]t is well established

that factual impossibility is not a defense to inchoate crimes, such as conspiracy to commit an

offense."   *United States v. Zheng*, 113 F.4th 280, 298 (2d Cir. 2024) (citing *United States v.

Williams*, 553 U.S. 285, 300 (2008)); *United States v. Hassan*, 578 F.3d 108, 123 (2d Cir. 2008)).

The government thus is not required to prove that Company 1's source code was in fact a trade

secret.   *See Zheng*, 113 F.4th at 298.   Instead, Counts Two and Three rely on facts showing that

the IP Defendants believed they were misappropriating trade secrets, "regardless of whether [the IP

Defendants'] belief turned out to be accurate."   *Id.* at 299; *see United States v. Hsu*, 155 F.3d 189,

203 (3d Cir. 1998) (holding that "the defendants have no need for the . . . documents [containing

trade secrets] to defend against the government's charges of conspiracy, because we conclude that

legal impossibility is not a defense to conspiracy").

        Moreover, the mere possibility that the original source code might be helpful to the

defense, with no particularized showing that the evidence would in fact be helpful, is insufficient

to establish actual prejudice.   *See United States v. D'Amico*, No. 86-CR-111 (SWK), 1987 WL

11686, at *2 (S.D.N.Y. May 27, 1987) (only "potential," not "actual," prejudice where defense

made no showing that deceased witness's testimony would have been favorable to him); *see also

United States v. Perry*, 92 F.4th 500, 513-14 (4th Cir. 2024) ("[W]here 'a dispassionate review' of

the evidence 'can only lead one to conclude that the chances are extremely low that the preserved

evidence would have been exculpatory,' failure to preserve 'is without constitutional defect.'")

(quoting *California v. Trombetta*, 467 U.S. 479, 488-89 (1984)).   And even if the source code did

tend to exculpate the IP Defendants in some way, they have not shown that it would be "key to the defense"—particularly given that it is just one of numerous examples of trade secret theft the government will prove at trial.   *United States v. Jordan*, 629 F. Supp. 3d 49, 54 (E.D.N.Y. 2022).

The same holds true for the inability to obtain testimony from the deceased neutral expert who prepared a report for the civil litigation involving Company 1.   Br. #2 at 16-17.   The IP Defendants again make no showing that testimony from the neutral expert would have been favorable to them.   Just the opposite, as stated in the Indictment, the report prepared by the expert was highly *inculpatory*, finding, among other things, that "[i]t is clear that there was Substantial Similarity in portions of the Huawei . . . code and that there has been copyright infringement;" that "'the conclusion is unescapable' that one routine of HUAWEI source code is 'Substantially Similar to [Company 1]'s [source code] and has been misappropriated;'" and that portions of other programming routines were "'were copied from [Company 1] source code,'" with one routine "'copied in its entirety and modified slightly.'"   S-3 Ind. ¶ 23.   Any contention that the neutral expert's testimony would have somehow assisted the defense is simply unwarranted speculation. *See United States v. DeMasi*, 445 F.2d 251, 255-56 (2d Cir. 1971) (no actual prejudice where "[t]here is no indication that [the witness] would have exculpated appellant had he lived to testify, and, indeed, it appears that [the witness] would have been more helpful to the Government than to the defense").

The IP Defendants similarly make no showing that testimony from the deceased "former Company 1 employee who provided a declaration in the civil case regarding Huawei's alleged attempts to recruit him" would be exculpatory.   Br. #2 at 16-17.   The IP Defendants merely assert that the witness "cannot be questioned" about his prior statements.   Br. #2 at 17.

They do not make a "specific, particularized showing" that the witness's testimony would have been helpful to their case. *Jordan*, 629 F. Supp. 3d at 54. Indeed, although the witness executed a declaration in the civil case, the IP Defendants cite nothing from that declaration that would assist in their defense. Given the allegation that "HUAWEI and FUTUREWEI hired or attempted to hire Company 1 employees and directed these employees to misappropriate Company 1 source code on behalf of the defendants," S-3 Ind. ¶ 18, the testimony of a former employee who claimed that Huawei attempted to recruit him would plainly be inculpatory, not exculpatory, evidence. *See United States v. Gotti*, No. 02-CR-743 (RCC), 2004 WL 32858, at *4 (S.D.N.Y. Jan. 6, 2004) (no actual prejudice where defendants "d[id] not provide any details as to how the witnesses would exculpate them and therefore do not offer any particularity as to how they have been prejudiced.").

The IP Defendants' arguments related to Company 2 fall even shorter. They cite no specific evidence that has been lost or testimony that is unavailable, other than a vague, conclusory statement about an inability to access "the full scope of documentary evidence and the fresh recollection of witnesses that would have been available twenty years ago." Br. #2 at 17. Under binding Supreme Court precedent, that is not sufficient. *See Marion*, 404 U.S. at 325-26 (the possibility "that memories will dim, witnesses become inaccessible, and evidence be lost" is insufficient, standing alone, to demonstrate actual prejudice). The IP Defendants also ignore the fact that the passage of time equally affects the prosecution, which bears the burden of proof, only confirming that they have not shown actual prejudice. *See United States v. Harrison*, 764 F. Supp. 29, 32 (S.D.N.Y. 1991) (rejecting defendant's argument that witnesses' impaired memories is sufficient to establish prejudice because "[t]he same fact . . . also handicaps the government in that

any prosecution witness who testifies . . . is vulnerable to challenge because of the time elapsed since the events at issue").

Finally, the IP Defendants assert a general lack of evidence produced in discovery related to Company 3.  Br. #2 at 17.  In the first place, their description of the discovery related to Company 3 is incomplete, omitting, for example, a scanned copy of the false identification badge carried by the Huawei employee who engaged in the attempted theft, *see* DOJ_HUAWEI_A_0124226767; immigration records for that employee, *see* DOJ_HUAWEI_A_0124226769; DOJ_HUAWEI_A_0124226772, email communications, *see* DOJ_HUAWEI_A_0124226770; DOJ_HUAWEI_A_0124226768; and news articles containing admissions related to the attempt to steal Company 3's technology, *see* DOJ_HUAWEI_A_0124226805;                              DOJ_HUAWEI_A_0124226809; DOJ_HUAWEI_A_0124226814; DOJ_HUAWEI_A_0124226819.

In any case, the IP Defendants once again make no particularized showing of actual prejudice.  They point to no specific piece of lost evidence or unavailable witness who would definitively help their defense in a material way.  They claim that photographs of the device at issue "could" help demonstrate "whether" the device was publicly available at the time, and thus not a trade secret.  Br. #2 at 17.  But proof that the device was not a trade secret is not a defense to the conspiracies charged in Counts Two and Three.  *See Hsu*, 155 F.3d at 204.  And the claim itself is pure speculation, as it is just as likely (if not more likely) that photographs of the device would be inculpatory evidence that witnesses could use to identify the device at trial.  *See United States v. Birney*, 686 F.2d 102, 105-06 (2d Cir. 1982) ("[P]roof of prejudice must be definite and

not speculative.").   Moreover, the overall lack of evidence as to certain elements of the conspiracy, if true, would inure to the IP Defendants' obvious benefit.

In short, the IP Defendants do not meet their "heavy burden" of demonstrating actual and substantial prejudice from the passage of time.   For that reason alone, their due process claim should be rejected.

2.    The Government Did Not Delay to Obtain a Tactical Advantage

Even if the IP Defendants were to show actual prejudice—which they cannot—they fail to meet their "heavy burden" of demonstrating that "delay was a course intentionally pursued by the government for an improper purpose."   *United States v. Scala*, 388 F. Supp. 2d 396, 399 (S.D.N.Y. 2005).

First, the IP Defendants offer no actual evidence of bad motive or improper tactics. They hypothesize that, "[g]iven the very public nature of the civil cases and the government's policy to focus on Chinese corporations and Huawei in particular," the government must have been aware of the underlying facts and delayed for some improper reason.   Br. #2 at 19.   But they do not identify what the purportedly improper purpose would be—and there is none.   It is not enough simply to allege significant time between the underlying conduct and the indictment.   *See Hoff v. Kelly*, No. 86-CV-2332, 1987 WL 10183, at *1 (E.D.N.Y. Apr. 13, 1987) (indictment for second degree murder approximately 24 years after killing did not violate Fifth Amendment).   Indeed, the IP Defendants' speculation makes especially little sense given that, typically, delay in prosecution inures to the benefit of the defendant because the passage of time renders it more difficult for the government to sustain its burden of proof.

34

There is simply no basis in fact or reason for the government to have delayed prosecution here as a tactic to obtain some advantage. The complete absence of any evidence of bad faith is fatal to the IP Defendants' argument. *See, e.g., United States v. Hoo*, 825 F.2d 667, 671 (2d Cir. 1987) (rejecting claim of preindictment delay where defendant "has made no showing of an improper prosecutorial motive"); *DeMasi*, 445 F.2d at 255 (rejecting dismissal based on preindictment delay where there was no "proof that the delay was actuated by a deliberate, purposeful or oppressive design on the part of the Government"); *United States v. Silberstein*, No. 02-CR-800 (SWK), 2003 WL 21488024, at *4 (S.D.N.Y. June 27, 2003) (no due process violation where, "[o]ther than citing the length of time between the onset of the defendants' actions and the time of the indictment, defendants put forth no evidence that the Government engaged in any deliberate actions to delay the indictment in this case for its own benefit").

The IP Defendants fall back on the assertion that the government "was reckless toward or consciously disregarded the prejudice to the Defendants' case." Br. #2 at 19. "[T]he Second Circuit has not specifically blessed the 'reckless disregard' standard, but neither has it declined to follow it." *Jordan*, 629 F. Supp. 3d at 54 n.1. The Circuit has held, however, that "inadvertent" delay attributable to the Government is not a sufficient basis to dismiss an indictment. *United States v. Chin*, 108 F.3d 1370, at *2 (2d Cir. 1997) (table); *Lovasco*, 431 U.S. at 787 (little activity but investigation left open for legitimate purposes). Regardless, this Court need not resolve this question, because the IP Defendants again offer no evidence of "reckless" conduct by the government, other than the bare passage of time. That is not sufficient. *See Hoff*, 1987 WL 10183, at *1; *Silberstein*, 2003 WL 21488024, at *4.

35

For the reasons set forth above, the IP Defendants have not established improper preindictment delay, and their claims should be denied on that basis. Nevertheless—although not the government's burden to prove—the government below outlines some significant reasons why Counts Two and Three were not returned until 2020.

To start with, this case is the product of a massive international investigation. The government interviewed scores of witnesses around the world, collected millions of documents, and secured evidence located overseas. As alleged, Counts Two and Three together encompass conduct related to at least six different victims and six different trade secrets. And the subjects under investigation included large corporations headquartered abroad. Although some of the trade secret allegations had previously been the subject of civil litigation, much of the evidence from the civil actions was under seal and/or subject to protective orders. The government thus had to work with victims and courts to unseal and obtain relevant evidence.

The Supreme Court has been clear that "investigative delay" is "fundamentally unlike delay undertaken by the Government solely to gain tactical advantage over the accused." *Lovasco*, 431 U.S. at 783, 795. "Rather than deviating from elementary standards of 'fair play and decency,' a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt." *Id.* at 795. Here, given the sheer scale of this case, it is unsurprising that the investigation would be lengthy. Any investigative delay is also partly the responsibility of the IP Defendants themselves, given their significant acts of obstruction. *See* S-3 Ind. ¶¶ 14-17 (detailing obstructive conduct, including instructing employees to conceal information from law enforcement, shifting blame to "purportedly rogue" low-level employees, providing false information in the civil cases,

and making "material misrepresentations as to the misappropriation and subsequent commercial use of intellectual property").

Even after relevant evidence was gathered, deliberations about whether and how to charge this case took significant time and involved high-level review within the Department of Justice. "The decision to file criminal charges, with the awesome consequences it entails, requires consideration of a wide range of factors in addition to the strength of the Government's case, in order to determine whether prosecution would be in the public interest. Prosecutors often need more information than proof of a suspect's guilt, therefore, before deciding whether to seek an indictment." *Lovasco*, 431 U.S. at 794. One key factor in the deliberations here was not simply that the IP Defendants had engaged in illegal conduct, but that the conduct had continued for years, in some cases decades. The IP Defendants thus have it precisely backwards. The delay in bringing charges for conduct related to Company 1, Company 2, and Company 3 reflects not some improper tactic, but instead careful consideration of the full scope of wrongful conduct and the fact that, for years, the conduct continued unabated.

That certain of the defendants are corporate entities introduced only additional deliberations. By Department of Justice Policy, certain factors must be considered before charging a corporation, above and beyond the traditional factors considered when charging an individual. *See* Justice Manual 9-28.000 - Principles of Federal Prosecution of Business Organizations (requiring consideration of factors including the "pervasiveness of wrongdoing within the corporation," the "the corporation's history of misconduct," "the corporation's willingness to cooperate," "the adequacy and effectiveness of the corporation's compliance program at the time of the offense," "collateral consequences," and "the adequacy of remedies such as civil or

37

regulatory enforcement actions").[4]    When coupled with the complex nature of the worldwide investigation and the government's careful consideration of the continuing underlying conduct, there is ample proper justification for the timing of indicting Counts Two and Three.    As such, this is an additional basis on which to reject the IP Defendants' due process claims.

        3.      <u>No Hearing or Discovery Regarding Preindictment Delay is Appropriate</u>

Finally, the IP Defendants request that, in the alternative, the Court order a hearing and discovery into "the reasons the government delayed bringing the allegations."    Br. #2 at 20 n.5.    Though the Court has the discretion to order a hearing on this issue, courts routinely deny such requests where, as here, there is no factual basis for the motion.    *See*, *e.g.*, *Jordan*, 629 F. Supp. 3d at 56 ("Defendants likewise fail to meet their burden to establish recklessness or intentionality, and a hearing on the issue is unwarranted."); *Hoff*, 1987 WL 10183, at *2 ("[The defendant] cannot show unjustifiable government conduct; as such, no hearing is required to dispose of the preindictment delay issue."); *United States v. Louie*, 625 F. Supp. 1327, 1342 (S.D.N.Y. 1985) ("Given the absence of any factual basis for the motion, no hearing need be conducted on this issue.").    Because there is no factual basis for the claim of improper tactics, any discovery or hearing on this issue would amount to an improper fishing expedition and a waste of judicial resources.    The request should therefore be rejected.

In sum, the IP Defendants have not shown prejudice or ill intent beyond thin, conclusory allegations.    Their motions to dismiss Counts Two and Three for preindictment delay should be denied without a hearing.

---

[4]      Available    at    https://www.justice.gov/jm/jm-9-28000-principles-federal-prosecution-business-organizations (accessed January 6, 2025).

IV.    The Financial Fraud Charges Are Sound

Counts Four through Nine charge Huawei Tech (and, for certain counts, Skycom) with bank fraud, bank fraud conspiracy, wire fraud, and wire fraud conspiracy, all related to schemes to defraud U.S. financial institutions out of funds in the form of dollar-clearing and other financial services.   First, despite these counts centering on a traditional form of property—that is, money held in bank accounts—Huawei Tech claims that the Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), renders the charges defective.   According to Huawei Tech, because the alleged frauds involved providing financial institutions with false and misleading information to induce them to grant continued access to banking services, these counts violate *Ciminelli*'s admonition that the "right to control valuable economic information necessary to make discretionary economic decisions" is not a proper object of a bank or wire fraud prosecution.   *Id.* at 306.   But Huawei Tech confuses the *means* used to effectuate the fraud with the *object* of the fraud itself.   Huawei Tech's materially false statements and omissions are how it defrauded the Victim Financial Institutions, while the funds provided as part of U.S. dollar-clearing and other financial services were the object of that fraud.    That object is a traditional form of money or property, and Counts Four through Nine are thus consistent with both *Ciminelli* and the cases applying it.   As such, this claim should be rejected.

Second, Huawei Tech claims that the evidence supporting its crimes will show that its otherwise criminal behavior was all extraterritorial.   This defense, like much that the defendants raise, is premature and should be evaluated in light of the evidence adduced at trial.

A. Relevant Allegations

The Indictment charges Huawei Tech with bank fraud conspiracies in Counts Four and Five, wire fraud conspiracy in Count Six, bank fraud in Counts Seven and Eight, and wire fraud in Count Nine. S-3 Ind. ¶¶ 99-110. Broadly speaking, these charges pertain to two criminal schemes, both of which were designed to obtain the financial institutions' funds in the form of dollar-clearing transactions.

The first scheme relates to Huawei Tech's operation of Skycom as "an unofficial subsidiary to obtain otherwise prohibited U.S.-origin goods, technology and services, including banking services, for HUAWEI's Iran-based business while concealing the link to HUAWEI." *Id*. ¶ 70. As alleged:

> Since in or about July 2007, HUAWEI repeatedly misrepresented to . . . various victim financial institutions . . . that, although HUAWEI conducted business in Iran, it did so in a manner that did not violate applicable U.S. law, including the [Iranian Transactions and Sanctions Regulations ("ITSR")]. In reality, HUAWEI conducted its business in Iran in a manner that violated applicable U.S. law, which includes the ITSR. Had the Victim Institutions known about HUAWEI's repeated violations of the ITSR, they would have reevaluated their banking relationships with HUAWEI, including their provision of U.S.-dollar . . . clearing services to HUAWEI.
>
> Additionally, HUAWEI repeatedly misrepresented to Financial Institution 1 that HUAWEI would not use Financial Institution 1 and its affiliates to process any transactions regarding HUAWEI's Iran-based business. In reality, HUAWEI used U.S. Subsidiary 1 and other financial institutions operating in the United States to process U.S.-dollar clearing transactions involving millions of dollars in furtherance of HUAWEI's Iran-based business. Some of these transactions passed through the Eastern District of New York.

*Id*. ¶¶ 71-72.

40

The second scheme relates to Financial Institution 1's decision to terminate its banking relationship with Huawei Tech, after which Huawei Tech took steps to secure and expand its banking relationships with other financial institutions, including Financial Institution 4.   As alleged:

> In doing so, HUAWEI employees made material misrepresentations to U.S. Subsidiary 4, among other financial institutions, regarding the reason for the termination of its relationship with Financial Institution 1 and the party responsible for the termination, claiming that HUAWEI, not Financial Institution 1, had initiated the termination. . . . HUAWEI's misrepresentation that it had decided to terminate its relationship with Financial Institution 1 was communicated to various components of U.S. Subsidiary 4, including in the Eastern District of New York.
>
> Based in part on these false representations and omissions made by the defendant[] HUAWEI . . . U.S. Subsidiary 4 undertook to expand its banking relationship with HUAWEI and its subsidiaries and affiliates, and continued to maintain its existing banking relationship with HUAWEI globally, including in the United States. Had the defendants told U.S. Subsidiary 4 the truth about Financial Institution 1's decision to terminate its relationship with HUAWEI, U.S. Subsidiary 4 would have reevaluated its relationship with HUAWEI and its subsidiaries and affiliates.

*Id*. ¶¶ 84-85.[5]

The Indictment specifies that, among the banking services offered to Huawei Tech by the Victim Financial Institutions was U.S.-dollar clearing through the institutions' U.S.-based affiliates and other financial institutions located in the United States.   *Id*. ¶¶ 64-67.

---

[5]     The Indictment also alleges that Huawei Tech representatives and employees made false representations to some of the Victim Financial Institutions about the company's involvement in projects in North Korea.   S-3 Ind. ¶¶ 80-82.

41

Indeed, each of the bank fraud charges alleges that Huawei Tech sought to defraud entities described in the Indictment as the "Victim Financial Institutions" of "moneys, funds, credits, and other property owned by and under the[ir] custody and control." *Id.* ¶¶ 100, 102, 106, 108. Similarly, each of the wire fraud charges alleges that Huawei Tech sought to defraud the Victim Financial Institutions of "money and property." *Id.* ¶¶ 104, 110.

Nowhere in the Indictment does the phrase "right to control" appear.

### B. *Ciminelli* Does Not Bar Counts Four Through Nine

In *Ciminelli*, the defendant was charged with wire fraud after participating in a scheme to rig the bidding process for government contracts relating to development work around Buffalo, New York. At trial, the government relied "solely" on a "right to control" theory of wire fraud, arguing that, by rigging the bidding process, the defendant had deprived the government of "potentially valuable economic information." 598 U.S. at 311; *see, e.g.*, *United States v. Ciminelli et al.*, No. 16-CR-776 (S.D.N.Y.), ECF No. 321 at ¶ 39 (second superseding indictment alleging that defendants "devised a scheme to defraud [the victim] of its right to control its assets, and thereby exposed [the victim] to risk of economic harm"). In overturning the defendant's conviction, the Court held that "information, without more" does not fall within the mail and wire fraud statutes' definition of "property" and therefore cannot be the object of a mail or wire fraud scheme. 598 U.S. at 316. Notably, Justice Alito suggested that the government could have properly charged wire fraud by alleging that the object of the defendant's fraud was the contract he received as a result of the collusive scheme. *See id.* at 317-18 (Alito, J., concurring) (noting that nothing in the Court's opinion would prevent the government from retrying defendant on the theory that he deprived the victim of "valuable contracts").

Following *Ciminelli*, lower courts considering motions to dismiss indictments have routinely rejected attempts to recast allegations about money and/or property as "right to control" cases. *See, e.g.*, *United States v. Griffin*, 76 F.4th 724, 738 & n.16 (7th Cir. 2023) (rejecting *Ciminelli* challenge where indictment alleged that the Small Business Administration "incurred losses" that it would not have incurred but for defendants' misrepresentations, because indictment properly alleged a scheme to obtain money and property); *United States v. Runner*, No. 18-CR-0578 (JS), 2023 WL 3727532, at *2 (E.D.N.Y. May 30, 2023) (finding *Ciminelli* inapposite to indictment alleging that the defendant "intended to and tangibly harmed victims by causing money and personal property to be sent" to defendant); *United States v. Motovich*, No. 21-CR-497 (WFK), 2024 WL 2943960, at *6 (E.D.N.Y. June 11, 2024) ("The Indictment does not allege a right-to-control theory, instead alleging the object of Defendants' bank fraud offenses was bank property, *i.e.*, funds in the Shell Company Bank Accounts.").

Despite Huawei Tech's claim to the contrary, the object of the financial fraud schemes charged in Counts Four through Nine was money or property under the Victim Financial Institutions' control.

The first clause of the bank fraud statute, 18 U.S.C. § 1344(1), criminalizes the execution of "a scheme or artifice to defraud a financial institution," whereas the second clause of the statute, 18 U.S.C. § 1344(2), criminalizes a "scheme or artifice" "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." Similarly, the wire fraud statute criminalizes the "obtaining of money or property by means of false or fraudulent pretense." 18 U.S.C. § 1343.

43

As construed by the Supreme Court, "a scheme or artifice to defraud" means a scheme to "deceive [a] bank and deprive it of something of value," *Shaw v. United States*, 580 U.S. 63, 72 (2016), through "a misrepresentation or concealment of material fact," *Neder v. United States*, 527 U.S. 1, 3 (1999). In a bank fraud case, the government must prove that a defendant acted with "knowledge that [the scheme] would likely harm the bank's property interest." *Shaw*, 580 U.S. at 64 (emphasis omitted).

In *Shaw*, the Supreme Court outlined the contours of a financial institution's property rights in a bank account for the purposes of the bank fraud statute. "When a customer deposits funds, the bank ordinarily becomes the owner of the funds and consequently has the right to use the funds as a source of loans that help the bank earn profits (though the customer retains the right, for example, to withdraw funds)." *Id*. at 66. Moreover, even where a "contract between the customer and the bank provides that the customer retains ownership of the funds and the bank merely assumes possession," the bank has "a property right" "as bailee . . . [to] assert the right to possess the deposited funds against all the world but for the bailor (or, say, the bailor's authorized agent)." *Id*. Accordingly, even if a victim bank does not suffer "ultimate financial loss," the government can prove bank fraud by showing that the scheme to defraud induced the bank to provide funds in its possession—in other words, to harm its property rights. *Id.* at 67; *see also id.* at 67-68 (noting the bank fraud statute is "analogous" to the mail fraud statute, which the Supreme Court has interpreted as only requiring a showing "that the victim (here, the bank) be 'deprived of its right' to use of the property, even if it ultimately did not suffer unreimbursed loss") (citing *Carpenter v. United States*, 484 U.S. 19, 26-27 (1987)).

44

District courts have repeatedly reaffirmed *Shaw*'s holding post-*Ciminelli*. For example, the U.S. Attorney's Office for the Southern District of New York recently charged that a defendant had, among other criminal schemes, "conspired to induce a bank to open an account, which was used to receive [the defendant's cryptocurrency company's] customer deposits and from which the defendant and his co-conspirators 'regularly took money' from the bank's custody." *United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023). The indictment detailed a scheme whereby the defendant resorted to opening bank accounts for his cryptocurrency business through false pretenses, after a particular bank refused to open an account for customer deposits and withdrawals for that cryptocurrency business. *United States v. Bankman Fried*, No. 22-CR-0673 (LAK) (S.D.N.Y.), ECF No. 115 at ¶¶ 14-21. Citing *Shaw*, Judge Kaplan rejected the defendant's pretrial motion to dismiss the bank fraud conspiracy charge under *Ciminelli*, finding that "the indictment plainly alleges a scheme to obtain 'money or property,' not a scheme to deprive a bank of 'valuable economic information.'" *Id.*

Similarly, in *Motovich*, Judge Kuntz held that allegations of materially false statements to induce banks to open deposit accounts and approve transactions "sufficiently alleges bank property was the object of Defendants' misrepresentations to the banks." 2024 WL 2943960, at *4; *see also United States v. Mansouri*, No. 22-CR-34 (LJV), 2023 WL 8430239, at *1, *3 (W.D.N.Y. Dec. 5, 2023) (denying pretrial motion to dismiss indictment alleging that defendant submitted multiple applications for loans under the Paycheck Protection Program and Economic Injury Disaster Loan program that included "materially false and fraudulent information, pretenses, representations, and promises supported by false and fictitious documents" by defendant and his employees, because "unlike the *Ciminelli* indictment, the indictment [in *Mansouri*] sa[id] nothing

about depriving the lenders or the [Small Business Association] of their 'right to control' property" and instead alleged a scheme "whose object was money itself"); *United States v. Pierre*, Nos. 22-CR-19, 22-CR-20, 2023 WL 4493511, at *15 (S.D.N.Y. July 12, 2023) (concluding that *Ciminelli* did not apply because defendants had allegedly conspired to commit healthcare fraud where they "fraudulently obtain[ed] the contracts themselves, rather than depriving the victim of valuable economic information for deciding to whom the contracts would be awarded").

Finally, in *United States v. An*, Judge Matsumoto denied the defendants' motion to dismiss a money laundering charge premised on bank fraud, where the defendants used deceptive tactics to frustrate U.S. banks' anti-money laundering controls to "enjoy continued access" to funds in U.S.-based accounts. 733 F. Supp. 3d 77, 86, 89-90 (E.D.N.Y. 2024). As the indictment "frame[d] the harm to the banks as the [defendants'] deprivation of deposited funds in accounts held by the victim banks," Judge Matsumoto held that a bank fraud scheme was sufficiently pled. *Id*. at 91-92, 95. Contrasting the prosecution in *Ciminelli*, where "[t]he government . . . relied *entirely* on an informational harm theory and did not attempt to convict the defendant for defrauding the state out of 'a traditional form of property, viz., valuable contracts,'" *Ciminelli*, 598 U.S. at 317-18 (Alito, J., concurring), Judge Matsumoto found that "a 'plan to deprive a bank of money in a customer's deposit account' similarly implicates a property interest," *An*, 733 F. Supp. 3d at 92.

Here, Huawei Tech and its coconspirators perpetrated a scheme to defraud multiple financial institutions to obtain continued access to "banking relationships . . . including their provision of U.S.-dollar . . . clearing services to HUAWEI." S-3 Ind. ¶ 71. In seeking continued access to U.S.-dollar clearing and other financial services, Huawei Tech and its coconspirators engaged in a scheme to access funds under the control of the Victim Financial Institutions—a

traditional property right recognized under *Shaw* and its progeny. *See United States v. Aronov*, No. 19-CR-408 (MKB), 2024 WL 554577, at *3-4 (E.D.N.Y. Feb. 12, 2024) (denying pretrial motion to dismiss where "Indictment does not allege a right-to-control theory of wire fraud," but rather a scheme "to defraud others of money and real property based on false or fraudulent pretenses").

Further, the Indictment charges in each of the financial fraud counts that Huawei Tech sought "money" in the possession of the Victim Financial Institutions. Nothing more is required at this juncture. *See United States v. Kwok*, No. 23-CR-118 (AT), 2024 WL 1407057, at *6 (S.D.N.Y. Apr. 2, 2024) ("At the motion-to-dismiss stage . . . [defendant] does not cite any caselaw suggesting a heightened pleading requirement that would require the wire fraud counts to do more than track the language of § 1343 and set forth 'approximate details' of the alleged schemes."); *see also United States v. Schwartz*, No. 22-CR-635, 2024 WL 3226575, at *4 (N.D. Ill. June 28, 2024) (denying pretrial motion to dismiss pursuant to *Ciminelli*, where "the Indictment tracks the statutory language of Section 1343, which is generally sufficient for pleading purposes").

Huawei Tech argues for a different result only by mischaracterizing the plain language of the charging instrument. The phrase "right to control" does not appear anywhere in the Indictment. Nor is any right-to-control theory implicated by the allegation that Huawei Tech made false representations to the Victim Financial Institutions. Defs.' Mem. No. 3 ("Br. #3") at 7, ECF No. 474-3. Every fraud case involves false representations, statements, or pretenses (or, at least, material omissions). That is the *means* by which a fraudster engages in a scheme to defraud. It is not the *object* of the fraud, which here is the money at the center of the dollar-clearing and other financial transactions. *See Runner*, 2023 WL 3727532, at *2 ("Defendant cannot

47

use *Ciminelli* as a shield to prevent the Government from introducing the misrepresentations or omissions underlying the alleged scheme to defraud under the guise of construing those same deceptions as exclusively relevant to a victim's property interest to 'mere information' to render them unactionable.").

Notably, Huawei Tech fails to discuss the Indictment's allegation that U.S. dollar-clearing was among the banking services at issue, much less cite any case law in which a district court has dismissed pretrial a financial fraud charge on the basis of sufficiency of the allegations concerning the relevant property interest.

In short, Huawei Tech's arguments under *Ciminelli* are deficient because money is the object of each of the wire and bank fraud charges in Counts 4 through 9, as expressly alleged in the Indictment.   Accordingly, the Court should deny Huawei Tech's motion.

C.  Counts Four, Six, Seven, and Nine Allege Domestic Applications of the Bank and Wire Fraud Statutes

Huawei Tech contends that Counts Four, Six, Seven, and Nine—the charges relating to the Skycom fraud—should also be dismissed as improper extraterritorial applications of the bank and wire fraud statutes.   Once again, this argument depends on the evidence to be presented at trial and thus is premature.

As with the RICO Defendants' argument about the purportedly extraterritorial application of Count One, Huawei Tech improperly seeks dismissal before a single piece of evidence has been introduced.   Because the Indictment tracks the language of the relevant criminal statutes, and because there has been no full proffer of the government's trial proof, the Indictment is sufficient, and the relevant counts should proceed to trial.

48

Specifically, consistent with the requirements repeatedly endorsed by the Second Circuit, Counts Four, Six, Seven, and Nine track the language of the bank and wire fraud statutes and provide the approximate time and place of the charged crime.

In relevant part, Section 1343 provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice [has committed a crime].

In turn, Section 1344 provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> [has committed a crime].

Section 1349 criminalizes any conspiracy to violate the bank or wire fraud statutes.

The Indictment closely tracks the language of Sections 1343 and 1344. For example, Count Four alleges a bank fraud conspiracy:

> In or about and between November 2007 and May 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants . . . did knowingly and intentionally conspire to execute a scheme and artifice to defraud U.S. Subsidiary 1, a financial institution, and to obtain moneys, funds, credits and other property owned by and under the custody and control of said financial institution, by means of one or more

49

materially false and fraudulent pretenses, representations and promises, contrary to Title 18, United States Code, Section 1344.

S-3 Ind. ¶ 100.   The other bank fraud charge (Count Seven) includes substantially similar language tracking the text of the bank fraud statute.

> Likewise, Count Six alleges a wire fraud conspiracy:

> In or about and between November 2007 and May 2015, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants . . . did knowingly and intentionally conspire to devise a scheme and artifice to defraud the Victim Institutions, and to obtain money and property from the Victim Institutions, by means of one or more materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, to transmit and cause to be transmitted by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, contrary to Title 18, United States Code, Section 1343.

*Id.* ¶ 104.   The other wire fraud charge (Count Nine) includes substantially similar language again tracking the text of the wire fraud statute.

Sections 1343, 1344, and 1349 make no explicit reference to domestic or territorial application, and thus there is no need to do so in the charging instrument (though the Indictment does allege that the crimes occurred in the Eastern District of New York and elsewhere).   Because Counts Four, Six, Seven, and Nine satisfy the Second Circuit's requirement that an indictment "track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime," *Alfonso*, 143 F.3d at 776, they adequately state offenses.   Huawei Tech's assertion that the government's proof will not meet the case law's requirement of a domestic application may be the basis for a jury argument or a motion pursuant to Rule 29, but it provides no vehicle for pretrial dismissal of the Indictment.

Were the Court to assess the merits at this stage—which again would be procedurally improper—it should hold that Counts Four, Six, Seven, and Nine state proper domestic applications of the bank and wire fraud statutes.

As noted, the government has not provided, and does not here provide, a full proffer of its trial evidence in this case.[6]   Nonetheless, even if the Court were to prematurely review the substance of the government's allegations, the government expects to demonstrate at trial that there is "conduct relevant to the statute[s'] focus occurr[ing] in the United States."   *RJR Nabisco*, 579 U.S. at 337.

Indeed, as alleged in the Indictment, a primary focus of the financial fraud scheme was allegedly targeted at the United States, occurred on U.S. soil, and had significant effects in the United States.   At the heart of the fraudulent scheme was the continuing use of U.S.-dollar clearing services through U.S. banks, which allowed Huawei Tech to process funds relating to its Iran-based business outside of Iran.   S-3 Ind. ¶ 72.   Among the actions taken in furtherance of this scheme that impacted and occurred in the United States were Huawei Tech's statements, deliberately transmitted into and through the United States, both through the press and from Huawei's own website, regarding Huawei Tech's compliance with the U.S. sanctions regime, *id.* ¶¶ 73-74; false statements made by Huawei Tech representatives and employees to the Victim Financial

---

[6]     Huawei Tech contends that the government proffered certain facts about the wires charged in Counts 6 and 9 in its response to the defendants' motion for a bill of particulars.   Br. #3 at 16-17.   However, as the government explained in that very response under the heading "The Defendants Are Not Entitled to Particulars Regarding Wires," "the defendants' requests for additional information serve only to limit the government's proof, which is not an appropriate use for a motion for a bill of particulars."   ECF No. 209 at 17-18.   Indeed, the portion of the opposition brief cited by Huawei Tech consists solely of references to the Indictment.   *Id.* at 17.

Institutions regarding Huawei Tech's compliance with U.S. sanctions, which were transmitted into the United States, *id.* ¶ 75; the domestic wires themselves that allowed Huawei Tech to process millions of dollars in Iran-related business activity, *id.* ¶¶ 75, 113; the false testimony in 2012 of a Huawei Tech principal before the U.S. Congress about Huawei Tech's compliance with U.S. sanctions, *id.* ¶ 113; and a 2012 meeting between the Huawei Tech Treasurer and a principal of U.S. Subsidiary 4 in which the Treasurer claimed that Huawei Tech and its global affiliates did not violate any applicable U.S. law, *id.*

Huawei Tech's arguments to the contrary lack merit. For example, Huawei Tech misleadingly asserts that its statements at issue were to the "foreign press" and "retransmitted by *others* to the United States." Br. #3 at 14. While *Reuters* is a news organization with foreign headquarters, it maintains a substantial presence and readership in the United States, and the articles referenced in the Indictment concerned possible violations of U.S. sanctions. It defies logic to contend that the misrepresentations Huawei Tech targeted towards U.S. lawmakers and the U.S. audience about violations of U.S. law are an "otherwise foreign scheme." *Id.* Huawei Tech papers over the allegation in the Indictment that it made a false representation through a press release on its website in response to claims from a domestic newspaper—The Wall Street Journal— about Huawei's spying activities in Iran, brushing off allegations that Huawei Tech "issued statements denying certain claims in newspaper articles" without acknowledging that the audience for those denials is likely shaped by the U.S. newspaper's distribution. Br. #3 at 13 (citing S-3 Ind. ¶ 73).

Similarly lacking force are Huawei Tech's claims that the domestic wires of Skycom funds were "facially incidental to the alleged scheme," where "foreign dollar clearinghouses" are

ubiquitous.   Br. #3 at 15.   The defense ignores the fact that the currency at issue—the U.S. dollar—is the national currency of the United States, and that it would have been reasonably foreseeable to Huawei Tech that some of the U.S.-dollar clearing transactions would occur in the United States.   The defendants likewise ignore the allegations of Huawei Tech's substantial actions to conceal the true nature of its relationship with Skycom—an effort that evinces knowledge of transactions taking place in the United States in violation of sanctions on Iran.   In short, Huawei Tech's claim that the misrepresentations transmitted into the United States were "incidental" to the scheme, Br. #3 at 16, is conclusory, and cannot provide a basis to dismiss properly pled charges before any witness has testified and any evidence has been introduced.   *See Bascunan v. Elsaca*, 927 F.3d 108, 122 (2d Cir. 2019).

In sum, there are sufficient allegations in the Indictment to establish that the Skycom-related fraud scheme is properly pled as a domestic scheme—even if the Court were to reach the issue at this time, which, as noted, would be premature.   *See   RJR Nabisco*, 579 U.S. at 337.

D.   The Skycom-Related Fraud Charges Properly Serve as Domestic Predicate Acts for the RICO Conspiracy in Count One

As demonstrated above, Huawei Tech's extraterritoriality argument is premature and lacks merit, and the Court should find that Counts Four, Six, Seven, and Nine of the Indictment properly allege violations of the bank and wire fraud statutes.   Accordingly, there is no reason to exclude this conduct as the basis for predicate acts for the RICO conspiracy charged in Count One, on the purported basis that the "predicates alleged . . . themselves [do not] apply extraterritorially." *RJR Nabisco*, 579 U.S. at 339.

53

V.    The Sanctions and Related Money-Laundering Charges Are Sound

In Counts Eleven and Twelve, Huawei Tech (and Skycom) is charged with conspiring to violate and violating IEEPA by, in essence, agreeing to cause and causing United States subsidiaries of victim banks to provide dollar-clearing services to Iran without the required licenses.  S-3 Ind. ¶¶ 114-20.  In Count Fifteen, Huawei Tech (and Skycom) is charged with promotional money laundering conspiracy in connection with the same misconduct.  *Id.* ¶¶ 125-26.  Huawei Tech argues that these counts must be dismissed because they purportedly (1) fail to state an IEEPA offense, by which Huawei Tech appears to mean they lack a sufficient nexus with Iran, *see* Defs. Mem. No. 4 ("Br. #4") at 4-5, ECF No. 474-4; and, alternatively, (2) violate Due Process, because Huawei Tech allegedly lacked fair notice that the charged conduct was criminal, *see* Br. #4 at 5-10.  Huawei Tech's arguments misconstrue or ignore critical allegations in the Indictment, and improperly preview trial and post-trial arguments about *mens rea*, the sufficiency of the evidence, and supposed as-applied unconstitutional vagueness.  They also preserve arguments that Huawei Tech acknowledges are currently foreclosed by binding precedent.  What Huawei Tech does not do is identify any legal infirmity with the charging instrument.  Its arguments should therefore be rejected.

A.    The Indictment Alleges a Sufficient Nexus to Iran to State an IEEPA Offense

Huawei Tech acknowledges that "[t]he Indictment tracks [the Iranian Transactions and Sanctions Regulations promulgated under IEEPA], which prohibit[] . . . the 'provision, directly or indirectly, to Iran or the Government of Iran of . . . banking services,'" Br. #4 at 4 (quoting 31 C.F.R. § 560.427(a)).  Huawei Tech also recognizes that the Indictment charges Huawei Tech with conspiring to violate and violating this provision by causing victim banks in the United States to

54

conduct dollar-clearing services for Huawei Tech's business (through Skycom) in Iran.  *Id.* at 2-3. No more is necessary for an indictment to survive a pretrial motion to dismiss.  *See*, *e.g.*, *Stavroulakis*, 952 F.2d at 693.  The government is not limited in its proof at trial to allegations in the Indictment, and Huawei Tech's assertions that its conduct does not violate the statute can be tested at trial and litigated under Rule 29.

Nevertheless, Huawei Tech argues that these charges should be dismissed now, because the transactions at issue occurred between non-Iranian banks, and because "[e]ven if the customers on whose behalf" those transactions were conducted (*i.e.*, Huawei Tech and its Iranian subsidiary Skycom) "could be considered indirect recipients" of the banking services, those customers were not Iranian either, because Huawei Tech is a Chinese company and Skycom is a Hong Kong company.  Br. #4 at 4-5.  Even if the Court were to consider the merits of this argument before any evidence has been presented at trial, this argument reflects an implausibly blinkered view of the IEEPA prohibition and ignores critical allegations in the Indictment.

First, and as a threshold point, there is no merit to Huawei Tech's suggestion that perhaps *the banks* are the only actual recipients of the dollar-clearing services performed on Huawei Tech's behalf, and that because the banks involved in the transactions were not Iranian banks, the dollar-clearing transactions through their U.S. subsidiaries cannot have violated IEEPA.  IEEPA's "prohibition on the exportation of services applies where the benefit of such services is received in Iran, if such services are performed in the United States."  *United States v. Homa Int'l Trading Corp.*, 387 F.3d 144, 146 (2d Cir. 2004); *see also United States v. Zarrab*, No. 15-CR-867 (RMB), 2016 WL 6820737, at *7 (S.D.N.Y. Oct. 17, 2016) (rejecting as unpersuasive defense argument on motion to dismiss that "the mere fact that a U.S. bank cleared a payment originating and terminating

at foreign banks without any involvement of [the defendant] . . . does not somehow transform the payment into a 'U.S. export' by [the defendant]").  The Indictment clearly alleges that Huawei Tech used dollar-clearing transactions performed in the United States for the benefit of its business in Iran—and thus that Huawei Tech caused the exportation of U.S. banking services to Iran.  S-3 Ind. ¶ 72 ("HUAWEI used . . . financial institutions operating in the United States to process U.S.-dollar clearing transactions involving millions of dollars in furtherance of HUAWEI's Iran-based business.").  The fact that Huawei Tech caused those transactions through foreign, non-Iranian intermediaries is immaterial.

Next, Huawei Tech argues that "[e]ven if the customers on whose behalf" the banks conducted the transactions count as the beneficiaries of those services (which they clearly do), the customers were not Iranian either, because Huawei Tech is a Chinese company and Skycom is a Hong Kong company.  Br. #4 at 5.  But the Indictment does not allege merely that Skycom was "a Hong Kong company," as Huawei Tech states in its brief.  Rather, the Indictment alleges that Skycom "was a corporation registered in Hong Kong whose primary operations were in Iran," and which "functioned as HUAWEI's Iran-based subsidiary."  S-3 Ind. ¶ 4.  The Indictment further alleges that Huawei Tech transferred ownership of Skycom to a purported third party that was actually controlled by Huawei Tech, in order to facilitate Huawei Tech's lie that Skycom was "one of HUAWEI's local business partners in Iran, as opposed to one of HUAWEI's subsidiaries or affiliates" in that country.  *Id.*  Still more, the Indictment alleges that Huawei Tech "operated SKYCOM as an unofficial subsidiary to obtain otherwise prohibited U.S.-origin goods, technology and services, including banking services, for HUAWEI's Iran-based business while concealing the link to HUAWEI," and did so even while "assist[ing] the Government of Iran by installing

surveillance equipment" in Tehran.  *Id.* ¶ 70.  The Indictment alleges that Huawei Tech lied to the victim banks, including by misrepresenting that it would not use them "to process any transactions regarding HUAWEI's Iran-based business," when in fact Huawei Tech did use them "to process U.S.-dollar clearing transactions involving millions of dollars in furtherance of HUAWEI's Iran-based business."  *Id.* ¶¶ 71-72.

In sum, the relevant portions of the Indictment plainly allege that Huawei Tech schemed to surreptitiously operate a subsidiary in Iran while claiming it was an independent entity to provide deniability.  As alleged, the scheme included doing business with the government of Iran and lying to banks to ensure that this Iran business could access (among other things) dollar-clearing services through the victim banks' U.S. subsidiaries.  To characterize these allegations as concerning merely transactions between a Chinese company and a Hong Kong company strains credulity.  The legal artifice of incorporating its Iranian subsidiary in Hong Kong does not immunize Huawei Tech from compliance with U.S. law when Huawei Tech uses the U.S. banking system to further its business interests in Iran.  To the extent Huawei Tech's arguments are suggestive of factual defenses—*i.e.*, that the particular transactions at issue did not pertain to Huawei Tech's Iran business (notwithstanding the Indictment's allegations about that business and of Skycom's principal purpose as Huawei Tech's Iran subsidiary), or that Huawei Tech lacked knowledge that the dollar-clearing services would be provided through U.S.-based subsidiaries (notwithstanding Huawei Tech's sophistication and the consciousness of guilt reflected in the allegations of persistent deceit)—those fact-based arguments may be presented to a jury or the Court on a sufficiency-of-the-evidence Rule 29 motion.  On a pretrial motion to dismiss, however, such arguments necessarily fail.  The Indictment sufficiently alleges—indeed, it far exceeds the

degree of specificity required to satisfy the pleading standard to charge—that Huawei Tech conspired to violate and violated IEEPA by causing victim banks in the United States to conduct dollar-clearing services for Huawei Tech's business (through Skycom) in Iran. Huawei Tech's arguments to the contrary are meritless and should be rejected.

   B. Huawei Tech's Purported Due Process Arguments Are Premature on a Pretrial Motion to Dismiss

   Huawei Tech argues that it "did not have fair notice" that the conduct alleged in Counts Eleven and Twelve was against the law (and those counts thus violate due process), Br. #4 at 5, because (1) the statute and regulations purportedly fail to make such prohibition reasonably clear, *id.* at 6-7; (2) at relevant times the Office of Foreign Assets Control ("OFAC") offered guidance purportedly suggesting that foreign entities doing business overseas were not subject to IEEPA, *id.* at 7-9; and (3) at relevant times OFAC did not bring (civil) enforcement actions on similar facts, *id.* at 9-10. Huawei Tech's arguments are wrong and premature on a pretrial motion to dismiss.

   Although not couched in precisely these words, Huawei Tech's argument that the IEEPA statute and relevant regulations fail to provide fair notice that the charged conduct was unlawful is an argument that the statute and regulations are unconstitutionally vague as applied to Huawei Tech. *See generally, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (a statute is unconstitutionally vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement"). As such, the argument is premature on a pretrial motion to dismiss. The law is clear that a defendant "must wait to bring an as-applied vagueness challenge until the

facts have been established by evidence introduced at trial and the fact-finder has had an opportunity to weigh in." *United States v. Raniere*, 384 F. Supp. 3d 282, 320 (E.D.N.Y. 2019) (collecting cases). This is because, in order to evaluate whether the law as applied to Huawei Tech provided fair notice, "it must be clear what the defendant did." *Id.* The Court should therefore defer ruling on this argument, because "the resolution of [the defendant's] 'as applied' challenge will require a more expansive factual record to be developed at trial." *United States v. Hoskins*, 73 F. Supp. 3d 154, 166 (D. Conn. 2014).

Even assuming, *arguendo*, that it were procedurally proper to entertain a vagueness challenge now, Huawei Tech's argument would still be meritless. Huawei Tech acknowledges that IEEPA's prohibition of the supply of services from the United States to Iran expressly "includes . . . the 'provision, directly or indirectly, to Iran . . . of banking services.'" Br. #4 at 4 (quoting 31 C.F.R. § 560.427(a)). That is an unmistakable, unambiguous proscription. Causing a bank in the United States to perform services for the benefit of a Huawei Tech subsidiary in Iran—as the Indictment alleges that Huawei Tech did—thus "falls within the core of the statute's prohibition, so that the enforcement before the court was not the result of the unfettered latitude that law enforcement officers and factfinders might have in other, hypothetical applications of the statute." *United States v. Farhane*, 634 F.3d 127, 139-40 (2d Cir. 2011). The statute was not vague in this case, and Huawei Tech's motion therefore must be denied.

To the extent Huawei Tech's arguments about supposedly contrary OFAC guidance or enforcement practice do more than buttress its mistaken and premature vagueness argument, they present factual arguments that serve as a preview of a defense case on *mens rea*. Indeed, Huawei Tech signals as much in a footnote by asserting (inappropriately on a pretrial motion to dismiss)

59

that the government "cannot meet its burden of proof to show that Huawei 'willfully' violated the law," in light of the OFAC guidance.  Br. #4 at 10 n.9.  That is transparently an argument about the weight of evidence that has not been adduced.  The Indictment properly alleges willfulness, and, moreover, includes specific factual allegations about patterns of deception that tend to show willfulness.  The government expects to meet its burden of proof at trial.  If Huawei Tech believes that contemporaneous OFAC guidance will show that it cannot have known that its conduct violated the law—notwithstanding its sophistication and the consciousness of guilt reflected in its persistent obfuscation and misrepresentations, as alleged in the Indictment—that is an argument for the jury, not a pretrial motion.

For all of these reasons, Huawei Tech's arguments for pretrial dismissal of the IEEPA counts (and the related money laundering count) are meritless and should be rejected.

VI.    The Klein Conspiracy Charge Is Sound

Count Ten of the Indictment charges Huawei Tech (and Skycom) with conspiring to defraud the United States by "impairing, obstructing and defeating, through deceitful and dishonest means, the lawful functions and operations of OFAC . . . in the enforcement of economic sanctions laws and regulations," in violation of 18 U.S.C. § 371.  S-3 Ind. ¶¶ 111-13.  Commonly known as a "Klein Conspiracy," *see United States v. Klein*, 247 F.2d 908 (2d Cir. 1957), the Supreme Court and Second Circuit have long recognized a conspiracy to obstruct and impede the lawful operations of the federal government as a valid theory of criminal liability, *see United States v. Nersesian*, 824 F.2d 1294, 1313 (2d Cir. 1987); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924). Despite this deep history, Huawei Tech contends that the Supreme Court has recently cast some doubt over the viability of the doctrine as it has been consistently applied by lower courts over

many decades.   Specifically, Huawei Tech argues that *Ciminelli*—which did not involve Section 371, let alone a *Klein* conspiracy—suggests that a proper understanding of what it means to "defraud" the United States must be limited to efforts to obtain money or property from the United States or to deprive the United States of money or property; and that *Marinello v. United States*, 584 U.S. 1 (2018)—which also does not involve Section 371 or a *Klein* conspiracy—suggests that Section 371 should be construed narrowly to reach only interference with specific pending investigations, to avoid vagueness concerns.

Huawei Tech concedes, as it must, that the Second Circuit has squarely addressed and rejected both of these arguments in *United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012), and *United States v. Atilla*, 966 F.3d 118 (2d Cir. 2020), and indicates that it raises them only to preserve the arguments for further review, Br. #4 at 11 ("Huawei recognizes that the Second Circuit held in *United States v. Coplan* that, under *Klein*, § 371 extends to conspiracies that do not seek to deprive the government of money or property."); *id.* at 13 ("Huawei acknowledges that the Second Circuit has rejected this argument, *see Atilla*, 966 F. 3d at 130-31, but preserves the argument for further review."); *id.* at 14-15 ("Again, although the Second Circuit has previously rejected this argument, *Atilla*, 966 F.3d at 130-31, Huawei preserves it for further review . . . .")).

Even if these arguments were not foreclosed by binding precedent, they misread both *Ciminelli* and the plain language of Section 371.

A.  Binding Precedent Holds that Section 371 Prohibits Conspiracies to Obstruct or Impede the Lawful Operations of the Federal Government

Under Section 371, it is a crime "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any

manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy." 18 U.S.C. § 371. "The Second Circuit has interpreted this statute as having an 'offense' clause—criminalizing conspiracies to 'commit any offense against the United States'— as well as a 'defraud' clause—criminalizing conspiracies to 'defraud the United States.'" *United States v. Rare Breed Triggers*, LLC, 690 F. Supp. 3d 51, 109 (E.D.N.Y. 2023) (quoting *Atilla*, 966 F.3d at 130). The defraud clause, for its part, "not only reaches schemes which deprive the government of money or property," but also "is designed to protect the integrity of the United States and its agencies." *Nersesian*, 824 F.2d at 1313 (citing *United States v. Johnson*, 383 U.S. 169, 172 (1966)). To that end, it encompasses "acts that interfere with or obstruct one of [the United States'] lawful governmental functions by deceit, craft, or trickery, or by means that are dishonest." *Nersesian*, 824 F.2d at 1313 (citing *Hammerschmidt*, 265 U.S. at 188). This interpretation of the defraud clause has been settled law for more than a century. *See, e.g.*, *Haas v. Henkel*, 216 U.S. 462, 479 (1910) (reading defraud clause in predecessor statute as "broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government").

The Second Circuit has also expressly held that conspiracies to obstruct the enforcement of economic sanctions laws properly fall within the defraud clause. In *Atilla*, the defendant was convicted of, among other things, obstructing OFAC's enforcement of economic sanctions. 966 F.3d at 129. On appeal, the defendant advanced the same argument Huawei Tech presses here: that Section 371 incorporates a common law definition of defraud that is limited to schemes to deprive another of property. *Id.* The Second Circuit rejected that argument, holding that a narrow interpretation of Section 371 "is inconsistent with the broad text of the statute," which

62

"does not single out any one agency, nor does it exempt OFAC and sanctions enforcement from its coverage." *Id.* at 130. The Court explained that it was "bound to follow both the law of the Circuit and long-lived Supreme Court decisions that have definitively adopted and reaffirmed the expansive reading of § 371 given by courts." *Id.* at 131; *see also Coplan*, 703 F.3d at 61 ("[I]t is now well established that § 371 'is not confined to fraud as that term has been defined in the common law,' but reaches 'any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government.'") (quoting *Dennis v. United States*, 384 U.S. 855, 861 (1966)). As Huawei Tech concedes, its contention that the defraud clause does not reach OFAC's administration of economic sanctions is contrary to binding precedent and must be rejected.

B. *Ciminelli* Did Not Silently Overrule More Than 100 Years of Precedent Interpreting the Defraud Clause

Notwithstanding the Supreme Court's and Second Circuit's consistent interpretation of Section 371, Huawei Tech contends that *Ciminelli*—which nowhere mentions Section 371— uprooted the settled reading of that statute. It is incorrect.

As explained above, in *Ciminelli*, the Supreme Court considered the "right to control" theory of liability under the federal mail and wire fraud statutes—that is, the theory that it is unlawful to deprive victims of "potentially valuable economic information necessary to make discretionary economic decisions." 598 U.S. at 310. The Court rejected the right to control theory, holding that the mail and wire fraud statutes criminalize only schemes to deprive victims of traditional property interests. *Id.* at 310-11. Nowhere, however, did the Supreme Court suggest that its reasoning would extend to conspiracies to defraud the United States. In fact, the Court did

not mention Section 371 at all.   And while the Court used the phrase "federal fraud statutes," its "discussion was limited to the mail and wire fraud statutes," as lower courts have since recognized. *United States v. Chang*, No. 18-CR-00681 (NGG), 2024 WL 2817494, at *5 (E.D.N.Y. May 31, 2024) (holding that *Ciminelli* did not impact the federal securities fraud statutes).

Indeed, at least one decision in this District has squarely rejected the argument that *Ciminelli* overruled the *Klein* doctrine *sub silentio*.   In *Rare Breed Triggers*, Judge Morrison held that, notwithstanding *Ciminelli*, she was bound to follow the Second Circuit's "controlling interpretation of § 371" that the statute encompassed schemes to impede the functioning of federal agencies.   690 F. Supp. 3d at 110 n.44.   As Judge Morrison explained, "[w]hereas other anti-fraud statutes, such as those prohibiting mail and wire fraud, define 'frauds' only as acts which deprive victims of money or property, it is well established that the term 'defraud' as used in section 371 is interpreted much more broadly."   *Id.* at 109-10.

The text of Section 371 makes this plain.   Though the mail and wire fraud statutes at issue in *Ciminelli* expressly target schemes to obtain "money or property," 18 U.S.C. §§ 1341, 1343, Section 371 includes no similar limitation.   Rather, it prohibits fraud against the United States and its agencies "in any manner or for any purpose."   18 U.S.C. § 371.   This broad language underscores why *Ciminelli*'s focus on traditional property interests cannot be extended to Section 371's defraud clause—even apart from the century of binding precedent.   Indeed, *Ciminelli* specifically and repeatedly cited the "'money or property' requirement" of the wire fraud statute as the basis for its limitation on "the 'scheme or artifice to defraud' element," *e.g.*, 598 U.S. at 312, and nowhere stated that such a requirement was inherent to all fraud schemes.   As such, *Ciminelli*

only limits the reach of Sections 1341 and 1343, and does not extend to broader statutes like Section 371.

Huawei Tech's attempt to shoehorn Section 371 into *Ciminelli*'s analysis is particularly inapt when considering the victim protected by Section 371.  The statute's defraud clause concerns frauds on the government itself, a singular victim with unique interests and responsibilities that extend beyond "money or property."   It is unsurprising that, while the mail and wire fraud statutes address traditional harms against private persons that sound in property, Section 371 would address a wider range of deceitful conduct given the special position of the federal government.  *See McNally v. United States*, 483 U.S. 350, 358 n.8 (1987) ("[A] statute which . . . has for its object the protection of the individual property rights of the members of the civic body, is one thing; a statute which has for its object the protection and welfare of the government alone, which exists for the purpose of administering itself in the interests of the public, [is] quite another.") (quoting *Curley v. United States*, 130 F. 1, 7 (1st Cir. 1904) (alterations in original)).  This is a salient distinction from the traditional private commercial victims in the context of Sections 1341 and 1343, whose interests could frequently be protected by "traditionally state" actions.  *Ciminelli*, 598 U.S. at 316.

Nor must the defraud clause be limited to deprivations of property to avoid unconstitutional vagueness, as Huawei Tech suggests.  Br. #4 at 12-13.  "[C]ourts have repeatedly rejected vagueness challenges to § 371 as applied to conspiracies, like this one, to impair lawful government functions."  *United States v. Concord Mgmt. & Consulting LLC*, 347 F. Supp. 3d 38, 59 (D.D.C. 2018) (collecting cases).  Given the long history of the defraud clause and the cases expressly applying it to sanctions evasion, *see Atilla*, 966 F.3d 129, Huawei Tech had ample

65

notice that its conduct was criminal.    And contrary to Huawei Tech's assertion, the defraud clause does not outlaw benign acts.    Br. #4 at 13-14.    Instead, the statute contains a scienter requirement—requiring an intent to join a conspiracy to obstruct the government's lawful functions—which "alleviates vagueness concerns, narrows the scope of [the statute's] prohibition, and limits prosecutorial discretion."    *McFadden v. United States*, 576 U.S. 186, 197 (2015). Likewise, the requirement that the defendants employ some "deceit, craft or trickery, or . . . means that are dishonest," *Hammerschmidt*, 265 U.S. at 188, "ensures that only culpable conduct is covered by § 371," *Concord Mgmt.*, 347 F. Supp. 3d at 60.

There is no dispute that Huawei Tech's arguments to dismiss Count Ten are foreclosed by binding Second Circuit precedent.    And they are meritless in any event.    They should be rejected.

66

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully submits that the defendants'

motions to dismiss should be denied in their entirety.

Dated:      Brooklyn, New York
              January 27, 2025

          JOHN J. DURHAM
          United States Attorney
          Eastern District of New York

By:      /s/
          Alexander A. Solomon
          Meredith A. Arfa
          Robert M. Pollack
          Matthew Skurnik
          Assistant U.S. Attorneys
          (718) 254-7000

          MARGARET A. MOESER
          Chief
          Money Laundering and Asset Recovery Section
          Criminal Division, U.S. Department of Justice

By:      /s/
          Taylor Stout
          Jasmin Salehi Fashami
          Morgan Cohen
          Trial Attorneys

          JENNIFER KENNEDY GELLIE
          Chief
          Counterintelligence and Export Control Section
          National Security Division, U.S. Department of Justice

By:      /s/
          Christian Nauvel
          Monica Svetoslavov
          Ahmed Almudallal
          Trial Attorneys