UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    - v. –

HUAWEI TECHNOLOGIES CO., LTD,
*et al.*,

                Defendants.

18 CR 457 (S-3) (AMD) (CLP)

**ORAL ARGUMENT REQUESTED**

**<u>DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ......................................................................................................... 1

I.     The RICO Conspiracy Charge (Count I) Should Be Dismissed. ........................... 2

      A.    The Charge That Huawei Conspired With Itself Lacks Merit. ................... 2

           1.     The Intra-Corporate Conspiracy Doctrine Bars Count One. .......... 2

           2.     ███████████████████████████████████ ................................. 5

      B.    The Indictment Fails to Allege a Domestic Application of § 1962(a). ....................................................................................... 6

      C.    The Indictment Evidences the Absence of a Pattern of Racketeering Activity. ........................................................................ 7

      D.    The Indictment Fails to Allege Investment in an Enterprise Other Than the Entity that Generated the Income. ................................. 8

II.    The Trade Secret Charges (Counts 2 and 3) Should Be Dismissed. ..................... 8

      A.    The Trade Secret Charges Are Impermissibly Duplicitous. ...................... 8

           1.     The Court Can Resolve the Duplicity Question on the Face of the Indictment. ......................................................................... 9

           2.     The Indictment Lacks Any Non-Boilerplate Allegation of a Single Conspiracy ...................................................................... 10

      B.    The Trade Secret Charges as to Companies 1–3 are Untimely. ............... 11

           1.     The Government Fails to Justify Its Two-Decade-Long Delay ........................................................................................ 12

           2.     The Court Need Not Find That Lost Evidence Would Be Exculpatory. ............................................................................. 13

III.   The Fraud Charges (Counts 4–9) Should Be Dismissed. .................................... 14

      A.    The Fraud Counts Are Based on the Now-Rejected Right-to-Control Theory. ......................................................................................... 14

           1.     The Government Cannot Evade *Ciminelli* By Recasting Its Fraud Charges Post-Indictment ...................................... 14

2.    The Court Should Order Disclosure of the Grand Jury Instructions. .................................................................... 20

B.    Even the Government's Rewritten Fraud Theory Would Be Invalid. ............................................................................... 21

C.    If Counts 4–9 Are Not Dismissed, Huawei Is Entitled to Particulars Regarding the Money or Property. ............................. 22

D.    Counts Four, Six, Seven, and Nine Do Not Allege Core Domestic Conduct. ................................................................ 24

IV.    The IEEPA-Related Charges (Counts 11, 12, and 15) Should Be Dismissed. ................................................................... 25

A.    The Indictment Fails to Allege Services Were Provided "to Iran." ......... 25

B.    Huawei Tech Did Not Have Fair Notice that IEEPA Reached Foreign Companies' Use of Foreign Banks. ............................... 27

1.    The Court Can Resolve Huawei Tech's Fair Notice Argument Now. ............................................................. 27

2.    Huawei Tech Lacked Fair Notice that Its Foreign Conduct Was Subject to IEEPA. .................................................. 29

CONCLUSION ............................................................................. 30

# TABLE OF AUTHORITIES

**Page**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023)...............................................................................................24

*Betterman v. Montana*,
   578 U.S. 437 (2016)...............................................................................................12

*Brown v. Sandimo Materials*,
   250 F.3d 120 (2d Cir. 2001)......................................................................................5

*Ciminelli v. United States*,
   598 U.S. 306 (2023).........................................................................................15, 21

*Fogie v. THORN Ams., Inc.*,
   190 F.3d 889 (8th Cir. 1999) .....................................................................................3

*Girard v. 94th St. & Fifth Ave. Corp.*,
   530 F.2d 66 (2d Cir. 1976).........................................................................................3

*Hartline v. Gallo*,
   546 F.3d 95 (2d Cir. 2008).........................................................................................3

*Herrmann v. Moore*,
   576 F.2d 453 (2d Cir. 1978).......................................................................................3

*Jesner v. Arab Bank, PLC*,
   584 U.S. 241 (2018)...............................................................................................22

*Kelly v. United States*,
   590 U.S. 391 (2020)...............................................................................................14

*Lateral Recovery LLC v. Funderz.Net LLC*,
   2024 WL 4350369 (S.D.N.Y. 2024)...........................................................................4

*Loughrin v. United States*,
   573 U.S. 351 (2014)...............................................................................................21

*Panthera Rail Car LLC v. Kasgro Rail Corp.*,
   985 F. Supp. 2d 677 (W.D. Pa. 2013).........................................................................5

*Reich v. Lopez*,
   858 F.3d 55 (2d Cir. 2017).....................................................................................3, 7

*Riquelme Valdes v. Leisure Res. Grp. Inc.*,
   810 F.2d 1345 (5th Cir. 1987) ...................................................................................5

*Salinas v. United States*,
    522 U.S. 52 (1997)................................................................................................4

*Sgro v. Getty Petrol. Corp.*,
    854 F. Supp. 1164 (D.N.J. 1994), *aff'd*, 96 F.3d 1434 (3d Cir. 1996)...................22

*Shaw v. United States*,
    580 U.S. 63 (2016)..............................................................................................21

*United States v. Akinyoyenu*,
    201 F. Supp. 3d 82 (D.D.C. 2016) ......................................................................19

*United States v. Atilla*,
    966 F.3d 118 (2d Cir. 2020)................................................................................27

*United States v. Banki*,
    685 F.3d 99 (2d Cir. 2012)..................................................................................30

*United States v. Bankman-Fried*,
    680 F. Supp. 3d 289 (S.D.N.Y. 2023)............................................................17, 22

*United States v. Bareno-Burgos*,
    739 F. Supp. 772 (E.D.N.Y. 1990) ......................................................................29

*United States v. Biba*,
    395 F. Supp. 3d 227 (E.D.N.Y. 2019) ..................................................................29

*United States v. Bodmer,*
    342 F. Supp. 2d 176 (S.D.N.Y. 2004)..................................................................28

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987)................................................................................24

*United States v. Boruchowitz,*
    2024 WL 5159364 (D. Nev. 2024), *motion for reconsideration partially
    granted on other grounds*, 2025 WL 581013 (2025)...........................................19

*United States v. Bravo-Fernandez*,
    239 F. Supp. 3d 411 (D.P.R. 2017)......................................................................20

*United States v. Castro*,
    829 F.2d 1038 (11th Cir. 1987) ..........................................................................11

*United States v. Constantinescu*,
    2024 WL 1221579 (S.D. Tex. 2024) ...............................................................19, 22

*United States v. Feola*,
    651 F. Supp. 1068 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) ..............24

*United States v. Fitzpatrick*,
   437 F.2d 19 (2d Cir. 1970)...................................................................................13

*United States v. Gross*,
   165 F. Supp. 2d 372 (E.D.N.Y. 2001) ...............................................................13

*United States v. Hoey*,
   2014 WL 2998523 (S.D.N.Y. 2014) ...................................................................20

*United States v. Hoskins*,
   73 F. Supp. 3d 154 (D. Conn. 2014) ..................................................................28

*United States v. Islam*,
   2021 WL 312681 (E.D. Pa. 2021) ......................................................................20

*United States v. Jordan*,
   629 F. Supp. 3d 49 (E.D.N.Y. 2022) ..................................................................12

*United States v. Laurent*,
   861 F. Supp. 2d 71 (E.D.N.Y. 2011) ..................................................................26

*United States v. Lazzaro*,
   2022 WL 4112395 (D. Minn. 2022) ...................................................................28

*United States v. Lien*,
   982 F. Supp. 2d 1184 (E.D. Wash. 2013) ..........................................................22

*United States v. Margiotta*,
   646 F.2d 729 (2d Cir. 1981)...............................................................................10

*United States v. Mansouri*,
   2023 WL 8430239 (W.D.N.Y. 2023) .................................................................22

*United States v. Motovich*,
   2024 WL 2943960 (E.D.N.Y. 2024)...........................................................17, 22

*United States v. Ohle*,
   678 F. Supp. 2d 215 (S.D.N.Y. 2010).............................................................9, 10

*United States v. Patel*,
   2022 WL 12358443 (D. Conn. 2022) .................................................................20

*United States v. Perez-Ceballos*,
   907 F.3d 863 (5th Cir. 2018) ..............................................................................22

*United States v. Raniere*,
   384 F. Supp. 3d 282 (E.D.N.Y. 2019) .............................................................7, 28

*United States v. Rosenblatt*,
   554 F.2d 36 (2d Cir. 1977)........................................................................................2

*United States v. Serrano*,
   191 F. Supp. 3d 287 (S.D.N.Y. 2016).....................................................................29

*United States v. Smith*,
   2010 WL 3724756 (D. Ariz. 2010)..........................................................................29

*United States v. Smith*,
   985 F. Supp. 2d 547 (S.D.N.Y. 2014)......................................................................28

*United States v. Sturdivant*,
   244 F.3d 71 (2d Cir. 2001)...................................................................................8, 10

*United States v. Tutino*,
   883 F.2d 1125 (2d Cir. 1989)....................................................................................9

*United States v. Twersky*,
   1994 WL 319367 (S.D.N.Y 1994)...........................................................................20

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991)....................................................................................15

*United States v. Williams*,
   2023 WL 6810569 (W.D. Pa. 2023).........................................................................28

*Williams v. Smith Ave. Moving Co.*,
   582 F. Supp. 2d 316 (N.D.N.Y. 2008).....................................................................22

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017).............................................................................................2, 4

**Statutes and Regulations**

18 U.S.C. § 1343.............................................................................................................21

18 U.S.C. § 1344.............................................................................................................21

18 U.S.C. § 1962(a)...................................................................................................6, 7, 8

31 C.F.R. § 560.204...................................................................................................25, 29

31 C.F.R. § 560.303.........................................................................................................26

31 C.F.R. § 560.427(a).....................................................................................................26

**Rules**

Fed. R. Crim. P. 6(e)(3)(E)(ii) ....................................................................................................20

## INTRODUCTION

As shown in Huawei's motion to dismiss,[1] the Indictment in this case is highly unusual and uniquely flawed. Conceived in Washington as an instrument of foreign policy and politics, *e.g.*, Br. #1, at 1–5; Br. #2, at 18–20, the Indictment reflects a series of unprecedented and aggressive charging decisions. It charges a supposed 20-year trade-secret-theft conspiracy allegedly made up of disparate, sporadic acts, almost all of which would be time-barred but for the government's claim that they are all part of a single conspiracy. It charges a supposed fraud on banks based on a since-invalidated right-to-control theory. It charges sanctions violations based on conduct that the principal oversight agency said at the time did not violate the law, and in any event cannot have violated the prohibition against supplying financial services "to Iran" because, as the government concedes, the transactions at issue did not, in fact, go to, from, or through Iran. And it tries to wrap these disparate charges up in an amorphous RICO conspiracy that, in apparent recognition that the government cannot prove a traditional RICO charge, accuses a legitimate business of conspiring with itself to violate a rarely-used RICO provision prohibiting *investing* racketeering proceeds.

Faced with these and other shortcomings of its own allegations, the government turns to the mantra that an indictment need only state the elements of the offense, repeating over and over that the Indictment is categorically beyond challenge regardless of whether the theories it expressly articulates could make out the crimes charged. The bar for surviving a motion to dismiss is not high, but it cannot be ignored. When an indictment is this unusual and flawed, scrutiny cannot be avoided by pointing to boilerplate elements. The Court should determine now whether the Indictment actually states offenses under the laws of the United States. Addressing those questions now is not only procedurally proper; it makes immense practical sense. By the government's own projection, this will be the longest trial in the modern history of this District if this case goes forward in its entirety. The Court should grant the motion to dismiss.

---

[1] Dkt. 474. Defined terms have the same meaning as in the memoranda of law in support of Huawei's Motion to dismiss, Dkts. 474-1 to -4 ("Br. #1" to "Br. #4," respectively).

I.      **The RICO Conspiracy Charge (Count I) Should Be Dismissed.**

The government's opposition, Dkt. 496 ("Opp."), fails to adequately address the extraordinary nature of the conspiracy charge the government chose to bring in Count One, which accuses three members of the Huawei corporate family of violating RICO by agreeing to invest income back into "HUAWEI and its parents, global affiliates and subsidiaries." S3 Indict. ¶¶ 89, 92.

The government does not deny that its charging theory is "unprecedented." Br. #1, at 1. Nor does it identify any other case where it has charged different parts of a single corporation with conspiring to violate RICO by agreeing to reinvest funds into its own operations, something countless business enterprises do every day. Approving this charge would expose U.S. businesses to sweeping criminal liability—and, given RICO's broad private right of action, to extraordinary treble damages liability too. The Court should dismiss Count One.

A.      **The Charge That Huawei Conspired With Itself Lacks Merit.**

1.      **The Intra-Corporate Conspiracy Doctrine Bars Count One.**

As the Supreme Court has explained, "an agreement between or among agents of the same legal entity, when the agents act in their official capacities, is not an unlawful conspiracy." *Ziglar v. Abbasi*, 582 U.S. 120, 153 (2017). Put simply, "conspiring" with oneself is not a crime. *See United States v. Rosenblatt*, 554 F.2d 36, 39–40 (2d Cir. 1977) (overturning conviction when, other than the defendant, "no one else agreed to commit [the charged] offenses"). That is all the government has charged here. Br. #1, at 11.

The government tries to limit the intra-corporate conspiracy doctrine, variously contending it applies only to antitrust or only to civil cases. The rule, however, is not so limited; rather, it "is derived from the nature of the conspiracy prohibition" itself. *Ziglar*, 582 U.S. at 153. Citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161–62 (2001), the government suggests that "the Supreme Court has expressly limited the intracorporate conspiracy doctrine to antitrust law." Opp. 7. The government fails to acknowledge the Supreme Court's subsequent clarification, in *Ziglar*, that it has *not* foreclosed the application of the doctrine to non-antitrust

conspiracies, and its recognition that courts have applied the doctrine to civil rights conspiracies. *Ziglar*, 582 U.S. at 153.

The government also ignores that the Second Circuit has repeatedly applied the doctrine beyond the antitrust context. Br. #1, at 9–10. Even before *Copperweld*, the Second Circuit applied the "familiar doctrine" to reject the notion that a corporation can conspire with itself. *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978); *see also Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 70 (2d Cir. 1976). *Copperweld*, applying the doctrine to a specific context, did not somehow overrule these cases, and the Second Circuit reaffirmed them after *Copperweld* and *Kushner*. *See Hartline v. Gallo*, 546 F.3d 95, 99 n.3 (2d Cir. 2008).

Next, the government states that the intra-corporate conspiracy doctrine has only been applied in certain "civil contexts," Opp. 5, glossing over the facts that several circuit courts and district courts within this circuit have applied the doctrine to RICO conspiracies, Br. #1, at 9–10, and that the Supreme Court has instructed courts to "treat civil and criminal [RICO] cases the same." *Reich v. Lopez*, 858 F.3d 55, 61 n.4 (2d Cir. 2017) (citing *Sedima, SPRL v. Imrex Co.*, 473 U.S. 479, 489 (1985)).[2] That directive forecloses the government's attempt to limit the intra-corporate conspiracy doctrine to civil cases. *Cf. United States v. Suntar Roofing, Inc.*, 897 F.2d 469, 474 (10th Cir. 1990) (applying doctrine in criminal antitrust case).

The government further suggests that the doctrine should not apply to civil RICO either, noting the circuit split on the question. As the Eighth Circuit reasoned, however, "[i]n the absence of [] an explanation" for why an agreement between "two entities [] under common control" would "create[] any of the special dangers § 1962(d) targets," a conspiracy allegation like the government presses here merely alleges that the parent corporation "conspired with its arms and hands" and cannot stand. *Fogie v. THORN Ams., Inc.*, 190 F.3d 889, 899 (8th Cir. 1999). The government also relies on two civil RICO cases from the Southern District of New York that declined to apply the intra-corporate conspiracy doctrine. Opp. 9–10. The court in *Alix*

---

[2] None of the government's cases declining to apply the doctrine to criminal charges involve RICO and thus none had occasion to confront the directive to treat civil and criminal RICO alike.

*v. McKinsey & Co*., however, recognized that "the issue is not clear cut." 2023 WL 5344892, at *23 (S.D.N.Y. 2023). Moreover, both cases involved alleged conspiracies to run the affairs of an enterprise through a pattern of racketeering, in violation of § 1962(c)—a context that may raise different questions for application of the intra-corporate conspiracy doctrine. *See, e.g.*, *Lateral Recovery LLC v. Funderz.Net LLC*, 2024 WL 4350369, at *40 (S.D.N.Y. 2024) (reasoning that "[u]nlike the antitrust statute," which permits coordination of enterprise business policy, "RICO was not intended to allow loan sharking and racketeering *within corporations*") (emphasis added). By contrast, as Defendants previously explained, the unique and rarely employed cause of action created by § 1962(a) closely resembles antitrust law: "[a]greeing to reinvest money among and between [] related entities cannot be classified as a crime for fundamentally the same reason wholly owned subsidiaries do not violate the antitrust laws when they agree on a business strategy." Br. #1, pp. 10–11. The government offers no meaningful response, other than to insist, once again, that the intra-corporate conspiracy doctrine is informed solely by "antitrust policy considerations." Opp. 10. As demonstrated above, that is not correct.

The government briefly asserts that the agreement alleged here creates specific dangers, but cites only the basic principle that combined criminal activity is a distinct evil. Opp. 6–7. When the alleged conspirators effectively constitute a single entity, however, there is no "combined" activity to begin with. *See Ziglar*, 582 U.S. at 153 ("When two agents of the same legal entity make an agreement in the course of their official duties, however, as a practical and legal matter their acts are attributed to their principal. And it then follows that there has not been an agreement between two or more separate people.").[3]

Ultimately, the government addresses none of the dangers inherent in criminalizing routine business activity among corporate affiliates—*i.e.*, agreeing to invest income to support the broader corporate enterprise. Nor does it succeed in distinguishing *Copperweld*, which recognizes the reality that corporate subsidiaries "act[] for the benefit of the parent, [their] sole

---

[3] Notably, in support of this proposition, the government cites only *Salinas v. United States*, 522 U.S. 52, 65 (1997), which involved *individual*, not corporate defendants.

shareholder," *Copperweld*, 467 U.S. at 771, and refuses to allow civil antitrust liability to rest on the intra-corporate arrangements that are a necessary part of business enterprise. The same result is warranted here. Count One should be dismissed.

2. ███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████

███████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████

███████████████████████████████

███████████████████████████████████████

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████ ███████████████████████████

███████████████████

**B.      The Indictment Fails to Allege a Domestic Application of § 1962(a).**

The government concedes that a conspiracy to violate 18 U.S.C. § 1962(a) requires an agreement to take income derived from a pattern of racketeering activity and use or invest it *in the United States*. Opp. 14–15. And the government does not point to any allegations in the Indictment specifically alleging an agreement to invest income in the United States, instead offering two arguments in defense of Count One; neither is persuasive.

First, the government argues that it need only "track[] the language of the … statute." Opp. 13–14. But unlike the government's cases, which are about whether an indictment sufficiently alleges the elements of the offense, *see* Opp. 3, 14, Huawei's motion contends the facts as alleged reveal a legal flaw in the charges. As to such deficiencies—like a statute-of-limitations defense or, as here, the improper extraterritorial application of a statute—"a party may raise and establish [the] defense via a Rule 12(b) motion … when the defense is clear from the face of the indictment." *Sampson*, 898 F.3d at 279. Indeed, where the statute does not include specific language regarding domestic application, it would be illogical to assert that merely parroting the statutory language sufficiently alleges a *domestic* violation, particularly when the facts alleged in the lengthy indictment indicate otherwise.

Second, the government strains to read the Indictment as alleging investment in the United States, particularly where, as here, almost all the alleged conduct and entities comprising the alleged enterprise are foreign. Given the absence of specific allegations to the contrary, the only plausible way to read the Indictment is that the relevant investment of racketeering income was in *Chinese* businesses—*i.e.*, foreign investment outside the scope of §§ 1962(a) and (d). The

---

[4] At a minimum, the government should be required to identify with particularity the individuals whose knowledge and actions the government charges were imputable to Huawei and the basis for any such imputation, as Huawei has requested in seeking a bill of particulars.

government argues that because the enterprise is technically defined to include U.S. subsidiaries of Chinese entities, it is theoretically possible that an agreement to invest racketeering-derived income in the enterprise means investment in the *U.S.-based* parts of the enterprise. Opp. 15. But the Indictment must allege that a crime occurred, not that a crime *may have* occurred. The government's strained interpretation should not be credited, and Count One should be dismissed.[5]

### C.    The Indictment Evidences the Absence of a Pattern of Racketeering Activity.

The government argues that it need only assert that there is a pattern of racketeering activity to survive a motion to dismiss. But as the government acknowledges but fails to take seriously, the indictment must "specify predicate acts '*that evidence continuity and relatedness*.'" *United States v. Raniere*, 384 F. Supp. 3d 282, 301 (E.D.N.Y. 2019) (emphasis added). The government identifies no allegations in the Indictment that "evidence continuity and relatedness." And it fails to address Huawei's showing that the Indictment affirmatively evidences a complete *lack* of continuity and relatedness. The government does not contest that "[t]here is simply no connective tissue" between the alleged trade secret predicate acts and the fraud and sanctions predicate acts, or that within each of those two sets of alleged conduct the Indictment alleges only disparate acts spanning multiple years, locations, and personnel. Br. #1, at 20. The only commonality alleged among these allegations is that they were supposedly done "to grow the 'Huawei' brand." But the Second Circuit has squarely rejected reliance on such a broad "purpose" to create the requisite pattern. *Reich*, 858 F.3d at 62. "[T]o engage purpose at that level of generality would make the factor meaningless: virtually all crimes committed on behalf of an enterprise are done to help it." *Id.* Because the Indictment evidences the absence of a pattern of racketeering activity, the RICO Count should be dismissed.

---

[5] At a minimum the government should be required to identify with particularity what income was reinvested domestically, as Huawei has requested in seeking a bill of particulars.

### D. The Indictment Fails to Allege Investment in an Enterprise Other Than the Entity that Generated the Income.[6]

The RICO charge should also be dismissed because the government has alleged only an agreement to reinvest racketeering income into the same entity that generated the income, which improperly conflates § 1962(a) with § 1962(c). As the government acknowledges, the two subsections serve different purposes and, accordingly, they must cover separate acts. Section 1962(a) is concerned with a "person" corrupting an enterprise by injecting racketeering income into that enterprise. Section 1962(c), by contrast, is concerned with using an enterprise to *engage* in racketeering. Permitting § 1962(a) to cover investing racketeering income into the same entity that generated the income would eviscerate this distinction.

This matters because the government, by choosing to charge a § 1962(a) rather than a § 1962(c) conspiracy, is attempting to avoid having to prove a "person" distinct from the "enterprise," a showing it could not make here, particularly when the enterprise is a legitimate business. The Court should hold the government to its evidentiary burden and not permit it to blur the distinction between § 1962(a) and § 1962(c).

That Huawei "offer[s] no case law in support of this proposition," Opp. 18, does not diminish its validity, particularly since the government cites no case rejecting this argument. Rather, it highlights how novel and unbounded the government's charging theories are here. Br. #1, at 5. The Court should reject the government's overreaching and dismiss Count One.

## II. The Trade Secret Charges (Counts 2 and 3) Should Be Dismissed.

### A. The Trade Secret Charges Are Impermissibly Duplicitous.

The government agrees (Opp. 23–24) that an indictment must not "combine two or more distinct offenses" into one count when it would prejudice the defendant. *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001). But it insists that a duplicity challenge must always wait until after trial, Opp. 21–23, and that Counts Two and Three are not duplicitous on their face. Opp. 23–27. On both scores, the government is wrong.

---

[6] Huawei continues to preserve its other arguments about the government's definition of the "enterprise" for further review. *See* Br. #1, at 22–23.

The government's opposition establishes that its duplicitous charging decision is highly prejudicial to Huawei. The government concedes that if it "had charged a series of narrower conspiracies or substantive crimes," many "likely would have fallen outside the applicable statute of limitations." Opp. 26. According to the government, the single-conspiracy theory allows it to evade the statute of limitations and unjustly pursue charges for events as far back as 2000, notwithstanding the obvious prejudice to the defense from having to meet such stale charges. The Court should reject that improper end-run and dismiss the trade secret counts.

### 1.    The Court Can Resolve the Duplicity Question on the Face of the Indictment.

The government contends that the Court may not even consider Huawei's duplicity arguments on this motion because the Indictment contains boilerplate allegations of a single conspiracy. Opp. 21–22; *see* S3 Indict. ¶¶ 95, 98. That is wrong. The indictment must also contain a "set of facts … that could warrant a reasonable jury in finding a single conspiracy." *United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010).

In *Ohle*, for example, the court looked beyond the government's boilerplate allegations to determine whether the indictment alleged a single conspiracy. *Id.* Although the Court agreed that the conspiracy charge "survive[d] the facial test," it did so based on its finding that "the two frauds occurred at the same time and had common participants, and that compensation was paid amongst the co-conspirators." *Id.* at 223. None of those elements is present in the six disparate incidents in Counts 2 and 3, which span multiple decades, traverse various continents, and involve neither a common cast of characters nor a repeated *modus operandi*. *Id.*

The government also asserts that a conspiracy charge does not raise duplicity concerns "merely because it could have been charged as multiple conspiracies," Opp. 24—*i.e.*, that the government can elect to aggregate multiple conspiracies into one conspiracy count the way it might aggregate certain related substantive offenses. Neither case cited by the government supports its assertion—or even involved a conspiracy charge. *See United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989) (aggregating drug offenses in single count to satisfy minimum

weight requirement); *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981) (combining multiple mailings into one mail fraud count). *Margiotta* and *Tutino* thus stand for the same basic principle as *Ohle*: that no duplicity concerns arise if the allegations, if proven, would permit the jury to find a "*single continuing scheme*." *Tutino*, 883 F.2d at 1141 (emphasis added). But if the allegations fail to do so and merely "combine[] two or more distinct crimes into one count," that count is "impermissibly duplicitous." *Sturdivant*, 244 F.3d at 75. As in *Ohle*, that analysis may be conducted on a motion to dismiss.

### 2. The Indictment Lacks Any Non-Boilerplate Allegation of a Single Conspiracy

On that standard, Counts Two and Three fail. The allegations here point only to multiple conspiracies; the Indictment contains "no set of facts" from which a jury could find the single conspiracy alleged. *Ohle*, 678 F. Supp. 2d at 222. Each of the six trade secret vignettes involves different actors without a common individual tying the vignettes together.[7] The vignettes also involved disparate manners and means, and occurred during vastly distinct periods of time. The government attempts to downplay this final distinction as mere "gaps in time." But they are much more than "gaps." *Five years* elapsed between the government's allegations regarding Companies 3 and 4. *See* Br. #2, at 3, 10. Similarly, the later-in-time allegations concerning Companies 5 and 6 occurred *a full decade* after the first three vignettes. Because the government has no credible explanation for how these disparate allegations amount to a single conspiracy, it leans heavily on its erroneous view that a boilerplate allegation is sufficient, regardless of what the rest of the Indictment alleges.

The government also ignores that, in another district, it has separately charged two of the Defendants for the allegations concerning Company 5 alone. Br. #2, at 13. There, the government claims the Company 5 conspiracy stands alone; here, it inconsistently claims that its "investigation did not uncover a series of isolated, unconnected conspiracies." Opp. 26.

---

[7] At a minimum, the Court should require the government promptly to identify—through a bill of particulars or otherwise—the employees of each Defendant who purportedly entered into the 20-year conspiracies to help determine whether the trade secret vignettes are part of a single conspiracy.

The government's other efforts to support its single conspiracy argument are equally flawed. For example, the government asserts that Huawei's "targeting of U.S.-based companies to steal confidential intellectual property … all to grow the Huawei business" serves as the "throughline" connecting each vignette. *Id.* Huawei already addressed this argument in its motion, Br. #2, at 11, yet the government still fails to point to any allegation that any vignette "depended on, was aided by or had an operational interest in the success of the other[s]." *United States v. Castro*, 829 F.2d 1038, 1045–46 (11th Cir. 1987).

The government also points to the allegation that Huawei offered "corporate bonuses for stealing the most valuable information." Opp. 25. But that ignores the government's own allegation that this alleged policy was "launched" only "in 2013." S3 Indict. ¶ 13. That places this supposedly unifying policy memo roughly a decade *after* the alleged thefts from Companies 1–3, and more than three years after the alleged theft from Company 4. *See, e.g.*, Br. #2, at 10. And the Indictment does not connect the Company 5 and 6 allegations to the alleged corporate bonuses—there is no allegation that anyone involved in those two incidents was acting based on, or even aware of, the memo. Thus, the supposed bonus policy does not connect the early, time-barred alleged thefts with the more recent ones, and the government provides no support for the suggestion that the trade secret counts each allege a single conspiracy.

The government also cannot reasonably dispute that, if the charges are duplicitous, Defendants will be prejudiced at trial. But for the government's dubious allegation of a single conspiracy, the statute of limitations would bar all but one of the vignettes. Br. #2, at 12–13. The Court and the jury will thus be subject to five highly inflammatory mini-trials that should never have been brought in the first place. It is therefore "especially appropriate" for the Court to resolve the issue before a jury is empaneled and before Huawei must "defend against ancient and stale charges." *See Gabriel*, 920 F. Supp. at 507.

**B.     The Trade Secret Charges as to Companies 1–3 are Untimely.**

The trade secret allegations regarding Companies 1–3 should be dismissed for the independent reason that the government delayed for nearly twenty years—well beyond the

applicable statute of limitations—before bringing charges related to these companies. These allegations were public and readily known to federal law enforcement, yet the government did nothing for decades, allowing memories to fade, witnesses to become unavailable (even die), and documentary evidence to disappear. The government has no bona fide justification for its prolonged inaction, which has predictably made it more difficult to prepare a defense.

1.    **The Government Fails to Justify Its Two-Decade-Long Delay.**

The government offers no credible justification for its tardiness in bringing the charges as to Companies 1–3. The government contends that its delay is partly due to the scope of its investigation, which was "massive" and "involved high-level review within [DOJ]." Opp. 36–37. High-level supervisory DOJ review does not justify a *twenty-year delay*. And while the government claims to have reviewed "millions of documents" and interviewed "scores of witnesses," such actions are typical in a complex white-collar case. In any event, none of this is reflected in the trade secret charges. Those allegations merely echo what was asserted in civil complaints publicly filed two decades ago.

The government further contends that its decades-long delay is attributable to the need to "work with victims and courts to unseal and obtain relevant evidence." Opp. 36. The mechanisms of a civil proceeding should not significantly impede the federal government's exercise of its criminal investigatory powers. The government has the ability to compel witnesses and obtain evidence through the power of a grand jury subpoena. Likewise, civil protective orders do not provide a credible excuse for a twenty-year delay—nor is there any indication that the government has sought to unseal a single page of discovery from the prior civil cases.

At best, the government displayed a reckless disregard for how its delay would affect Huawei's ability to defend itself. But the Due Process Clause does not tolerate "prosecutorial delay," whether "tactical" or "reckless." *Betterman v. Montana*, 578 U.S. 437, 441 (2016); *see also United States v. Jordan*, 629 F. Supp. 3d 49, 54 (E.D.N.Y. 2022) ("intentional or reckless"

delay). The Court need not decide whether the government *intended* to harm defendants through delay; recklessness suffices.[8]

### 2.    The Court Need Not Find That Lost Evidence Would Be Exculpatory.

The government incorrectly argues that Huawei must show that the lost evidence is "exculpatory." *See, e.g.*, Opp. 31. Not so. Courts have inferred prejudice where lost evidence is "critical to … receiving a fair trial." *See, e.g.*, *United States v. Gross*, 165 F. Supp. 2d 372, 382–83 (E.D.N.Y. 2001). That standard is easily met here.

The Indictment identifies key pieces of evidence that allegedly support the trade secret counts, including a neutral expert's report and a Company 1 employee's declaration from a civil suit between Huawei and Company 1. Both witnesses are now dead, and Huawei cannot test the veracity of the evidence through cross-examination. That is fundamentally unfair. *See id.*; *cf. United States v. Fitzpatrick*, 437 F.2d 19, 23 (2d Cir. 1970) ("Full and fair cross-examination is the cornerstone of the adversary system."). The government assumes these witnesses' testimony, if they were alive, "would plainly be inculpatory." Opp. 32. But that is self-serving speculation—the government has no idea what the deceased witnesses would have said at trial or whether cross-examination would have undermined the credibility of any adverse testimony.

The government also contends that Huawei will not be prejudiced if Company 1's allegedly proprietary source code no longer exists[9] because the conspiracy charges do not require proof of an actual trade secret. Opp. 29–30. But this interpretation is far too narrow. Whether the source code *was* a trade secret is highly relevant to whether the government can prove that Huawei had a culpable mental state. Notably, the government does not disclaim any intent to put on evidence the source code was a trade secret, yet it is confident denying Huawei a full and fair opportunity to argue the opposite. Further, if one of the government's "numerous examples of trade secret theft" were shown to be actually an example of Huawei gathering *publicly disclosed*

---

[8] If the Court is inclined to credit the government's representations about the reasons for its delay, Defendants renew their request to test these assertions through discovery and a hearing. *See* Br. #2, at 20 n.5.

[9] Because of AEO restrictions, Defendants have not, and cannot, presently determine whether the government's recent discovery productions contain all or part of Company 1's alleged source code.

information, that would powerfully undercut the government's claim to have uncovered a theft conspiracy—let alone a *unitary* and *decades-long* theft conspiracy. In short, the government is simply wrong: the code is clearly relevant, and the defense would be prejudiced to the extent it— or any historical instances of public disclosure of the code—is no longer available.

## III.    The Fraud Charges (Counts 4–9) Should Be Dismissed.

### A.    The Fraud Counts Are Based on the Now-Rejected Right-to-Control Theory.

In an effort to overcome an intervening change of law that is fatal to the Indictment's theory of the financial fraud charges, the government now claims—implausibly—that the right-to-control allegations in the Indictment are not the basis of those charges. The government now asks the Court to uphold the fraud counts on a new theory that does not appear in the Indictment and was most likely never presented to the grand jury. That improper effort should be rejected.

### 1.    The Government Cannot Evade *Ciminelli* By Recasting Its Fraud Charges Post-Indictment.

When the S3 Indictment was returned, controlling law in this Circuit recognized the validity of the right-to-control theory of fraud. *See* Br. #3, at 4–5. The government, understandably, relied on this theory in charging Huawei with six substantive and conspiracy charges of wire and bank fraud. It did so out of necessity.[10] To be guilty under the federal fraud statutes, a defendant's scheme must not simply *involve* money or property. Instead, *obtaining* money or property, or *depriving* the victim of it, "must be an *object* of the fraud." *Kelly v. United States*, 590 U.S. 391, 402 (2020) (emphasis added). But in this case, there is no dispute that Huawei intended to—and did—pay the banks exactly what they charged for their dollar-clearing services. *E.g.*, Br. #3, at 2. Huawei did not (and did not attempt to) swindle the banks out of any part of the value of the banks' services. Neither the Indictment nor the government's Opposition alleges otherwise.

---

[10] It also did so out of convenience. *See* Oral Arg. Tr. 60:6–13, *Ciminelli v. United States*, No. 21-1170 (Nov. 28, 2022) (Deputy Solicitor General describing right to control as an "easier route to prove to a jury").

Accordingly, in charging the case, the government relied on an alternative and then-well-established theory of fraud in the Second Circuit: that a defendant commits federal fraud when it schemes to deprive a victim of the "right to control" its money or property through "the withholding or inaccurate reporting of information that could impact on economic decisions." *United States v. Wallach*, 935 F.2d 445, 463 (2d Cir. 1991). The government made that language and that supposed harm—that Huawei's supposed misrepresentations influenced the banks' decisions to continue their business relationships with, and provide their services to, Huawei— the central feature of its fraud charges, repeating it again and again. *See* S3 Indict. ¶ 71 ("Had the Victim Institutions known about HUAWEI's repeated violations of [U.S. sanctions law], they would have reevaluated their banking relationships with HUAWEI, including their provision of U.S.-dollar and Euro clearing services to HUAWEI."); *id.* ¶ 79 ("Based in part on the false representations … Financial Institution 1 continued its banking relationship with HUAWEI and its subsidiaries and affiliates."); *id.* ¶ 85 ("Had the defendants told U.S. Subsidiary 4 the truth about Financial Institution 1's decision to terminate its relationship with HUAWEI, U.S. Subsidiary 4 would have reevaluated its relationship with HUAWEI[.]").

In the face of all of this—with the right-to-control theory having since become a dead letter, *see Ciminelli v. United States*, 598 U.S. 306 (2023)—the government now claims it never brought a right-to-control case at all. According to the government, the money or property that the Indictment alleges Huawei sought to obtain through fraud was "funds in the form of dollar-clearing transactions." Opp. 40. To the extent the government ever attempts to clarify this vague and linguistically impenetrable description (funds cannot take the "form" of a transaction; funds are money and a transaction is a process), the government seems to be saying that the object of Huawei's supposed scheme was to access "money held in bank accounts" at some unspecified stage(s) of the dollar-clearing process. *Id.* at 39; *see also id.* ("funds provided as part of U.S.

dollar-clearing and other financial services were the object of that fraud").[11] But the supposed victim banks were *Huawei's* banks, the money held or released from any bank account during the dollar-clearing process belonged to Huawei, and so the government's new theory is that Huawei schemed to get its *own* money. *Id.* at 44–48.

Setting aside briefly that that is not a valid theory of fraud, *infra* at 21-22, it is also transparently not the one charged. There is no reference anywhere in the Indictment to the charged scheme having been "designed to obtain the financial institutions' *funds* in the form of dollar-clearing transactions." Opp. 40 (emphasis added). Other than when generically quoting the statutory charging language, the Indictment never mentions *any* money Huawei sought to obtain from the alleged scheme. Instead, the Indictment repeatedly identifies the object of the scheme as the banking *relationship* Huawei was supposedly able to maintain with the banks through its alleged misrepresentations. *See* S3 Indict. ¶ 71 (absent false representations, banks would have "reevaluated their banking relationships with HUAWEI"), ¶ 74 (false representations caused victims "to continue their banking relationships with HUAWEI"), ¶ 75 (based on false representations, victims "continued their banking relationships with HUAWEI"), ¶ 79 (based on false representation, victim "continued its banking relationship with HUAWEI"), ¶ 85 (based on false representation, victim "undertook to expand its banking relationship with HUAWEI"). Although the Indictment alleges those relationships included the banks' "provision of U.S.-dollar and Euro clearing services to HUAWEI," *id*. ¶ 71, those are *services*, and there is no dispute that Huawei paid for them or that the money cleared belonged to Huawei. The Indictment alleges that Huawei tricked the banks into agreeing to sell Huawei their services, but that is a right-to-control theory of fraud. The Indictment nowhere alleges that Huawei's fraudulent objective was obtaining some unspecified money from the custody or control of some bank during some

---

[11] The government occasionally throws "and other financial services" into the mix, but it nowhere explains what it is talking about. From the lack of any description anywhere, the government seems to be inserting a vague placeholder in case the government's pivot from a right-to-control theory to a dollar-clearing-funds theory requires yet another escape hatch.

undescribed dollar-clearing process. The notion that getting those unidentified funds was the object of the charged scheme is a newly-formed invention in the government's Opposition.

The Indictment here thus stands in stark contrast with the indictments in the cases the government cites, all of which survived because they *expressly identified* obtaining money from the victim as the object of the scheme. *See* Opp. 43. *United States v. Griffin* and *United States v. Runner* are garden-variety fraud cases in which the defendants made false statements in order to inflict a monetary loss on the victims. In *Griffin*, the defendants lied to get SBA loan guarantees, and the court correctly concluded that did not involve a right-to-control theory because "the Government's allegations focused explicitly on the defendants' attempts to deprive the SBA of loan guarantees and the millions of dollars the SBA lost paying out on these loan guarantees." 76 F. 4th 724, 739 (7th Cir. 2023). Similarly, *Runner* involved allegations of a straight-up swindle—"psychic mail solicitations, which contained material misrepresentations" to induce the victims to send the defendants their "money and personal property"—so the court correctly rejected the argument that the case involved the right-to-control theory. 2023 WL 2429610, at *2 (E.D.N.Y. 2023). And in *United States v. An*, the court observed that the Indictment itself "frame[d] the harm to the banks as the Ans' deprivation of deposited funds in accounts held by the victim banks." 733 F. Supp. 3d 77, 91–92 (E.D.N.Y. 2024)*.* Other cases cited by the government likewise include express allegations about the money that was the schemes' alleged object. *See United States v. Bankman-Fried*, 680 F. Supp. 3d 289, 305 (S.D.N.Y. 2023) (indictment alleged defendant "'regularly took money' from the bank's custody"); *United States v. Motovich*, 2024 WL 2943960, at *5 (E.D.N.Y. 2024) (indictment alleged "Defendants induced the banks to part with their property" including "funds deposited into the Shell Company Bank Accounts").

Unlike those generally more traditional fraud cases, which involved express allegations that the object was to obtain money, this case bears more in common with *United States v. Nejad*, another Iran-sanctions/dollar-clearing case charged around the same time as this case in which the government *openly acknowledged* that its charge of fraud on the dollar-clearing banks

17

was predicated on a right-to-control theory. *Nejad* involved allegations that the defendant cleared U.S. dollar payments through U.S. banks while concealing information from the banks that could have caused the banks to reject the transactions. *See* 2019 WL 6702361, at *1 (S.D.N.Y. 2019). Specifically, the government alleged that the defendant and his co-conspirators created front companies in Switzerland and Turkey to receive payments from Venezuela that were actually intended for an Iranian construction company, routing approximately $115 million through U.S. banks while concealing the Iranian beneficiary. *Id*.[12]

Far from claiming these transactions amounted to a scheme to obtain bank property, the government opposed the defendant's motion to dismiss by explicitly characterizing its case as a right-to-control case, arguing that the requisite risk of tangible economic harm to the banks existed because the defendant "den[ied] the victim banks the right to control their assets by depriving them of information necessary to make discretionary economic decisions." *See* Gov't Opp. to MTD at 38–39, *United States v. Nejad*, No. 18-cr-224 (S.D.N.Y. Apr. 26, 2019), Dkt. 108 (Ex. A) (internal alterations and quotation marks omitted). The government understood then, as it should now, that where the alleged fraud involves concealing information to influence banks' decisions about providing services—rather than stealing their money—it implicates the banks' right to control their assets, not a traditional property interest.

The court in *Nejad* accepted the government's argument, acknowledging that "the Government allege[d] that the banks were deprived of the right to control their assets," and upholding the indictment on that "right to control theory." *Nejad*, 2019 WL 6702361, at *14. In particular, the court explained, the indictment made out a (then-valid) right-to-control case because the indictment alleged that the defendant deprived banks of "information with respect to the true beneficiaries of the services these banks were providing" and that this information "would have been economically valuable to these banks because they were allegedly lured—by

---

[12] Although not relevant to this analysis, the allegation in *Nejad* was that the payments were intended for an Iranian company. The alleged IEEPA-violating transactions here are not alleged to have been on behalf of or ultimately intended for Iran. *See infra* § IV.A.

the concealment of this information—into providing these services in violation of the law." *Id.* at *15. The same theory was obviously charged here: The core harm alleged in the Indictment is that banks were deprived of information that would have been relevant to them in deciding what services to provide Huawei, not that they were cheated out of any money. The government cannot credibly disavow this theory now simply because *Ciminelli* has rendered it legally invalid.

Nor can the government turn the tables on the Indictment's lack of any allegation about traditional money or property by countering that "[n]owhere in the Indictment does the phrase 'right to control' appear." Opp. 42. The indictment in *Nejad* also did not use the phrase "right to control," but the government in that case expressly made the point (convincing the court) that its right-to-control theory did not require the literal use of the words "right to control." *See* Ex. A at 39–40. The same is true here. Although the Indictment does not use the words "right to control," it repeatedly makes clear that the intended harm was the one proscribed by the right-to-control theory—namely, depriving the banks of accurate information that would have informed whether they wanted to maintain a relationship with Huawei. Courts have regularly identified indictments as charging a right-to-control theory under such circumstances, even absent the words "right to control." *See United States v. Akinyoyenu*, 201 F. Supp. 3d 82, 85–86 (D.D.C. 2016) (describing 15-page description of scheme to "sell drugs to customers while deceiving them as to the soundness of their prescriptions" as "right to control" case even without "magic words 'right to control' or 'right to decide'"); *United States v. Constantinescu*, 2024 WL 1221579, at *2, 6 (S.D. Tex. 2024) (indictment that did "not explicitly cit[e] the 'right-to-control theory'" nevertheless "fail[ed] a *Ciminelli* analysis"); *see also United States v. Boruchowitz*, 2024 WL 5159364, at *5 (D. Nev. 2024) (dismissing indictment that "track[ed] the language of the wire fraud statute, including the allegation that money and property were objects of the scheme" where government's arguments "boiled down" to right-to-control theories), *motion for reconsideration partially granted on other grounds*, 2025 WL 581013 (2025).

The Court should reject the government's post-indictment, reality-blinking attempt to reframe the fraud charges into being about a scheme to obtain dollar-clearing funds.

### 2. The Court Should Order Disclosure of the Grand Jury Instructions.

Were any doubt to remain that the Indictment was brought on a right-to-control theory, the Court should order disclosure of the relevant portions of the legal instructions provided to the grand jury—or at least review them *in camera*—to determine whether the government's instructions were consistent with its claim that the right-to-control theory was not charged.

Courts have long held that disclosure of grand jury instructions is warranted if the defendant shows a "particularized need … that outweighs the Government's interest in maintaining the secrecy of the grand jury proceeding." *United States v. Twersky*, 1994 WL 319367, at *5 (S.D.N.Y 1994) (cleaned up) (granting *in camera* review of grand jury instructions following change in controlling law); *see* Fed. R. Crim. P. 6(e)(3)(E)(ii) (disclosure may be authorized if defendant "shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury"). Applying this standard, courts have reviewed grand jury instructions when a change in controlling law casts doubt on the validity of an indictment. *See United States v. Bravo-Fernandez*, 239 F. Supp. 3d 411, 416 (D.P.R. 2017) (granting *in camera* review to assess "whether the indictment pending against defendants [was] valid" under new controlling law); *United States v. Islam*, 2021 WL 312681, at *1 (E.D. Pa. 2021) ("[T]he fact that the law in this area remains in flux provides a strong basis for reviewing the determination the grand jury was asked to make."); *United States v. Patel*, 2022 WL 12358443, at *8 (D. Conn. 2022) ("Courts have requested to review grand jury instructions *in camera*, … where the defendants put forth evidence that there was an intervening change in the law and that the Government had previously argued against it."); *United States v. Hoey*, 2014 WL 2998523, at *3 (S.D.N.Y. 2014) (defendant established a "particularized need" for *in camera* review of grand jury instructions based on new controlling precedent where "Department of Justice had argued against the adoption of the standard" the U.S. Supreme Court ultimately adopted).

That is the situation here. When the grand jury voted on the Indictment, controlling Second Circuit precedent allowed the right-to-control theory, and the allegations of the Indictment strongly indicate that is the theory on which the Indictment was returned.

20

Subsequently, the Supreme Court rejected the theory, which—if it was the theory proposed to and relied on by the grand jury—would make the Indictment invalid. Accordingly, this is exactly the circumstance in which inspection of the grand jury instructions is warranted. Thus, if the Court has any doubt that Counts 4–9 should be dismissed based on the right-to-control allegations that are patent in the Indictment, the Court should order disclosure (or, at a minimum, *in camera* review) of the relevant portions of the grand jury's legal instructions.

**B.    Even the Government's Rewritten Fraud Theory Would Be Invalid.**

Even if the government were permitted to swap in a new theory, the charge would still fail as a matter of law. The government's new theory that Huawei schemed to "obtain" the funds involved in clearing Huawei's own transactions is not cognizable under the fraud statutes. One cannot commit fraud by obtaining one's own money from one's own bank. Whether wire fraud or bank fraud, the federal fraud statutes require the scheme to be one to defraud someone of, or obtain from them, money or property. *See* 18 U.S.C. §§ 1343 (wire fraud), 1344 (bank fraud); *Loughrin v. United States*, 573 U.S. 351, 359 (2014) (two prongs of bank fraud distinguish between bank as victim and others as victim, but both require scheme to obtain money or property from some victim). That is what the word "defraud" *means*: "[T]he 'common understanding' of the words 'to defraud' when the [wire fraud] statute was enacted referred 'to wronging one in his property rights.'" *Ciminelli*, 598 U.S. at 312 (quoting *Cleveland*, 531 U.S. at 19). *A priori*, the money or property has to be something that is not already the defendant's; *i.e.*, that belongs to someone else.

The government's new argument thus goes too far. As the government concedes, while a depository institution has "the right to use the funds as a source of loans that help the bank earn profits," the account holder at all times "retains the right … to withdraw funds" for any reason or no reason at all. *See* Opp. 44 (quoting *Shaw v. United States*, 580 U.S. 63, 66 (2016)). Thus, the customer retains *superior rights* to the property *vis-à-vis* the bank, and the bank's inferior rights dissipate the moment the account holder validly demands release of its funds. *See Shaw*, 580

U.S. at 66 ("[A]s bailee, the bank can assert the right to possess the deposited funds against all the world *but for the bailor*." (emphasis added)).[13]

None of the government's cases suggest otherwise; they involve schemes to obtain money the bank held *for a third party*. *See id.* at 65 (funds in "account belonging to a bank customer, Stanley Hsu"); *Bankman-Fried*, 680 F. Supp. 3d at 305 (deposits belonging to customers of defendant's company); *Motovich*, 2024 WL 2943960, at *3 (money from account where defendant was not "authorized signatory"); *United States v. Mansouri*, 2023 WL 8430239, at *1 (W.D.N.Y. 2023) (federal funds administered by victim bank). Meanwhile, other cases reaffirm that a defendant cannot defraud a bank out of the defendant's own money. *See, e.g.*, *United States v. Perez-Ceballos*, 907 F.3d 863, 868 (5th Cir. 2018) (reversing conviction where defendant allegedly obtained "*her* money, which she had authority to withdraw freely"); *United States v. Lien*, 982 F. Supp. 2d 1184, 1188 (E.D. Wash. 2013) (dismissing fraud charge where supposedly fraudulent check "was drawn on Defendant's own account"); *cf. Constantinescu*, 2024 WL 1221579, at *4 (noting "glaring … dearth of factual allegations" connecting the scheme "to the deprivation of the other investors' traditional property interests").[14] The government's newly crafted theory is not only not charged, it is also not fraud.

## C.    If Counts 4–9 Are Not Dismissed, Huawei Is Entitled to Particulars Regarding the Money or Property.

Finally, to the extent the Court does not dismiss Counts 4–9 outright, it should order the government to provide particulars concerning the money or property that was the object of Huawei's alleged schemes. Nearly five years ago, Huawei moved for a bill of particulars,

---

[13] The government likens the Victim Financial Institutions to "bailee[s]." Opp. 44. However, upon demand for return of the property by the bailor, a bailee "cannot thereafter prescribe the conditions under which he will perform that duty." *Sgro v. Getty Petrol. Corp.*, 854 F. Supp. 1164, 1180 (D.N.J. 1994), *aff'd*, 96 F.3d 1434 (3d Cir. 1996); *accord, e.g.*, *Williams v. Smith Ave. Moving Co.*, 582 F. Supp. 2d 316, 323 (N.D.N.Y. 2008).

[14] Only *An* even arguably goes the government's way, but *An* is distinguishable because the court there noted it was not established that the defendants "'owned' all the accounts at issue." 733 F. Supp. 3d at 92. To the extent *An* stands for the proposition that a defendant can deprive a bank of money in the defendant's own account, it is wrong. But in any event, *An* articulated the supposed deprivation as the profit the bank could have made from use of the funds. *Id.* at 93–94. Here, there can be no such deprivation of an opportunity to profit from the funds involved in dollar-clearing: Clearing transactions are "an entirely mechanical function; [that] occurs without human intervention in the proverbial 'blink of an eye.'" *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 250 (2018).

seeking, among other things, "the specific object(s) of the fraudulent scheme[s]." Dkt. 174-1, at 15. The government resisted, in part pointing to its "55-page speaking" Indictment and an additional 33 pages it submitted to a Canadian court in trying to extradite Huawei's CFO. *See* Dkt. 209, at 1, 4. But nowhere in those materials did the government provide any details beyond a right-to-control scheme. *See* Br. #3, at 7–8. Now, no longer able to rely on a right-to-control theory, the government advances a vague theory alleged nowhere in the Indictment that the object of the scheme was actually "funds in the form of dollar-clearing and other financial services." Opp. 39. The government cannot have it both ways, contending the Indictment offers sufficient details to stave off a bill of particulars and then saying its fraud charges survive based on details not contained in the Indictment.

Regardless, the government's years-too-late assertion that Huawei was actually scheming to obtain *funds* rather than "clearing *services*" and "banking *relationships*," *e.g.*, S3 Indict. ¶ 71 (emphases added), begs the same types of questions Huawei asked in its bill-of-particulars motion and was told to answer for itself from the Indictment: What supposed funds, at what supposed stage of the clearing process, from what banks? The object of a fraud charge—meaning the thing the government alleges the defendant was trying to get by his crime—is usually both obvious and specifically identified. Here, it is both shifting and, in its latest incarnation, so vague and linguistically tortured as to be beyond comprehension and trial preparation.

The government is at sea as to what money it is alleging Huawei schemed to obtain through its supposed fraud. Cut loose from the right-to-control theory charged in the Indictment, the government has come back with a theory it cannot coherently articulate. But to the extent the Court determines that the fraud charges are nonetheless permitted to survive dismissal, the government should be required to land somewhere intelligible on this essential element. The government has not substantively responded to Huawei's request for particulars about this information, beyond referring to a "continued … banking relationship" with Financial Institution 1 and "cost savings and the value of continued banking services," Dkt. 166, at 6, none of which make sense in light of the government's shift in theory. Huawei is entitled to have the

government "identify with sufficient particularity the nature of the charge[s] pending against [it]," *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam), including the "money or property" that was the alleged object of the fraud, in order to prepare its defense. *See United States v. Feola*, 651 F. Supp. 1068, 1131–32 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989) (bill of particulars serves to "to minimize surprise, to enable [the] movant to obtain such ultimate facts as are needed to prepare his defense, and to permit a defendant successfully to plead double jeopardy if he should be prosecuted later for the same offense").

### D.    Counts Four, Six, Seven, and Nine Do Not Allege Core Domestic Conduct.

The government does not dispute that the bank and wire fraud statutes (1) do not apply extraterritorially and (2) require that the use of domestic wires was "a *core component*" of the scheme. Br. #3, at 11, 17. The government likewise does not even attempt to rebut the Supreme Court's teaching in *Abitron Austria GmbH v. Hetronic International, Inc.*, 600 U.S. 412, 421–28 (2023), that domestic *effects* of foreign conduct are insufficient to support extraterritorial reach. *See* Br. #3, at 12. Under these principles, Counts Four, Six, Seven, and Nine are plainly deficient.

The government first argues that the Indictment is sufficient so long as it recites the statutory language. For the reasons given above (*supra* 6–7), that is wrong. The government next asserts that the Indictment adequately alleges domestic conduct, straining to characterize fringe conduct beyond Huawei's control as a "core component" of the scheme. Opp. 51–53. The "use of U.S.-dollar clearing services through U.S. banks," however, could not have been "[a]t the heart of the fraudulent scheme," *Id.* at 51. Dollar-clearing can be done with no involvement of U.S. banks, and the *bank*—not the customer—chooses where dollar-clearing occurs. *Id.* at 15–16. The government posits that it was "reasonably foreseeable" that dollar-clearing transactions would occur in the United States, *id.* at 53, but that theory was roundly discredited by *Abitron*.

The government's reliance on Huawei's statements to the press and on its website, *id.* at 51, likewise fails. The government provides no authority for the proposition that posting information on a website accessible from the United States counts as domestic conduct—a sweeping assertion that would seemingly bring every allegedly false statement uttered on the

*worldwide* web within the scope of the federal fraud statutes. With regard to the press, as explained in *Abitron*, Huawei must have *itself* acted domestically, but here it was the news agencies that independently caused Huawei's statements to be reproduced in this country.

Finally, the government invokes allegations of false testimony before Congress and a meeting in the United States in which a Huawei employee allegedly made false statements about compliance with U.S. law. Opp. 52. The Indictment does not draw any connection between these alleged incidents and the bank- and wire-fraud counts—it does not even incorporate by reference those allegations into the financial fraud charges. *See* S3 Indict. ¶¶ 99, 103, 105, 109. This alleged conduct could not possibly be a core component of the charged schemes.

Counts Four, Six, Seven, and Nine should be dismissed for these reasons as well.

## IV.    The IEEPA-Related Charges (Counts 11, 12, and 15) Should Be Dismissed.

The government fails to show that any of the dollar-clearing charges under IEEPA (Counts 11 & 12) or the derivative money laundering conspiracy charge (Count 15) states a valid offense.[15] The government's defenses of its novel and flawed charging theory are meritless, as are its pleas for the Court to overlook the legal defects in these counts until after the jury has been exposed to complex and inflammatory evidence about the supposed dollar-clearing scheme. Given the complexity of the IEEPA statute, the likelihood that these charges will invite mini-trials on dense and inflammatory issues, and the clear legal defects in these charges, Counts 11, 12, and 15 should be dismissed.

### A.    The Indictment Fails to Allege Services Were Provided "to Iran."

The ITSR prohibits the supply of certain services "*to Iran* or the Government of Iran," including the "transfer of funds, directly or indirectly, from the United States or by a U.S. Person … *to Iran*." 31 C.F.R. § 560.204, .427(a) (emphases added). The Indictment here fails to

---

[15] The government does not dispute that Count 15 must be dismissed if Count 11 is dismissed. *See* Br. #4, at 10–11. In addition, while the government is correct the *Klein* conspiracy charge is sufficiently alleged under existing precedent, *see id.* at 11, 14–15 (conceding as much), that precedent is irreconcilable with *Ciminelli* and other intervening decisions narrowly construing fraud offenses to schemes designed to obtain money or property.

allege any supply of financial services "to Iran"; the transactions at issue were all between non-Iranian bank accounts held by non-Iranian companies.

The government asks the Court to disregard this statutory argument until trial because the Indictment recites the bare-bones elements of the charged offenses. Opp. 54. However, the government does not dispute that it has made "a full proffer of the evidence it intends to present at trial" with respect to the allegedly unlawful dollar-clearing transactions. The Court may consider this proffer on a pre-trial motion to dismiss. *United States v. Laurent*, 861 F. Supp. 2d 71, 109–10 (E.D.N.Y. 2011); *see* Br. #4, at 4 n.1. Specifically, as to the allegedly unlawful dollar-clearing transactions, the government has identified the transactions that it alleges illegally "cleared through the United States." *See* Dkt. 267, 271. The government does not dispute that these were all "foreign transactions that neither began nor ended in Iran," nor that the companies involved in these transactions were all incorporated outside of Iran. Br. #4, at 3, 5. The Court can therefore decide now whether entirely non-Iranian transactions could violate the ITSR's prohibition of providing financial services "to Iran."

The government's defense of these charges on the merits fares no better. The thrust of the government's argument is that the Indictment alleges "a sufficient nexus with Iran." *E.g.*, Opp. 54. But the ITSR does not penalize transactions with a mere "nexus" to Iran; as to the prohibition on the provision of financial services, the ITSR requires a "transfer of funds … to Iran." 31 C.F.R. § 560.427(a)(1). And the term "Iran" is defined geographically: "the territory of Iran … over which the Government of Iran claims sovereignty." 31 C.F.R. § 560.303. Where, as here, the relevant transactions originated and terminated outside of Iran and were processed by non-Iranian banks on behalf of non-Iranian customers, there can be no liability under IEEPA.

Unable to show that these transactions were sent "to Iran," the government repeats the Indictment's allegations that Skycom "functioned as HUAWEI's Iran-based subsidiary." Opp. 56 (quoting S3 Indict. ¶ 4). Even accepted as true for purposes of Huawei's motion to dismiss, these allegations fail to show that any financial services were exported "*to Iran*." Skycom was located

in Hong Kong, as were all relevant Skycom-controlled bank accounts. That Skycom did work in Iran is irrelevant to whether dollar-clearing services were exported "to Iran."

The cases the government cites do not support its argument. In *United States v. Homa*, the defendants were accused of "implementing the transfer of funds from the United States *to bank accounts in Iran* via Dubai." 387 F.3d 144, 145 (2d Cir. 2004) (emphasis added). Here, by contrast, there is no allegation in the Indictment that any transactions ever reached an Iranian bank. Likewise, the government's passing citation to *United States v. Zarrab* does not lend support to the government's charges, because the allegations there involved "transactions with Iranian businesses" that were sent to "Iranian banks." 2016 WL 6820737, at *2, *7 (S.D.N.Y. 2016); *cf. United States v. Atilla*, 966 F.3d 118, 127 (2d Cir. 2020) (affirming conviction where defendant "agreed to transfer money from the United States to Iran"). The government cites not a single IEEPA conviction based on transactions involving no Iranian bank accounts or customers.

### B. Huawei Tech Did Not Have Fair Notice that IEEPA Reached Foreign Companies' Use of Foreign Banks.

The IEEPA-related counts should also be dismissed because Huawei Tech lacked fair notice that the decision by a third-party bank to clear a transaction through a bank in the United States at some point along the payment chain could subject Huawei to criminal liability under IEEPA. *See* Br. #4, at 5–10. Neither IEEPA nor the ITSR expressly reach foreign companies using foreign banks, and at the relevant time, the U.S. government consistently and publicly stated that foreign companies using foreign banks were *not* subject to IEEPA. It was not until years after the transactions at issue that the U.S. government changed course and expanded its interpretation of IEEPA. The government responds (at 58–60) that Huawei Tech's fair notice arguments are premature and incorrect as a matter of law. Both arguments miss the mark.

#### 1. The Court Can Resolve Huawei Tech's Fair Notice Argument Now.

The government contends that an as-applied vagueness challenge can never be resolved until the facts of the alleged violation have been established at trial. Opp. 58. But the Second

Circuit recently held—adopting the arguments of this very U.S. Attorney's Office[16]—that a vagueness challenge is untimely if not made before trial and "the basis for the motion is then reasonably available." *United States v. Kelly*, 128 F.4th 387, 420  (2d Cir. 2025) (quoting Fed. R. Crim. P. 12(b)(3)(B)). The government cites cases where the court found that the defendant *in that case* would have to wait until it became "clear what [the government alleges] he did." *Raniere*, 384 F. Supp. 3d at 320; *United States v. Hoskins*, 73 F. Supp. 3d 154 (D. Conn. 2014). But, as the Second Circuit recently recognized in *Kelly*, "whether a pretrial as-applied vagueness challenge is premature depends on the arguments … and the facts of the case." *United States v. Lazzaro*, 2022 WL 4112395, at *9 (D. Minn. 2022). Where, as here, the basis for the claim is "reasonably available" from the fact of the indictment, *Kelly*, 128 F.4th at 420, a pre-trial vagueness challenge is timely.

The government alleges that Huawei Tech is "a global networking, telecommunications and services company headquartered in Shenzhen," S3 Indict. ¶ 1; that Skycom was "a corporation registered in Hong Kong whose primary operations were in Iran," *id.* ¶ 4; and that Huawei Tech's foreign banks used U.S. subsidiary banks to clear Skycom-related transactions "between November 2007 and November 2014," *id.* ¶¶ 64–67, 71, 118, 120, 126. To resolve this vagueness challenge, the Court need only apply these allegations to the law in place at the time of the alleged offense, in light of the government's contemporaneous public statements about IEEPA's scope. *See United States v. Smith*, 985 F. Supp. 2d 547, 602 (S.D.N.Y. 2014) (pre-trial vagueness challenge appropriate where the court merely has to apply the "law to the allegations in the Indictment"), *aff'd*, 664 F. App'x 23 (2d Cir. 2016); *cf. United States v. Williams*, 2023 WL 6810569, at *2 n.3 (W.D. Pa. 2023).

*United States v. Bodmer* is instructive. In *Bodmer*, a Swiss national allegedly conspired to violate the Foreign Corrupt Practices Act ("FCPA") by bribing Azerbaijani officials. 342 F. Supp. 2d 176, 178–79 (S.D.N.Y. 2004). Surveying the statutory language, legislative history, and

---

[16] *See, e.g.*, Opp. to Rule 29 Motion, at 38, *United States v. Full Play Grp. S.A.*, No. 15-cr-252 (E.D.N.Y. June 2, 2023), Dkt. 1999 (arguing a Rule 29 motion was "not the proper procedural device" to raise a vagueness challenge).

judicial interpretations, the court dismissed the FCPA charge on the grounds that the defendant "did not have fair notice that the FCPA's criminal sanctions applied to him." *Id.* at 189.[17] So too here: The Court can determine from the Indictment and the government statements identified in the motion to dismiss that a reasonable person in Huawei Tech's position lacked fair notice that it could be held criminally liable for the independent decision of its foreign financial institutions to route dollar-clearing transactions through U.S. correspondent banks.

### 2. Huawei Tech Lacked Fair Notice that Its Foreign Conduct Was Subject to IEEPA.

The government also argues Huawei Tech's as-applied challenge fails because the ITSR's prohibition on providing banking services to Iran is "an unmistakable, unambiguous proscription." Opp. 59. But the government never joins issue on the critical point: if the regulations truly were "unmistakable" and "unambiguous," why did OFAC repeatedly get it wrong, and how was Huawei supposed to know better than the expert sanctions-enforcement agency?

As detailed in Huawei Tech's motion, it is far from clear that the ITSR's prohibitions of certain financial transactions "from the United States, or by a United States person," 31 C.F.R. § 560.204, apply to financial transactions from non-U.S. locales by a non-U.S. person, simply because the bank responsible for the transaction chose to route it through the United States. Nor did case law, agency guidance, or enforcement precedent make this clear. To the contrary, during and for years after the alleged IEEPA scheme at issue here, OFAC consistently defined the "universe" of entities subject to OFAC regulations as U.S. citizens and permanent residents, corporations "organized under U.S. law," individuals and entities located in the United States, and entities owned or controlled by any of the above. *See* Br. #4, at 7–9. During this period, consistent with OFAC's repeated and consistent position, neither OFAC nor the Department of

---

[17] *Accord, e.g.*, *United States v. Bareno-Burgos*, 739 F. Supp. 772, 783 (E.D.N.Y. 1990) (dismissing charge based on regulatory violation because regulations did not give "fair warning" of currency reporting obligations); *United States v. Smith*, 2010 WL 3724756, at *14 (D. Ariz. 2010) (granting motion to dismiss because regulations "would not place a person of ordinary intelligence on fair notice as to whether his or her conduct was criminal"); *United States v. Biba*, 395 F. Supp. 3d 227, 235–36 (E.D.N.Y. 2019) (resolving as-applied vagueness arguments raised in a motion to dismiss); *United States v. Serrano*, 191 F. Supp. 3d 287, 292 (S.D.N.Y. 2016) (same).

Justice brought a single civil or criminal enforcement action against a non-U.S. company that used a non-U.S. bank account to route a dollar-denominated transaction to a non-U.S. recipient. *See id.* at 9–10. Judicial opinions construing ITSR Sections 204 and 206(a), similarly, were clear that the ITSR prohibited any "U.S. person" from engaging in prohibited activities, but stopped short of implicating foreign nationals when those persons or entities acted entirely abroad. *See id.* at 6–7; *see also United States v. Banki*, 685 F.3d 99, 106 (2d Cir. 2012). The government never explains how Huawei Tech should have understood the ITSR better than OFAC or the Department of Justice.

The government does not dispute Huawei Tech's reading of OFAC's guidance and enforcement practices from the relevant time period. Instead, the government seizes upon a footnote in Huawei Tech's motion that OFAC's public statements undermine the government's ability to prove willfulness, mischaracterizes that footnote as Huawei Tech's entire argument, and suggests that Huawei Tech's entire argument goes to *mens rea*. This is a red herring. Huawei Tech has been clear that it is moving to dismiss Counts 11, 12, and 15 on the ground that at the time that Huawei Tech was allegedly violating IEEPA, it lacked fair notice that its conduct was subject to IEEPA. *See, e.g.*, Br. #4, at 1, 5. A footnoted observation that these same issues would undermine the government's ability to prove an essential element of the offense at trial does not change the substance of Huawei Tech's argument.

## CONCLUSION

For the foregoing reasons, Huawei's Motion to Dismiss should be granted.

30

Respectfully submitted,

/s/ Douglas A. Axel

David Bitkower
Matthew S. Hellman
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
(202) 639-6048
dbitkower@jenner.com

Douglas A. Axel
Michael A. Levy
Jennifer Saulino
Daniel Rubinstein
Ellyce R. Cooper
Frank R. Volpe
Melissa Colón-Bosolet
Daniel J. Hay
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
(212) 839-5300
daxel@sidley.com

Brian M. Heberlig
Ryan P. Poscablo
William L. Drake
Jessica I. Rothschild
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
rposcablo@steptoe.com

*Counsel for Huawei Technologies Co., Ltd., Huawei Device USA Inc.,*
*Huawei Device Co., Ltd., and Futurewei Technologies, Inc.*