NJM:AAS/MAA/MS
F. #2017R05903

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -                                     18-CR-457 (S-3) (AMD)

HUAWEI TECHNOLOGIES CO., LTD., ET AL.,

           Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF THE
GOVERNMENT'S MOTIONS *IN LIMINE*
TO ADMIT CERTAIN EVIDENCE AND PRECLUDE CERTAIN EVIDENCE AT TRIAL

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

MARGARET A. MOESER
Chief
Money Laundering, Narcotics
and Forfeiture Section
Criminal Division
U.S. Department of Justice

CHRISTIAN NAUVEL
Acting Chief
Counterintelligence and Export
Control Section
National Security Division
U.S. Department of Justice

ALEXANDER A. SOLOMON
MEREDITH A. ARFA
ROBERT M. POLLACK
MATTHEW SKURNIK
MATTHEW SULLIVAN
Assistant U.S. Attorneys
        (Of Counsel)

TAYLOR G. STOUT
MORGAN J. COHEN
JASMIN SALEHI FASHAMI
Trial Attorneys

CHRISTOPHER FENTON
Trial Attorney

<u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................... iv

PRELIMINARY STATEMENT .................................................................................... iv

ARGUMENT .................................................................................................................. 3

I.      The Court Should Preclude Argument as to Prosecutorial Motivation ................. 3

II.     The Court Should Preclude Evidence, Argument, or Questioning
        Regarding the Propriety of Seizures of Personal Property ..................................... 5

III.    The Court Should Preclude Evidence, Argument, or Questioning
        Regarding Underlying Civil Litigation Resolutions or Judicial Rulings ............... 7

        A. Background ....................................................................................................... 7

            1.  █████ Civil Litigation ................................................................................ 8

            2.  ███████ Civil Litigation ........................................................................... 9

            3.  ███████ Civil Litigation ......................................................................... 11

            4.  ███████ Civil Litigation ......................................................................... 12

            5.  █████ Civil Litigation ............................................................................. 13

        B. Argument ........................................................................................................ 14

            1.  The Civil Litigation Resolutions Should Be Precluded ...................... 14

            2.  The Civil Judicial Orders Should Be Precluded ................................ 18

            3.  References to the Civil Litigations Should Be Permitted for
                Limited Purposes ............................................................................... 19

IV.     The Court Should Preclude Evidence, Argument, or Questioning
        Suggesting that the Charged Conduct Was Consistent with Industry
        Practice ................................................................................................................. 19

V.      The Court Should Preclude Evidence, Argument, or Questioning
        Regarding the Victim Financial Institutions' Alleged Negligence ...................... 21

VI.     The Court Should Preclude Evidence, Argument, or Questioning that the
        Defendants' Failure to Benefit Economically from Certain Stolen Intellectual
        Property Is a Defense to Trade Secret Theft ........................................................ 22

VII.    The Court Should Preclude Evidence, Argument, or Questioning
        Regarding the Defendants' Prior Commission of "Good Acts" or
        Non-Commission of Other "Bad Acts" ................................................................ 23

VIII.   The Court Should Establish Reasonable Procedures to Preserve the
        Confidentiality of Any Trade Secrets Presented During Trial ............................. 24

IX.     The Court Should Preclude Evidence, Argument, or Questioning
        Regarding █████'s Alleged Prior Wrongdoing .................................................. 26

X.      The Court Should Preclude Evidence, Argument, or Questioning
        Regarding ████ Continuing Its Banking Relationship with
        Huawei Tech After Learning of Huawei Tech's Skycom Fraud .......................... 26

XI.     The Court Should Permit the Government to Elicit Testimony
        Regarding Materiality Through Hypothetical Questions...................................... 28

XII.    The Court Should Permit Evidence Regarding Dissemination of
        Huawei Tech's Statements Through Media Reports ............................................ 29

        A. Background ........................................................................................................ 29

            1.  *Huawei Tech's Statements in the* Light Reading *Articles*.................. 29

            2.  *Huawei Tech's Statements in the* Reuters *Articles* ............................ 30

        B. Argument ........................................................................................................... 31

            1.  *Huawei Tech's Statements in the* Light Reading *Articles
                Should Be Admitted*................................................................................ 32

            2.  *Huawei Tech's Statements in the* Reuters *Articles
                Should Be Admitted*................................................................................ 35

XIII.   The Court Should Admit Contemporaneous Accounts Memorialized
        in Writing ................................................................................................................ 37

        A. Background ........................................................................................................ 37

            1.  *Memorialization of* ████ *'s Meeting* ................................................ 37

            2.  *Memorialization of* ████ *Events* ...................................................... 38

        B. Argument ........................................................................................................... 38

XIV.    The Court Should Permit Evidence Regarding FutureWei's Payment
        of Attorneys' Fees and Costs for a Co-conspirator............................................. 38

XV.     The Court Should Preclude Evidence, Argument, or Questioning
        Regarding a Purported Cyber Intrusion of ████ 's Network Post-Dating
        the Alleged Misappropriation ................................................................................ 40

XVI.    The Court Should Admit Evidence of ██ 's Destruction of Evidence................ 41

XVII.   The Court Should Preclude Argument that FutureWei's Application
        for a Provisional U.S. Patent with Misappropriated Technology Negates
        Criminal Intent ....................................................................................................... 43

XVIII.  The Court Should Permit Evidence of Huawei Tech's Misrepresentations
        to Victim Financial Institutions ............................................................................ 44

        A. Relevant Facts ................................................................................................... 44

        B. Applicable Law.................................................................................................. 45

        C. Argument ........................................................................................................... 46

XIX.  The Court Should Permit Certain Witnesses to Testify Under
      Pseudonyms or Initials and Preclude Cross-Examination of These
      Witnesses Regarding Certain Identifying Information ........................................ 47

      A.  The Court Should Permit the Protected Witnesses to Testify Under
          Aliases ........................................................................................................ 48

      B.  The Court Should Preclude Cross-Examination Eliciting Certain
          Identifying Information .............................................................................. 51

XX.   The Court Should Preclude Evidence, Argument, or Questioning About Classified
      Information Outside the Scope of CIPA ............................................................. 52

XXI.  The Court Should Preclude Evidence, Argument, or Questioning
      Inconsistent with Facts Known to Defense Counsel, Including Facts
      Made Known in Unclassified Discovery ............................................................. 54

REQUEST FOR SEALING ................................................................................................. 55

CONCLUSION ................................................................................................................... 55

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
  182 F. App'x 994 (Fed. Cir. 2006) ........................................................... 43

*Brimelow v. New York Times Co.*,
  No. 20-CV-222 (KPF), 2020 WL 7405261 (S.D.N.Y. Dec. 16, 2020) .................................. 35

*Delaware v. Van Arsdall*,
  475 U.S. 673 (1986) ........................................................... 49

*Dep't of Navy v. Egan*,
  484 U.S. 518 (1988) ........................................................... 53

*In re Gen. Motors LLC Ignition Switch Litig.*,
  No. 14-MD-2543 (JMF), 2015 WL 9165341 (S.D.N.Y. Dec. 16, 2015) ............................... 16

*In re Grand Jury Subpoena Served Upon Doe*,
  781 F.2d 238 (2d Cir. 1986) ........................................................... 39

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003) ........................................................... 34

*Kellner v. City of New York*,
  No. 17-CV-1268 (NRM), 2025 WL 3507346 (E.D.N.Y. Dec. 8, 2025) ........................ 31, 34, 36

*Kousisis v. United States*,
  605 U.S. 114 (2025) ........................................................... 22

*Lemberger v. Westinghouse Elec. Corp.*,
  76-C-552 (JW), 1976 WL 834 (E.D.N.Y. Nov. 1976) ........................................................... 29

*Lugosch v. Pyramid Co.*,
  435 F.3d 110 (2d Cir. 2006) ........................................................... 55

*Mandal v. City of New York*,
  No. 02-CV-1234 (WHP), 2006 WL 3405005 (S.D.N.Y. Nov. 26, 2006) ..................... 31, 34, 36

*Manko v. United States*,
  63 F. App'x 570 (2d Cir. 2003) ........................................................... 15

*Neder v. United States*,
  527 U.S. 1 (1999) ........................................................... 27

*Parker v. Reda*,
   327 F.3d 211 (2d Cir. 2003) ........................................................................... passim

*Pavlica v. Behr*,
   No. 03-CV-9628 (DC), 2005 WL 3181586 (S.D.N.Y. Nov. 29, 2005) .................................... 17

*Sharkey v. J.P. Morgan Chase & Co.*,
   No. 10-CV-3824, 2017 WL 374735 (S.D.N.Y. Jan. 26, 2017) ............................................. 14

*Tardif v. City of New York*,
   No. 13-CV-4056 (KMW), 2022 WL 1239233 (S.D.N.Y. Apr. 26, 2022) ............................. 15

*Texas Gulf Sulphur Co. v. Ritter*,
   371 F. 2d 145 (10th Cir. 1967) ........................................................................................ 29

*United States v. Alaniz*,
   726 F.3d 586 (5th Cir. 2013) .......................................................................................... 50

*United States v. Allen*,
   201 F.3d 163 (2d Cir. 2000) ........................................................................................... 22

*United States v. Amico*,
   486 F.3d 764 (2d Cir. 2007) ........................................................................................... 22

*United States v. Aref*,
   533 F.3d 72 (2d Cir. 2008) ............................................................................................. 55

*United States v. Armstrong*,
   517 U.S. 456 (1996) ........................................................................................................ 3

*United States v. Badia*,
   827 F.2d 1458 (11th Cir. 1987) ...................................................................................... 53

*United States v. Benedetto*,
   571 F.2d 1246 (2d Cir. 1978) ......................................................................................... 24

*United States v. Bennett*,
   409 F.2d 888 (2d Cir. 1969) ........................................................................................... 48

*United States v. Blake*,
   195 F. Supp. 3d 605 (S.D.N.Y. 2016) ............................................................................. 17

*United States v. Bradley*,
   No. 21-CR-87 (VAB), 2022 WL 1708400 (D. Conn. May 27, 2022) ............................ 31, 35

*United States v. Carboni*,
   204 F.3d 39 (2d Cir. 2000) ............................................................................................. 45

*United States v. Cavallaro,*
    553 F.2d 300 (2d Cir. 1977) ........................................................................... 51

*United States v. Celis,*
    608 F.3d 818, (D.C. Cir. 2010). ................................................................... 50

*United States v. Chang,*
    No. 18-CR-681 (NGG), 2024 WL 3303717 (E.D.N.Y. July 3, 2024) ................... 28

*United States v. Coonan,*
    938 F.2d 1553 (2d Cir. 1991) ........................................................................ 45

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013) ......................................................................... 27

*United States v. Crawford,*
    541 U.S. 36 (2004) ....................................................................................... 33

*United States v. Cuti,*
    720 F.3d 453 (2d Cir. 2013) .................................................................... 28, 29

*United States v. Daly,*
    842 F.2d 1380 (2d Cir. 1988) ........................................................................ 45

*United States v. Dawkins,*
    999 F.3d 767 (2d Cir. 2021) ......................................................................... 23

*United States v. Demosthene,*
    334 F. Supp. 2d 378 (S.D.N.Y. 2004) ............................................................. 4

*United States v. Devery,*
    935 F. Supp. 393 (S.D.N.Y. 1996) .................................................................. 7

*United States v. Dominique-McClain,*
    623 F. Supp. 3d 33 (E.D.N.Y. 2022) .............................................................. 23

*United States v. Dupree,*
    870 F.3d 62 (2d Cir. 2017) ........................................................................... 45

*United States v. Eisen,*
    974 F.2d 246 (2d Cir. 1992) .................................................................... 41, 42

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011) ........................................................................... 4

*United States v. Figueroa,*
    548 F.3d 222 (2d Cir. 1992) ........................................................................... 6

*United States v. Golfo*,
 No. 19-CV-95 (KAM), 2020 WL 2513445 (E.D.N.Y. May 15, 2020) .................................. 23

*United States v. Gonzalez*,
 110 F.3d 936 (2d Cir. 1997) ............................................................................................ 45

*United States v. Gotti*,
 784 F. Supp. 1013 (E.D.N.Y. 1992) ................................................................................ 23

*United States v. Guzman Loera*,
 No. 09-CR-466 (BMC), 2018 WL 2744701 (E.D.N.Y. June 7, 2018) .......................... 4, 50, 51

*United States v. Hatfield*,
 No. 06-CR-550 (JS), 2010 WL 2541057 (E.D.N.Y. June 10, 2010) ...................................... 28

*United States v. Hernandez*,
 No. 12-CR-809 (PKC), 2013 WL 3936185 (S.D.N.Y. July 29, 2013) ............................ 49, 51

*United States v. Inniss*,
 No. 18-CR-134 (KAM), 2019 WL 699912 (E.D.N.Y. Dec. 20, 2019)................................... 20

*United States v. Inserra*,
 34 F.3d 83 (2d Cir. 1994) ................................................................................................ 45

*United States v. Isola*,
 No. 10-CR-833 (WHP), 2012 WL 243083 (S.D.N.Y. Jan. 11, 2012) ................................... 22

*United States v. Israilov*,
 No. 22-CR-20 (PGG), 2023 WL 4407464 (S.D.N.Y. July 6, 2023) ...................................... 42

*United States v. Jennings*,
 487 F.3d 564 (8th Cir. 2007)............................................................................................ 28

*United States v. Johnson*,
 469 F. Supp. 3d 193 (S.D.N.Y. 2019) ..................................................................... 18, 40, 47

*United States v. Kelly*,
 128 F.4th 387 (2d Cir. 2025)............................................................................................ 24

*United States v. Langford*,
 990 F.2d 65 (2d Cir. 1993) .............................................................................................. 45

*United States v. Lawes*,
 292 F.3d 123 (2d Cir. 2002)............................................................................................... 6

*United States v. Litvak*,
 889 F.3d 56 (2d Cir. 2018) .............................................................................................. 27

*United States v. Liu*,
No. 19-CR-804 (VEC), 2022 WL 773315 (S.D.N.Y. Mar. 14, 2022) .................................... 5

*United States v. Maldonado-Rivera*,
922 F.2d 934 (2d Cir. 1990) ............................................................................................... 5

*United States v. Marcus*,
No. 05-CR-457 (ARR), 2007 WL 330388 (E.D.N.Y. Jan. 31, 2007) ................................. 48

*United States v. Marin*,
669 F.2d 73 (2d Cir. 1982) ................................................................................................ 17

*United States v. Marti*,
421 F.2d 1263 (2d Cir. 1970) ................................................................................. 48, 51, 52

*United States v. Maso*,
No. 07-10858, 2007 WL 3121986 (11th Cir. 2007) ............................................................ 51

*United States v. McDaniel*,
398 F.3d 540 (6th Cir. 2005) ............................................................................................. 17

*United States v. Mejia*,
376 F. Supp. 2d 460 (S.D.N.Y. 2005) ............................................................................... 42

*United States v. Newton*,
369 F.3d 659 (2d Cir. 2004) .............................................................................................. 20

*United States v. Oldbear*,
568 F.3d 814 (10th Cir. 2009) ........................................................................................... 21

*United States v. Paulino*,
445 F.3d 211 (2d Cir. 2006) .............................................................................................. 40

*United States v. Persico*,
425 F.2d 1375 (2d Cir. 1970) ............................................................................................ 51

*United States v. Potamitis*,
739 F.2d 784 (2d Cir. 1984) .............................................................................................. 42

*United States v. Raines*,
No. 22-CR-18-02 (NSR), 2023 WL 6211980 (S.D.N.Y. Sept. 25, 2023) ............................ 46

*United States v. Ranney*,
719 F.2d 1183 (1st Cir. 1983) ........................................................................................... 28

United States v. *Re*,
401 F.3d 828 (7th Cir. 2005) ............................................................................................... 4

*United States v. Reese*,
    933 F. Supp. 2d 579 (S.D.N.Y. 2013) ................................................................. 4

*United States v. Regan*,
    103 F.3d 1072 (2d Cir. 1997) ................................................................. 3, 4

*United States v. Rivera*,
    No. 13-CR-149 (KAM), 2015 WL 1725991 (E.D.N.Y. Apr. 15, 2015) ................. 24

*United States v. Roberts*,
    No. 08-CR-175 (CCS), 2010 WL 1010000 (E.D. Tenn. Mar. 17, 2010) ................ 25

*United States v. Rosa*,
    11 F.3d 315 (2d Cir. 1993) ................................................................. 6

*United States v. Scarpa*,
    897 F.2d 63 (2d Cir. 1990) ................................................................. 23

*United States v. Schulte*,
    No. 17-CR-548 (PAC), 2020 WL 264687 (S.D.N.Y. Jan. 17, 2020). ................. 47

*United States v. Simmons*,
    923 F.2d 934 (2d Cir. 1991) ................................................................. 39

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) ................................................................. 33

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009) ................................................................. 54

*United States v. Stewart*,
    No. 03-CR-717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004) ................. 4, 21

*United States v. Stone*,
    No. 05-CR-401 (ILG), 2007 WL 4410054 (E.D.N.Y. Dec. 14, 2007) ................. 6

*United States v. Sun Myung Moon*,
    718 F.2d 1210 (2d Cir. 1983) ................................................................. 4

*United States v. Thomas*,
    377 F.3d 232 (2d Cir. 2004) ................................................................. 22

*United States v. Turkette*,
    452 U.S. 576 (1981) ................................................................. 24

*United States v. Walker*,
    191 F.3d 326 (2d Cir. 1999) ................................................................. 23

*United States v. Washington,*
   705 F.2d 489 (D.C. Cir. 1983) ................................................................. 7

*United States v. Wilkerson,*
   361 F.3d 717 (2d Cir. 2004) ................................................................... 5

*United States v. Williams,*
   205 F.3d 23 (2d Cir. 2000) .................................................................. 45

*United States v. Yunis,*
   867 F.2d 617 (D.C. Cir. 1989) ............................................................... 54

*United States v. Zuniga,*
   312 F. App'x 653 (5th Cir. 2009) ........................................................... 39

*Washington v. Walsh,*
   No. 08-CV-6237, 2010 WL 423056 (S.D.N.Y. Feb. 5, 2010) ................................ 49

*Winter v. Natural Resources Defense Council,*
   555 U.S. 7 (2008) ........................................................................ 18

*Zirvi v. Flatley,*
   433 F. Supp. 3d 448 (S.D.N.Y. 2020) ..................................................... 43

**Statutes**

18 U.S.C. § 1835(a) .......................................................................... 34

18 U.S.C. app. 3 § 5 ......................................................................... 62

18 U.S.C. app. 3 § 6 ......................................................................... 62

18 U.S.C. app. 3 § 7 ......................................................................... 62

18 U.S.C. app. 3 § 8 ......................................................................... 62

**Federal Rules**

Fed. R. Crim. P. 12(b)(3)(A)(iv) ............................................................. 13

Fed. R. Crim. P. 6(e)(6) ..................................................................... 64

Fed. R. Evid. 403 ............................................................................ 15

Fed. R. Evid. 404(a)(2)(A) ................................................................... 33

Fed. R. Evid. 404(b)(2) ...................................................................... 54

Fed. R. Evid. 405(a) ......................................................................... 33

Fed. R. Evid. 608(b)......................................................................................................... 15, 35

Fed. R. Evid. 611 ................................................................................................................ 14

Fed. R. Evid. 803(5)........................................................................................................... 41

Fed. R. Evid. 805 ............................................................................................................... 41

<u>PRELIMINARY STATEMENT</u>

The government respectfully moves *in limine* to admit certain evidence at trial and to preclude defendants Huawei Technologies Co., Ltd. ("Huawei Tech"), Huawei Device Co., Ltd. ("Huawei Device"), Huawei Device USA Inc. ("Huawei Device USA"), and FutureWei Technologies, Inc. ("FutureWei," and together with Huawei Tech, Huawei Device, and Huawei Device USA, the "defendants" or "Huawei") from introducing certain evidence, arguments, or questioning of witnesses at trial.[1]

Specifically, the government moves for leave to: (1) elicit testimony regarding the issue of materiality through hypothetical questions; (2) introduce evidence of Huawei Tech's statements contained in media reports; (3) admit contemporaneous accounts memorialized in writing as recorded recollections; (4) introduce evidence regarding FutureWei's payments of attorneys' fees and costs in connection with the prosecution of one of Huawei Tech and FutureWei's co-conspirators; (5) admit evidence of the destruction of evidence by an uncharged co-conspirator; (6) admit evidence of Huawei Tech's material misstatements to a victim financial institution as direct evidence or under Federal Rule of Evidence 404(b); and (7) permit certain witnesses to testify under pseudonyms or initials and to preclude cross-examination of those witnesses regarding certain identifying information.

The government also seeks to preclude the defense from: (1) attacking purportedly improper motives of the prosecution team; (2) introducing evidence, arguments, or questioning of witnesses regarding the propriety of seizures of personal property; (3) introducing evidence, argument, or questioning of witnesses regarding resolutions of, or judicial rulings in, underlying

---

[1]    The government anticipates moving *in limine* at a later date regarding witness-specific issues identified in the course of preparing for trial, such as preclusion of unfairly prejudicial topics of impeachment.

civil litigations; (4) introducing evidence, argument, or questioning of witnesses suggesting that the charged criminal conduct was consistent with industry practice; (5) arguing that the financial fraud charges are unsound because the victim financial institutions did not suffer any financial loss from the defendants' criminal conduct or somehow had unclean hands; (6) introducing evidence, argument, or questioning suggesting that the defendants' failure to economically benefit from certain stolen intellectual property is a defense to trade secret theft; (7) introducing evidence, argument, or questioning of witnesses regarding the defendants' prior commission of "good acts," or non-commission of other "bad acts"; (8) introducing evidence, argument, or questioning of witnesses relating to a victim intellectual property company's alleged prior wrongdoing; (9) introducing evidence, argument, or questioning of witnesses regarding a financial institution's decision to continue a global banking relationship with Huawei Tech; (10) introducing evidence, argument, or questioning of witnesses regarding a purported cyber intrusion post-dating the relevant misappropriation allegations; (11) arguing that FutureWei's application in 2009 for a provisional U.S. patent using ████████'s misappropriated technology is relevant to FutureWei's criminal intent; (12) introducing evidence, argument, or questioning of witnesses about the existence or non-existence of specified classified information; and (13) introducing evidence, argument, or questioning of witnesses inconsistent with facts known to defense counsel, including facts made known in unclassified discovery.

In addition, the government respectfully requests that the Court establish reasonable procedures to preserve the confidentiality of any trade secrets presented during trial.

ARGUMENT

I.    The Court Should Preclude Argument as to Prosecutorial Motivation

In seeking pretrial dismissal of the charges, the defendants have asserted that the charges in this case are vindictive, selective, and/or politically motivated.  (*See* ECF No. 474 at 8-9.)  Among other things, the defendants have claimed:

> The government's untenable misuse of RICO [Racketeer Influenced and Corrupt Organizations Act] against Huawei represents the apex of the Justice Department's ill-founded "China Initiative," which had the express goal of targeting Chinese companies and Chinese nationals—including Huawei—with prosecution, sanctions, and other legal actions.  Under the China Initiative, the government dramatically lowered the standard applied to investigate and prosecute people and companies with ties to China.  At the same time, competition in the global 5G marketplace and the government's intensifying trade war with China made Huawei a prime target for the Justice Department and other federal agencies.

(*Id.*)

These accusations are wholly unsupported by any evidence and irrelevant to the question before the jury—whether the defendants are guilty of the charged crimes.  Tellingly, the defendants have not brought any selective or vindictive prosecution claim, which would require them to support their accusations before trial.  It is well established that a claim of improper prosecutorial motive or purpose, whatever its grounds, "is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution."  *United States v. Armstrong*, 517 U.S. 456, 463 (1996).  Such a claim is "unrelated to factual innocence of the crime[s] charged," which is the sole issue to be decided by the jury.  *United States v. Regan*, 103 F.3d 1072, 1082 (2d Cir. 1997).

Whatever the defendants' intent in making sweeping accusations about the government's motives without raising corresponding legal claims or offering any factual support, such accusations would serve no purpose at trial other than to distract the jury from the evidence

or to encourage jury nullification.  Such evidence, argument, and questioning of witnesses should therefore be precluded, in any form, including in opening statements.  *See id.* (a "selective prosecution defense is an issue for the court rather than the jury").[2]

Evidence, argument, or questioning about the Department of Justice's ("DOJ's") China Initiative,[3] in particular, has no place at trial.  As a district court in this Circuit previously reasoned in granting a government motion to preclude cross-examination or introduction of evidence concerning the DOJ's China Initiative:

> Whatever knowledge the Government's witnesses may have about the China Initiative reflects nothing about the knowledge or states of mind of unrelated third parties.  Asking about the China Initiative would quickly devolve into evidence explaining why the Department of Justice announced a "China Initiative," and why it and the Federal Bureau of Investigation ("FBI") were focused on China as part of their counterintelligence program.  That could quickly segue into the fact that this case was investigated as part of the FBI's counterintelligence program, evidence Defendant wishes

---

[2]     *See also United States v. Farhane*, 634 F.3d 127, 166-67 (2d Cir. 2011) (affirming district court's ruling precluding defendant from arguing in summation that government had improperly targeted him for prosecution); *United States v. Re*, 401 F.3d 828, 833 (7th Cir. 2005) (prosecuting authority's motives or views underlying its "charging decisions are not proper subjects for cross-examination and argument"); *United States v. Guzman Loera*, No. 09-CR-466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) (observing defense selective prosecution argument to jury would be "improper"); *United States v. Reese*, 933 F. Supp. 2d 579, 583 (S.D.N.Y. 2013) (precluding defendant from advancing arguments aimed at jury nullification and the overall propriety of the government's investigation); *United States v. Demosthene*, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (defendant "may not argue before the jury issues relating to the overall propriety of the Government's investigation in this case"); *United States v. Stewart*, No. 03-CR-717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (precluding defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant], as opposed to other individuals who may also have committed the crimes charged or similar crimes"); *see also* Fed. R. Crim. P. 12(b)(3)(A)(iv); *United States v. Sun Myung Moon*, 718 F.2d 1210, 1229 (2d Cir. 1983).

[3]     The China Initiative was an initiative led by the DOJ's National Security Division, focused on "the strategic priority of countering Chinese national security threats."  *See* Information About the Department of Justice's China Initiative and a Compilation of China-Related Prosecutions Since 2018, https://www.justice.gov/archives/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related (last visited Feb. 8, 2026).  The China Initiative was launched in 2018 and ended in 2022.

4

> to keep out of the case.  None of that evidence is remotely relevant
> to whether Defendant is guilty of the charged crime.  In short,
> evidence related to the China Initiative is not relevant.

*United States v. Liu*, No. 19-CR-804 (VEC), 2022 WL 773315, at *2 (S.D.N.Y. Mar. 14, 2022).

The reasoning in *Liu* applies with equal force in this case, as no evidence or argument about the

government's current or past enforcement priorities is "remotely relevant" to the defendants' guilt.

In short, any argument or attempt to elicit evidence to place the government's

charging decisions at issue, or to suggest to the jury that the defendants should be acquitted because

the case was brought for improper reasons or because it is novel or unlike other cases, is irrelevant

to the issues properly before the jury, would create a time-consuming and contentious distraction,

and would encourage the jury to make a decision on an improper basis.  Any such argument,

evidence, or questioning, including with respect to the DOJ's China Initiative, should be precluded.

II.    **The Court Should Preclude Evidence, Argument, or Questioning Regarding the Propriety of Seizures of Personal Property**

The Court should preclude evidence, argument, or questioning, including

questioning on cross-examination of government witnesses, regarding the propriety of the

government's seizures of personal property.  Any such evidence or argument lacks probative value

and would only serve to encourage jury nullification.

The scope and extent of cross-examination is a matter committed to the sound

discretion of the district court.  *See United States v. Wilkerson*, 361 F.3d 717, 734 (2d Cir. 2004).

The court may properly bar cross-examination that is marginally relevant to the pertinent issues

before the jury.  *See United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990); *see*

*also* Fed. R. Evid. 611 (stating that "court should exercise reasonable control . . . so as to . . . avoid

wasting time[] and protect witnesses from harassment or undue embarrassment").  "The decision

to restrict cross-examination will not be reversed absent an abuse of discretion."  *United States v.*

*Lawes*, 292 F.3d 123, 131 (2d Cir. 2002) (quoting *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993)).  In addition to a trial court's inherent powers to limit cross-examination, the Federal Rules of Evidence provide numerous bases for precluding cross-examination that is irrelevant or prejudicial.  Rule 608(b) provides that "[s]pecific instances of [the] conduct of a witness" may be inquired into on cross-examination "if probative of truthfulness or untruthfulness."  Fed. R. Evid. 608(b).  However, "[i]f all that can be said about behaviors is that it might be called improper, immoral, or unlawful . . . asking about it cannot be justified under Fed. R. Evid. 608."  *United States v. Stone*, No. 05-CR-401 (ILG), 2007 WL 4410054, at *1 (E.D.N.Y. Dec. 14, 2007) (internal quotations and citation omitted).  Such testimony is further limited by Federal Rules of Evidence 402, which excludes irrelevant evidence, and 403, which excludes otherwise relevant evidence if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  *United States v. Figueroa*, 548 F.3d 222, 229 (2d Cir. 1992) (quoting Fed. R. Evid. 403).

Here, the defendants have moved to suppress the government's seizures of certain property (*see* ECF No. 542), and that motion will be decided by the Court.  If the Court resolves the pending motion in the government's favor, then there is nothing improper about the seizures and the defendants should not be permitted to suggest otherwise.  On the other hand, if the Court resolves the pending motion in the defendants' favor and suppresses any of the seizures at issue, the alleged impropriety would not be probative, and any arguable probative value would be substantially outweighed by the risk that the jury would be misled.

Nothing about the government's seizures of property implicates the defendants' guilt of the charged crimes, nor any government agent's propensity for truthfulness or

untruthfulness. *See United States v. Devery*, 935 F. Supp. 393, 407-08 (S.D.N.Y. 1996). Indeed, the only purpose of asking government agents about any purportedly improper seizure would be to suggest some type of government misconduct and encourage juror nullification. *See United States v. Washington*, 705 F.2d 489, 494 (D.C. Cir. 1983). The probative value of any such argument or examination of witnesses would be far outweighed by the undue prejudice to the government and the risk of causing juror confusion—and enduring a potential mini-trial—about a tangential issue unrelated to the defendants' guilt. It should therefore be precluded.

III.    **The Court Should Preclude Evidence, Argument, or Questioning Regarding Underlying** <u>Civil Litigation Resolutions or Judicial Rulings</u>

In this case, several of the corporate victims engaged in civil litigation with one or more of the defendants regarding the defendants' alleged intellectual property thefts. The government anticipates introducing evidence at trial of the existence of certain of these prior cases for the purpose of authenticating evidence or proving the defendants' obstructive acts. However, the results of these prior civil cases turned on different records, different claims, and different standards of proof than the present criminal matter. Accordingly, though the existence of the prior cases may be necessary to reference at trial, the Court should preclude introduction of evidence, argument, or questioning concerning the resolutions of the cases, including any settlement agreements, findings of liability, or awards of damages, or other judicial rulings issued during the civil matters.[4]

A.    <u>Background</u>

As alleged, 

---

[4]    Additionally, the government respectfully seeks a limiting instruction that the results of these civil litigations are inadmissible.

██████████████ engaged in civil litigation with the defendants regarding, among other issues, the defendants' alleged misappropriation of intellectual property. (S-3 Ind. ¶¶ 18-27, 30-58.) Brief descriptions of certain relevant facts, the litigations and resolutions thereof, as well as certain applicable judicial decisions, are below.

1.     ████    *Civil Litigation*

In a lawsuit filed in the Eastern District of Texas, ████ alleged that Huawei Tech and FutureWei had misappropriated ████'s operating system source code for internet routers, command line interface (a structure of textual commands used to communicate with routers) and operating system manuals, which intellectual property was incorporated into routers marketed by FutureWei in the United States. (*Id.* ¶¶ 18-20.)

At the outset of the litigation, ████ sought injunctive relief as to its claims for copyright infringement regarding its user manuals, online help files, command line interface, and operating system, and trade secret misappropriation regarding its source code. In pertinent part, the court issued injunctive relief as to Huawei's user manuals and online help files and as to ███████████████████████████████████████████████████ ████ software. (*See* Ex. A (the "████ Order") at 3-9.) As an initial matter, the defendants agreed that they "will no longer sell anywhere in the world any version of ████ containing the ████ code accused by ████." (*Id.* at 8.) However, the court declined to impose the worldwide injunction ████ sought that would prevent "any dissemination, disclosure, or transfer from Huawei to any third party of *any* ████ source code, or any ████ source code or object code derived from ████'s source code," where the "record developed so far" on the similarity between ████'s router identification protocol and that used by the defendants' routers "does not persuade the court that the defendants' use of ████'s [identification protocol] was in an effort other than to ensure compatibility." (*Id.* at 9 (emphasis in original).)

Shortly after the court's partial grant of injunctive relief, ███ entered into a settlement agreement with Huawei Tech; that agreement and its terms are not public. (*See* Ex. B (the "███ Settlement Agreement").) ████████████████████████████



2.    ███████    *Civil Litigation*

In or about and between 2000 and 2003, an engineer employed by ██████, ████████, engaged in a scheme to misappropriate ███████'s intellectual property. At the same time, Huawei Tech targeted ███ for recruitment, and ███ provided a document with technical specifications for ███████ technology to Huawei Tech. (S-3 Ind. ¶¶ 25-27.)

In or around 2008, ████████ initiated litigation in the Northern District of Illinois against ███, among other defendants. The causes of action against ███ included computer fraud and misappropriation of trade secrets.

On or about May 26, 2009, the court in the civil case ordered ███ to immediately produce the contents of three of his personal computers to ████████. ███ produced three personal computers two days later, on May 28, 2009. Subsequent forensic analysis demonstrated that

(1) the secure deletion program "Eraser" was installed, used, and then uninstalled on two of the three computers on May 28, 2009—the day the computers were produced for imaging—to securely delete over 165,000 files; (2) on these same two computers, the clocks were changed multiple times to make it appear that the Eraser program had been used in 2007 and 2008, whereas the Eraser program was used only in the early morning of May 28, 2009, just hours before the computers were delivered for forensic imaging; (3) one of the computers specified by the court order was never produced; rather, one of the produced computers was a decoy that was renamed internally during the early hours of May 28, 2009; and (4) ▬ failed to delete all of the electronic files, leaving some files containing the word "Huawei" on the computers.  The communications between ▬ and Huawei Tech principals (briefly summarized in the Third Superseding Indictment paragraphs 25 to 27) were found in these computers and cited in an amended civil complaint from 2010 that added Huawei Tech as a defendant in the civil action.

In 2011, Huawei Tech initiated a separate lawsuit against ▬ in the Northern District of Illinois pertaining to ▬'s intention to sell its wireless infrastructure business to a third party, ▬.  Huawei Tech claimed that it had been providing confidential wireless and core network communications technologies to ▬ pursuant to a series of agreements, and that ▬ was a direct competitor of Huawei Tech.

In April 2011, Huawei Tech and ▬ consummated a settlement agreement resolving both litigations in the Northern District of Illinois.[5] (*See* Ex. C (the "▬ Settlement

---

[5]    As the Court is aware (*see* ECF No. 516), the government has developed evidence that the defendants ▬ ▬.  The government nevertheless has represented to the defense that it does not intend to present this evidence at trial during its case-in-chief but reserves the right to do so for impeachment or during any rebuttal case.

Agreement").)  The ███████ Settlement Agreement and its terms were not public. ███████ ████████████████████████████████████████████████████████████ ██████████████████████████████

In connection with the civil settlement, Huawei Tech and ████████ issued a joint statement.  In pertinent part, a ████████ principal stated:



Elsewhere in the joint statement, a Huawei Tech principal stated:



3.     ███████  *Civil Litigation*

In or about 2009, Huawei Tech and FutureWei engaged in a scheme to misappropriate antennae technology from ████████.  After entering into a nondisclosure agreement ("NDA") with FutureWei that prohibited FutureWei from using confidential information provided by ████████ for FutureWei's own benefit or to the competitive disadvantage of ████████, ████████ provided a presentation to FutureWei regarding its proprietary antennae technology, with each slide marked "Commercial in Confidence."  On or about October 30, 2009, FutureWei filed a provisional patent application with the U.S. Patent and Trademark Office that used and relied on ████████'s intellectual property.  Huawei Tech received approximately $22 million in income

11

derived from the sale of products that incorporated intellectual property misappropriated from

██████. (S-3 Ind. ¶¶ 30-34.)

In 2015, ██████ sued Huawei Tech and FutureWei in the Eastern District of Texas, alleging breach of contract, misappropriation of trade secrets under common law and Texas law, unfair competition by misappropriation, and common law fraud and fraud in the inducement. The case proceeded to a jury trial.

During the trial, the parties entered into a settlement agreement, in which ████

████████████████████████████████████████████████████████

███████████████████████████████████████. (*See* Ex. D (the "██████ Settlement

Agreement").) The ██████ Settlement Agreement, which was not made public, contemplated that

████████████████████████████████████████████████

████████████████████████████████████

██████████████████████

██████████████████

████████████████████████

██████████████████████

██ ██

4.    ██████ *Civil Litigation*

In or about 2012 and 2013, Huawei Tech, Huawei Device, and Huawei Device USA engaged in a scheme to misappropriate robot technology from ██████, in which a Huawei Device engineer secretly photographed and gathered technical information about the robot in a

secure laboratory, before surreptitiously removing a part of the robot from the laboratory. (S-3 Ind. ¶¶ 35-44.)

In 2014, ███████ sued Huawei Tech and Huawei Device USA in the Western District of Washington, alleging trade secret misappropriation and breach of contract under Washington State law. During the litigation, Huawei Tech successfully moved for summary judgment. In pertinent part, the court found that it lacked jurisdiction over Huawei Tech. (*See* Ex. E (the "████ Order").) Specifically, the Court ████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████ (*Id.* at 12.)

On May 17, 2017, a jury found Huawei Device USA liable for misappropriation of trade secrets and breach of contract. With respect to damages, the jury found that ████████ was not entitled to actual damages or unjust enrichment damages as to the trade secret misappropriation and that ████████ was entitled to $█ million in unjust enrichment damages for the breach of contract. The jury also found that Huawei Device USA's trade secret misappropriation was not willful and malicious. Following trial, the parties entered into a settlement agreement and stipulated to dismissal of ████████'s claims.

     5.    ████ *Civil Litigation*

Between 2013 and 2018, Huawei Tech engaged in a scheme to misappropriate technology related to architecture for memory hardware from ████. This scheme culminated in Huawei Tech's use of ████, a professor employed by a PRC-based university, to obtain ████'s proprietary technology through false pretenses. (S-3 Ind. ¶¶ 45-58.)

In 2017, Huawei Tech and FutureWei initiated suit against ███ and one of ███'s founders, ████████, who was a former FutureWei employee. As alleged, ███ used information obtained through his employment at FutureWei in drafting patent applications that ███ filed with U.S. patent authorities, shortly after founding ███, in violation of his employment agreement with FutureWei. Additionally, the lawsuit alleged that ███ had improperly solicited FutureWei employees to work at ███, in violation of his non-solicitation covenant with FutureWei. In 2018, ███ made counterclaims against Huawei Tech and FutureWei, including misappropriation of ███'s trade secrets.

At trial, the jury found that (1) FutureWei had not proved that ███ failed to comply with his employment agreement's nondisclosure of confidential information provision; (2) FutureWei had proved ███'s failure to comply with his employment agreement's patent application disclosure provision but failed to prove any harm caused by such conduct; (3) FutureWei had not proved that ███ failed to comply with his employment agreement's non-solicitation provision; (4) FutureWei had not proved ███'s interference with contractual relations; (5) FutureWei had not proved the existence of trade secrets that were the subject of misappropriation; (6) FutureWei had not proved civil RICO violations by ███ or ███; (7) FutureWei had not proved a conspiracy to violate 18 U.S.C. § 1030 (the Computer Fraud and Abuse Act); and (8) ███ had proved Huawei Tech's misappropriation of ███'s trade secrets but did not prove any unjust enrichment.

B.    Argument

1.    *The Civil Litigation Resolutions Should Be Precluded*

The Court should preclude evidence, argument, or questioning of witnesses regarding the resolutions of the civil litigations between the defendants and the corporate victims of intellectual property theft, including any jury findings, court judgments, settlement agreements,

or associated joint statements by the parties to these litigations, including the companies that the government alleges are victims of crimes charged in the Third Superseding Indictment.

To begin, evidence of the outcomes of underlying civil litigation should be excluded under Rules 401 and 403, as any "probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury." The Second Circuit in *Manko v. United States* addressed this very concern, where habeas petitioners argued that they should have been permitted to introduce at trial evidence of a prior settlement with the Internal Revenue Service ("IRS"):

> If the evidence were admitted, the trial would have been diverted from the central issue of guilt or innocence to a complicated inquiry into the IRS's bureaucratic mechanisms in hopes of divining the IRS's true intent in reaching a civil settlement with appellants. This inquiry necessarily would delve into the morass of a particularly messy negotiation in this case and into the IRS's complex policies of settlement and enforcement. Admission of the settlement would have yielded little probative value, and it would have confused and misled the jury. Furthermore, this evidence would have wasted time. Fed. R. Evid. 403. Exploration of the issues relating to the settlement at the district court's § 2255 hearing lasted several days, and could have been expected to consume more time when conducted before a jury.

63 F. App'x 570, 572-73 (2d Cir. 2003) (unpublished). Other courts in this Circuit have similarly precluded such evidence. *See, e.g.*, *Tardif v. City of New York*, No. 13-CV-4056 (KMW), 2022 WL 1239233, at *2 (S.D.N.Y. Apr. 26, 2022) ("[I]ntroducing into evidence the verdict from the first trial presents a risk of prejudice that substantially outweighs the probative value of the verdict, and there is a significant likelihood that the jury would be confused or misled by this evidence."); *Sharkey v. J.P. Morgan Chase & Co.*, No. 10-CV-3824, 2017 WL 374735, at *4 (S.D.N.Y. Jan. 26, 2017) ("Any probative value would be far outweighed by the risk of confusion and prejudice by introducing settlements and consent orders from other unrelated cases.").

Here, any exploration before the jury of the outcomes of the civil litigations would needlessly confuse the jury with facts of marginal relevance, where the civil cases applied different substantive law (tort claims versus federal criminal charges), different procedural law (federal civil procedure versus federal criminal procedure), and different standards of proof (preponderance of evidence versus proof beyond a reasonable doubt).  For example, ███████'s litigation against Huawei USA involved contract and trade secret misappropriation claims under Washington State law, while ██████ pressed tort claims against Huawei Tech and FutureWei under Texas State law. Likewise, the civil cases involved substantially different evidentiary records; indeed, in this prosecution, the government has identified significant evidence, including electronic evidence and witness testimony, that was not used by the civil litigants at trial.

Similarly, the amount of any monetary penalty (or lack thereof) associated with the resolutions of the civil cases would confuse the jurors by, for example, encouraging speculation that the magnitude of any financial penalty would somehow bear on whether the defendants are guilty of the charged crimes.

Moreover, the fact that parties to a civil litigation decided to settle civil claims simply is not relevant to the questions before the jury.  When deciding whether to settle a civil litigation, the litigants needed to weigh, among other considerations, the potential commercial costs of continuing with civil litigation, including the potential disruption of the victims' PRC-based business activities, or, ████████████████████████████ ███████████████████████. *See In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543 (JMF), 2015 WL 9165341, at *1 (S.D.N.Y. Dec. 16, 2015) ("[I]f those [underlying court] documents were admitted, New GM would be compelled 'to explain the circumstances surrounding the resolution of the criminal investigation, the DPA's various terms and conditions,

and New GM's agreement to pay a $900 million penalty" . . . all of which would be a sideshow to the main event.").

Finally, any public statements associated with the settlement agreements—by the defendants or the victims of intellectual property theft—would constitute inadmissible hearsay if offered by the defendants. As an initial matter, the victims' out-of-court statements in the settlement agreements would be offered for their truth and are thus inadmissible; the victims are not party-opponents under Rule 801. Any efforts by the defense to cross-examine the victims about these statements would devolve into a separate mini-trial about the reasons the victims felt compelled to settle litigation with the defendants, including complex business considerations and strategies and negotiations with the defendants and foreign regulators. None of these reasons are remotely relevant to any issue of disputed fact in the forthcoming criminal trial and, if admitted, would lead to unnecessary juror confusion under Rule 403 and would needlessly extend the trial.

In the same vein, it is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial. *See United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) ("[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); *United States v. Blake*, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (same). Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005); *see Pavlica v. Behr*, No. 03-CV-9628 (DC), 2005 WL 3181586, at *2 (S.D.N.Y. Nov. 29, 2005) (holding that settlement agreements are inadmissible hearsay). Accordingly, the Court should preclude any introduction of evidence, argument, or

17

questioning regarding the defendants' out-of-court statements regarding the resolution of civil litigations with the intellectual property theft victims.

    2.    *The Civil Judicial Orders Should Be Precluded*

The Court should also preclude any evidence or argument regarding the ██████ Order or the ██████ Order.  Once again, the orders turned on different legal standards and factual records than the upcoming trial, and, if admitted at trial, would needlessly confuse the jurors.  *See United States v. Johnson*, 469 F. Supp. 3d 193, 226 (S.D.N.Y. 2019) ("While the fact that the lawsuit has been resolved may be elicited, the court decisions and the ultimate settlement are not to be alluded to.  The Court finds that introducing details regarding the court decisions and settlement present a significant risk of jury confusion and have little probative value.  Accordingly, these matters are excluded under Rule 403.").

The ██████ Order resolved whether a preliminary injunction should issue as to all ██████ source code incorporated into Huawei Tech's technology.  Should the jury hear that another court found that ██████ had not sustained its preliminary burden of establishing misappropriation beyond that involving ██████ containing the ██████ code—based on a more constrained factual record than what the government will present in this case—such evidence would displace the jury's critical factfinding role.  Moreover, permitting argument or introduction of evidence regarding the ██████ Order would unnecessarily confuse the jury and necessitate a side trial on the issues surrounding the issuance of the preliminary injunction, including what issues were or were not fully briefed to the Texas court.  Indeed, the standard for obtaining a preliminary injunction in a civil case turns on factors such as irreparable harm, the balance of the equities, and the public interest—factors entirely foreign to guilt in a criminal trial.  *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008).

Similarly, allowing argument or introduction of evidence at trial regarding the ██

██ Order—which determined that Huawei Tech did not participate in the misappropriation of

██ robot technology based on a more limited factual record than what the government will

present at trial here—would undermine the jurors' essential factfinding as to Huawei Tech's role

in the misappropriation and would only serve to exacerbate any juror confusion and cause delay.

    3.    *References to the Civil Litigations Should Be Permitted for Limited Purposes*

Notwithstanding the inadmissibility of the above topics, the parties should be

permitted to reference the civil litigations for certain limited purposes.  Specifically, the

government anticipates introducing evidence from the civil cases, such as deposition and trial

testimony of Huawei employees, as statements of party opponents.  Similarly, where appropriate,

the parties should be permitted to impeach witnesses with their prior testimony from the civil cases.

And finally, the government will seek to introduce evidence that the defendants and co-

conspirators sought to obstruct the civil litigations and conceal their crimes by destroying and

withholding evidence and submitting false affidavits.  Evidence on these limited topics—which

does not include the resolutions of the civil cases—does not pose the same risk of substituting the

jury's role as factfinder or of confusing the issues or wasting time.

IV.    The Court Should Preclude Evidence, Argument, or Questioning Suggesting that the
<u>Charged Conduct Was Consistent with Industry Practice</u>

In court filings, the defense has argued that the charges are inappropriate because,

among other reasons, they target conduct that is commonplace in the technology industry.  (*See*

ECF No. 474-2 at 6 ("Across those cases, the government's consistent approach—including in

cases involving similar allegations, proven misconduct, and judgments orders of magnitude larger

than anything Huawei has ever faced—was to stand aside and allow the civil disputes to be fought

out between private parties.  None of these other companies has been charged, let alone has the

government attempted—as it does in this Indictment—to transmute its ordinary history of civil trade secret disputes into some overarching, twenty-year-long conspiracy.").)  The Court should preclude any such evidence, argument, or questioning as irrelevant because the government's charging decisions with respect to unrelated companies about unrelated allegations of ostensibly similar wrongdoing is not probative of any element of the crimes with which the defendants are charged.  To the extent there is any probative value—which there is not—it is substantially outweighed by the fact that introduction of evidence regarding these unrelated companies would require a mini-trial and would mislead the jury to focus on the guilt of those companies rather than on the defendants' guilt.  It would also invite the jury to speculate about the government's internal processes for making charging decisions, which likewise is irrelevant.[6]

For the same reasons that the Court should preclude argument, evidence, or questioning regarding the government's motives in pressing charges, any suggestion to the jury that the charges are somehow novel or that the defendants are being uniquely targeted would be improper.  *See United States v. Inniss*, No. 18-CR-134 (KAM), 2019 WL 6999912, at *7 (E.D.N.Y. Dec. 20, 2019) (noting defense concession that there is no "lawful 'custom or common practice' defense to a violation of charges of a conspiracy to commit money laundering and/or money

---

[6]    Similarly irrelevant is the fact that many of the defense attorneys in this case have previously served as federal prosecutors before entering private practice.  The government respectfully requests that the Court preclude defense counsel from referring to their prior government roles in front of the jury.  A defense counsel's reference to being a "former prosecutor" would be improper because it could suggest to the jury that any argument or question should be given greater weight simply because of defense counsel's background.  *Cf. United States v. Newton*, 369 F.3d 659, 681 (2d Cir. 2004) (prosecutorial vouching).  But a defense argument is not entitled to more or less weight because of the resume of the attorney making the argument.  References by defense counsel to being a "former prosecutor" also may suggest to the jury that the government's conduct in the investigation or prosecution of this case was improper.  Such a suggestion is improper, for the reasons above.  Because there is no legitimate reason for defense counsel to refer to prior governmental roles before the jury, any such references should be precluded.

laundering"); *Stewart*, 2004 WL 113506, at *2 ("Any characterization of the securities fraud charge in Count Nine as 'novel' is irrelevant to the jury's consideration of the indictment in this case.  The defense may not argue or present evidence to the jury that tends to show that this count is an unusual or unprecedented application of the securities laws."); *see also United States v. Oldbear*, 568 F.3d 814, 821 (10th Cir. 2009) (district court properly excluded testimony that attempted to establish an "everybody-is-doing-it" defense).  Put simply, the fact that other companies may unlawfully misappropriate technology of third parties without legal consequence has no bearing on the guilt or innocence of the defendants in this case.[7]

V.    The Court Should Preclude Evidence, Argument, or Questioning Regarding the Victims' Alleged Negligence or Lack of Financial Harm

In seeking disclosures from the government, the defense has contended that the victim financial institutions knew or should have known about Huawei Tech's full relationship with Skycom Tech. Co., Ltd. ("Skycom"), and that the banks' purported negligence in continuing to deal with Huawei notwithstanding these ties somehow exculpates the defendants.  (*See* Def. Ltr. to Gov't, Feb. 7, 2021, at 5 (arguing "██████'s awareness of Huawei's relationship with Skycom 'either did not make it, *or did not matter*'" to senior ██████ leadership).)  However, whether the victim financial institutions were somehow negligent in not fully detecting or comprehending Huawei Tech's control over Skycom—in the face of Huawei's lies on this very subject—is irrelevant to the charged financial fraud.  It is black-letter law that negligence or lack of diligence or reasonableness on the part of a target of a fraudulent scheme is no defense to federal fraud charges.  *United States v. Isola*, No. 10-CR-833 (WHP), 2012 WL 243083, at *1 (S.D.N.Y. Jan.

---

[7]    Nor would a selective prosecution argument have any validity, where the defendants' repeated subterfuge—including, among other things, falsification of court documents, furtive misappropriation of a robot arm, and false statements to victim companies—belies any suggestion of good faith.

11, 2012) ("A victim's negligence is not a defense to fraud.").[8]  The defendants should therefore be precluded from introducing evidence or argument about the victim financial institutions' purported negligence in failing to comprehend Huawei Tech's control over Skycom.

By the same token, the defendants should be precluded from offering evidence or argument about the victim companies' or financial institutions' lack of financial harm.  It is well-established that a lack of financial harm is not a defense to fraud.  *See, e.g.*, *Kousisis v. United States*, 605 U.S. 114, 124 (2025) ("[T]he wire fraud statute is agnostic about economic loss.  The statute does not so much as mention loss, let alone require it.").  The defendants should therefore be prevented from introducing evidence, arguing, or otherwise suggesting that a lack of financial harm to the victims is somehow a defense to the fraud charges.

## VI. The Court Should Preclude Evidence, Argument, or Questioning that the Defendants' Failure to Benefit Economically from Certain Stolen Intellectual Property Is a Defense to Trade Secret Theft

The government anticipates proving at trial that, over the course of the charged conspiracies, the defendants attempted to steal numerous trade secrets from victim companies.  In some of those instances, the defendants incorporated the stolen intellectual property into their own products.  In other instances, the defendants either failed to successfully obtain the relevant trade secrets or to incorporate them into a Huawei product or service.  This difference is not material as to guilt, however.  The defendants properly can be convicted for conspiring to steal trade secrets (and related racketeering and wire fraud conspiracies) even if they did not use or economically benefit from the stolen trade secrets.  Indeed, such use or economic benefit is not an element of

---

[8]    *See United States v. Amico*, 486 F.3d 764, 780 (2d Cir. 2007) (victim's gullibility or lack of reasonableness is no defense to mail fraud); *United States v. Thomas*, 377 F.3d 232, 243-44 (2d Cir. 2004) (victim's "foolishness" is no defense to fraud); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability for her substantive offense.").

theft of trade secrets, much less conspiracy to steal trade secrets. 18 U.S.C. § 1832; *see also* 2 Modern Federal Jury Instructions-Criminal 4.18.1832 (2026) (elements of § 1832). Accordingly, the defendants should be precluded from introducing evidence, arguing, or otherwise suggesting to the jury that a lack of use or economic benefit from a stolen trade secret is a defense to the charges.

VII.  The Court Should Preclude Evidence, Argument, or Questioning Regarding the <u>Defendants' Prior Commission of "Good Acts" or Non-Commission of Other "Bad Acts"</u>

The defendants likewise should be precluded from presenting evidence or argument concerning their prior commission of "good acts"—including their creation of jobs, sale of quality products, charitable giving, or positive role in the global economy—or to offer proof of their non-criminal activities to seek to disprove their guilt of the crimes charged. Specific-act propensity evidence is no more admissible to refute a criminal charge than it is to establish one. Evidence of a defendant's prior "good acts" is "only relevant if we assume that a defendant acted in conformity with those prior good acts—*i.e.*, if we make the exact propensity inference Rule 404(b)(1) is designed to prohibit." *United States v. Dawkins*, 999 F.3d 767, 792 (2d Cir. 2021).[9] The racketeering statute in particular contemplates the possibility of crimes committed through

---

[9]      *See also United States v. Gotti*, 784 F. Supp. 1013, 1017 (E.D.N.Y. 1992) ("[A] defendant cannot establish that he did not commit a crime as to A because he did not commit a crime as to B."); *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions."); *United States v. Walker*, 191 F.3d 326, 336 (2d Cir. 1999) ("Whether [the defendant] had prepared other, non-fraudulent applications was simply irrelevant to whether the applications charged as false statements were fraudulent."); *United States v. Dominique-McClain*, 623 F. Supp. 3d 33, 37 (E.D.N.Y. 2022) (precluding argument or evidence that the defendant provided some non-fraudulent therapy sessions and related billings in case where the defendant was charged with crimes related to falsely billing for different therapy sessions); *United States v. Golfo*, No. 19-CV-95 (KAM), 2020 WL 2513445, at *3-4 (E.D.N.Y. May 15, 2020) (precluding defendant charged with submitting fraudulent billing records from introducing evidence of non-fraudulent billing records because such evidence was irrelevant to whether she lied on specific occasions, and, even if relevant, would confuse the issues, mislead the jury and waste time).

"legitimate and illegitimate enterprises," such that an enterprise's legitimacy cannot provide a defense to a racketeering charge predicated on crimes enabled through that legitimate business. *United States v. Kelly*, 128 F.4th 387, 409 (2d Cir. 2025) (quoting *United States v. Turkette*, 452 U.S. 576, 580-81 (1981)).

And though a defendant may offer general testimony from a character witness about the defendant's reputation for a "pertinent trait," or the witness' opinion of the defendant regarding that trait, *see* Fed. R. Evid. 404(a)(2)(A) & 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. *See, e.g.*, *United States v. Benedetto*, 571 F.2d 1246, 1249-50 (2d Cir. 1978) (finding defense-proffered character evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"); *Inniss*, 2019 WL 6999912, at *8 (precluding "evidence or argument concerning [the defendant's] prior commission of 'good acts' or non-commission of other bad acts"); *United States v. Rivera*, No. 13-CR-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. Apr. 15, 2015) (precluding evidence of unrelated charitable giving).  Accordingly, the Court should preclude defense counsel from offering evidence or argument, including in their opening statements, concerning the defendants' roles as job creators, their sale of quality products, their charitable giving, their contributions to the global economy or any other specific instance of prior good acts, or the lack of commission of other bad acts.

VIII.   The Court Should Establish Reasonable Procedures to Preserve the Confidentiality of Any Trade Secrets Presented During Trial

The government respectfully moves that the Court enter an order establishing reasonable procedures to preserve the confidentiality of any trade secrets that will be at issue during trial.  *See* 18 U.S.C. § 1835(a) (permitting court to "enter such orders and take such other

action as may be necessary and appropriate to preserve the confidentiality of trade secrets"). Counts Two and Three of the Third Superseding Indictment allege that the defendants conspired to steal trade secrets from U.S. technology companies and to defraud U.S. technology companies through materially false statements and pretenses. Accordingly, the government anticipates that the trade secrets from the victims of the defendants' alleged conspiracy will be at issue during the trial, reflected in exhibits admitted into evidence and shown to the jury, and discussed during witness testimony. Central to the concept of a trade secret, however, is the fact that the information is secret and that the trade secret's owner must take reasonable precautions under the circumstances to keep the information secret. *See* 2 Modern Federal Jury Instructions-Criminal ¶ 49A.01 (2026) (defining "trade secret"). Accordingly, the government requests that the Court establish procedures to preserve the confidentiality of any trade secrets and protect them from unnecessary public disclosure during trial. At a minimum, the government proposes that: (1) any exhibit containing a trade secret not be published to the public gallery; (2) at a party's request, an exhibit containing a trade secret that is admitted into evidence be submitted under seal; and (3) any testimony taken about a trade secret, either on direct or by cross-examination, be kept to a sufficient level of generality that would prevent the public from discerning the substance of the trade secret, either by listening in the gallery or reading trial transcripts. To the extent testimony exceeds this level of generality, the government requests that either party be permitted to move to seal that portion of the transcript.

The government submits that these proposed measures—and any other conditions the Court may impose—will address the need to preserve the confidentiality of the trade secrets in the context of a public jury trial. *See, e.g.*, *United States v. Roberts*, No. 08-CR-175 (CCS), 2010 WL 1010000, at *9 (E.D. Tenn. Mar. 17, 2010) (ordering that photographs containing a company's

confidential and trade secret information may be seen only by the Court, the parties, and the jury,
and that they be displayed to the jury in such a way that public could not also see them).

IX.    The Court Should Preclude Evidence, Argument, or Questioning Regarding ███'s
       <u>Alleged Prior Wrongdoing</u>

As described above, Huawei Tech and FutureWei initiated the litigation with
███, alleging various violations of ███'s employment contract with FutureWei and
misappropriation of FutureWei's trade secrets.  These claims—which were rejected by the civil
jury—should be excluded under Rules 401 and 403.  They relate to an entirely different set of facts
that would only serve to confuse the jury and invite nullification with reference to unrelated alleged
bad acts.  Moreover, the government does not intend to call ███ as a government witness in its
case-in-chief, rendering any allegations regarding ███'s alleged misconduct in establishing
███ irrelevant.    Further, any inquiry regarding ███'s alleged misconduct would be
inappropriate for cross-examination of any other ███ witness who testifies at trial, none of
whom was alleged to be involved in or have knowledge of the alleged misappropriation.  *See* Fed.
R. Evid. 608(b).  Accordingly, the Court should preclude evidence, argument, or questioning
regarding ███'s alleged wrongdoing involving FutureWei.

X.    The Court Should Preclude Evidence, Argument, or Questioning Regarding ███
      Continuing Its Banking Relationship with Huawei Tech After Learning of Huawei Tech's
      <u>Skycom Fraud</u>

The government has recently learned that ██████████████████
██████████████████████████, elected to continue its
banking relationship with Huawei Tech and other Huawei entities, notwithstanding the unsealing
of charges in this case in early 2019.  The government moves to preclude evidence, argument, or
questioning about ███'s decision to maintain its banking relationship with the defendants.

The fact that ▮▮▮▮ elected to continue its banking relationship with Huawei Tech and other Huawei entities is not relevant to whether the defendants made any effort to defraud the victim financial institutions.  Notably, a victim can be defrauded and then continue its relationship with the fraudster for reasons entirely separate from the fraud.  *See United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013) ("[A] misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do."); *United States v. Litvak*, 889 F.3d 56, 66 (2d Cir. 2018) ("A finding of materiality, therefore, requires a showing only of importance, not 'actual reliance.'" (citation omitted)).

Moreover, such evidence has no bearing on the materiality of the defendants' false statements to the victim financial institutions.  Materiality is assessed from the objective standard of a reasonable decisionmaker, not the subjective standard of a particular victim.  *See Neder v. United States*, 527 U.S. 1, 22 n.5 (1999) (a matter is material if "*a reasonable man* would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question" (emphasis added; quotations and citation omitted)).  ▮▮▮▮'s decision to continue its banking relationship with Huawei Tech and related entities is irrelevant to whether an objectively reasonable decisionmaker would have viewed the defendants' misrepresentations to the other victim financial institutions as material.

At bottom, evidence that Huawei maintained its relationship with ▮▮▮▮ would amount to evidence that the defendants' lies did not change the behavior of one particular fraud victim (out of several).  Where such evidence would not bear on any issue before the jury and would only serve to confuse the issues, it should be precluded.

XI.    The Court Should Permit the Government to Elicit Testimony Regarding Materiality Through Hypothetical Questions

To establish that the defendants' misrepresentations would have been material to an objectively reasonable decisionmaker—which is the applicable standard, as described above— the government intends to present testimony from current and former employees of the victim technology companies and victim financial institutions.  In doing so, the Court should permit the government to elicit testimony regarding the issue of materiality through hypothetical questions.

In *United States v. Cuti*, the Second Circuit permitted the use of hypothetical questions to inquire into the effect of a fraud on the victim, finding that such testimony would not constitute improper expert testimony:

> [P]ersonal knowledge of a fact "is not an absolute" to Rule 602's foundational requirement, which "may consist of what the witness thinks he knows from personal perception." *Id.*  Similarly, a witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior.  As this case illustrates, "what-if-you-had-known" questions that present withheld facts to a witness are especially useful to elicit testimony about the impact of fraud.

720 F.3d 453, 458-59 (2d Cir. 2013).[10]

---

[10]    *See also United States v. Chang*, No. 18-CR-681 (NGG), 2024 WL 3303717, at *9 (E.D.N.Y. July 3, 2024) (permitting the use of hypothetical questions to victim investors to elicit evidence of materiality if the questions did not assume the defendant's guilt); *United States v. Hatfield*, No. 06-CR-550 (JS), 2010 WL 2541057, at *2 (E.D.N.Y. June 10, 2010) (finding materiality questions in the form of hypotheticals appropriate and "plainly relevant and probative when they concern 'the materiality of Defendant's actions' in the context of a securities fraud prosecution" (citations omitted)); *United States v. Jennings*, 487 F.3d 564, 582 (8th Cir. 2007) (hypothetical questions concerning materiality are appropriate because "[t]he government would be hard pressed to prove this element without asking whether the undisclosed information would have affected the decision maker's analysis"); *United States v. Ranney*, 719 F.2d 1183, 1189 (1st Cir. 1983) (holding that the district court was "eminently correct" in admitting hypothetical questions concerning materiality).

Here, the Court should permit the proposed hypothetical questioning in the form of "'what-if-you-had-known' questions that present withheld facts to . . . witness[es]" about the impact of the charged fraud schemes. *Cuti*, 720 F.3d at 459. Such questioning is routinely admitted in this District and appropriate here.

XII.   **The Court Should Permit Evidence Regarding Dissemination of Huawei Tech's Statements** <u>Through Media Reports</u>

The Court should admit Huawei Tech's statements disseminated through certain news reports as acts in furtherance of the charged conspiracies, including (1) statements in *Light Reading* articles in 2004 as acts in furtherance of the charged theft of trade secrets and wire fraud conspiracies, and (2) statements in *Reuters* articles in the fall of 2012 and the winter of 2013 as acts in furtherance of the charged financial fraud.[11]

A.   <u>Background</u>

1.   *Huawei Tech's Statements in the* Light Reading *Articles*

In 2004, *Light Reading*, which is a digital media platform providing news and analysis for the global communications industry, published several articles regarding the conduct of a Huawei Tech employee, ███████, at the June 2004 Supercomm trade show in Chicago, during which ███ was caught after-hours attempting to photograph proprietary information belonging to ███. At the time he was apprehended, ███ was wearing a badge reflecting his employer as "WEIHUA"—*i.e.*, Huawei with the syllables reversed.

---

[11]   The publication of Huawei Tech's misrepresentations in the *Reuters* articles is also relevant to establish venue for the financial fraud charges. *See Lemberger v. Westinghouse Elec. Corp.*, 76-C-552 (JW), 1976 WL 834 (E.D.N.Y. Nov. 1976) ("Thus, venue is proper in a district if a single press release is disseminated through a newspaper or over the Dow-Jones board tape." (citing *Texas Gulf Sulphur Co. v. Ritter,* 371 F. 2d 145, 148-49 (10th Cir. 1967))).

One article recounted an interview conducted by the authors with █ through a Chinese-language interpreter. According to the article, █ said that "the incident is a misunderstanding . . . He sa[id] this is his first time traveling outside of China and he was not aware that photography was prohibited on the Supercomm floor." Phil Harvey, Peter Heywood, Ray Le Maistre, "Huawei in Spying Flap," *Light Reading*, June 24, 2004, https://www.light reading.com/cable-technology/huawei-in-spying-flap (last visited Feb. 13, 2026). Additionally, █ claimed that "the incorrectly listed name on his exhibitor badge was also a misunderstanding. He sa[id] the Chinese custom of listing surnames first caused him to fill out his show paperwork incorrectly, resulting in the mangled name." *Id.* Regarding the contents of notes found in his possession, which included proprietary diagrams of U.S. telecommunications companies' technology, █ said that "his notes were just a guide to the vendors he was interested in" and denied "pulling out any vendor's circuit boards to have a closer look." *Id.*

      2.   *Huawei Tech's Statements in the* Reuters *Articles*

On December 30, 2012, *Reuters* published an article titled "Exclusive: Huawei Partner Offered Embargoed HP Gear to Iran," detailing how co-defendant Skycom (an entity that is alleged in this case to be Huawei Tech's unofficial and undeclared Iranian subsidiary) offered to sell 1.3 million euros worth of U.S.-made technology to Iran's largest mobile phone operator MCI, in addition to previously-provided equipment. The author attributed the following statements as made by Huawei Tech in response to the reporting:

> In a statement to *Reuters*, Huawei called [the Skycom proposal] a "bidding document" and said one of its "major local partners," Skycom Tech Co Ltd, had submitted it to MCI. The statement went on to say, "Huawei's business in Iran is in full compliance with all applicable laws and regulations including those of the U.N., U.S. and E.U. This commitment has been carried out and followed strictly by our company. Further, we also require our partners to follow the same commitment and strictly abide by the relevant laws and regulations.

30

. . . .

Asked who had provided the existing HP equipment to MCI, Vic Guyang, a Huawei spokesman, said it wasn't Huawei.  "We would like to add that the existing hardware equipment belongs to the customer.  Huawei does not have information on, or the authority to check the source of the customer's equipment."

On January 31, 2013, *Reuters* reported on the link between then-Huawei Tech's CFO Wanzhou ("Cathy") Meng and Skycom in an article titled "Exclusive: Huawei CFO Linked to Firm that Offered HP Gear to Iran."  This latter article, by the same author of the *Reuters* article discussed above, reprinted the following emailed statement from Huawei Tech:

The relationship between Huawei and Skycom is a normal business partnership.  Huawei has established a trade compliance system which is in line with industry best practices and our business in Iran is in full compliance with all applicable laws and regulations including those of the UN.  We also require our partners, such as Skycom, to make the same commitments.

B.    Argument

"[N]ewspaper articles containing quoted remarks are hearsay within hearsay—they contain out of court statements by the quoted individual, within a document that is itself an out of court statement"—and are "usually inadmissible" for the truth of the matter asserted.  *Mandal v. City of New York*, No. 02-CV-1234 (WHP), 2006 WL 3405005, at *1-2 (S.D.N.Y. Nov. 26, 2006).  However, "newspaper articles need not be excluded from evidence when they contain admissions by a party opponent under Rule 801, provided the article is a recorded recollection under Rule 803(5), or falls within the 'residual exception' of Rule 807."  *Id.*; *see Kellner v. City of New York*, No. 17-CV-1268 (NRM), 2025 WL 3507346, at *26-27 (E.D.N.Y. Dec. 8, 2025) (applying *Mandal* to find Rule 807's requirements satisfied to admit defendant's statement to *The New Yorker*); *United States v. Bradley*, No. 21-CR-87 (VAB), 2022 WL 1708400, at *8-9 (D. Conn. May 27, 2022) (applying *Mandal* to find admissible defendant's statements reported in a blog

31

post).  Indeed, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.

Rule 803(5) of the Federal Rules of Evidence is an exception to the rule against hearsay for recorded recollections.  To constitute a recorded recollection, a record must concern "a matter the witness once knew about but now cannot recall well enough to testify fully and accurately; was made or adopted by the witness when the matter was fresh in the witness's memory; and accurately reflects the witness's knowledge."  Fed. R. Evid. 803(5).  If admitted under Rule 803(5), a document may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.  *Id.*  Before any document can be read into evidence under Rule 803(5), the proponent of the document must establish that (1) the witness's "memory of the events detailed in the [document] was sufficiently impaired"; (2) the witness had "prepared or adopted the [document] at or near the time of the events" at issue; and (3) at the time the witness "prepared or adopted [the document], it correctly reflected his knowledge of the events."  *Parker v. Reda*, 327 F.3d 211, 213 (2d Cir. 2003) (citations omitted).

Under Rule 807(a), once the proponent provides the required written notice, a statement is excluded from the rule against hearsay under the following conditions: (1) the statement is supported by sufficient guarantees of trustworthiness, in light of the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.  *Id.*

1.  *Huawei Tech's Statements in the* Light Reading *Articles Should Be Admitted*

As an initial matter, with respect to ████'s statements to *Light Reading*, there is only one level of hearsay, as the government is not seeking to admit the statements for their truth.

Instead, they are affirmative acts in furtherance of the conspiracy to misappropriate competitors' trade secrets. *See United States v. Crawford*, 541 U.S. 36, 55-56 (2004) (statements in furtherance of a conspiracy were generally not testimonial and were exceptions to the hearsay rule that encountered no Confrontation Clause obstacle). As the Second Circuit explained:

> [T]he admissibility of . . . totally false statements, made in the course and in furtherance of the conspiracy, suffers no Sixth Amendment bar under *Crawford.* The truthful portions of statements in furtherance of the conspiracy, albeit spoken in a testimonial setting, are intended to make the false portions believable and the obstruction effective. Thus, the truthful portions are offered, not for the narrow purpose of proving merely the truth of those portions, but for the far more significant purpose of showing each conspirator's attempt to lend credence to the entire testimonial presentation and thereby obstruct justice.

*United States v. Stewart*, 433 F.3d 273, 292 (2d Cir. 2006). Should the authors of the *Light Reading* article who interviewed ▮▮ testify at trial about ▮▮'s statements to them, there would be no hearsay concern, as ▮▮'s obfuscated remarks—even to the extent they may contain kernels of truth—constitute acts in furtherance of the charged conspiracies. *See id.*

If the authors of the *Light Reading* article lack memory of ▮▮'s statements, the *Light Reading* article would be admissible as a recorded recollection.[12] Indeed, the government presently understands that the authors who interviewed ▮▮ contemporaneously memorialized ▮▮'s statements into notes that were incorporated into the article, whose accuracy the authors verified. *See Parker*, 327 F.3d at 213.

Further, the article would be independently admissible under the residual hearsay rule. As an initial matter, the article has sufficient guarantees of trustworthiness. *See Kellner*,

---

[12]    Of course, if the authors remember the statements without reviewing the article, they may testify to it as non-hearsay evidence of the fact that ▮▮ made the statements about which they would testify.

2025 WL 3507346, at *26-27 (finding sufficient guarantees of trustworthiness for statements printed in *The New Yorker*); *Mandal*, 2006 WL 3405005, at *3 (same for *The New York Times*). *Light Reading* is a prominent industry periodical that at least one court has cited for its reliability. *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1240-41 (N.D. Okla. 2003) ("Here, the April 27, 2000, article in the industry publication *Light Reading* concerning Defendants' lucrative friends and family deals constituted a red flag, and as such should have prompted an investigation by E & Y into WCG's inventory practices, including the value of that inventory.").  It has also won industry awards for excellence, *see* https://www.prnewswire.com/news-releases/light-reading-wins-gold-in-the-ava-digital-awards-246327281.html (last visited Feb. 13, 2026); *see* https://www.prnewswire.com/news-releases/light-reading-wins-3-apex-awards-of-excellence-264562151.html (last visited Feb. 13, 2026).

Moreover, the defendants have never disavowed the reported statements in *Light Reading*.  Notably, in 2007, the founder of Huawei Tech, ███████, was voluntarily interviewed by FBI agents in New York City.  During the meeting, he stated, without prompting, that Huawei Tech makes every effort to protect intellectual property rights but added that Huawei Tech would not immediately fire an employee accused of violating U.S. export laws—apparently referring to U.S. legal protections of trade secrets and other intellectual property.  ███ also, again speaking without prompting by the agents, presented the scenario of a Huawei Tech employee who had attended a trade show in the United States a couple of years earlier.  ███ advised that, as a new employee, the individual was not aware of the rules and regulations regarding "export violations" such as taking photographs of another company's proprietary technology and emphasized that Huawei Tech did not direct these actions—an obvious reference to ███ 's conduct at the Supercomm show.

The reported statements by ▉ are more probative than other evidence containing similar misrepresentations by Huawei Tech, insofar as they were contemporaneous statements of a Huawei Tech employee who, upon his apprehension at the Supercomm show, articulated the very lies regarding his misconduct that ▉ repeated several years later.

2.    *Huawei Tech's Statements in the* Reuters *Articles Should Be Admitted*

As to the first level of hearsay, the statements attributed in the *Reuters* articles to Huawei Tech constitute not only acts in furtherance of the Skycom fraud but also party admissions by Huawei Tech.  They would thus be admissible through the trial testimony of the articles' author. *See Bradley*, 2022 WL 1708400, at *9 ("Mr. Grimaldi's testimony regarding the portion of the February 26 post that attributes specific statements to Mr. Bradley is not hearsay because it is an admission by a party opponent, and Mr. Bradley does not deny having made the statements attributed to him.").

As to the second level of hearsay, Huawei Tech's statements described in the *Reuters* articles are admissible either as recorded recollections or under Rule 807(a).

Should the author's memory falter, the government expects to satisfy the criteria of Rule 805(6) through the author's trial testimony, namely that (1) the author's "memory of the events detailed in the memorandum was sufficiently impaired"; (2) the author had "prepared or adopted the memorandum at or near the time of the events" at issue; and (3) at the time the author "prepared or adopted [the memorandum], it correctly reflected his knowledge of the events." *Parker*, 327 F.3d at 213.

Huawei Tech's statements in the article would also be admissible through the residual rule.  To begin, the articles possess sufficient guarantees of trustworthiness.  *Reuters* has a sterling reputation for fact-checking and accuracy.  *See Brimelow v. New York Times Co.*, No. 20-CV-222 (KPF), 2020 WL 7405261, at *12 (S.D.N.Y. Dec. 16, 2020) (describing *Reuters* as

"an indisputably reputable wire service"); *Reuters*, "*Reuters* Ranked as Second Most Trusted News Brand in GlobalWebIndex Report (July 11, 2019), https://www.reuters.com/article/technology/ reuters-ranked-as-second-most-trusted-news-brand-in-globalwebindex-report-idUSKCN1U62D U/ (last visited Feb. 13, 2026).  According to *Media Bias/Fact Check*, *Reuters* is rated "Least Biased based on objective reporting and Very High for factual reporting due to proper sourcing of information with minimal bias and a clean fact check record."  *See* https://mediabias factcheck.com/reuters/ (last visited Feb. 13, 2026); *see also Kellner*, 2025 WL 3507346, at *26-27; *Mandal*, 2006 WL 3405005, at *3.  Further evidence of the reported statements' trustworthiness would include (1) their exact mirroring of the written and oral representations of then-Huawei Tech's CFO Meng to ███████████████████ regarding Huawei Tech's relationship with Skycom (*see* S-3 Ind. ¶ 77) (Meng's presentation falsely claimed that "HUAWEI's engagement with SKYCOM is normal business cooperation"); (2) the fact that the defendants have never disavowed the reported statements; and (3) if necessary, the anticipated availability of the author to testify about the manner in which Huawei Tech conveyed the misrepresentations to *Reuters* and his procedure for memorializing such communications, including in accurately reproducing them in the *Reuters* articles.

The reported statements are more probative than other evidence containing similar misrepresentations by Huawei Tech, insofar as they are the only such communications directed at a global audience.  These statements furthering Huawei Tech's company-wide policy of claiming that Skycom was nothing more than one of Huawei Tech's business partners constitute direct evidence of the charged conspiracy.  The representations constitute Huawei Tech's purposeful conduct directed at regulators and global financial institutions that regularly review news reports as part of their due diligence.  Indeed, as reflected in contemporaneous communications, Huawei

Tech repeated the same lie to multiple global financial institutions that had found the *Reuters* articles and asked Huawei Tech about them as part of their standard due diligence processes.  (*See* S-3 Ind. ¶¶ 74-75.)

XIII.    The Court Should Admit Contemporaneous Accounts Memorialized in Writing

If necessary, the Court should admit, as recorded recollections, contemporaneous written accounts of (1) a meeting in August 2013 between then-Huawei Tech CFO Meng and ███████████████████ ; and (2) a letter sent by █████ to Huawei Tech regarding the incident at the Supercomm trade show in 2004.

A.    Background

1.    *Memorialization of* █████ *'s Meeting*

On or about August 22, 2013, Meng met with █████ in Hong Kong to discuss allegations in news reports suggesting that Huawei Tech operated Skycom as an unofficial Iranian subsidiary.  During the meeting, Meng addressed the allegations while speaking from a slide presentation, which was written in Chinese.  In sum and substance, Meng asserted (falsely) that Skycom was an independent party that was not controlled by Huawei Tech and that Huawei Tech was not soliciting new business in Iran.  (S-3 Ind. ¶¶ 76-77.)

The next day—on or about August 23, 2013—█████ described the meeting with Meng in an email to a coworker:

> I had a good meeting with Cathy [Meng] yesterday.  Mainly in Chinese with an interpreter as she wanted to be very precise. Anyway, no new issues - which was a relief to me.  No new contracts, very high scrutiny of end customers, careful product and supply chain control, so everything appears to be above board. Cathy will send me an English translation of her presentation and we should probably send it to RRC (Reputational Risk Committee) for noting.

2.    *Memorialization of* █████ *Events*

Less than a month after ████ was caught after hours at the Supercomm trade show improperly examining █████'s proprietary optical networking device, █████'s then-general counsel, █████████, wrote a letter dated July 21, 2004, to principals of Huawei Tech regarding the incident. (*See* Ex. F.) The letter summarized █████'s contemporaneous understanding of the events, including her receipt of the memory cards and notebook that were forwarded to her.

B.    <u>Argument</u>

████████ and ███████ each are expected to testify at trial. Should their memories falter, the substance of the August 23, 2013 email and the July 21, 2004 letter should be admitted as recorded recollections. The government expects to satisfy the criteria of Rule 805(6) through the witnesses' trial testimony, namely that (1) the witnesses' "memory of the events detailed in the memorandum was sufficiently impaired"; (2) the witnesses' had "prepared or adopted the memorandum at or near the time of the events" at issue; and (3) at the time the witnesses' "prepared or adopted [the memorandum], it correctly reflected his [or her] knowledge of the events." *Parker*, 327 F.3d at 213.

XIV.    The Court Should Permit Evidence Regarding FutureWei's Payment of Attorneys' Fees <u>and Costs for a Co-conspirator</u>

As alleged, Huawei Tech sought to misappropriate the intellectual property of ████, including through the efforts of ███████. While concealing from █████ his contractual relationship with Huawei Tech, ███████ accessed a board containing █████'s nonpublic technology. He then ran tests on the board and provided the results to Huawei Tech, assisting Huawei Tech's efforts to reverse engineer █████'s proprietary technology. (S-3 Ind. ¶¶ 50-57.) Subsequently, ███████ was arrested and prosecuted in a related matter in this District. In

connection with that prosecution, which culminated in ███████'s guilty plea to having made materially false statements to federal agents, FutureWei paid ███████'s attorneys' fees and costs. According to a billing invoice, the total legal fees billed as of February 2020 surpassed $900,000.

The Court should admit evidence of FutureWei's payment of ███████'s legal fees as an act in furtherance of the conspiracies charged in Counts Two (theft of trade secrets conspiracy) and Three (wire fraud conspiracy).  As an initial matter, FutureWei has no obvious connection to ███████.  Moreover, under Second Circuit law, the payment of a co-conspirator's legal fees is admissible as evidence of the existence of the alleged conspiracy, as an act in furtherance of the conspiracy, as compensation for the defendant's participation in the conspiracy, and/or as "hush" money.  *See In re Grand Jury Subpoena Served Upon Doe*, 781 F.2d 238, 251 (2d Cir. 1986) ("[P]ayment for legal representation may be a form of compensation to members of a crime 'crew'" and is "highly probative of the role of Colombo as the head of that 'enterprise', as the term is defined in RICO."); *United States v. Simmons*, 923 F.2d 934, 949 (2d Cir. 1991) ("Rather, the evidence demonstrated that Peter Monsanto preferred that appellants use [attorney] Port and that, in at least some situations, he made benefactor payments to Port on their behalf, including a payment with Gary Simmons of $10,000 to handle an appeal for Arnold Lawson in a state narcotics case and of $100,000 to $150,000 for services in connection with certain FBI searches.  These facts alone created a suspicion that appellants were somehow linked."); *see also United States v. Zuniga*, 312 F. App'x 653, 659 (5th Cir. 2009) (finding that the defendant's payment of two co-conspirators' legal fees helped demonstrate the defendant's position as "organizer and leader of [the] conspiracy").

Rule 403 balancing concerns do not preclude admission of this evidence.  The payment records are no more incendiary than other allegations in this case, which involve theft of

trade secrets from several corporate victims, the defrauding of multiple financial institutions regarding the lead defendant's relationship with an undeclared affiliate which provided technology used by a hostile foreign state (Iran) to quell public demonstrations, and obstruction of a federal grand jury investigation. *See Johnson*, 469 F. Supp. 3d at 217 ("Where uncharged conduct is at issue, an important consideration in conducting this inquiry is whether the evidence at issue is 'more inflammatory than the charged crime.'" (quoting *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006)).

XV.    The Court Should Preclude Evidence, Argument, or Questioning Regarding a Purported Cyber Intrusion of ████'s Network Post-Dating the Alleged Misappropriation

In communications with the government, defense counsel has suggested that ████'s source code may have been publicly available at the time of the defendants' alleged misappropriation due to a cyber intrusion of ████, and therefore that no misappropriation by the defendants could have occurred. However, the cyber intrusion the defendants identify occurred *after* their own alleged misappropriation. The Court should therefore preclude any such evidence, argument, or questioning as irrelevant and likely to sow juror confusion.

As background, on May 5, 2009, the DOJ issued a press release announcing the indictment of a Swedish national, Philip Gabriel Pettersson. As reported in the press release, Pettersson committed one or more cyber intrusions on the computer system and network of ████ between May 12, 2004, and May 13, 2004, and misappropriated the ██████████ ████████ code of ████. *See* https://www.justice.gov/archives/opa/pr/swedish-national-charged-hacking-and-theft-trade-secrets-related-alleged-computer-intrusions (last visited Feb. 13, 2026).

That cyber intrusion, however, postdated the misappropriation of ████'s intellectual property alleged in the Third Superseding Indictment. As alleged, the defendants'

misappropriation of ▉▉▉▉▉ occurred between 2000 and 2002, culminating in the incorporation of ▉▉▉▉ in FutureWei routers in 2002. (S-3 Ind. ¶ 18.) Pettersson's activities occurred almost two years later, and after ▉▉▉ filed suit against Huawei Tech and FutureWei in 2003. (*Id.* ¶ 21.) Because Pettersson's conduct postdates the defendants' alleged theft, there is no plausible argument that ▉▉▉▉▉ was publicly available, including to the defendants, due to Pettersson's conduct. Accordingly, any argument or evidence regarding Pettersson's 2004 cyber intrusion would amount to nothing more than an irrelevant evidentiary tangent that would only befuddle jurors.

Similarly, that Pettersson successfully hacked ▉▉▉'s computer systems has no bearing on any element in the theft of trade secrets statute, 18 U.S.C. § 1832, charged in Count Two. Indeed, the statutory definition of trade secrets requires that the owner of a trade secret "has taken reasonable measures to keep such information secret" and that the trade secret is not "readily ascertainable through proper means by[] another person." 18 U.S.C. § 1839(3). Pettersson's successful misappropriation through an illegal cyber intrusion is irrelevant to whether ▉▉▉ took sufficient measures to keep its ▉▉▉ secret, and did not render the ▉▉▉ "readily ascertainable through proper means."

## XVI. The Court Should Admit Evidence of ▉▉▉'s Destruction of Evidence

The Court should permit the government to introduce evidence of ▉▉▉'s effort to delete evidence of his relationship with Huawei Tech from his home computers, to prove the existence of a conspiracy between ▉▉▉ and Huawei Tech to steal ▉▉▉▉▉'s trade secrets.

The Second Circuit has instructed that "acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy." *United States v. Eisen*, 974 F.2d 246, 269 n.8 (2d Cir. 1992). Accordingly, evidence of "acts or statements designed to conceal" a conspiracy is admissible not only where obstruction is charged, but also as evidence of the charged

conspiracy. *See United States v. Potamitis*, 739 F.2d 784, 788 (2d Cir. 1984) ("The evidence established a single conspiracy involving the robbery itself, obstruction of the investigation, and various acts of concealment. For example, it was essential to the plan that Potamitis remain behind to play the 'victim,' to conceal his involvement in the crime and the identity of his co-conspirators. Potamitis's ruse enabled the others to flee and gave them time to secrete the proceeds.").[13]

Here, ███'s efforts to destroy evidence is probative of the existence of the conspiracy between ███ and Huawei Tech to steal ████'s trade secrets. *See id.* Though the communications summarized in paragraphs 25 to 27 of the Third Superseding Indictment date from 2001 to 2003, many of these communications were only discovered in 2009 when they were recovered from the very computers on which ███ had run the "Eraser" program on the morning of the computers' disclosure to ████ counsel. ███'s efforts to destroy these communications with Huawei Tech in 2009 constitute direct evidence of the existence of the conspiracy. Moreover, the charged conspiracy to steal trade secrets (Count Two) alleges that the illegal scheme spanned from 2000 to 2020, meaning that ███'s obstruction occurred during the pendency of the conspiracy. ███'s efforts to conceal his communications with the defendants constitute "acts or statements designed to conceal an ongoing conspiracy," which "are in furtherance of that conspiracy" and are admissible. *Eisen*, 974 F.2d at 269 n.8.

---

[13]      *See United States v. Israilov*, No. 22-CR-20 (PGG), 2023 WL 4407464, at *13 (S.D.N.Y. July 6, 2023) ("[T]he obstruction evidence about which he complains is admissible against him as direct evidence of the existence of the charged healthcare fraud and money laundering conspiracies."); *United States v. Mejia*, 376 F. Supp. 2d 460, 463 (S.D.N.Y. 2005) ("A jury might reasonably infer from Mejia's attempt to conceal the $71,000 from U.S. Customs officials, along with evidence suggesting that those funds derived not from any legitimate business but from the drug conspiracy, that at least one of Mejia's purposes in attempting to unlawfully remove the funds was to conceal his participation in the activities that allegedly produced them. Therefore, evidence of the $71,000 is admissible as evidence of an act done in furtherance of the conspiracy.").

XVII.  The Court Should Preclude Argument that FutureWei's Application for a Provisional U.S. Patent with Misappropriated Technology Negates Criminal Intent

The Court should preclude the defense from arguing that Huawei Tech and FutureWei lacked criminal intent to misappropriate the trade secrets of ███, as evidenced by their purportedly open and notorious use of ███'s trade secrets immediately after receiving them in late-September 2009.  As described above, FutureWei applied for a provisional U.S. patent in October 2009—weeks after it had received ███'s trade secrets pursuant to an NDA. However, as provisional patents are not publicly filed, any such argument would not only be misleading but also irrelevant.

Normally, "[t]he existence of a patent application or a public patent puts parties on notice of their existence."  *Zirvi v. Flatley*, 433 F. Supp. 3d 448, 459-60 (S.D.N.Y. 2020) (citing *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 182 F. App'x 994, 999 (Fed. Cir. 2006) (per curiam)).  However, provisional patents, which have a duration of only twelve months, are not publicly filed and are not required to have a formal patent claim or an oath or declaration. *See* "Provisional Application for Patent," U.S. Patent & Trademark Office, https://www.uspto.gov/patents/basics/apply/provisional-application (last visited Feb. 13, 2026).  Therefore, FutureWei's filing of the provisional patent would not have put ███ on notice of its theft.  Moreover, ███ did not learn that FutureWei had applied for a provisional patent using its trade secrets until March 2015, when the European Patent Office rejected ███'s own patent application and cited FutureWei's then-permanent patent of the very trades secrets stolen from ███.

Accordingly, any argument that the filing of the provisional patent either reflected the defendants' lack of criminal intent or put ███ on notice of the trade secrets theft should be precluded as factually wrong, misleading, and irrelevant.

XVIII. The Court Should Permit Evidence of Huawei Tech's Misrepresentations to Victim Financial Institutions About the Reasons for its Commercial Separation from █████

   The government has informed the defendants that it no longer intends to proceed at trial on Counts Five and Eight, which charge bank fraud conspiracy and bank fraud, respectively, related to efforts to defraud ████ in or about and between August 2017 and January 2019. However, the Court should nonetheless admit evidence of lies by Huawei Tech to multiple victim financial institutions (including █████) during that timeframe as direct evidence of the RICO conspiracy (Count One) or pursuant to Rule 404(b).

A. Relevant Facts

   The government intends to introduce Huawei Tech's misrepresentations regarding its separation from ████ made to ██████████████████, ██████, and ██████████ as direct evidence of the RICO conspiracy and under Rule 404(b) as evidence of motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident.

   For example, in November 2017, Huawei Tech principals met with ████ principals in Singapore.  Regarding the separation from ████, Huawei Tech falsely claimed that "it is time to change and enhance their relationships with other banking partners like ████" due to ████'s "slow-down business and low efficiency," which Huawei Tech characterized as "a different mind-set," including a "different understanding on compliance issues."  Huawei Tech further falsely claimed that the "cash business re-allocation is Huawei's general management decision and is not driven by any sanction violation issues."  Huawei Tech represented that it "fully understands the compliance requirement and has already moved away from business dealing with sanction-related countries."  The defendants made similar misrepresentations to ████ and to ██████.

B.    <u>Applicable Law</u>

Direct evidence of a crime is not limited to "that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Rather, direct evidence also includes evidence that is "inextricably intertwined with the evidence regarding the charged offense," and/or "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). The Second Circuit has interpreted this category of evidence to include acts that provide necessary background or context for the charged crimes. *See United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").[14]

Rule 404(b) separately provides that evidence of other uncharged acts is admissible if relevant to an issue at trial other than the defendant's character—such as proving motive, intent, preparation, plan, knowledge, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(2). To be admissible, the probative value of such evidence must not be substantially outweighed by the risk of unfair prejudice. *See United States v. Williams*, 205 F.3d 23, 33 (2d Cir. 2000). This Circuit follows an "inclusionary approach," which admits all relevant "other act" evidence that does not serve the sole purpose of showing the defendant's bad character and that is not overly prejudicial. *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017).

---

[14]    *United States v. Langford*, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's discretion to admit evidence of acts committed prior to the time charged in the indictment to prove the existence of the alleged conspiracy as well as to show its background and history."); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment. Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1988)).

C.    <u>Argument</u>

The Court should permit the government to introduce evidence of Huawei Tech's lies regarding the reasons for its separation from ███ as direct evidence of the charged crimes or, in the alternative, under Rule 404(b).

To begin, the evidence constitutes part of Huawei Tech's ongoing scheme to reinvest proceeds of racketeering income to maintain or grow Huawei's operations in the United States. As alleged, at the time of the misrepresentations, Huawei Tech was looking to expand its relationships with other global financial institutions in order to "receive[] income indirectly in the form of cost savings and the value of continued banking services, the proceeds of which income were used to operate and grow HUAWEI's business." (S-3 Ind. ¶ 86.) Thus, this evidence is central to the RICO conspiracy charge (Count One), completes the story of the Skycom fraud perpetrated on multiple global financial institutions, and should be admitted as direct evidence of that charge. *United States v. Raines*, No. 22-CR-18-02 (NSR), 2023 WL 6211980, at *3 (S.D.N.Y. Sept. 25, 2023) ("Evidence that 'complete[s] the story of the crime on trial' or that 'is inextricably intertwined with the evidence regarding the charged crime," is considered direct evidence of a charged crime rather than other evidence under Rule 404(b).') (quoting *Carboni*, 204 F.3d at 44).

In the alternative, the evidence is admissible under Rule 404(b) to demonstrate motive, intent, plan, absence of mistake, or lack of accident regarding the Skycom-related financial fraud charged in Counts Four, Six, and Nine. Huawei Tech's repeated lies to financial institutions in 2017 demonstrate the importance to the defendants of the object of the overarching criminal scheme—to obtain access to dollar-clearing services so that Huawei Tech could repatriate its funds from commercial activities in sanctioned countries such as Iran. That Huawei Tech would misrepresent the reasons for the separation from ███ underscores Huawei Tech's commercial reliance on international banks' dollar-clearing services in 2012 and 2013—at the height of the

Skycom-related financial fraud.  This is powerful evidence of motive.  *See United States v. Schulte*, No. 17-CR-548 (PAC), 2020 WL 264687, at *1 (S.D.N.Y. Jan. 17, 2020).  Nor is the probative value of this evidence substantially outweighed by the possibility of the risk of unfair prejudice, where the evidence is less inflammatory than the underlying Skycom scheme in which Huawei Tech repeatedly lied to multiple financial institutions and the U.S. government about its operations in Iran, which operations included helping the Iranian regime surveil—and purge—pro-democracy protestors.  *See Johnson*, 469 F. Supp. 3d at 217.

XIX.  **The Court Should Permit Certain Witnesses to Testify Under Pseudonyms or Initials and Preclude Cross-Examination of These Witnesses Regarding Certain Identifying Information**

Nearly all the government's witnesses—law enforcement agents, cooperating witnesses, expert witnesses, and others—will identify themselves in court using their full names during their testimony.  For a small number of witnesses (the "Protected Witnesses"), however, there is a risk of serious safety concerns should the witnesses need to testify in open court under their full names.  The government requests that the Court grant a protective order (1) authorizing the Protected Witnesses to testify under aliases or their initials;[15] (2) precluding defense counsel and the defendants from disseminating the true names of the Protected Witnesses, after the government discloses the names to them in connection with its disclosures under 18 U.S.C. § 3500 ("3500 materials") or in connection with providing its witness list; (3) permitting other government witnesses to use the pseudonyms to refer to the Protected Witnesses; and (4) instructing any defense witnesses, including the defendants, to use the pseudonyms when referring to the Protected

---

[15]    For any Protected Witness for whom the government seeks the Court's permission to use an alias or initials to identify the witness in court and in public filings, the government will provide the defense with the witness's name and will comply with its obligations under *Giglio* and 18 U.S.C. § 3500.  The defense, therefore, will be able to fully investigate and cross-examine the Protected Witnesses, avoiding any prejudice or Confrontation Clause concerns.

Witnesses.[16]  The government has separately filed a sealed submission (the "Sealed Submission") detailing the security concerns for the specific witnesses for whom it seeks such a protective order on this motion; here, the government sets forth the legal standards governing testimony under an alias.

The government also requests that the Court grant a protective order precluding the defense from eliciting in open court identifying information for the Protected Witnesses, such as home and work addresses, telephone numbers, email addresses, and other specific identifying information (such as current employers), which could be used to locate the witnesses.  Due to the high-profile nature of this trial and the national security concerns related to the defendants, such information, if revealed, could subject the witnesses and their family members to harassment and significant danger.

A.     The Court Should Permit the Protected Witnesses to Testify Under Aliases

The Court has discretion to permit witnesses to testify using aliases.  Where the government seeks to limit disclosure of identifying information in open court, "the government must provide a reason for the limitation."  *United States v. Marcus*, No. 05-CR-457 (ARR), 2007 WL 330388, at *1 (E.D.N.Y. Jan. 31, 2007) (citing *United States v. Marti*, 421 F.2d 1263, 1266 (2d Cir. 1970)).  The reason offered by the government to justify such a limitation "'may be that the answer may subject the witness to reprisals.'"  *Id*. (quoting *Marti*, 421 F.2d at 1266).  Once the government has offered such a rationale, the defendant is required to demonstrate a "particularized need" for in-court disclosure of the identifying information.  *Id*. (citing *United States v. Bennett*, 409 F.2d 888, 901 (2d Cir. 1969)).

---

[16]     In connection with certain of the Protected Witnesses' testimony, the government reserves the right to move the Court to close the courtroom during their trial testimony and to seal the portions of the trial transcript containing their testimony.

Allowing a witness to use an alias or otherwise limiting cross-examination as to identifying details does not infringe upon a defendant's Sixth Amendment right to confront the witnesses against him. *See United States v. Hernandez*, No. 12-CR-809 (PKC), 2013 WL 3936185, at *3 (S.D.N.Y. July 29, 2013) (explaining that, while "Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to cross-examine adverse witnesses, this right is not absolute, and a trial court has broad discretion to restrict cross-examination 'based on concerns about, among other things . . . the witness's safety'" (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986))); *see also Washington v. Walsh*, No. 08-CV-6237, 2010 WL 423056, at *7 (S.D.N.Y. Feb. 5, 2010) (collecting cases, and holding that law enforcement officer "testifying under a badge number rather than his name does not infringe upon a defendant's right to confront the witnesses against him"). A witness's use of an alias, moreover, does not prejudice the defendant where the identity of the witness is known to or provided to the defendant, and where the government provides *Giglio* material. As the *Hernandez* court explained:

> [T]he limited open-court anonymity of permitting the [witness] to testify using an alias does not outweigh the defendant's right to cross-examination, because the defendant will not be prejudiced by the use of an alias. The Government must still provide the defense with any and all *Giglio* material for the [witness]. The Government also offered to provide the [witness's] real name privately to defense counsel under a stipulation or under a protective order if necessary, in order to allow the defense to fully investigate the [witness] out of court to prepare for cross-examination.

2013 WL 3936185, at *3.

Applying these principles, courts have granted the government's request to allow cooperating witnesses to testify using an alias in circumstances like those present here. For example, in *Guzman Loera*, Judge Cogan granted the government's unopposed motion to allow certain witnesses to testify under alias in the trial of the notorious drug kingpin "El Chapo." 2018

WL 2744701 at *5-6. In its underlying motion, the government agreed to provide full disclosure to the defense team of those witnesses' names and 3500 materials, thus enabling the defense to fully investigate those witnesses before trial. *Guzman Loera*, ECF No. 213 at 74.

Similarly, in *United States v. Celis*, the government requested that certain government witnesses testifying against the FARC, a Colombian drug trafficking and terrorist organization, be permitted to testify under aliases. 608 F.3d 818, 830, 833 (D.C. Cir. 2010). The government made that request in light of "evidence that in Colombia the FARC had killed people suspected of helping to arrest [the defendant] and had threatened to kill cooperating witnesses." *Id*. at 833. The district court granted the order, and the D.C. Circuit affirmed. *Id*. In so holding, the D.C. Circuit noted that the district court appropriately weighed the competing interests "where the government disclosed the true identities of protected witnesses to defense counsel and those witnesses testified at trial under pseudonyms." *Id*. The court further held that the "appropriateness of using pseudonyms to protect witnesses does not depend on whether the threat to the witness comes directly from a defendant or another source." *Id*. at 832.

Likewise, in *United States v. Alaniz*, 726 F.3d 586, 609 (5th Cir. 2013), the Fifth Circuit upheld the district court's protective order authorizing two confidential informants to testify under aliases against members of the Gulf Cartel and Los Zetas. *Id*. at 599, 609. Specifically, the court upheld the procedure by which the confidential informants testified under aliases and precluded defense counsel from using the witnesses' true names in court, but defense counsel was provided their true names and significant background information. *Id*. at 609-10. The court concluded that, "[b]alancing the public interest in protecting the flow of information against the defendant's confrontation rights, . . . the limited use of pseudonyms did not violate the Confrontation Clause in this case." *Id*. at 610; *see also United States v. Maso*, No. 07-10858, 2007

WL 3121986, at *3-4 (11th Cir. 2007) (summary order) (affirming district court's order
authorizing cooperating witness to testify under pseudonym).

As noted above, the government will provide the defense with the names and with
*Giglio* and 3500 materials for any Protected Witnesses, enabling the defense to investigate and
cross-examine them.  *See generally Hernandez*, 2013 WL 3936185, at *3.

As further noted above, the Sealed Submission details the specific security and
safety concerns for the Protected Witnesses for whom the government seeks permission to testify
using an alias in this motion.  For the reasons herein, as well as set forth in that submission, the
government requests that the Court grant the protective order for the Protected Witnesses.

B.    The Court Should Preclude Cross-Examination Eliciting Certain Identifying
Information

As the Second Circuit has explained, a trial court has a "duty to protect [a witness]
from questions which go beyond the bounds of proper cross-examination merely to harass, annoy
or humiliate him."  *United States v. Persico*, 425 F.2d 1375, 1383-84 (2d Cir. 1970) (internal
quotations omitted).  It has also explained that the possibility that disclosure of a witness's address
in open court may "subject the witness to reprisals or . . . humiliate or annoy the witness" is
sufficient justification to limit cross-examination about such information.  *Marti*, 421 F.2d at 1266.
Thus, the court has upheld district court orders limiting cross-examination about such information.
*See Persico*, 425 F.2d at 1383-84 (affirming district court ruling that two government witnesses
need not disclose their addresses or employers in open court).[17]

---

[17]    *See also United States v. Cavallaro*, 553 F.2d 300, 304-05 (2d Cir. 1977) (affirming
district court order denying defendant access to witness's address, because "there was good reason
to fear for the safety of the witness"); *Guzman Loera*, 2018 WL 2744701, at *6 ("Because of the
media attention this case has attracted already and will likely continue to attract at trial, the Court
grants the Government's motion to limit the possibility that the Government's witnesses will be
subject to reprisals or harassment.").

The government requests that the Court preclude cross-examination of the Protected Witnesses as to their home and work addresses, phone numbers, and other specific identifying information, such as the identities of their employers, which could be used by third parties to locate the witnesses. Such a limit on cross-examination is proper in this case, which has drawn considerable attention from the media and the public—attention which will only increase as trial draws closer. To disclose the Protected Witnesses' addresses and identifying information to the public in open court would invite harassment of the witnesses and interference with their testimony as the press and members of the public might seek to contact and question those witnesses about their testimony and involvement with this matter. Moreover, the disclosure of such information to the public would necessarily mean that third parties, including hostile state actors, would have access to that information. Such persons could use that information to attempt to locate and harm the Protected Witnesses or their family members, some of whom are located abroad.

A limitation on cross-examining the Protected Witnesses as to specific identifying details, by contrast, would not inhibit the defense from investigating the Protected Witnesses or conducting meaningful cross-examination. Nor will the limitation proposed by the government prevent the jury from fully assessing the Protected Witnesses, including their credibility. *See Marti*, 421 F.2d at 1266.

## XX. The Court Should Preclude Evidence, Argument, or Questioning About Classified Information Outside the Scope of CIPA

Pursuant to the Court's *ex parte* classified order, the government has provided unclassified substitutions to the defense. In an abundance of caution, the government moves to preclude any evidence, argument, or questioning about classified information during trial outside the scope of the Classified Information Procedures Act ("CIPA"). *See, e.g.*, *United States v. Badia*,

827 F.2d 1458, 1464-66 (11th Cir. 1987) (precluding inquiry for failure to provide notice under CIPA § 5). Any argument or questioning about the general absence or existence of classified information would be irrelevant and inadmissible.

Section 5 of CIPA requires a defendant to provide notice of his or her intent to seek to disclose classified information at trial. 18 U.S.C. app. 3 § 5. Section 6 prescribes a hearing for the Court to make pretrial determinations about the use, relevance, and admissibility of that classified information at trial. 18 U.S.C. app. 3 § 6. Finally, Section 8 addresses limited circumstances not addressed by Sections 5 and 6, such as when defense counsel inadvertently asks a question calling for classified information, and permits the government to object to any inquiries that might require a witness to disclose classified information not previously held to be admissible.[18] 18 U.S.C. app. 3 § 8(c).

The Supreme Court has "recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business" and described the reasons underlying that interest as "too obvious to call for enlarged discussion." *Dep't of Navy v. Egan*, 484 U.S. 518, 527, 529 (1988) (citations and internal quotations omitted). This interest applies both to disclosing information as well as to confirming or denying the existence of such information, which could harm intelligence sources, methods, and operations by revealing the scope of the government's ability to collect information (or lack thereof). As the D.C. Circuit has explained, "much of the government's security interest in the conversation lies not so much in the contents of the conversations, as in the time, place, and nature

---

[18]    Section 7 of CIPA permits the government to take an expedited interlocutory appeal if the district court: (1) authorizes the disclosure of classified information; (2) imposes sanctions for nondisclosure of classified information; or (3) refuses to issue a protective order sought by the government to prevent the disclosure of classified information. 18 U.S.C. app. 3 § 7.

of the government's ability to intercept the conversations at all." *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989). The Second Circuit has adopted *Yunis*'s reasoning and made clear that disclosing whether the U.S. intelligence community obtained information about any particular person would reveal national security and classified information. *See United States v. Stewart*, 590 F.3d 93, 131-32 (2d Cir. 2009) (holding that the details of the NSA's operations, including "the surveillance vel non of any particular group," implicate national security).

Questions or arguments about the existence or non-existence of classified information are irrelevant and inadmissible and should also be precluded. Testimony confirming the existence of classified documents (if any did exist) after the Court ordered that any such documents could be withheld under CIPA Section 4 could cause the jury to speculate about the nature of any such document and could damage national security by revealing intelligence sources and methods. *See Yunis*, 867 F.2d at 623. Testimony confirming that no such documents exist (if that were so) is likewise inadmissible and could theoretically expose gaps in U.S. national security efforts or capabilities that could be exploited by hostile actors. Any inquiry or argument about classified information at trial should thus be precluded.

XXI. **The Court Should Preclude Evidence, Argument, or Questioning Inconsistent with Facts Known to Defense Counsel, Including Facts Made Known in Unclassified Discovery**

The government respectfully moves to preclude the defendants from offering evidence, advancing arguments, or questioning witnesses in ways inconsistent with their prior statements or that are otherwise factually inaccurate, including based on unclassified discovery.

The New York Rules of Professional Conduct prohibit attorneys from asserting a defense unless "there is a basis in law and fact for doing so that is not frivolous." *See* Rule 3.1 (governing "Non-Meritorious Claims and Contentions"). A lawyer therefore may not "knowingly assert material factual statements that are false." *Id.* at Rule 3.1(b)(3). Similarly, the Rules prohibit

54

attorneys from "knowingly mak[ing] a false statement of fact" in the course of representing a client, or from "offer[ing] or us[ing] evidence that the lawyer knows to be false." *See id.* at Rule 3.3(a), Rule 4.1.

In an abundance of caution, the government seeks a ruling that the defense cannot present evidence or argument that defense counsel knows to be false, including based on the contents of declassified discovery produced pursuant to the Court's CIPA Section 4 ruling.

<u>REQUEST FOR SEALING</u>

The government respectfully requests leave to file this brief and all of the exhibits under seal, with a redacted version of the brief filed on the public docket. The government is sensitive to the need to minimize the amount of information in a criminal case that is filed under seal, but sealing is warranted here to protect the privacy interests of third parties. *See* Fed. R. Crim. P. 6(e)(6); *see also United States v. Aref*, 533 F.3d 72, 83 (2d Cir. 2008); *Lugosch v. Pyramid Co.*, 435 F.3d 110, 120 (2d Cir. 2006); *United States v. Amodeo*, 44 F.3d 141, 147 (2d Cir. 1995). Under the circumstances here, the interest in safeguarding the privacy of these third parties outweighs the public's qualified right to access such information. The facts set forth herein provide a sufficient basis for the "specific, on the record findings" necessary to support sealing. *Lugosch*, 435 F.3d at 120.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should grant the government's motions *in limine*.

Dated: Brooklyn, New York
       February 13, 2026

                         Respectfully submitted,

                         JOSEPH NOCELLA, JR.
                         United States Attorney
                         Eastern District of New York

By:    /s/
                         Alexander A. Solomon
                         Meredith A. Arfa
                         Robert Pollack
                         Matthew Skurnik
                         Matthew Sullivan
                         Assistant United States Attorneys
                         (718) 254-7000

                         MARGARET A. MOESER
                         Chief, Money Laundering, Narcotics and
                         Forfeiture Section,
                         Criminal Division,
                         U.S. Department of Justice

                         Taylor G. Stout
                         Morgan J. Cohen
                         Jasmin Salehi Fashami
                         Trial Attorneys

                         CHRISTIAN NAUVEL
                         Acting Chief, Counterintelligence and
                         Export Control Section,
                         National Security Division,
                         U.S. Department of Justice

                         Christopher Fenton
                         Trial Attorney