UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>HUAWEI TECHNOLOGIES CO., LTD., *et al.*,<br><br>Defendants. | 18 CR 457 (S-4) (AMD) (JAM) |

**DEFENDANTS HUAWEI TECHNOLOGIES CO., LTD., HUAWEI DEVICE CO., LTD., HUAWEI DEVICE USA INC., AND FUTUREWEI TECHNOLOGIES, INC.'S TRIAL MOTION IN LIMINE TO ADMIT EVIDENCE FROM GOVERNMENT'S OFAC WITNESS**

David Bitkower
Matthew S. Hellman
Katya Jestin
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
(202) 639-6048
dbitkower@jenner.com

Douglas A. Axel
Michael A. Levy
Ellyce R. Cooper
Frank R. Volpe
Melissa Colón-Bosolet
Daniel J. Hay
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
(212) 839-5300
daxel@sidley.com

Brian M. Heberlig
Ryan P. Poscablo
Julia Gatto
William L. Drake
Jessica I. Rothschild
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
rposcablo@steptoe.com

*Counsel for Huawei Technologies Co., Ltd., Huawei Device Co., Ltd., Huawei Device USA Inc., and Futurewei Technologies, Inc.*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ..... 1

BACKGROUND ..... 3

I. The Government Has Introduced Anecdotal Evidence of Huawei's Use of U.S.-Branded Goods to Suggest Huawei Committed Export Control Violations ..... 3

II. Huawei Seeks to Introduce Counterevidence Undermining the Government's "U.S-Branded Goods" Theory ..... 4

ARGUMENT ..... 7

I. The Court Should Permit Limited Cross-Examination Regarding Export Controls ..... 7

II. The Court Should Admit the VSD Evidence ..... 10

A. The VSD evidence shows that Huawei lacked intent to defraud Congress and the banks. ..... 10

B. The VSD evidence is relevant to rebut the government's theory that Huawei intentionally impeded OFAC. ..... 11

C. The VSD evidence corroborates Huawei's lack of willfulness. ..... 12

D. The VSD evidence is admissible non-hearsay, not character evidence. ..... 13

III. Alternatively, The Court Should Exclude Evidence of So-Called Export Control Violations Altogether ..... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Borochoff v. GlaxoSmithKline PLC*,
No. 07-cv-5574 (LLS), 2008 WL 2073421 (S.D.N.Y. May 9, 2008), *aff'd* 343 F. App'x 671 (2d Cir. 2009) ....................12

*In re MetLife Demutualization Litig.*,
262 F.R.D. 217 (E.D.N.Y. 2009) ....................11

*Salim v. Mobile Telesystems PJSC*,
2022 WL 966903 (2d Cir. Mar. 31, 2022) ....................12

*United States v. Brandt*,
196 F.2d 653 (2d Cir. 1952) ....................10

*United States v. Cert. Envt'l Servs., Inc.*,
753 F.3d 72 (2d Cir. 2014) ....................10, 11, 14

*United States v. Collorafi*,
876 F.2d 303 (2d Cir. 1989) ....................10

*United States v. Damti*,
109 Fed. App'x 454 (2d Cir. 2004) ....................14

*United States v. Kohan*,
806 F.2d 18 (2d Cir. 1986) ....................11

*United States v. Kosinski*,
976 F.3d 135 (2d Cir. 2020) ....................13

*United States v. Roldan*,
167 F.4th 569 (2d Cir. 2026) ....................10, 14

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) ....................10

**Other Authorities**

31 C.F.R. § 560.205 (2007) ....................5, 8

## PRELIMINARY STATEMENT

Beginning with its very first witness, the government has sought to advance the narrative—nowhere charged in the Indictment—that Huawei violated U.S. sanctions and export control laws by exporting U.S.-origin goods to Iran, and then lied to Congress and its banks about that conduct. Yet the government's admitted and anticipated evidence rests solely on anecdotes from witnesses claiming to have observed Huawei use U.S.-branded products in Iran. This evidence falls far short of establishing a sanctions or export controls violation. The government nevertheless asks the jury to infer both a violation and the falsity of subsequent statements from nothing more than the presence of U.S.-branded products in Iran. *See* Tr. at 1404:19-1405:3 (government explaining that "evidence regarding whether the witnesses in Iran saw western communications equipment … is squarely relevant to the representations that were made in the bank and wire fraud portion of the case"). That theory is legally deficient and threatens substantial prejudice to Huawei.

To rebut these allegations and the government's theory, Huawei seeks to elicit two narrow categories of evidence from Seth Bridge, the government's proffered witness from the Treasury Department's Office of Foreign Assets Control ("OFAC"). First, Huawei seeks to cross-examine Bridge on the basic regulatory framework governing exports and reexports to Iran under the Iranian Transactions Sanctions Regulations ("ITSR"). This testimony would establish that determining whether U.S.-branded goods were unlawfully exported or reexported to Iran is considerably more complex than merely identifying U.S.-branded or "western" products in that country. Such clarity is necessary to rebut the government's apparent contention that the mere presence or use of U.S.-branded goods in Iran establishes a sanctions violation, and therefore Huawei's representations regarding sanctions compliance were false.

Second, Huawei seeks to elicit testimony and evidence relating to Huawei's voluntary self-disclosure (the "VSD") to OFAC during the charged conspiracy period regarding the provision of U.S. goods to Iran, and OFAC's subsequent issuance of a no action letter. This evidence undermines several of the government's charges by showing that Huawei did not knowingly and intentionally deceive its banking partners and Congress about its sanctions compliance; that Huawei did not conceal the nature of its work in Iran, including its use of resellers Panda International Information Technology Company ("Panda") and CMEC International Trading Co. Ltd. ("CMEC"), which the government characterizes as front companies; that Huawei did not intentionally impede OFAC's functions through deception; and that Huawei did not willfully violate OFAC's financial sanctions regime.

By eliciting evidence and testimony relating to alleged export control violations involving U.S.-branded goods, the government has necessarily made relevant the limited counter-evidence Huawei seeks to present. Huawei does not seek to litigate the substantive legality of any particular transaction, or to suggest that evidence of Huawei's prior VSD disclosure is a complete defense to the charged crimes. Rather, it seeks only to provide the jury with the basic regulatory context and exculpatory state-of-mind evidence that courts within the Second Circuit routinely permit. Such evidence will allow the jury to fairly evaluate the government's fraud and conspiracy allegations, using direct evidence from the charged conspiracy period. Without it, the jury will be left with a lopsided, misleading account of Huawei's conduct.

## BACKGROUND

### I. The Government Has Introduced Anecdotal Evidence of Huawei's Use of U.S.-Branded Goods to Suggest Huawei Committed Export Control Violations

The Indictment charges Huawei with sanctions-related violations arising from U.S.-dollar transactions—not from the export of U.S.-origin goods to Iran. Specifically, the Indictment alleges that Huawei caused U.S. banks to export "financial services" to Iran in violation of the ITSR, S-4 Ind. ¶¶ 62–64, 111, 113. It also alleges that Huawei defrauded certain banks and Congress by misrepresenting that it complied with U.S. sanctions and export regulations, *id.* ¶¶ 60, 68; and defrauded the United States by concealing the nature and extent of Huawei's work in Iran, thereby impeding OFAC's regulatory functions, *id.* ¶ 105. While the Indictment asserts that Huawei lied to Congress and its banks about "[selling] and [attempting] to sell U.S.-origin goods to Iran in violation of U.S. law," *id.* ¶ 71, it does not allege a substantive violation of any export control laws, much less charge Huawei with a crime based on such a violation.

Despite this, the Court ruled that the government could introduce evidence that Huawei "used intermediaries in China to purchase U.S. telecommunications equipment for Huawei Tech's and Skycom's Iran-based telecommunications customers" to support its bank and wire fraud and RICO charges. Aug. 19 HSD Order at 18. The Court reasoned that the alleged *Reuters* reporting that Skycom had sold and attempted to sell embargoed U.S.-origin goods to Iran in violation of U.S. law, that Huawei denied those allegations, and that the banks allegedly relied on Huawei's denials was relevant to the fraud charges. *Id.* The Court also explained that the evidence is admissible "to prove the existence of the enterprise and its pattern of racketeering." *Id.* at 19.

To prove these allegations, the government has relied on testimony from witnesses who worked with or for Huawei in Iran and allegedly saw Huawei use U.S.-branded goods there. For

example, Parham Beheshti testified that Huawei used a database supplied by Oracle, which he described as an "American database company," in its telecommunication solution for an Iranian internet service provider. Tr. 322:21-323:10. And Babak Vahdati testified that while working at Huawei in Iran he saw U.S. software, like "MSOFT" and "Window 7," as well as U.S. hardware made by IBM, HP, Dell, and Sun Microsystems. Tr. 1640:16-1641:14. He assumed the products were "made in the U.S." because they had "a logo of U.S. brands," but he did not know how that equipment arrived in Iran. Tr. 1657:21-1658:9. Vahdati further testified regarding his belief that "most American equipment" and "even the software" was "banned … to be imported to Iran," Tr. 1644:15-16, and that "American brand equipment" had "to do something with sanctions," Tr. 1646:16-17. Yet he confirmed that his belief about sanctions was based on his perspective as an ordinary citizen. Tr. 1657:15-20. The government apparently intends to elicit similarly vague and legally inaccurate anecdotal testimony from its cooperating witness, identified as "Employee 1" in the Indictment, as well as other witnesses. *See* Tr. at 1404:19-1405:3 (government explaining reason for eliciting "evidence regarding whether the witnesses in Iran *saw western communication equipment*") (emphasis added).

## II. Huawei Seeks to Introduce Counterevidence Undermining the Government's "U.S-Branded Goods" Theory

To rebut the government's "U.S-branded goods" theory, Huawei seeks to introduce two categories of evidence and testimony.

*First*, Huawei seeks to cross-examine Bridge to establish that identifying a U.S.-branded product in a sanctioned country does not, by itself, show an export control violation. The ITSR spells out technical requirements that OFAC and manufacturers use to assess whether a foreign company requires a license to export or reexport U.S. goods to a sanctioned country, including:

- *Whether the item is of U.S. origin*. The ITSR's relevant export control restrictions apply only to goods, technology, or services that were previously exported from the United States. The existence of a U.S. brand name or label is not by itself sufficient to implicate the ITSR. 31 C.F.R. § 560.205(a) (2007).

- *Whether the original U.S. export was independently subject to U.S. export license requirements*. The item must have been subject to export licensing requirements imposed by a separate U.S. export control regulatory regime, such as the Export Administration Regulations ("EAR") administered by the Department of Commerce Bureau of Industry Security ("BIS"). *Id.* § 560.205(b).

- *Whether the item exceeds the regulation's* de minimis *exception*. Even assuming that U.S.-origin content subject to separate export control licensing requirements has been exported, the export is still not prohibited if the content is incorporated into a foreign-made product and accounts for less than 10% of the total value of the foreign-made product. Thus, the U.S.-origin content must constitute 10% or more of the foreign-made product's value for the reexport prohibition to apply. *Id.* § 560.205(b)(2).

Huawei seeks to elicit from Bridge that a license is required only if each of these requirements is satisfied.

*Second*, Huawei seeks to admit selected excerpts from a VSD that it submitted to OFAC during the charged conspiracy period through Huawei Symantec Technologies Co. Ltd. ("Huawei-Symantec"). Huawei-Symantec was a joint venture between defendant Huawei Technologies Co. Ltd., the majority owner, and U.S.-based Symantec Corporation, the minority owner.[1]

On December 14, 2009, Huawei-Symantec submitted to OFAC "an initial notification of voluntary self-disclosure of suspected indirect sales of [Huawei-Symantec] products by one or more third [sic] OEM distributors to customers located in Iran and Sudan." Ex. A at 1 (DX-03651-0001). Two months later, Huawei-Symantec filed a formal VSD that attached a letter from

[1] The government's claim that Huawei-Symantec is "not at issue in this case," Tr. 1411:10-14, is incorrect. Defendant Huawei Tech. Co., Ltd., controlled the joint venture; Huawei's Chief Legal Officer personally certified the VSD submission to OFAC; the goods that the joint venture supplied were incorporated into Huawei's network solution to MTN Irancell; and Huawei conducted and provided the *de minimis* calculation that resulted in the no action disposition.

Huawei's Chief Legal Officer to OFAC made "in support of the voluntary disclosure letter." *Id.* at 21 (DX-03651-0021). The VSD confirmed that Huawei had sold Huawei-Symantec's OceanStor product—a storage device containing U.S.-origin parts—to resellers CMEC and Panda, which sold the products to a customer in Iran, MTN Irancell, and a customer in Syria. Ex. B at 5-6, 19 (DX-03652.1-0005 to 0006, 0019). Huawei-Symantec also notified OFAC that it had previously disclosed these transactions to the Department of Commerce's Office of Export Enforcement ("OEE"), a federal law enforcement agency within BIS. *Id.* at 5 (DX-03652.1-0005).

On April 20, 2010, Huawei-Symantec advised OFAC that, based on information it had received from Huawei, the U.S.-origin exports did not violate either U.S. sanctions or export regulations. Ex. C at 3-4 (DX-03653.1-0003 to 0004). Specifically, Huawei-Symantec told OFAC that the relevant product was incorporated into a larger Huawei network solution, which was supplied to CMEC for resale to MTN Irancell. *Id.* at 3 (DX-03653.1-0003). Further, Huawei had completed and supplied a *de minimis* analysis and explained that the product "was below the *de minimis* thresholds" of the export regulations and of the ITSR. *Id.* at 4 (DX-03653.1-0004). Huawei-Symantec thus requested that OFAC close the investigation without an enforcement action. *Id.* at 7 (DX-03653.1-0007). About a year later, Huawei-Symantec reported to OFAC that OEE had agreed with the *de minimis* analysis and urged OFAC to issue a no action letter for the same reason:

> As you will note, the Office of Export Enforcement concluded that the transactions that were the subject to the voluntary self-disclosure (both to the Office of Export Enforcement and to OFAC) did *not* constitute violations of the Export Administration Regulations, because (i) the H-S products in question were incorporated into complete telecommunications systems by H-S OEM partner, Huawei Technologies Co. Ltd. ("Huawei"); and (ii) the H-S products constituted only a minimal portion of the total Huawei telecommunications systems, well below the 10 percent *de minimis* threshold specified in section 734.4 of the Export Administration Regulations.

> As explained in our May 17, 2010 letter to OFAC, the finding of no violation by the Office of Export Enforcement, on the basis of a *de minimis* analysis, supports the conclusion that the H-S transactions reported to OFAC in the February 26, 2010 voluntary self-disclosure letter were also outside the jurisdictional scope of the OFAC trade sanctions directed at Iran, in accordance with sections 560.205(b) and 560.420 of the Iranian Transactions Regulations.

Ex. D at 1-2 (DX-03654.0-0001 to 0002) (emphasis in original).

On June 28, 2012, OFAC issued a no action letter. Ex. E (DX-03664-0001). In its Rule 17 subpoena production to Huawei in this case,[2] OFAC provided a report confirming that it issued the no action letter because "Huawei Symantec is not a U.S. person and there is no indication that a U.S. person exercised control or authority over any of the third-party resellers involved in the *de minimis* sales in Sudan or Iran." Ex. F at 4 (DX-03872-0004). Notably, none of the communications between Huawei-Symantec and OFAC contains any discussion of whether the sales to Iran included any U.S. dollar clearing transactions by Huawei, CMEC, Panda, or customers in Iran.

**ARGUMENT**

**I. The Court Should Permit Limited Cross-Examination Regarding Export Controls**

The Court should allow Huawei to elicit testimony from Bridge regarding the complex factors that determine the existence of an export control violation under the ITSR. Such testimony is necessary to combat the government's introduction of testimony and evidence suggesting that Huawei violated export control laws by using U.S.-branded goods in Iran. The government's

---

[2] On October 9, 2025, Huawei served a Rule 17 subpoena on OFAC requesting, among other things, "[a]ll ... voluntary self-disclosures ("VSDs") sent to or made available to OFAC relating to transactions involving Huawei or Skycom and (b) documentation showing the disposition, if any, of the VSDs." Ex. F at 1 (DX-03872-0001). On May 27, 2026, OFAC produced to Huawei a spreadsheet reflecting, among other things, OFAC's disposition of the Huawei-Symantec VSD. *Id.* at 4 (DX-03872-0004).

evidence is not only legally misleading, but it has limited (if any) probative value. Even if credited, it shows only that Huawei used U.S.-branded goods in Iran; it does not come close to establishing that Huawei violated U.S. export controls or sanctions regulations.[3]

Contrary to the insinuations in the government's evidence, export control laws do not regulate the mere presence or use of U.S. goods in a sanctioned country. Rather, the ITSR spell out technical requirements that OFAC and manufacturers must use to assess whether a license is required to export or reexport U.S. goods to a sanctioned country, including (1) whether the item was manufactured or acquired in the United States, (2) whether the original U.S. export was subject to export license requirements, and (3) whether the item's U.S.-origin content exceeded the regulation's *de minimis* threshold. 31 C.F.R. § 560.205 (2007). Each factor requires a detailed analysis, and only if each of these requirements is satisfied is a license required to reexport the goods to Iran.

However, the testimony and evidence so far wrongly suggest that Huawei violated U.S. export control laws by *using* U.S.-branded goods in Iran. Absent an opportunity to contextualize the government's evidence with proof of what an actual export control violation entails, the jury is likely to be misled into believing that Huawei violated U.S. export control and sanctions laws by its mere use of U.S.-branded goods, and convicting Huawei on the financial fraud and *Klein* conspiracy counts based solely on the allegations that Huawei used U.S.-branded products in Iran.

---

[3] It is also difficult to understand how the government can advocate that the mere presence of U.S.-branded goods in Iran establishes an export control violation, when OEE—which the government has identified as a member of the prosecution team—issued a no action letter to Huawei-Symantec related to the same U.S. origin transactions identified in the OFAC VSD. Ex. G (DOJ_HUAWEI_B_0000004831).

Huawei does not seek to question Bridge about what the law is or to ask Bridge whether any particular transaction did or did not comply with U.S. sanctions regulations.[4] Nor does Huawei seek expert testimony on the ultimate legality of its conduct. Huawei seeks only limited cross-examination sufficient to establish the basic contours of the ITSR's regulatory framework governing exports and reexports to Iran, so that the jury can fairly evaluate the government's contention that Huawei's sanctions-compliance statements were false or misleading due to the presence of U.S.-branded goods. Without that foundational context from a witness who is qualified to provide it,[5] the jury may incorrectly equate the mere presence or use of U.S.-branded products in Iran with a legal violation, precisely the inference the government invites but the law does not support.

To the extent the government continues to elicit evidence of Huawei's use of U.S.-branded goods to show that Huawei allegedly deceived Congress and the banks regarding its sanctions compliance, Huawei intends to request that the jury be instructed that a statement about compliance with export control laws is not false absent proof of a violation of export control law, and that the mere presence of U.S. items in Iran does not establish an export control violation. Such instructions—which would necessarily be complicated, convoluted, and untethered to any charged

[4] The government has suggested it does not intend to present evidence of any specific export transaction—i.e., identifying a specific shipment of specific goods to a specific customer—that would even permit such an analysis. *See* Tr. 1404:4-6 (government explaining that it is "not intending to go into the EAR" with Bridge).

[5] During Vahdati's testimony, the Court sustained objections to defense counsel's questions regarding Vahdati's lack of knowledge of export control laws and *de minimis* rules. Tr. 1661:13-24. Recognizing the Court determined those topics were not appropriate for that witness, Bridge is qualified to offer testimony on these subjects, and defense counsel should be permitted to examine him on them.

offense—would be necessary to ensure that the jury does not improperly convict Huawei of fraud based on a misunderstanding of the law.

## II. The Court Should Admit the VSD Evidence

### A. The VSD evidence shows that Huawei lacked intent to defraud Congress and the banks.

The Court should also admit excerpts from Huawei's voluntary self-disclosure to OFAC to rebut the government's claim that Huawei intended to defraud Congress and the banks when it proclaimed its compliance with U.S. sanctions laws. When Huawei responded to news reports about alleged exports of U.S.-origin goods by denying violations of U.S. law, the company believed those statements were true and did not intend to defraud Congress or its banks. The VSD is admissible to help establish that good-faith belief.

Second Circuit precedent supports admitting this kind of evidence. It is axiomatic that "most evidence of intent is circumstantial" and may only be inferentially proven. *United States v. Salameh*, 152 F.3d 88, 143 (2d Cir. 1998). For that reason, "trial courts … follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind." *United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989). Consistent with this principle, courts in this Circuit have repeatedly held that defendants may introduce evidence of their prior disclosures to regulators and regulators' responses to show lack of intent. *See, e.g.*, *United States v. Cert. Envt'l Servs., Inc.*, 753 F.3d 72, 97 (2d Cir. 2014) (reversing conviction where the district court excluded agency's responses to the defendant that were offered as circumstantial evidence of good faith); *United States v. Roldan*, 167 F.4th 569, 579 (2d Cir. 2026) (reversing exclusion of evidence that corroborated state of mind); *United States v. Brandt*, 196 F.2d 653, 657 (2d Cir. 1952) (holding that defendant's "disclosure to postal authorities" was circumstantial evidence of lack of intent);

*cf. In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 237 (E.D.N.Y. 2009) (agency's opinion was "highly probative non-hearsay evidence of [lack of] scienter and non-negligence").

For example, in *Certified Environmental*, the Second Circuit reversed a district court order excluding the defendants' outreach to agencies seeking compliance guidance regarding air monitoring regulations that the company was later charged with violating. The Second Circuit reasoned that, although the defendants' communications with the agency fell outside the time period of the charged offense, the exchange constituted circumstantial evidence of the defendant's state of mind during the charged period. *Id.* at 90. Huawei's correspondence with OFAC is even stronger: it occurred *during the period charged in the Indictment* and shortly before Huawei's alleged misstatements to the banks and the public about its sanctions compliance. Accordingly, the VSD and OFAC's response go directly to whether Huawei's statements that it "did comply with applicable U.S. law" were made in good faith and without intent to defraud. *See United States v. Kohan*, 806 F.2d 18, 22 (2d Cir. 1986).

**B. The VSD evidence is relevant to rebut the government's theory that Huawei intentionally impeded OFAC.**

The VSD evidence also rebuts the government's claim that Huawei conspired to intentionally impede OFAC's functions by, in effect, concealing its Iran-related business. *See* S-4 Ind. ¶¶ 104-106. During the period of the alleged conspiracy, Huawei—through a joint venture which it controlled—voluntarily disclosed to OFAC potentially inculpatory evidence that Huawei initially believed warranted remedial action in the form of a cautionary letter or a "finding of a violation." Ex. B at 17 (DX-03652.1-0017). Over nearly three years, Huawei produced to OFAC—in at least five disclosures and supplements—dozens of pages of documents and exhibits in a good-faith effort to comply with OFAC's sanctions regulations. The fact and extent of Huawei's

disclosure of potential export control and sanctions violations to OFAC is evidence of Huawei's attempt to comply with the sanctions, not evade them, and is fundamentally at odds with the government's claim that Huawei attempted to conceal its Iranian business and obstruct OFAC's administration of the sanctions regime. The jury is entitled to consider that evidence in weighing Huawei's guilt or innocence of the charged crimes.

The VSD evidence will also undercut the government's "front company" allegations. Huawei-Symantec voluntarily told OFAC that it conducted business in Iran through resellers Panda and CMEC. That disclosure is inconsistent with the government's theory *in this case* that Huawei used those entities as front companies to conceal its Iranian operations. *Chalmers Disclosure*, at 15 (Jan. 9, 2026) (claiming that Huawei used Panda and CMEC as "intermediaries located in the PRC to purchase U.S. telecommunications equipment"). *See Salim v. Mobile Telesystems PJSC*, 2022 WL 966903, at *2 (2d Cir. Mar. 31, 2022) (defendants' disclosure of bribery investigations was evidence that the company did not intend to conceal potential liability arising from the alleged misconduct); *Borochoff v. GlaxoSmithKline PLC*, No. 07-cv-5574 (LLS), 2008 WL 2073421, at *8 (S.D.N.Y. May 9, 2008) (defendants' disclosures to the FDA and on website rebutted intent to defraud), *aff'd* 343 F. App'x 671, 674-75 (2d Cir. 2009) (citing disclosures to FDA as evidence of lack of intent to deceive). This evidence is highly probative of Huawei's lack of intent to commit the charged *Klein* and IEEPA offenses.

**C. The VSD evidence corroborates Huawei's lack of willfulness.**

Finally, the VSD evidence corroborates other evidence showing Huawei's lack of willfulness to violate the ITSR's financial sanctions. The government claims that Huawei willfully caused a violation of OFAC's financial sanctions by engaging in U.S.-dollar transactions. S-4 Ind. ¶¶ 107-113. But Huawei's correspondence with OFAC suggests that Huawei had no reason to

know that causing dollar clearing transactions "was unlawful." *United States v. Kosinski*, 976 F.3d 135, 154 (2d Cir. 2020) ("[I]n order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful." (internal quotation marks omitted)).

Huawei-Symantec disclosed that it distributed U.S.-origin goods to resellers Panda and CMEC, which resold the products in Iran and Sudan. These facts, at least based on the government's theory, should have put OFAC on notice that the transactions may have involved U.S. dollars that cleared through the United States. Yet, Huawei-Symantec *voluntarily disclosed* this information to OFAC. Furthermore, the VSD focused on the potential export control implications of the transactions, not the financial sanctions implications. And OFAC never asked Huawei-Symantec how the transactions were financed, i.e., whether the resellers or the end users paid for the goods in U.S. dollars. From these facts, the jury could fairly infer that Huawei did not willfully violate the financial sanctions. It was just not aware of them. That inference—combined with other inferences the jury could draw from (a) OFAC's general lack of enforcement history against foreign companies for using U.S. dollars to pay for Iran-related work, and (b) the absence of public guidance from OFAC that causing U.S. banks to clear Iran-related transactions by using dollars might violate the ITSR—tends to show that Huawei lacked any reason to know that dollar-clearing transactions exposed it to sanctions violations. The jury is entitled to consider and weigh the evidence for that purpose.

**D. The VSD evidence is admissible non-hearsay, not character evidence.**

The VSD evidence is admissible because Huawei is not offering it for its truth, i.e., whether the VSD's contents regarding Huawei-Symantec's conduct were true. Huawei is instead offering the VSD evidence "to show that a statement was made, to demonstrate the statement's effect on

the listener, [and] to show the circumstances under which subsequent events occurred." *Cert. Env'l Servs., Inc.*, 753 F.3d at 89 (citations omitted). The VSDs show that Huawei voluntarily communicated potential sanctions violations to OFAC (that the "statement was made"); that in response, OFAC issued a no action letter endorsing the *de minimis* rule (the "effect on the listener"); and that Huawei's representations to its banks and Congress occurred in the context of and immediately after this regulatory exchange (the "circumstances under which subsequent events occurred").

The VSD evidence is also admissible to show Huawei's state of mind during the period charged in the Indictment. Huawei's voluntary self-disclosure occurred during the charged conspiracy period and involved agencies and entities that are at issue in this case, including OFAC, which Huawei is charged with obstructing, and Panda and CMEC, which Huawei allegedly used to conceal its work in Iran. This evidence does not rest upon "propensity-based inference[s]" but is instead evidence of the charged crimes. *Roldan*, 167 F.4th at 579.[6] The Court should therefore admit it.

---

[6] Huawei's engagement with OFAC and OFAC's resolution is also an important part of its defense against the government's broader prosecution theory, which is that Huawei was engaged in a continuous pattern of committing and concealing sanctions violations and other misconduct as a matter of corporate policy and culture. *See* Dkt. 790, at 14 (quoting *United States v. Damti*, 109 Fed. App'x 454, 456 (2d Cir. 2004)). In its opening statement, the government argued that the "Huawei companies engaged in a pattern of criminal activity lasting over 20 years, all to expand Huawei's business empire across the globe," Tr. 212:10-13; that "corruption existed throughout Huawei," Tr. 212:19; and that "Huawei cultivated a culture of crime and corruption, and crime was an important business strategy. The entire organization operated through a pattern of thefts, lies, and cover-ups," Tr. 213, 221. The VSD evidence would contradict these assertions and "undermine[s] the underlying theory of criminal prosecution," Dkt. 790, at 14, and is therefore admissible in any event.

### III. Alternatively, The Court Should Exclude Evidence of So-Called Export Control Violations Altogether

Alternatively, the Court should reconsider its ruling permitting the government to introduce evidence of supposed export control violations. As the record has developed, the government's proof has consisted solely of testimony that fact witnesses observed U.S.-branded products in Iran, not evidence sufficient to establish any export control violation. The evidence therefore does not support the charged fraud offenses or serve the purpose for which the Court admitted it. *See* Tr. 1404:19-1405:3. Nor is there any indication the government can or will bridge that evidentiary gap. The Court should therefore preclude the government from introducing additional prejudicial evidence on this topic. Reconsidering the Court's prior ruling would eliminate the need for the VSD evidence and much of the requested cross-examination testimony concerning export controls. And the Court could attempt to cure any prejudice from the already-admitted U.S.-branded goods testimony with a limiting instruction.[7]

## CONCLUSION

For the reasons stated above, the Court should permit Huawei to cross-examine Bridge regarding export controls and admit the VSD evidence. Alternatively, the Court should exclude evidence of so-called export control violations.

[7] Reconsideration would not eliminate the need for all the evidence; Huawei would still seek to introduce evidence regarding the disclosure of CMEC and Panda. It would, however, largely obviate the need for the extensive export control-related testimony needed to rebut the government's U.S.-branded goods testimony.

Dated: September 18, 2026

Respectfully submitted,

/s/ *David Bitkower*
David Bitkower
Matthew S. Hellman
Katya Jestin
JENNER & BLOCK LLP
1099 New York Avenue, NW
Washington, D.C. 20001
(202) 639-6048
dbitkower@jenner.com

/s/ *Douglas A. Axel*
Douglas A. Axel
Michael A. Levy
Ellyce R. Cooper
Frank R. Volpe
Melissa Colón-Bosolet
Daniel J. Hay
SIDLEY AUSTIN LLP
787 7th Avenue
New York, NY 10019
(212) 839-5300
daxel@sidley.com

/s/ *Brian M. Heberlig*
Brian M. Heberlig
Ryan P. Poscablo
Julia Gatto
William L. Drake
Jessica I. Rothschild
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3900
rposcablo@steptoe.com

*Counsel for Huawei Technologies Co., Ltd., Huawei Device USA Inc., Huawei Device Co., Ltd., and Futurewei Technologies, Inc.*