# Exhibit B

BAKER & McKENZIE

Baker & McKenzie LLP
Two Embarcadero Center, 11th Floor
San Francisco, California 94111-3802, USA

Tel: +1 415 576 3000
Fax: +1 415 576 3099; 576 3098
www.bakernet.com

**Asia Pacific**
Bangkok
Beijing
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur
Manila
Melbourne
Shanghai
Singapore
Sydney
Taipei
Tokyo

**Europe & Middle East**
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Bologna
Brussels
Budapest
Cairo
Dusseldorf
Frankfurt / Main
Geneva
Kyiv
London
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**North & South America**
Bogota
Brasilia
Buenos Aires
Caracas
Chicago
Chihuahua
Dallas
Guadalajara
Houston
Juarez
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre
Rio de Janeiro
San Diego
San Francisco
Santiago
Sao Paulo
Tijuana
Toronto
Valencia
Washington, DC

February 26, 2010

Mr. Adam J. Szubin
Director, Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC 20320

Re: Chengdu Huawei Symantec Technologies Co. Ltd.: Voluntary Self-Disclosure

Dear Mr. Szubin:

We represent Chengdu Huawei Symantec Technologies Co. Ltd. ("H-S"), a Chinese corporation, in connection with certain export control and trade compliance matters. In that capacity, we respectfully submit this report on behalf of H-S as part of H-S' voluntary self-disclosure of certain compliance problems under the OFAC trade sanctions regulations, in accordance with the Economic Sanctions Enforcement Guidelines, 31 C.F.R. Part 501, Appendix A, as amended by 74 Fed. Reg. 57601 (November 9, 2009) (the "OFAC Guidelines").

By a letter dated December 14, 2009, H-S submitted to the Office of Foreign Assets Control ("OFAC") an initial notification of voluntary self-disclosure, in accordance with the OFAC Guidelines. For your ease of reference, a copy of that initial notification letter is attached to this letter as **Exhibit No. 1**. As **Exhibit No. 1** shows, in that initial notification letter, H-S notified OFAC that it had reason to believe that certain H-S products had been supplied to customers in Iran and Sudan by third party OEM distributors or resellers in a manner contrary to the Iranian Transactions Regulations, 31 C.F.R. Part 560 and the Sudanese Sanctions Regulations, 31 C.F.R. Part 538.

The definition of a "voluntary self-disclosure" in the OFAC Guidelines states that:

> In addition to [an initial] notification, a voluntary self-disclosure must include, or be followed within a reasonable time by, a report of sufficient detail to afford a complete understanding of the apparent violation's circumstances…

Consistent with that requirement, in its initial notification letter, H-S advised OFAC that it was in the process of conducting an internal investigation of suspected third party sales of H-S products to embargoed countries, and undertook to provide a complete report of findings to OFAC upon completion of that internal investigation, on or before February 28, 2010. In accordance with that undertaking, H-S respectfully submits this report, in order to perfect the voluntary self-disclosure initiated by that December 14, 2009 initial notification letter.

SFODMS/6595079.2

Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein.

DEFENSE EXHIBIT
DX-03652.1
18 CR 457 (AMD)

TREASURY DEPARTMENT
RECEIVED
MAR - 1 2010
FOREIGN ASSETS CONTROL

**1. Background**

H-S is a Chinese wholly foreign-owned entity (a "WFOE"), with its principal place of business located in Chengdu, Sichuan Province, People's Republic of China. H-S is a wholly-owned subsidiary of Huawei Symantec Technologies Ltd. ("HuaSy"), a Hong Kong corporation, which was formed as a joint venture between Huawei Technologies Co. Ltd. ("Huawei"), a Chinese corporation holding a 51 percent equity interest, and Symantec Corporation ("Symantec"), a Delaware corporation holding a 49 percent equity interest, on or about February 5, 2008.

H-S is engaged in the development, manufacture and sale of network security and storage appliances and related equipment and services. Most of the H-S network security and storage appliances are legacy Huawei products, responsibility for which was transferred from Huawei to H-S upon, or shortly after, the formation of the HuaSy joint venture. As such, those network security and storage appliances generally have little or no United States origin content, in the form of parts, components, materials and technology, and may not, therefore, be subject to the export control jurisdiction of the United States under section 734.3 of the Export Administration Regulations, 15 C.F.R. Parts 730-774. All of the H-S products are manufactured in, and shipped to OEM distributors and customers from, H-S facilities in Shenzhen and in Chengdu, Sichuan Province, People's Republic of China.

At the time that the HuaSy joint venture was formed, Symantec licensed certain of its United States origin software code and technology to H-S, in furtherance of Symantec's commitments under the joint venture agreements. All of the Symantec software code and technology was exported to H-S in accordance with the requirements of the Export Administration Regulations, under authority of (i) an export license issued by the Commerce Department's Bureau of Industry and Security (Export License No. D380176); (ii) license exception ENC, as provided in section 740.17 of the Export Administration Regulations; or (iii) NLR (no license required), as the case may be. H-S has incorporated, or is in the process of incorporating, the Symantec software code and technology into some of the network security and storage appliances that are now being manufactured by H-S.

Also, in furtherance of its commitments under the HuaSy joint venture agreements, Symantec authorized H-S to distribute certain of the Symantec products solely within the People's Republic of China. All of those Symantec products have been duly authorized for export from the United States to China, and for reexport from China to all other foreign destinations, except the embargoed countries, in accordance with the requirements of the Export Administration Regulations.

**2. The H-S Export Compliance Commitment**

From the outset, the parties to the HuaSy joint venture (*i.e.*, Huawei and Symantec) understood the importance of strict compliance with all United States export control restrictions and requirements (including the various trade sanctions programs embodied in the OFAC regulations, 31 C.F.R. Parts 500 *et seq.*) potentially applicable to H-S' operations. Prior to the actual formation of HuaSy and H-S, Huawei and Symantec entered into an

export compliance Memorandum of Understanding, signed by their respective Chief Executive Officers, in which those parties agreed to: (i) treat all of the products manufactured or distributed by H-S as subject to United States export controls; and (ii) cause H-S to implement appropriate compliance programs and technology control plans, in order to assure compliance with those United States export controls (including the prohibitions on transactions with embargoed countries and OFAC specially designated nationals and blocked persons).

In accordance with the commitments made in that Memorandum of Understanding, HuaSy and H-S have taken the following steps to assure compliance with United States export controls and trade sanctions:

- The HuaSy Board of Directors adopted a Statement of Corporate Policy confirming the HuaSy and HS commitment to compliance with United States export controls and trade sanctions. That Statement of Corporate Policy is incorporated into the H-S technology control plan, and a copy of those provisions of the H-S technology control plan is attached to this letter as **Exhibit No. 2**.

- H-S established a trade compliance department, headed up by an export compliance manager with substantial experience in United States export control and trade sanctions compliance activities. In addition, H-S implemented detailed export compliance procedures. Among other things, those export compliance procedures include: (i) a requirement that all export shipments must be supported by end-user information from the H-S sales force about the prospective customer for H-S products; and (ii) export and trade sanctions compliance screening of each prospective customer, in order to confirm that that customer is not located in an embargoed country, and is not listed on any of the United States Government's lists of prohibited and restricted parties (including the OFAC list of specially designated nationals and blocked persons).

- H-S products are currently distributed through a network of third party OEM distributors, including Huawei and certain legacy Huawei distributors and resellers, as well as its own distribution network. In order to assure that those third party OEM distributors understand their export control and trade sanctions obligations with respect to the distribution and resale of H-S products, the H-S standard OEM distribution agreement includes a detailed export compliance covenant (which, among other things, prohibits the direct or indirect resale of H-S products to any customer located in an embargoed country). A copy of the export compliance covenant (Section 15) of the standard OEM distribution agreement is attached to this letter as **Exhibit No. 3.**

- H-S' trade compliance manager conducted export control and trade sanctions compliance training for H-S sales personnel. Those H-S sales employees are non-United States nationals, and were previously unfamiliar

with United States export control and trade sanctions compliance requirements and restrictions. Initial compliance training for the H-S sales personnel was conducted between June 2 and June 14, 2008. Follow-up compliance training sessions for H-S personnel were conducted in August and September, 2009. The list of H-S personnel that participated in one or both of those training sessions, either in person or by webinar, is attached to this letter as **Exhibit No. 4**.

## 3. Suspected Violations of the OFAC Trade Sanctions

In February, 2009, H-S trade compliance personnel, in collaboration with experienced trade compliance officials from Symantec, undertook a review of H-S exports and other shipments of H-S network security and storage appliances, in order to confirm that those transactions had been handled in full conformance with the Export Administration Regulations. In the course of that review, H-S determined that certain of its products with data encryption functionality, potentially subject to export controls under ECCN 5A002 on the Commerce Control List, may have been exported or supplied to Chinese Government end-users before those transactions were authorized under license exception ENC, in accordance with section 740.17 of the Export Administration Regulations.

As result of that finding, and in conformance with its United States export compliance commitments, as set forth in the Memorandum of Understanding, *supra*, H-S: (i) filed an initial notification of voluntary self-disclosure with the Commerce Department's Office of Export Enforcement, pursuant to a notification letter dated May 27, 2009; and (ii) initiated an internal review of its exporting activities, to determine the nature and scope of export control and/or trade sanctions violations, if any, with respect to the H-S products. At the time that the May 27, 2009 initial notification was filed with the Office of Export Enforcement, H-S management had no reason to suspect that any H-S products had been exported or otherwise supplied, directly or indirectly, to any person or entity located in any embargoed country. Nonetheless, for the sake of completeness, and in furtherance of its commitment to strict compliance with the United States export controls and trade sanctions, the H-S internal review was not limited solely to compliance with the provisions of the Export Administration Regulations governing exports and reexports of data encryption products under license exception ENC, but, instead, covered the full range of H-S exporting activities.

During its internal review that H-S trade compliance group learned that some of the H-S products furnished to OEM distributors and resellers, specifically Huawei and International Turnkey Systems ("ITS"), may have ultimately been supplied to entities located in the embargoed countries of Iran and Sudan. The H-S trade compliance group identified 12 sales leads by OEM distributors or resellers to customers located in Iran or Sudan (or Syria[1]), as set forth on **Exhibit No. 5** to this letter.

---

[1] The Syrian entities listed on **Exhibit No. 5** are not among the entities that are subject to sanction under the Syrian Sanctions Regulations, 31 C.F.R. Part 542, so that any proposed transaction with one of those Syrian entities would ***not*** constitute a violation of the OFAC

BAKER & MCKENZIE



As discussed below, of the sales leads listed on **Exhibit No. 5** only two (2), one involving Iran and one involving Syria, were apparently completed. In addition, H-S identified one additional proposed equipment loan transaction listed on **Exhibit No. 5** in which a reseller, ITS, acquired H-S products on loan for possible resale to a customer in Sudan, but ITS returned such equipment to H-S at H-S' request.

The possibility of those OEM distributor or reseller sales of H-S products to customers located in embargoed countries (*i.e.*, Iran and Sudan), and the fact that certain H-S sales personnel may have been aware of the proposed sales of those H-S products to embargoed countries, were reported to the HuaSy Directors at their meeting on September 3, 2009. In response to that report, the Board of Directors specifically directed that a thorough investigation into any possible embargoed country transactions be undertaken. Any pending OEM distributor or reseller transaction that might involve the transfer of H-S products to an embargoed country was carefully scrutinized and blocked where appropriate. In addition, H-S initiated the process of filing appropriate voluntary self-disclosures with the Office of Export Enforcement and OFAC. In furtherance of that last directive, the H-S initial notification of voluntary self-disclosure was submitted to OFAC on or about December 14, 2009.

The investigation mandated by the HuaSy Board of Directors revealed that: (i) of the sales leads set forth in **Exhibit No. 5**, certain of them were to be the responsibility of Huawei, in its role as OEM distributor of H-S products; (ii) one of the proposed transactions was to be the responsibility of ITS, an H-S reseller based in the Middle East; (iii) certain H-S international sales personnel may have been aware that the products in question were intended for resale in Iran or Sudan (or Syria); and (iv) three (3) H-S technical employees each spent a total of between one and five months in Iran and Sudan, respectively, in late 2008 and early 2009, where, according to their expense reports, they provided training and technical support[2].

---

trade sanctions. The proposed Syrian transactions listed on that **Exhibit No. 5** are not, therefore, within the scope of this voluntary self-disclosure.

2 During its review, H-S' trade compliance team identified a set of transactions in which H-S products were sold to Huawei, for resale to entities located in China, but were identified in H-S records as international sales. The transactions in question are identified by Huawei sales codes that H-S understands have previously been used by Huawei for sales to customers in the Middle East. Research by the H-S trade compliance group has revealed that the Chinese customers in those transactions are import/export companies, rather than end-users. In response to H-S' request for information as to the actual end-users of the H-S products in the transactions in question, Huawei has not been able to obtain any end-user information, explaining that, because those Chinese import/export companies are unrelated third parties, they are, apparently, unwilling to share end-user information with Huawei. As a result, H-S is unable to determine if any of the H-S products sold to Huawei in those transactions may ultimately have been diverted by any of those Chinese import/export companies to customers located in Iran or Sudan.

None of the sales leads listed on **Exhibit No. 5** involved a direct sale to the end-user/customer by H-S. For the two proposed transactions that were, apparently, completed, the sales were made by a third party "downstream" reseller that purchased the H-S products from Huawei. The violations, if any, of the OFAC trade sanctions with respect to those transactions were limited to actions taken by certain H-S sales personnel who may have had knowledge that the H-S products were ultimately destined for Iran or Sudan. None of those H-S sales employees, however, is a "United States person" within the meaning of section 538.315 of the Sudanese Sanctions Regulations or section 560.314 of the Iranian Transactions Regulations.

Both Huawei and ITS have cooperated with H-S' investigation into the suspected diversion of H-S products to Iran and/or Sudan. In particular, after the suspected embargoed country transactions were reported to the HuaSy Board of Directors (which includes Huawei officials), the Huawei general counsel immediately sent a directive to all Huawei sales personnel reemphasizing that in accordance with export control policies adopted by Huawei, it is prohibited to sell any H-S product to any country that is subject to a United States Government embargo. In addition, at H-S' request, Huawei reviewed its internal sales records involving H-S products, and, based on that review, the Huawei general counsel has certified that, of the sales leads listed on **Exhibit No. 5**, only two (2) transactions were actually completed indirectly by Huawei's resellers, and all of the other sales leads were either not consummated or cancelled. A copy of that Huawei certification is attached to this letter as **Exhibit No. 6**.

With respect to the one transaction involving ITS, a proposed loan by ITS of H-S products to a prospective customer in Sudan, H-S not been able to confirm whether those products were actually delivered to Sudan, but, at H-S' instruction, ITS has returned the products in question to H-S.

## 4. Causes of Trade Sanctions Compliance Problems

H-S management believes that the trade sanctions problems reported in Section 3 of this letter, *supra*, and violations, if any, of the Iranian Transactions Regulations and/or the Sudanese Sanctions Regulations, were due primarily to misunderstandings on the part of foreign persons as to the nature and scope of the restrictions on embargoed country transactions embodied in the OFAC trade sanctions regulations, and their application to the H-S products, particularly the legacy Huawei products. During its review, H-S identified the following possible sources of confusion about how the United States export controls and trade sanctions may affect the distribution and sale of H-S products.

- The members of the H-S sales force are all foreign nationals (primarily Chinese citizens), who may not have previously worked in a sales capacity for companies whose products are subject to the export control and trade sanctions jurisdiction of the United States. Those H-S sales employees were not, therefore, familiar with United States export controls and trade sanctions, and may not have understood how United States regulatory restrictions apply to non-U.S. corporations, such as H-S, and to products

manufactured and distributed outside of the United States. Although H-S did provide export compliance training to its sales personnel, the extraterritorial application of United States laws and regulations has apparently proven to be an extremely difficult concept for those (and other) foreign persons to understand..

- To date, the majority of the products manufactured and distributed by H-S have been legacy Huawei products. As such, those legacy Huawei products may not, in fact, be subject to the export control and trade sanctions jurisdiction of the United States. Prior to the formation of the HuaSy joint venture, those products may have been exported and sold by Huawei without reference to United States export control or trade sanctions restrictions. Certain H-S sales personnel did not, apparently, understand that, by virtue of the Symantec-Huawei Memorandum of Understanding, following the formation of HuaSy and H-S, ***all*** H-S products are to be treated as subject to those United States restrictions, even if, in fact, the products are legacy Huawei products without any controlled United States origin content.

- In the course of the internal review, a number of H-S sales employees indicated that they were aware, as a result of the H-S export compliance training, of the prohibitions on transactions with countries subject to United States trade embargoes, including Iran and Sudan. Those sales employees stated that they understood that those United States restrictions applied to H-S, because one of the indirect owners of H-S (Symantec) is a United States corporation. Those H-S sales employees apparently did not, however, understand that, because all of the H-S products are ***deemed*** to be subject to United States export control and trade sanctions jurisdiction, the restrictions on embargoed country sales apply even to indirect sales transactions when those H-S products have been sold and supplied to third party OEM distributors or resellers.

- As noted in Section 2 of this letter, *supra*, H-S has implemented detailed export compliance procedures which are designed to assure that all sales and shipments of H-S products are handled in conformance with United States export control and trade sanctions restrictions and requirements. Among those procedures is the requirement for end-user information, even when the H-S products are supplied to third party OEM distributors or resellers, so that H-S trade compliance personnel can identify any proposed transaction in which H-S products might be furnished to an unauthorized end-user or end-use, or to a customer located in an embargoed country. In the course of the internal review, however, H-S management learned that there was a misunderstanding on the part of H-S sales personnel and the OEM distributors about the end-user information requirement. Thus, in some instances, the information furnished to the H-S trade compliance group identified the OEM distributor or the "downstream" reseller as the "end-

user", rather than the entity that would ultimately install and use the H-S products.

## 5. Remedial Actions

The OFAC Guidelines identify the remedial actions taken by the "Subject Person" (in this case, H-S) upon discovery of suspected violations of the OFAC trade sanctions regulations as one of the key factors in OFAC's determination of any administrative action to be taken with respect to those suspected violations. Thus, Section III, F of the OFAC Guidelines (General Factors Affecting Administrative Action) provides that OFAC will consider: (i) steps taken by the Subject Person upon discovery of an apparent violation to stop the conduct at issue immediately; (ii) whether the Subject Person conducted a sufficient investigation to ascertain information as to the causes and extent of the apparent violations in a timely manner; (iii) whether the Subject Person has adopted new and more effective internal controls to prevent recurrence of the apparent violation; and (iv) whether the Subject Person undertook a thorough review to identify other possible violations. *See* 31 C.F.R. Part 501, App. A, Para. III, F., as amended by 74 Fed. Red. 57601, 57603 (November 9, 2009). It is respectfully submitted that H-S has made good faith efforts to fulfill its responsibilities under each of the foregoing factors set out in Paragraph III, F of the OFAC Guidelines, as follows.

- **Steps to Stop the Conduct at Issue Immediately**: As explained in Section 3 of this letter, *supra*, upon discovery of the suspected third party sales of H-S products to embargoed countries, H-S trade compliance provided timely notification of those suspected transactions to the HuaSy Board of Directors. In response to that report, all proposed or pending sales to OEM distributors and resellers where the products might be resold or shipped to an embargoed country were carefully scrutinized and blocked, where appropriate. In addition, the Huawei general counsel immediately sent a notice to all Huawei sales personnel handling the distribution of H-S products, reemphasizing to those sales employees that in accordance with export control policies adopted by Huawei, H-S products may not be sold to any embargoed countries. All save two (2) of the proposed transactions listed on **Exhibit No. 5** to this letter were not consummated or cancelled (the other two transactions had apparently already been completed).

- **Investigation into the Causes and Extent of the Suspected Violations**: As soon as concerns about possible diversion of H-S products to embargoed countries were brought to the attention of the HuaSy Board of Directors (*i.e.*, at the meeting on September 3, 2009), the Board directed that a thorough investigation of those suspected embargoed country transactions be conducted. In accordance with that directive, the H-S trade compliance group has conducted a detailed review of the suspected transactions, and any other actual or proposed transactions that might involve indirect sales of H-S products to embargoed countries. The results of that review are reported in this voluntary self-disclosure letter. Without limiting the generality of the

foregoing statement, the information that has been identified as to the causes of the suspected violations (*i.e.*, good faith misunderstandings as to the extraterritorial application of the United States export control and trade sanctions regulations) is summarized in Section 4 of this letter, *supra*.

- **Internal Controls Designed to Prevent Recurrence**: As explained in Section 4 of this letter, it appears that the principal causes of the compliance problems reported in this letter were (i) misunderstandings on the part of H-S sales personnel about the application of the OFAC trade sanctions regulations to H-S products; and (ii) incomplete end-user information furnished by the sales force and/or OEM distributors to the H-S trade compliance group. To address those concerns, H-S has undertaken the following remedial actions:

  - The H-S General Counsel and the H-S Director of Trade Compliance have initiated an enhanced export control and trade sanctions training program for the H-S sales force, OEM distributors and independent sales representatives. A central element of the enhanced training program is a detailed explanation of the prohibition on the sale or supply, under any circumstances, of any H-S product **directly or indirectly** to any person or entity located in an embargoed country.

  - An enhanced end-user information collection procedure has been implemented, in order to assure that the H-S trade compliance group receives, and has the opportunity to screen, information about the identity and address of each party to any proposed export transaction, and no OEM distributor product order will be processed if that OEM distributor, or a reseller, is identified as the end-user of the H-S products. In any proposed international sale of H-S products to an OEM distributor or reseller, the actual location in which the H-S products will be installed and used must be identified. Any proposed transaction that involves a person or entity, regardless of role in the transaction, located in or affiliated with an embargoed country or listed on any of the United States Government's lists of prohibited and restricted parties will be summarily rejected and blocked by the H-S trade compliance group.

  - The H-S technical service and support department are being trained that any request for service or support for H-S products by any person or entity located in an embargoed country must be denied, and information about that request, including the name and address of the person or entity requesting service, and the serial numbers of the H-S products for which service is sought, must be immediately reported to the H-S General Counsel and the H-S Director of Trade Compliance.

- H-S engaged the services of a leading export compliance consulting firm, Larkin Trade International ("LTI"), to conduct a thorough review and assessment of H-S' internal compliance procedures, and to make recommendations as to how those procedures can be improved. LTI is led by Mr. John Larkin, the former BIS export control attaché in the United States Embassy in Beijing, who has had many years of experience in advising companies in China (both Chinese entities and foreign subsidiaries of United States companies) on their compliance responsibilities under the Export Administration Regulations and the OFAC trade sanctions regulations.

- **Thorough Review to Identify Other Suspected Violations**: As explained above, when H-S management discovered the possibility of export compliance problems with H-S products under the Export Administration Regulations, H-S conducted a detailed review, in order to ascertain whether any of its exporting activities involved possible violations of the United States export control or trade sanctions regulations. It was during that review that the suspected third party embargoed country transactions reported in this voluntary self-disclosure letter were identified. In addition, as explained in Section 3 of this letter, *supra*, H-S has made diligent efforts to obtain from its OEM distributors, especially Huawei, information about each proposed or actual sale of H-S products to those OEM distributors in which there has been any suggestion of possible resale of the H-S products directly or indirectly to an embargoed country. The results of those inquiries are summarized in Section 3 and in **Exhibit No. 5** to this letter.

## 6. Mitigating Circumstances

The factors that OFAC will consider in the administrative disposition of violations of the OFAC trade sanctions are identified in the OFAC Guidelines, *supra*. It is respectfully submitted that there are a number of factors, specifically identified as mitigating circumstances in those OFAC Guidelines, which are directly applicable to the transactions described in this voluntary self-disclosure letter, as follows.

a. **Voluntary Self-Disclosure**: Under the OFAC Guidelines, one of the most important mitigating circumstances is the fact that the Subject Person (in this case, H-S) filed a voluntary self-disclosure of the suspected violations of the OFAC trade sanctions regulations, provided that that voluntary self-disclosure meets the standards specified in Paragraph I, I of the OFAC Guidelines. Specifically, the term "voluntary self-disclosure" is defined as a self-initiated notification by the Subject Person to OFAC of an apparent violation, provided that: (i) that notification is filed before discovery by OFAC or any other United States Government agency; (ii) that notification does not involve an apparent violation which another party is required to report under the OFAC trade sanctions regulations; (iii) the notification is not incomplete; (iv) the notification is self-initiated (*i.e.*,

it is not made at the suggestion of another United States Government agency); or (v) the notification is made with the authorization of senior management.

It is respectfully submitted that the H-S voluntary self-disclosure, comprised of the December 14, 2009 initial notification letter and this report, meets all of the foregoing standards set forth in the OFAC Guidelines for a "voluntary self-disclosure". Thus, the H-S voluntary self-disclosure is entirely self-initiated, based on H-S' commitment of compliance with United States export control and trade sanctions regulations, and not at the behest or suggestion of any other United States Government agency. To the best of H-S' knowledge, no other person is required to provide a report on any of the third party embargoed country transactions described in this letter. This voluntary self-disclosure is made with the full support and authorization of H-S senior management, in accordance with the specific directive of the HuaSy Board of Directors, as described in Section 3 of this letter, *supra*. Under the circumstances, it is respectfully submitted that H-S should be accorded the full benefit of its voluntary self-disclosure as a mitigating circumstance with respect to the transactions reported in this letter.

b. **General Factors Affecting Administrative Action**: Other factors identified as mitigating circumstances with respect to violations of the OFAC trade sanctions regulations are enumerated in section III of the OFAC Guidelines (entitled "General Factors Affecting Administrative Action"). A number of those additional mitigating circumstances are applicable to H-S with respect to the transactions reported in this letter.

**(1) Effective Compliance Program**: Paragraph III, E of the OFAC Guidelines states that OFAC will consider "the existence, nature and adequacy of a Subject Person's risk-based OFAC compliance program at the time of the apparent violation, where relevant." As explained in Section 2 of this letter, *supra*, from the outset of the HuaSy joint venture, the parties recognized the importance of compliance by H-S with United States export control and trade sanctions requirements. For that reason, immediately after the formation of the HuaSy joint venture, in accordance with the Memorandum of Understanding between Symantec and Huawei, H-S implemented an export control and trade sanctions program, which was designed to assure that all of H-S' operations would be conducted in accordance with the requirements of those United States laws and regulations, notwithstanding the facts that: (i) H-S is a foreign corporation, staffed primarily by non-United States persons; and (ii) the H-S products have been developed primarily in China, are manufactured exclusively in China, and are shipped to OEM distributors, resellers and customers from China (and, as such, may not, in fact, be subject to the export control jurisdiction of the United States).

It was through the implementation and operation of the H-S trade compliance program that the two third party transactions that involve suspected violations of the OFAC trade sanctions were identified, and notified to OFAC. Moreover, as elaborated in Section 5 of this letter, *supra*, upon discovery of those third party transactions that may have involved violations of the Iranian Transactions Regulations and/or the Sudanese Sanctions Regulations, H-S has taken remedial actions to enhance its compliance program, in order to minimize the risk of any recurrence of the type of compliance program reported in this letter. Under the circumstances, it is respectfully submitted that H-S should be accorded the full

benefit of its extraordinary efforts, as a foreign corporation, to implement and maintain an effective compliance program, as an important mitigating factor in this matter.

**(2)** **<u>Inadvertent Violations</u>**: If, in fact, H-S has engaged in any actions contrary to the OFAC trade sanctions with respect to the third party transactions involving the shipment of H-S products to Iran and Sudan, it is respectfully submitted that those actions were due solely to inadvertence, and not to any willfulness on the part of H-S. In that context, consistent with the OFAC Guidelines, H-S wishes to emphasize the following four (4) points, which H-S believes demonstrate that any violations on the part of H-S were inadvertent in nature.

- As noted above, the H-S sales employees responsible for, or involved in, the sales leads listed on **Exhibit No. 5** are not "United States persons" within the meaning of the OFAC trade sanctions regulations[3], who had no prior experience with United States prohibitions on transactions with embargoed countries. In particular, those foreign persons apparently did not understand or appreciate the application of United States restrictions on Chinese-developed products, manufactured in China, and shipped to customers directly from China.

- At least some of the H-S sales employees apparently mistakenly assumed that the prohibition on transactions with embargoed countries was due to the fact that one of the indirect shareholders of H-S is a United States corporation, and, accordingly, that that prohibition on embargoed country transactions did not apply to H-S products that had been sold and delivered to a non-United States person, such as Huawei. Those H-S sales employees did not understand that, because the H-S products are ***deemed*** to be subject to United States export control jurisdiction, the prohibition on the supply or shipment of the H-S products to embargoed countries extends even to third party OEM distributors and "downstream" resellers, even where those third parties have no other nexus with the United States.

- As also explained above, the H-S network security and storage appliances are generally legacy Huawei products, developed and manufactured in China, which may ***not***, in fact, be subject to the export control jurisdiction of the United States. Those legacy Huawei products were distributed by Huawei, prior to the formation of the HuaSy joint venture, without reference to United States export control and trade sanctions regulations. Apparently, as H-S was assuming responsibility for those products, and commencing independent operations, various members of the H-S sales force did not understand that, by virtue of the commitments made in the

---

[3] *See, e.g.*, 31 C.F.R. § 538.315 (Sudan); 31 C.F.R. 560.314 (Iran).

Symantec-Huawei Memorandum of Understanding, all of the H-S products were to be treated as subject to United States export controls and trade sanctions.

- None of the members of H-S senior management were, apparently, aware of the suspected third party sales of H-S products to embargoed countries before those suspected violations were brought to the attention of the HuaSy Board of Directors at its September 3, 2009 meeting. When those suspected violations were, however, notified to the Board of Directors at that meeting, the members of the Board of Directors took immediate remedial action, as summarized in Section 5 of this letter, *supra*.

The OFAC Guidelines provide that OFAC will consider whether apparent violations of the OFAC trade sanctions regulations were due (i) to willfulness or recklessness on the part of the Subject Person, or, (ii) instead solely to inadvertence. As explained above, the transactions reported in this letter were apparently due to misunderstandings and lack of knowledge on the part of H-S sales personnel. The internal investigation did not reveal: (i) any intention on the part of H-S sales personnel to violate the OFAC trade sanctions regulations; or (ii) knowledge of the third party embargoed country transactions on the part of H-S senior management. Moreover, H-S did not attempt to conceal the suspected violations. To the contrary, H-S voluntarily disclosed the suspected violations to OFAC, pursuant to the December 14, 2009 initial notification and this report. Under the circumstances, it is respectfully submitted that H-S should be accorded the benefit of the inadvertent nature of the apparent violations as a mitigating factor, in accordance with the OFAC Guidelines.

**(3)** **Individual Characteristics**: Paragraph III, D of the OFAC Guidelines indicates that OFAC will consider "individual characteristics" of the Subject Person in the administrative disposition of apparent violations. In accordance with that Paragraph III, D, it is respectfully submitted that the following individual characteristics of H-S are particularly relevant to OFAC's consideration of the transactions reported by H-S in this voluntary self-disclosure letter.

- H-S is a Chinese corporation, which is engaged in the development, manufacture and distribution of its products in the People's Republic of China. As noted above, the products involved in the transactions listed on **Exhibit No. 5** that were ultimately completed by OEM distributors or resellers were legacy Huawei products that may, in fact, ***not*** be subject to the export control jurisdiction of the United States. Despite those facts, H-S is committed to compliance with the United States export control and trade sanctions regulations, as stated in the Memorandum of Understanding between H-S indirect shareholders, Huawei and Symantec. This voluntary self-disclosure and the remedial actions described in Section 5 of this letter, *supra*, are manifestations of that commitment.

- None of the transactions reported in this letter involved a direct sale or shipment from H-S to a customer located in an embargoed country. To the contrary, in each case, the H-S products were supplied indirectly to a customer located in Iran or Sudan. If there have been any violations of the OFAC trade sanctions regulations on the part of H-S, those violations were limited to possible knowledge on the part of certain H-S sales employees that H-S' OEM distributors or resellers intended to resell the H-S products to customers located in embargoed countries. ***We emphasize that none of those H-S sales employees is a "United States person" within the meaning of the applicable OFAC trade sanctions regulations.*** H-S' internal investigation did not reveal any evidence that any "United States person" employed by, or acting on behalf of, H-S had any knowledge of, or participation in, any of the embargoed country transactions.

- Similarly, there is no evidence suggesting that H-S senior management or H-S trade compliance officials were aware of any possible embargoed country transactions until August, 2009. Without limiting the generality of the foregoing, none of the third party embargoed country transactions that were, apparently, completed was approved or authorized by the H-S trade compliance group. From its inception, the H-S compliance program included procedures that were intended to identify, and block, proposed transactions with embargoed countries and prohibited and restricted parties. The embargoed country transactions reported in this letter occurred because the definition of "end-user " may not have been clear to all third parties supplying this information to the H-S trade compliance group. As explained in Section 5 of this letter, *supra*, H-S has taken remedial action to enhance its end-user information collection procedure to correct that weakness in its export compliance program.

- The H-S sales employees that may have had knowledge of the proposed embargoed country transactions are all "foreign persons" for purposes of the OFAC trade sanctions regulations[4], who had no previous experience in dealing with compliance issues under the United States export control and trade sanctions regulations. It is respectfully submitted that the lack of "commercial sophistication", in the sense of no experience, and little familiarity, with United States export controls and trade sanctions, should be considered by OFAC as an important mitigating factor in this matter.

---

[4] *See* 31 C.F.R. § 538.315 (Sudan); 31 C.F.R. 560.314 (Iran).

- As best H-S can ascertain, based on information furnished to it by OEM distributors (*i.e.*, Huawei and ITS), only two (2) of the proposed transactions set forth on **Exhibit No. 5** were completed (one of which involved Syria and was therefore not subject to OFAC trade sanctions restrictions); and in the additional transaction involving products loaned to ITS for possible sale in Sudan, the products were returned by ITS at H-S' request. As such, those transactions were isolated incidents, constituting a *de minimis* part of H-S' overall business during the course of calendar year 2009 (both in terms of number of transactions, and in terms of dollar value). Moreover, those transactions occurred shortly after the transition of responsibility for the network security and storage appliance products from Huawei to H-S, before H-S had fully implemented its internal sales procedures or established its own infrastructure for the international distribution of those products. As such, the compliance problems reported in this letter should be seen as "start up" and "transition" problems, atypical of H-S' overall compliance commitment and efforts.

**(4) Cooperation with OFAC**: H-S affirms its commitment to cooperate with OFAC in any investigation that OFAC may undertake with respect to the transactions and occurrences reported in this voluntary self-disclosure letter. That commitment is further manifested by the December 14, 2009 initial notification letter and this voluntary self-disclosure report, as well as the efforts that H-S has made to work with officials of the Office of Export Enforcement to address the implications of the transactions in question under the Export Administration Regulations, including (i) H-S' May 27, 2009 initial notification letter to the Office of Export Enforcement; (ii) the December 14, 2009 supplement to that initial notification letter; (iii) a meeting between H-S officials and a Special Agent of the Office of Export Enforcement in San Jose, California on December 17, 2009 (where those H-S officials traveled from China to California in part to meet with the Special Agent); and (iv) the filing with the Office of Export Enforcement of a comprehensive narrative statement of voluntary self-disclosure, concurrently with the submission of this letter to OFAC.

It is respectfully submitted that H-S' efforts are consistent with the standards set forth in Paragraph III, G of the OFAC Guidelines, and, as such, H-S cooperation with OFAC should be treated as a further mitigating factor, as contemplated in that Paragraph III, G.

## 7. Conclusion

Based on the facts and circumstances set forth in this letter, including (i) this voluntary self-disclosure; (ii) the uncertainty as to whether any of the H-S products in question were, in fact, subject to United States export control jurisdiction; (iii) the fact that no "United States persons" were involved in, or had knowledge of, the embargoed country transactions; (iv) the substantial compliance efforts made by H-S as a foreign corporation; and (v) the remedial actions implemented by H-S following discovery of these compliance

BAKER & McKENZIE



problems, H-S respectfully requests that all compliance penalties that might otherwise be imposed under the OFAC trade sanctions regulations be waived in their entirety. H-S believes that this is an appropriate case for the issuance only of a "cautionary letter" or "finding of a violation" as specified in Paragraphs II, C and II, D of the OFAC Guidelines.

Thank you very much for your consideration of this voluntary self-disclosure. If you should have any questions about any of the transactions or occurrences described in this letter, or if you require any additional information in order to complete your review of these matters, please do not hesitate to contact John F. McKenzie, outside legal counsel to H-S (telephone 415 576-3033; E-mail address: john.f.mckenzie@bakernet.com).

Respectfully Submitted,

John F. McKenzie
Attorney for Chengdu
Huawei Symantec Technologies Co. Ltd.

Attachments
cc: Michelle C. VonderHaar, Esq. - H-S
Dr. Angela Ling – H-S
Mark D. Menefee, Esq.

*This letter contains H-S proprietary and confidential information and trade secrets, which are exempt from public disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(4). Such H-S proprietary and confidential information is also protected by the Trade Secrets Act, 18 U.S.C. § 1905. Any disclosure of H-S proprietary and confidential information could adversely affect H-S' financial or competitive position and the normal conduct of H-S' business. Accordingly, we respectfully request that this letter, the accompanying Exhibits and the information contained herein be maintained in confidence, and withheld in the event of any demand for release or disclosure hereof. We further request that, in the event of any such demand for release or disclosure, OFAC provide H-S with prompt notice of that demand and the opportunity to be heard prior to any such release or disclosure.*

# EXHIBIT NO. 5

Summary of Sales Leads and
Iran, Sudan and Syria Sales or Equipment Loan Transactions

| No. | Suspected Sales Leads | Country | Products Related to HS | PO Received by HS from OEM Partners and Distributors | PO received by OEM partner and Distributor from their Customer | OEM Partner or Distributor Customer | Shipping Date | Status |
|---|---|---|---|---|---|---|---|---|
| 1 | ITIC- Telecom Operator Backbone Network Project | Iran | 16 Units of E-8000; 16 Units of SIG9810 | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 2 | MCCI- Telecom Operator Operation Charge System Project | Iran | S-3100 (51 units) | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 3 | MTN- Telecom Operator Storage Replacement Project | Iran | 50 units of S3100 | 0003640607029A | Internal equipment loan arrangement | CMEC International Trading Co., Ltd | 9/22/2008 | Transaction Confirmed, sale through Huawei |
| 4 | MTN- Telecom Operator Core Network Project | Iran | | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 5 | SyriaTel- Telecom Operator Data Center Backup Project | Syria | OceanStor 6800, or 2 5600 and 2 VIS | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 6 | SyriaTel- Telecom Operator Data Center Project | Syria | OceanStor S-3100 (1 unit) | 0007600806150A | PI08-HW002SYR | Panda International Information Technology Co., Ltd | 9/30/2008 | Transaction Confirmed, sale through Huawei |
| 7 | Ministry of Information Communication E-government Project | Sudan | | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 8 | SudanTel- Telecom Operator Data Center Project | Sudan | Symantec SSIM as part of quote to customer | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 9 | Sudan Central Bank; Bank of Kartoum project | Sudan | OceanStor S-3200 (33 Units);RH228 (15 units) | N/A | N/A | N/A | N/A | Equipment Loaned to ITS and returned at H-S' Request |
| 10 | Ministry of Information Communication E-University Project | Sudan | | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 11 | Ministry of Information Communication E-Media Project | Sudan | | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |
| 12 | Ministry of Information Communication E-School Project | Sudan | 380 Units of AR2800 | N/A | N/A | N/A | N/A | Not Consummated or Cancelled |

# EXHIBIT NO. 6

February 26, 2010

Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W
Washington, DC 20320

Re: Chengdu Huawei Symantec Technologies Co. Ltd.: Voluntary Self-Disclosure: Certification of Dr. Song Liuping

Ladies and Gentlemen:

I, Dr. Song Liuping, hereby certify that:

1. I am the Chief Legal Officer of Huawei Technologies, Co. Ltd. ("Huawei"), and I make this certification on behalf of Huawei in support of the voluntary self-disclosure letter, dated February 26, 2010, submitted by Chengdu Huawei Symantec Technologies Co. Ltd. ("H-S") to the United States Office of Foreign Assets Control.

2. At the request of H-S, I have assigned the competent persons to review the Huawei sales and shipping records for the eleven (11) proposed transactions listed on Exhibit No. 5 to this certificate.

3. Based on my review of those Huawei sales and shipping records, I confirm that, to the best of my knowledge and belief, only two (2) of the proposed transactions, as highlighted on Exhibit No. 5, were actually completed. In those two transactions, Huawei sold and shipped H-S products to third party resellers, and those third party resellers may have resold the H-S products to customers located in Iran or Syria, as indicated on Exhibit No. 5.

4. All of the other proposed transactions listed on Exhibit No. 5 were not completed, and the customer purchase orders for those proposed transactions were cancelled. To the best of my knowledge and belief, no H-S products were, therefore, supplied, directly or indirectly by or through Huawei, to any customer located in any country subject to a United States Government embargo in any of those other transactions listed on Exhibit No. 5.

Respectfully Submitted,

Song Liuping

Dr. Song Liuping

Chief Legal Officer
Huawei Technologies Co. Ltd.