# Exhibit C

BAKER & McKENZIE

**Baker & McKenzie LLP**
Two Embarcadero Center, 11th Floor
San Francisco, California 94111-3802, USA

Tel: +1 415 576 3000
Fax: +1 415 576 3099; 576 3098
www.bakernet.com

**Asia Pacific**
Bangkok
Beijing
Hanoi
Ho Chi Minh City
Hong Kong
Jakarta
Kuala Lumpur
Manila
Melbourne
Shanghai
Singapore
Sydney
Taipei
Tokyo

**Europe & Middle East**
Almaty
Amsterdam
Antwerp
Bahrain
Baku
Barcelona
Berlin
Bologna
Brussels
Budapest
Cairo
Dusseldorf
Frankfurt / Main
Geneva
Kyiv
London
Madrid
Milan
Moscow
Munich
Paris
Prague
Riyadh
Rome
St. Petersburg
Stockholm
Vienna
Warsaw
Zurich

**North & South America**
Bogota
Brasilia
Buenos Aires
Caracas
Chicago
Chihuahua
Dallas
Guadalajara
Houston
Juarez
Mexico City
Miami
Monterrey
New York
Palo Alto
Porto Alegre
Rio de Janeiro
San Diego
San Francisco
Santiago
Sao Paulo
Tijuana
Toronto
Valencia
Washington, DC

April 20, 2010

Mr. Adam J. Szubin
Director, Office of Foreign Assets Control
United States Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, DC 20320

Re: Chengdu Huawei Symantec Technologies Co. Ltd:
Voluntary Self-Disclosure: Supplementary Information

Dear Mr. Szubin:

By a letter dated February 26, 2010, we submitted a voluntary self-disclosure, on behalf of our client, Chengdu Huawei Symantec Technologies Co. Ltd. ("H-S"), a Chinese corporation, of certain suspected compliance problems under the OFAC trade sanctions regulations, in accordance with the Economic Sanctions Enforcement Guidelines, 31 C.F.R. Part 501, Appendix A, as amended by 74 Fed. Reg. 57601 (November 9, 2009) (the "OFAC Guidelines"). In that February 26, 2010 voluntary self-disclosure letter, H-S reported that:

a. certain H-S products may have been supplied by H-S OEM distributors or resellers to customers in Iran and Sudan, respectively, and that those transactions may have been contrary to the provisions of the Iranian Transactions Regulations, 31 C.F.R. Part 560, and the Sudanese Sanctions Regulations, 31 C.F.R. Part 538; and

b. three (3) H-S employees spent time in Iran and Sudan in late 2008 and early 2009 engaged in activities described on expense reports as "training and technical support". Although none of those H-S employees is a "United States person" within the meaning of section 538.315 of the Sudanese Sanctions Regulations or section 560.314 of the Iranian Transactions Regulations, H-S was concerned that the activities of those employees in Iran and Sudan might have involved the transfer or disclosure of United States origin technology to persons or entities in those embargoed countries.

Following the submission of that February 26, 2010 voluntary self-disclosure letter, H-S has conducted further research into the facts and circumstances of the transactions and activities reported in the voluntary self-disclosure, including (i) detailed discussions with H-S' key OEM distributor, Huawei Technologies Co. Ltd. ("Huawei"); and (ii) interviews with the H-S employees in question. As a result of the information learned through that further research, this supplement to the February 26, 2010 voluntary self-disclosure letter is respectfully submitted on behalf of H-S. As explained in detail below, the additional information learned by the H-S trade compliance group suggests that, in fact, the transactions and activities reported in the February 26, 2010 voluntary self-disclosure letter

DEFENSE EXHIBIT
DX-03653.1
18 CR 457 (AMD)



Baker & McKenzie LLP is a member of Baker & McKenzie International, a Swiss Verein.

2010 APR 23 PM 3:07

TREASURY DEPARTMENT
FOREIGN ASSETS CONTROL

did not involve any violation of the Iranian Transactions Regulations or the Sudanese Sanctions Regulations.

## 1. Background

Concurrently with the submission of the February 26, 2010 voluntary self-disclosure letter to the Office of Foreign Assets Control ("OFAC"), H-S filed a companion voluntary self-disclosure of the same transactions and occurrences with the Commerce Department's Office of Export Enforcement ("OEE"), under section 764.5 of the Export Administration Regulations, 15 C.F.R. Parts 730-774. In response to that latter voluntary self-disclosure letter, the OEE case agent requested that H-S provide certain additional information about the transactions and activities reported in the voluntary self-disclosure.

In particular, the OEE case agent requested that H-S perform a detailed jurisdictional analysis to determine if the H-S products that were apparently supplied by OEM distributors or resellers to customers in Iran and Sudan (as well as Syria) were, in fact, outside the export control jurisdiction of the United States (*i.e.*, foreign produced products with controlled United States origin content below the 10 percent *de minimis* threshold specified in section 734.4(c) of the Export Administration Regulations). H-S has arranged for Huawei to perform that *de minimis* analysis, and is submitting the results of that analysis, as well as the other information requested by the OEE case agent, to OEE. Because that analysis and that information have a direct bearing on the compliance issues under the OFAC trade sanctions regulations reported in the February 26, 2010 voluntary self-disclosure letter to OFAC, we are pleased to submit the following information to OFAC on behalf of H-S.

## 2. H-S Product Supplied to Customer in Iran

In the February 26, 2010 voluntary self-disclosure letter, H-S reported to OFAC that one of its OEM distributors, Huawei, apparently supplied an H-S product to a reseller that, in turn, sold that product to a customer in Iran. The product in question was the H-S OceanStor data storage product, which incorporates certain United States origin parts and components, and may, therefore, be subject to the export control jurisdiction of the United States. The OceanStor data storage device does not include any data encryption functionality, and H-S has classified that OceanStor device for United States export control purposes under ECCN 4A994 on the Commerce Control List.

In the course of its research in order to respond to the OEE case agent's request for additional information, the H-S trade compliance group learned from Huawei that the OceanStor product that was supplied to the Iranian customer was ***not*** sold on a stand-alone basis, but was, instead, incorporated into a complete Huawei system, which Huawei supplied to a reseller, for resale to the Iranian customer. Specifically, Huawei advised H-S that the OceanStor product was incorporated into a complete Huawei network solution, which was supplied to MTN Irancell for a local mobile telecommunications network.

At H-S' request, Huawei has performed an export control jurisdictional analysis of that Huawei network solution, and has determined that the Huawei network solution was below the *de minimis* thresholds of section 734.4(c)(1) of the Export Administration Regulations (*i.e.*, United States origin content of less than 10 percent). In confirmation of that jurisdictional analysis, attached to this letter as **Exhibit No. 1-A** is the Huawei *de minimis* analysis (together with an English language translation thereof). As you will note from that **Exhibit No. 1-A**, Huawei has determined that:

(i) the H-S OceanStor product was the only product that Huawei understands to be subject to United States export control jurisdiction that was included in the Huawei network solution; and

(ii) that OceanStor product constituted only 2.79 percent of the total value of the Huawei network solution furnished to the Iranian customer, MTN Irancell.

As such, the Huawei network solution, including the H-S OceanStor product incorporated therein, was ***not*** subject to United States export controls under the Export Administration Regulations. Correspondingly, because the United States origin content of that Huawei network solution was below that 10 percent threshold, the supply of that Huawei network solution to the Iranian customer was ***not subject to the restrictions*** set forth in section 560.205(a) of the Iranian Transactions Regulations, as provided in sections 560.205(b)(2) and 560.420 of those Regulations.

## 3. H-S Product Loaned to International Turnkey Systems

In the February 26, 2010 voluntary self-disclosure, H-S also reported that it had loaned certain equipment to International Turnkey Systems ("ITS"), a reseller and systems integrator based in Dubai, United Arab Emirates, which ITS may subsequently have reexported to Sudan. The equipment in question, another H-S OceanStor data storage device, was loaned to ITS for a six (6) month period, for testing purposes, in accordance with the Product Loan Agreement dated February 16, 2009, a copy of which is attached to this letter as **Exhibit No. 2-A**. In your review of that Product Loan Agreement, you may wish to give particular attention to the provisions that: (i) restrict ITS' use of the product for internal testing only (Section 2.1); (ii) specify the term of the loan as six months (Section 12.1); and (iii) require return of the equipment to H-S upon expiration of that six month term (Section 3.4). Most importantly, pursuant to Section 11.1, H-S specifically placed ITS on notice that the product is subject to United States export controls, and, pursuant to Section 11.4, ITS specifically acknowledged that the product was not eligible for export or reexport to any embargoed country, including Sudan.

H-S has not been able to determine if, at any time during the period in which the OceanStor product in question was loaned to ITS, that product was actually shipped to Sudan. As stated in the February 26, 2010 submission, however, that OceanStor product has been returned by ITS to H-S in accordance with the requirements of Section 3.4 of the Product Loan Agreement (albeit to the H-S office in Dubai, rather than to the H-S office in

Hong Kong). Specifically, an H-S employee based in Dubai, Mr. Naji Samaleh, has confirmed that H-S OceanStor equipment was returned by ITS on or about December 9, 2009 in Dubai. For the avoidance of doubt, H-S has also had its Chief Technology Officer, Mr. Ted Lebeck, personally inspect the OceanStor equipment in Dubai, and Mr. Lebeck has confirmed that that OceanStor product is in the possession of H-S representatives at 24th Floor, Al Thuraya Tower, Dubai Media City, Dubai, United Arab Emirates. Mr. Lebeck has provided the certificate attached to this letter as **Exhibit No. 3-A**, confirming that information.

## 4. Activities of H-S Personnel in Iran and Sudan

In the February 26, 2010 voluntary self-disclosure letter, H-S reported that three (3) H-S employees spent time in Iran and Sudan in late 2008 and early 2009 for "training and technical support". As part of its further research into the transactions and activities reported in that voluntary self-disclosure letter, H-S conducted interviews of those employees (or, in one case, the supervisor of a former employee who is no longer employed by H-S), in order to determine if the activities of those employees in Iran and Sudan likely involved the disclosure or release of any H-S technology to persons or entities in those embargoed countries in a manner contrary to section 538.205 of the Sudanese Sanctions Regulations or section 560.205(a) of the Iranian Transactions Regulations.

The individuals whose travel expense records indicated that they had spent time in Iran and Sudan are three H-S Middle East and North Africa ("MENA") region employees, Zhaoxi, Liyouwei, and Yanxiwei, a former H-S employee who left H-S in or around June, 2009. Zhaoxi and Liyouwei, who traveled to Iran, were interviewed about their activities in that country. It was not possible to interview Mr. Yanxiwei, because he is no longer with H-S, but Yanxiwei's supervisor, Mr. Maxwell Tsang, was interviewed about Yanxiwei's activities in Sudan. We believe that the information provided by those individuals suggests that no H-S technology was disclosed, released or transferred to Iran or Sudan by virtue of the activities of those H-S employees.

**a. Zhaoxi and Liyouwei**: Both Zhaoxi and Liyouwei joined H-S following completion of their academic studies, and neither individual had any previous experience or knowledge about H-S products. As H-S employees for the MENA region, it was important for them to ***receive*** training with respect to certain products manufactured and sold in the MENA region by Huawei, as a key H-S OEM partner.

To that end, Zhaoxi was sent to the MENA region as part of his basic training as a new H-S employee. That training included three (3) trips to Iran in late 2008 and early 2009 to receive training from Huawei personnel located in that country. When interviewed, Zhaoxi stated that the purposes of his trips to Iran were to ***receive*** training: (i) with respect to certain Huawei products (that become part of telecommunications solutions and that may incorporate H-S products as components thereof); and (ii) in sales and marketing techniques from Huawei sales personnel.

Liyouwei traveled to Iran in April, 2009. Liyouwei stated that the purpose of his trip to Iran was to participate in business planning and sales training with Huawei sales personnel from various countries throughout the MENA region. Accordingly to Liyouwei, his participation in those planning and sales sessions was important to highlight for Huawei sales personnel the business opportunities for joint marketing of H-S and Huawei products, because of the complementary nature of those products. He asserted that the focus of the meetings was sales training, and that there was no discussion of the technical details of any H-S products.

**b. Yanxiwei**: The H-S travel expense reports indicate that Yanxiwei traveled to Sudan between October, 2008 and March, 2009. As noted above, it was not possible to interview Yanxiwei, as he is no longer employed by H-S. Yanxiwei's supervisor, Mr. Maxwell Tsang, was, however, interviewed about Yanxiwei's activities in Sudan. According to Mr. Tsang, Yanxiwei was dispatched to Sudan to provide technical assistance and support for ***Huawei products*** that had been supplied to a Sudanese customer. Mr. Tsang stated that Yanxiwei was sent to Sudan to provide that technical assistance for the Huawei customer as an accommodation to Huawei, because he had previously worked for Huawei and had some familiarity with the Huawei products in question[1]. Because Yanxiwei apparently worked only with Huawei products, to the best of H-S' knowledge no H-S technology was likely disclosed to any person or entity in Sudan.

It is worth noting that, prior to May 2009 (*i.e.*, when Zhaoxi, Liyouwei and Yanxiwei made their trips to Iran and Sudan respectively), all of the products distributed by H-S were legacy Huawei products, which contained no Symantec content or technology. We also emphasize that none of those H-S employees is a "United States person" as defined in section 538.315 of the Sudanese Sanctions Regulations and section 560.314 of the Iranian Transactions Regulations.

## 5. Conclusion

The foregoing supplementary information is respectfully submitted to OFAC on behalf of H-S in furtherance of: (i) H-S' commitment to compliance with all applicable provisions of the United States export controls and trade sanctions, and (ii) H-S' undertaking, as stated in the February 26, 2010 voluntary self-disclosure letter, to provide full cooperation with any investigation that may be initiated by OFAC with respect to the transactions and activities reported in that voluntary self-disclosure letter. As such, the submission of this supplement to the voluntary self-disclosure letter should be treated as a further mitigating factor (to the extent that OFAC determines that there has been any violation of the OFAC trade sanctions regulations), in accordance with Paragraph III, G of the OFAC Guidelines.

---

[1] For the sake of completeness, H-S has confirmed with H-S human resources that Yanxiwei was, in fact, a Huawei employee before he became an employee of H-S.

Based on the information contained in this letter and its accompanying Exhibits, we believe that the transactions and activities reported by H-S to OFAC in the February 26, 2010 voluntary self-disclosure letter may not, in fact, have involved actual violations of the Iranian Transactions Regulations or the Sudanese Sanctions Regulations respectively on the part of H-S or any H-S employees. Under the circumstances, we respectfully request that this matter be closed by OFAC with (i) a "No Action" determination; or (ii) the issuance of a Cautionary Letter, as provided in Paragraphs II, A and II, C of the OFAC Guidelines.

Thank you very much for your consideration of this supplementary information to the H-S voluntary self-disclosure. If you should have any questions about any of the information set forth in this letter, or if you require any additional information about the transactions and activities reported in the February 26, 2010 voluntary self-disclosure letter, please do not hesitate to contact the undersigned (telephone 415 576-3033; E-mail address: john.mckenzie@bakermckenzie.com).

Respectfully Submitted,

John F. McKenzie
Attorney for Chengdu Huawei Symantec
Technologies Co. Ltd.

Attachments
cc: Michelle C. VonderHaar, Esq. - H-S
Dr. Angela Ling - H-S
Mark D. Menefee, Esq.

*This letter and its Exhibits contain H-S proprietary and confidential information and trade secrets, which are exempt from public disclosure under the Freedom of Information Act (FOIA), 5 U.S.C. § 552(b)(4). Such H-S proprietary and confidential information is also protected by the Trade Secrets Act, 18 U.S.C. § 1905. Any disclosure of any H-S proprietary and confidential information could adversely affect H-S' financial or competitive position and the normal conduct of H-S' business. Accordingly, we respectfully request that this letter, its accompanying Exhibits and the information contained herein be maintained in confidence, and withheld in the event of any demand for release or disclosure hereof. We further request that, in the event of any such demand for release or disclosure, the Office of Foreign Assets Control provide H-S with prompt notice of that demand and the opportunity to be heard prior to any such release or disclosure.*

# EXHIBIT NO. 1-A

1、 华为解决方案：

MTN和Syria Tel项目采用如下流程，在用户经华为接入设备连线到华为解决方案，用户完成消费后将计费及日志信息存放到OceanStor设备。

（关键词：接入设备 Access equipment/计费 Charging/日志 log）




2、 微量例外测算结果：

经华为内部相关员工对交付的内贸合同BOQ进一步确认，在前期华赛VSD中所指的在伊朗MTN和叙利亚Syriatel两个项目，除华赛产品外，没有其他的美国产品：

De Minimis calculation as follows:

| 合同号 | 项目名 | 合同总金额 | 产品名称 | 产品总价 | 比率 |
|---|---|---|---|---|---|
| 0003640807029A | MTN Irancell | 378199.21 | S3100 | 10549.236 | 2.79% |

| 合同号 | 项目名 | 合同总金额 | 产品名称 | 产品总价 | 比率 |
|---|---|---|---|---|---|
| 0007600806150A | Syriatel | 17824367.16 | S3100 | 671786 | 3.77% |

1. Huawei Solution

MTN and Syria Tel projects adopt the following process: users are connected to Huawei Solutions via Huawei access equipment; and after their use, the charging information and log information will be saved in OceaStor equipment.
(Key words: Access equipment / Charging / Log)




2. *De Minimis* Exception Evaluation Result:

As further confirmed by the relevant employee of Huawi through studying the delivered domestic trade contract BOQ, in the Iran MTN project and the Syriatel project referred to in the previous Huawei-Symantec VSD, there is no US product other than the products of Huawei-Symantec:

De Minimis calculation as follows:

| Contract Number | Project Name | Total Contract Amount | Product Name | Price of the Product | Percentage |
|---|---|---|---|---|---|
| 0003640807029A | MTN Irancell | 378,199.21 | S3100 | 10,549.236 | 2.79% |

| Contract Number | Project Name | Total Contract Amount | Product Name | Price of the Project | Percentage |
|---|---|---|---|---|---|
| 0007600806150A | Syriatel | 17,824,367.16 | S3100 | 671,786 | 3.77% |