# Exhibit A

GOVERNMENT EXHIBIT
25003
18 CR 457 (AMD)

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AAS:JN/DKK/SME/MAA
F. #2017R05903

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 23, 2021

By Hand

The Honorable Ann M. Donnelly
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

A TRUE COPY
ATTEST
DATE 09/10 20 26
BRENNA B. MAHONEY
CLERK
BY Leonidy Protorest
DEPUTY CLERK

Re: United States v. Wanzhou Meng
Criminal Docket No. 18-457 (S-3) (AMD)

Dear Judge Donnelly:

The government respectfully submits this letter to request, on behalf of the government and the defendant Wanzhou Meng, that an appearance before this Court be scheduled at 1:00 p.m. on Friday, September 24, 2021, to address with this Court a resolution of the charges against Meng. The government anticipates that, at that appearance, Meng will be arraigned on the four charges against her in the third superseding indictment in the above-referenced matter, and agree to an exclusion of time under the Speedy Trial Act until December 1, 2022, pursuant to a deferred prosecution agreement ("DPA") between the government and Meng.

By way of background, Meng is the Chief Financial Officer of Huawei Technologies Co., Ltd. ("Huawei"). In August 2018, Meng was charged with conspiracy to commit bank fraud, conspiracy to commit wire fraud, bank fraud and wire fraud. (See ECF No. 25). The charges relate to her alleged participation in a conspiracy to misrepresent the nature of Huawei's business in Iran—including its control of Skycom, a company that functioned as Huawei's Iran-based subsidiary—to global financial institutions. As part of that conspiracy, Meng is alleged to have made false statements to a senior executive of a global financial institution ("Financial Institution 1") in August 2013 in order to deceive Financial Institution 1 and ensure that Financial Institution 1 would continue its banking relationship with Huawei and its subsidiaries and affiliates. (Id. ¶¶ 21-23). On or about December 1, 2018, Meng was arrested in Canada pursuant to a request from the government, and the government has been seeking her extradition from Canada since that arrest. In February 2020, Meng was charged in a third superseding indictment with the same crimes described above. (See ECF No. 126 ¶¶ 76-79).

The government respectfully submits that the court appearance addressing the charges against Meng should proceed as follows:

First, Meng will consent to appear by video from the office of her attorney Richard C.C. Peck, Q.C., in Vancouver, Canada. The government respectfully submits that Meng should be allowed to appear by video consistent with Rule 10(c) of the Federal Rules of Criminal Procedure, as well as the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281, and Administrative Order No. 2021-05-02 of the United States District Court for the Eastern District of New York, in light of the ongoing COVID-19 pandemic. See, e.g., United States v. Jo, 21-CR-05 (S.D. Oh.) (Mar. 14, 2021), ECF No. 13 (arraignment by video conference of defendant located in South Korea). An attorney for Meng, Michelle L. Levin, Esq., will enter a notice of appearance and be present in the courtroom, as will the attorneys for the government. The government respectfully requests that the Court arrange for a court-certified Mandarin interpreter to be present and sworn by the Court at the beginning of the proceeding.

Second, because this is Meng's first appearance in this matter, Meng will be sworn in and arraigned on the charges against her in the third superseding indictment, specifically Count Four (conspiracy to commit bank fraud), Count Six (conspiracy to commit wire fraud), Count Seven (bank fraud) and Count Nine (wire fraud). The government anticipates that Meng will enter a plea of not guilty to these charges.

Third, the government will move the Court, pursuant to 18 U.S.C. § 3161(h)(2), to exclude time under the Speedy Trial Act between the date of the court appearance on September 24, 2021 and December 1, 2022, pursuant to the terms of the DPA. See United States v. HSBC Bank USA, N.A., 863 F.3d 125, 138 (2d Cir. 2017) (Section "3161(h)(2) authorizes courts to determine that a DPA is bona fide before granting a speedy trial waiver—that is, that the DPA in question is genuinely intended to 'allow[] the defendant to demonstrate his good conduct,' § 3161(h)(2), and does not constitute a disguised effort to circumvent the speedy trial clock."). The government will set forth the terms of the DPA and respectfully submits that the DPA is "bona fide" because, among other reasons, it holds Meng accountable for her criminal conduct, including through her admissions of wrongdoing, and allows her to demonstrate good conduct during the period of deferral.

The government also will request that the Court inquire of Meng, under oath, and of defense counsel as to their understanding of the terms of the DPA and to Meng's knowing and voluntary agreement to enter into the DPA and to exclude time. In particular, the DPA contains a four-page agreed-upon Statement of Facts concerning Meng's conduct related to the charged offenses, including that Meng made statements to Financial Institution 1 in August 2013 that were untrue, that she knew those statements to be untrue, and that information Meng concealed through those untrue statements would have been material to Financial Institution 1. The government respectfully submits that the Court should ask Meng the following questions with respect to the Statement of Facts:

(1) Has the entire Statement of Facts been translated for you into Mandarin?
(2) Have you read the entire Statement of Facts in Mandarin?
(3) Have you reviewed the entire Statement of Facts with your U.S. legal counsel and asked any questions you might have?
(4) Have all of your questions about the Statement of Facts been answered?

(5) Is every statement of fact set forth in the Statement of Facts true and accurate?
(6) Do you disagree with any statement of fact set forth in the Statement of Facts?

Fourth, the parties will recommend Meng's pre-trial release on a personal recognizance bond, subject to certain standard conditions of such release as detailed in the DPA.[1]

At the conclusion of the proceeding, the government will file this letter and the DPA on the public docket.

Respectfully submitted,

NICOLE BOECKMANN
Acting United States Attorney
Acting Under Authority Conferred by 28 U.S.C. § 515

By: /s/ David K. Kessler
Alexander A. Solomon
Julia Nestor
David K. Kessler
Sarah M. Evans
Meredith A. Arfa
Assistant U.S. Attorneys

DEBORAH L. CONNOR
Chief
Money Laundering and Asset Recovery Section
Criminal Division, U.S. Department of Justice

Laura M. Billings
Christian J. Nauvel
Trial Attorneys

JAY I. BRATT
Chief
Counterintelligence and Export Control Section
National Security Division, U.S. DOJ

Thea D. R. Kendler
David Lim
R. Elizabeth Abraham
Trial Attorneys

Encl.

cc: Michelle L. Levin, Esq. (counsel for Defendant Meng)

[1] The parties agree to waive an interview by pretrial services.

AAS:JN/DKK/SME/MAAF.#2017R00850

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

UNITED STATES OF AMERICA

- against -

WANZHOU MENG,

Defendant.

------------------------------------------------------------x

DEFERRED PROSECUTION AGREEMENT

Cr. No. 18-457 (S-3) (AMD)

The United States Attorney's Office for the Eastern District of New York, the Money Laundering and Asset Recovery Section of the Criminal Division of the U.S. Department of Justice ("DOJ"), and the DOJ's National Security Division's Counterintelligence and Export Control Section (collectively, the "Offices") and the defendant WANZHOU MENG ("MENG") agree as follows:

1. The Offices agree to defer prosecution of MENG for the charges in the above-captioned third superseding indictment (the "Indictment") for four years from the date of her arrest in Canada (the "deferral period"). MENG waives all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Eastern District of New York for the deferral period.

2. The DOJ will, upon execution of this Deferred Prosecution Agreement (the "Agreement") by all parties and approval by the Court of an exclusion of time under this Agreement, promptly notify the Minister of Justice of Canada that it is withdrawing its request for MENG's extradition.

3. The Offices will recommend to the Court that MENG be released on a personal recognizance bond with the Standard Conditions of Release, including that she not commit any federal, state, or local crime. In that regard, however, the Offices agree that the Standard Condition of Release (2) (related to a DNA sample) is inapplicable to this case, the Offices do not recommend imposing a reporting requirement, and the balance of the conditions would apply to conduct within the jurisdiction of the United States. MENG agrees that, during the deferral period, she will comply with all conditions of this agreement and the Court's order setting conditions of release.

4. The Offices agree that, if MENG is in full compliance with her obligations under this Agreement for the deferral period, they will move to dismiss the Indictment against her, as well as the underlying charging instruments against her, with prejudice and will not bring any criminal charges against her in connection with conspiracy to commit bank fraud, conspiracy to commit wire fraud, bank fraud, and wire fraud, as set forth in Counts Four, Six, Seven and Nine of the Indictment, respectively, or for any of the charges against her in the underlying charging instruments in this matter. Ms. Meng's appearance will not be required for the dismissal.

5. If MENG fails to comply with her obligations under this Agreement, (a) the Office will be released from its obligations under paragraph 4 above, and (b) prosecutions that are not time-barred by the applicable statutes of limitation on the date the Agreement is signed may be commenced against MENG, notwithstanding the expiration of the statutes of limitation between the signing of the Agreement and the commencement of any such prosecutions. MENG further agrees that venue for any such prosecution would be proper in the Eastern District of New York and that she will not contest venue in any such prosecution.

6. MENG stipulates that she has reviewed the facts described in the Statement

of Facts, attached as Exhibit A to this Agreement and incorporated by reference, with the undersigned counsel and a translator, and that all of the facts in the Statement of Facts are true and accurate to the best of her information and belief. Should the Offices pursue the prosecution that is deferred by this Agreement, MENG stipulates to the admissibility of the Statement of Facts, attached as Exhibit A to this Agreement, in any proceeding against her, including any trial, guilty plea, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

7. MENG agrees that her entry into this Agreement in general, and in particular that her agreement that the Statement of Facts is true and accurate, is being made knowingly and voluntarily. MENG further agrees that she, and her lawyers and representatives authorized to speak on her behalf, will not make any statements after entry into this Agreement that: (1) contradict any of the facts in the Statement of Facts; or (2) state, suggest, or imply in any way that her entry into this Agreement was involuntary, unknowing or coerced. Any such statements by MENG, her lawyers, or her representatives will constitute a breach of agreement under the terms of Paragraph 5.

8. MENG irrevocably waives any and all claims for relief, demands, rights, and causes of action of whatsoever kind and nature arising from, and by reason of any and all known and unknown, foreseen and unforeseen, personal injury and monetary damage and the consequences thereof which she may have or hereafter acquire against the United States of America and its agents, servants, and employees in connection with or on account of the captioned case and its subject matter, including any future claim or lawsuit of any kind or type whatsoever, and whether for compensatory or exemplary damages, including without limitation any claim under the "Hyde Amendment," 18 U.S.C. § 3006A note. The foregoing waiver is

continual and permanent and is not limited to the deferral period.

9. This Agreement sets forth all the terms of the Agreement between MENG and the Offices. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the signatories listed below. This Agreement supersedes all prior agreements, representations and promises by or between the parties.

Dated: Brooklyn, New York
September 22, 2021

NICOLE BOECKMANN
Acting United States Attorney
Acting Under Authority Conferred by 28 U.S.C. § 515
Eastern District of New York

[redacted]

David K. Kessler
Assistant United States Attorney

Approved:
ALEXANDER SOLOMON Digitally signed by ALEXANDER SOLOMON Date: 2021.09.22 19:08:11 -04'00'

Alexander A. Solomon
Deputy Chief
National Security and Cybercrime Section

[redacted]

Julia Nestor
Deputy Chief
Business and Securities Fraud Section

DEBORAH L. CONNOR
Chief
Money Laundering and Asset Recovery Section
Criminal Division
U.S. Department of Justice

[redacted]

Laura M. Billings
Christian J. Nauvel

JAY I. BRATT
Chief
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

[redacted]

Thea D. R. Kendler
David Lim
R. Elizabeth Abraham
Trial Attorneys

Agreed and consented to by:

[redacted]

WANZHOU MENG

[redacted]

William W. Taylor, III
Zuckerman Spaeder LLP
Counsel to Ms. Meng

[redacted]

Reid H. Weingarten
Steptoe & Johnson LLP
Counsel to Ms. Meng

Translated by:

[redacted]

ATTACHMENT A

STATEMENT OF FACTS

Huawei Technologies Co., Ltd. ("Huawei") has been charged with a total of 16 counts in the U.S. District Court in the Eastern District of New York ("EDNY"), and two Huawei subsidiaries have been charged with nine counts in the U.S. District Court for the Western District of Washington. See United States v. Huawei Technologies Co., Ltd., et al., 18-CR-457 (E.D.N.Y.), Dkt. No. 126 (the "EDNY Indictment"). Meng Wanzhou, Huawei's Chief Financial Officer, has also been charged in four of the counts in the EDNY Indictment. Ms. Meng and the U.S. Department of Justice—the Criminal Division's Money Laundering and Asset Recovery Section, the National Security Division's Counterintelligence and Export Control Section, and the U.S. Attorney's Office for the Eastern District of New York (the "Government")—have agreed to enter into a Deferred Prosecution Agreement (the "Agreement") in connection with the EDNY Indictment.

The following Statement of Facts is incorporated by reference as part of the Agreement between Ms. Meng and the Government.

* * *

Huawei is a Chinese company headquartered in Shenzhen, Guangdong, and a leading global provider of information and communications technology. Huawei, including its corporate subsidiaries and affiliates, employs more than 197,000 people and operates in over 170 countries and regions.

Ms. Meng is a Chinese citizen and the daughter of Huawei's founder, Ren Zhengfei, and since 2010 has served as Huawei's Chief Financial Officer. Ms. Meng also serves as Deputy Chairwoman of Huawei's Board of Directors.

Skycom Tech. Co. Ltd. ("Skycom") was a Hong Kong company that primarily operated in Iran. As of February 2007, Skycom was wholly owned by Huawei subsidiary Hua Ying Management ("Hua Ying"). In November 2007, Hua Ying transferred its shares of Skycom to another entity that Huawei controlled, Canicula Holdings ("Canicula"). At the time Hua Ying transferred its Skycom shares to Canicula, Ms. Meng was the Secretary of Hua Ying.

In February 2008, after Huawei transferred ownership of Skycom from Hua Ying to Canicula, Ms. Meng joined Skycom's Board of Directors, which was comprised of Huawei employees. She served on the Board until April 2009. After Ms. Meng departed from Skycom's Board, Skycom's Board members continued to be Huawei employees, Canicula continued to own Skycom, and Canicula continued to be controlled by Huawei. As of August 2012, Huawei included Skycom among a list of "other Huawei subsidiaries" in Huawei corporate documents written in English.[1]

Between 2010 and 2014 (the "Relevant Time Period"), Huawei controlled Skycom's business operations in Iran, and Skycom was owned by an entity controlled by Huawei. All

[1] Skycom ceased to exist no later than 2017.

significant Skycom business decisions were made by Huawei. Moreover, Skycom's country manager—the head of the business—was a Huawei employee. Individuals employed by Skycom believed they worked for Huawei. Indeed, Skycom employees used email addresses with the domain "huawei.com."

During the Relevant Time Period, Huawei employees engaged with a U.K. staffing company to provide engineers in Iran to support Skycom's work with Iranian telecommunications service providers. Negotiations and contracting on behalf of Skycom were conducted by Huawei employees. To pay for these contractors, Huawei sent at least $7.5 million to the U.K. staffing company in a series of approximately 80 payments from Skycom's bank accounts in Asia, including at a multinational financial institution ("Financial Institution 1"), to the U.K. staffing company's account in the United Kingdom. The transactions were denominated in U.S. dollars and cleared through the United States.

In December 2012 and January 2013, various news organizations, including Reuters, reported that Skycom offered to sell "embargoed" equipment from a U.S. computer equipment manufacturer in Iran in potential violation of U.S. export controls law, and that Huawei had close ties with Skycom. In a statement to Reuters published in a December 2012 article, Huawei claimed that Skycom was one of its "major local partners" in Iran. Reuters reported that Huawei had further stated that "Huawei's business in Iran is in full compliance with all applicable laws and regulations including those of the U.N., U.S. and E.U. This commitment has been carried out and followed strictly by our company. Further, we also require our partners to follow the same commitment and strictly abide by the relevant laws and regulations."

In January 2013, a subsequent Reuters article reported that Ms. Meng had served on the Board of Directors of Skycom between February 2008 and April 2009 and identified other connections between Skycom directors and Huawei. The article also quoted a statement from Huawei that: "The relationship between Huawei and Skycom is a normal business partnership. Huawei has established a trade compliance system which is in line with industry best practices and our business in Iran is in full compliance with all applicable laws and regulations including those of the UN. We also require our partners, such as Skycom, to make the same commitments." This statement was incorrect, as Huawei operated and controlled Skycom; Skycom was therefore not Huawei's business "partner."

After these articles were published, Financial Institution 1 and other global financial institutions that provided international banking services to Huawei (collectively, the "Financial Institutions"), including U.S. dollar-clearing, made inquiries to Huawei in response to the above-described press reports. In early 2013, Huawei employees represented to the Financial Institutions that Skycom was just a local business partner of Huawei in Iran and that Skycom had not conducted Iran-related transactions using its accounts at the Financial Institutions.

To address the allegations in the news reports, Huawei requested an in-person meeting with a senior Financial Institution 1 employee. That meeting occurred on August 22, 2013 (the "August Meeting"), at which time Ms. Meng met in Hong Kong with an executive of Financial Institution 1 responsible for operations in the Asia Pacific region. During the meeting, Ms. Meng delivered a PowerPoint presentation written in Chinese, which was translated by an

interpreter into English. Ms. Meng stated that she was using an interpreter to be precise in her language.

In her presentation, Ms. Meng stated, among other things, that Huawei's relationship with Skycom was "normal business cooperation" and "normal and controllable business cooperation," and she described Skycom as a "partner," a "business partner of Huawei," and a "third party Huawei works with" in Iran. Those statements were untrue because, as Ms. Meng knew, Skycom was not a business partner of, or a third party working with, Huawei; instead, Huawei controlled Skycom, and Skycom employees were really Huawei employees. It would have been material to Financial Institution 1 to know that Huawei controlled Skycom. In addition, Ms. Meng stated that Huawei "was once a shareholder of Skycom" but had "sold all its shares in Skycom." Those statements were untrue, because, as Ms. Meng knew, Huawei had "sold" its shares to an entity that Huawei controlled. Specifically, Huawei transferred Skycom shares from a Huawei subsidiary (Hua Ying) to another entity that was controlled by Huawei (Canicula). It would have been material to Financial Institution 1 to know that Skycom was transferred from one Huawei-controlled entity to another. Finally, Ms. Meng stated that Huawei "operates in Iran in strict compliance with applicable laws, regulations and sanctions" and that "there has been no violation of export control regulations" by "Huawei or any third party Huawei works with." These statements were untrue because Huawei's operation of Skycom, which caused the Financial Institutions to provide prohibited services, including banking services, for Huawei's Iran-based business while Huawei concealed Skycom's link to Huawei, was in violation of the U.S. Department of the Treasury's Office of Foreign Assets Control's Iranian Transactions and Sanctions Regulations, 31 C.F.R. Part 560. Moreover, during the Relevant Time Period, Huawei caused Skycom to conduct approximately $100 million worth of U.S.-dollar transactions through Financial Institution 1 that cleared through the United States, at least some of which supported its work in Iran in violation of U.S. law, including $7.5 million for Iran-based contractors from the U.K. staffing company to do work in Iran.

At no point during or after the August Meeting did Ms. Meng, who was aware of Huawei's public statements about Skycom published by Reuters, retract or amend any of those statements. Moreover, Huawei's Treasurer, who also attended the August Meeting, did not correct or amend any of the statements made by Ms. Meng.

During the Relevant Time Period, Ms. Meng possessed a computer file that contained "Suggested Talking Points" about Huawei's relationship with Skycom that closely tracked the untrue statements made during the meeting in Hong Kong. Specifically, that file contained the following text, written in Chinese: "The core of the suggested talking points regarding Iran/Skycom: Huawei's operation in Iran comports with the laws, regulations and sanctions as required by the United Nations, the United States and the European Union. The relationship with Skycom is that of normal business cooperation. Through regulated trade organizations and procedures, Huawei requires that Skycom promises to abide by relevant laws and regulations and export controls. Key information 1: In the past — ceased to hold Skycom shares 1, With regards to cooperation: Skycom was established in 1998 and is one of the agents for Huawei products and services. Skycom is mainly an agent for Huawei."

Shortly after the August Meeting, Huawei prepared an English version of the PowerPoint presentation at Financial Institution 1's request. Ms. Meng later arranged for a

paper copy of that PowerPoint presentation to be delivered to the Financial Institution 1 executive in September 2013. The representations in the English version of the PowerPoint presentation closely tracked the ones Ms. Meng gave during the in-person August Meeting.

After the August Meeting, and subsequent receipt of the PowerPoint presentation, Financial Institution 1 decided to continue its relationship with Huawei. The other Financial Institutions similarly continued their respective relationships with Huawei.